# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

**FEDERAL TRADE COMMISSION**,

          Plaintiff,

   v.

**IBACKPACK OF TEXAS, LLC**, a Texas limited liability company; and

**DOUGLAS MONAHAN**, individually and as a corporate officer;

          Defendants.

Case No. 3:19-cv-00160

## PLAINTIFF FEDERAL TRADE COMMISSION'S
## MOTION FOR SUMMARY JUDGMENT AND
## SUPPORTING MEMORANDUM

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.  NATURE AND STAGE OF PROCEEDINGS ......................................... 2

III. STATEMENT OF THE ISSUES TO BE RULED UPON ........................... 2

IV.  SUMMARY OF THE ARGUMENT ........................................................ 3

V.   STATEMENT OF MATERIAL FACTS ................................................... 4

  a.   Parties ....................................................................................................... 4

    i.   Federal Trade Commission ("FTC") ............................................... 4

    ii.  iBackPack of Texas, LLC ................................................................ 4

    iii. Douglas Monahan ........................................................................... 5

  b.   Background on Crowdfunding .................................................................. 6

  c.   Defendants' Deceptive Crowdfunding Campaigns.................................... 6

    i.   Defendants Launched Crowdfunding Campaigns Representing They Would Use Campaign Funds Primarily to Develop, Produce, Complete, and Distribute the Advertised Products. .................................................................................. 6

    ii.  Defendants' Representations That They Would Use Campaign Funds Primarily to Develop, Produce, Complete, and Distribute the Advertised Products Were False... ............................................................................................................... 10

    iii. As Consumer Complaints Mounted, Defendants Made New Misrepresentations to Conceal Their Failure to Deliver Completed Products .......................................... 14

VI.  LEGAL ARGUMENT........................................................................... 16

  a.   Summary Judgment Is Appropriate in This Case.................................... 16

  b.   Jurisdiction And Venue Are Proper ...................................................... 17

  c.   Defendants Violated Section 5 of the FTC Act by Deceiving Consumers Regarding the Use of Campaign Funds ................................................................................. 17

    i.   Section 5 Legal Standard .............................................................. 17

    ii.  Defendants Violated Section 5 of the FTC Act By Making Material Misrepresentations About How They Would Use Campaign Funds. ........................ 19

  d.   Individual Liability.................................................................................. 21

    i.   Legal Standard ............................................................................. 21

    ii.  Monahan Exercised Pervasive Control Over iBackPack of Texas or Directly Participated in Its Deceptive Acts, and Had Knowledge of Those Acts.................... 22

VII. REQUEST FOR RELIEF ...................................................................... 23

  a.   Injunctive Conduct Relief ...................................................................... 24

b.     Monetary Relief................................................................................. 25

c.     Standard FTC Order Provisions to Protect Consumers and to Monitor Defendant's Compliance ................................................................................. 26

VIII. CONCLUSION................................................................................. 27

# I.    INTRODUCTION

Defendant Douglas Monahan—operating through his company, Defendant iBackPack of Texas, LLC—took more than $800,000 from consumers through four crowdfunding campaigns, falsely claiming that the funds would primarily be used to develop and produce a high-tech backpack and other products for those consumers.  In truth, however, Monahan primarily used the funds on personal expenses and on marketing efforts in an attempt to solicit more campaign contributions.  He did not provide a single completed product to consumers, and failed to take basic steps to fulfill the campaigns.  As consumers' complaints mounted and Defendants faced a potential suspension of their ability to crowdfund, Defendants doubled down on their deception, falsely claiming that the products they had never created had already shipped to consumers.  Defendants' deceptive actions violate Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), and have caused substantial consumer injury.

Plaintiff, the Federal Trade Commission (the "FTC"), hereby moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment against Defendant Douglas Monahan.[1]  As discussed below, the material facts necessary for the Court to grant summary judgment are undisputed, and the FTC is entitled to judgment as a matter of law, including equitable monetary relief in an amount equal to consumer injury and permanent injunctive relief to prevent future law violations.

---

[1] By separate motion pursuant to Federal Rule 55(b), the FTC is seeking the entry of a default judgment, including injunctive and monetary relief identical to that sought here, against Defendant iBackPack of Texas, LLC.

## II.   NATURE AND STAGE OF PROCEEDINGS

The FTC commenced this action on May 6, 2019, alleging that Defendants

violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), by engaging in deceptive acts or

practices in the course of operating multiple crowdfunding campaigns.  Pursuant to

Federal Rule of Civil Procedure 56(c), the FTC now seeks summary judgment against

individual defendant Douglas Monahan.[2]  The evidence in this case—which includes

Defendant's pleadings, testimony, communications, websites, and banking and financial

institution records, as well as declarations from consumers and two individuals who

performed work for iBackPack of Texas—establishes that there are no genuine issues as

to any material fact, and that the FTC is entitled to judgment as a matter of law.

Through its motion, the FTC seeks a permanent injunction prohibiting Defendant

Monahan from crowdfunding activities and enjoining him from making further

misrepresentations.  The FTC also seeks an equitable monetary judgment against

Defendant for $797,502, which represents the consumer injury caused by Defendants'

deceptive activities.

## III.   STATEMENT OF THE ISSUES TO BE RULED UPON

The FTC submits the following statement of issues that are to be decided by the

Court in connection with the FTC's Motion for Summary Judgment:

---

[2] The corporate defendant, iBackPack of Texas, LLC, is not represented in this matter.  On August 26, 2019 (Dkt. 25), the FTC moved for entry of default against iBackPack of Texas, LLC, pursuant to Federal Rule 55(a), which was entered by the Clerk on August 28, 2019 (Dkt. 26).  By separate motion pursuant to Federal Rule 55(b), the FTC seeks the entry of a default judgment—including injunctive and monetary relief identical to that sought here—against iBackPack of Texas, LLC.

2

A.    Whether Defendants violated Section 5(a) of the Federal Trade

Commission Act, 15 U.S.C. § 45(a).

B.    Whether the individual defendant, Monahan, is liable for injunctive and

monetary relief.

C.    The amount of equitable monetary relief to be granted for Defendants'

violations of the FTC Act.

D.    The scope of the injunctive relief to be granted for Defendants' violations

of the FTC Act.

The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

## IV.    SUMMARY OF THE ARGUMENT

Summary judgment is appropriate in this case because the FTC has overwhelming

and uncontroverted evidence that Defendants violated Section 5(a) of the FTC Act by

falsely representing to consumers that they would use funds obtained from their four

crowdfunding campaigns primarily to develop, produce, complete, and distribute certain

products to consumers.

Defendant Monahan can be permanently enjoined for the deceptive conduct of his

entity, Defendant iBackPack of Texas, LLC, because he had the authority to control the

company or directly participated in its misconduct.  In addition, Monahan is monetarily

liable for the deceptive conduct of iBackPack of Texas, LLC, because he had knowledge

of its unlawful acts and practices.

3

Accordingly, the Court should enter the proposed order submitted with this motion, which provides for (i) permanent injunctive conduct provisions to prevent future violations; (ii) a monetary judgment against Defendant for $797,502.20, which represents the consumer injury caused by Defendants' deceptive activities; and (iii) monitoring, reporting, and recordkeeping provisions to ensure Monahan's compliance.

## V.   STATEMENT OF MATERIAL FACTS

### a.   Parties

#### i.   Federal Trade Commission ("FTC")

The FTC is an independent agency of the United States government created by the FTC Act, 15 U.S.C. § 41 *et seq.* The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC, through its own attorneys, to initiate federal district court proceedings to enjoin violations of the FTC Act and secure appropriate equitable relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

#### ii.   iBackPack of Texas, LLC

Defendant iBackPack of Texas, LLC ("iBackPack of Texas") was registered as a Texas limited liability corporation on June 19, 2015, with a registered address of 100 Congress Avenue, Suite 2000, Austin, TX 78701.[3] iBackPack of Texas launched the

---

[3] Ex. 1, Declaration of FTC Investigator Kathleen Nolan ("Nolan Decl.") Att. A (iBackPack Certificate of Formation).

four crowdfunding campaigns at issue in this lawsuit,[4] and transacts or has transacted

business in this district and throughout the United States.[5]

### iii.   Douglas Monahan

Defendant Monahan founded iBackPack of Texas, and is its Chief Executive

Officer ("CEO") and sole shareholder.[6]   Monahan had responsibility for and direct

control over all business operations for iBackPack of Texas,[7] which operated out of his

home.[8]   Monahan's responsibilities and oversight included launching and running the

four crowdfunding campaigns at issue in this lawsuit,[9] related marketing efforts,[10]

communications with consumers who backed the crowdfunding campaigns,[11] and any

efforts to produce and distribute to campaign backers the products advertised by the

crowdfunding campaigns.[12]   Monahan also had sole control over, and sole access to, the

financial accounts for iBackPack of Texas containing the funds received from campaign

backers.[13]   Indeed, Monahan admits that he, acting alone or in concert with others, has

formulated, directed, controlled, had the authority to control, or participated in the acts

---

[4] Ex. 2, Oral Deposition of Douglas Monahan ("Monahan Depo.") at 16:13-25.
[5] Dkt. 1 (Complaint) ¶ 6; Dkt. 18 (Answer) ¶ 6.
[6] Ex. 2, Monahan Depo. at 14:1-17.
[7] Ex. 2, Monahan Depo. at 71:12 ("As CEO, I direct everything."); *see also* 61:24-62:2; 68:12-16.
[8] Ex. 2, Monahan Depo. at 19:23-20:14.
[9] Ex. 2, Monahan Depo. at 67:3-69:25.
[10] Ex. 2, Monahan Depo. at 71:7-72:2.
[11] Ex. 2, Monahan Depo. at 61:18-62:11.
[12] Ex. 2, Monahan Depo. at 63:23-64:13.
[13] Ex. 2, Monahan Depo. at 62:12-22; *see also* Ex. 1, Nolan Decl. Att. T at 1-2 (PlainsCapital Bank Signature Card).

and practices of Defendant iBackPack of Texas, LLC, including the acts and practices set forth in the Complaint.[14]

### b.     Background on Crowdfunding

Crowdfunding is the practice of funding a project or venture by raising relatively small amounts of money from a large number of people, typically via the Internet.[15] Crowdfunding transactions typically involve consumers, or "backers," contributing money to a "campaign" that the campaign owner uses to develop and produce a product or products (sometimes referred to as "perks"), which the campaign owner distributes to backers after the products are completed.[16]

Defendants have operated crowdfunding campaigns on two platforms, Indiegogo.com ("Indiegogo") and Kickstarter.com ("Kickstarter").[17]  To initiate a crowdfunding campaign on either the Kickstarter or Indiegogo platforms, the campaign owner develops a homepage on that platform that provides information about the product or products that will be created with the funds raised.[18]

### c.     Defendants' Deceptive Crowdfunding Campaigns

### i.     Defendants Launched Crowdfunding Campaigns Representing They Would Use Campaign Funds Primarily to Develop, Produce, Complete, and Distribute the Advertised Products.

Defendants launched four crowdfunding campaigns that combined raised over $800,000 from consumers.  Defendants admit that they represented to consumers that the

---

[14] Dkt. 1 (Complaint) ¶ 7; Dkt. 18 (Answer) ¶ 7.
[15] Dkt. 1 (Complaint) ¶ 10; Dkt. 18 (Answer) ¶ 10.
[16] Dkt. 1 (Complaint) ¶ 11; Dkt. 18 (Answer) ¶ 11.
[17] Dkt. 1 (Complaint) ¶ 10; Dkt. 18 (Answer) ¶ 10.
[18] Dkt. 1 (Complaint) ¶ 12; Dkt. 18 (Answer) ¶ 12.

funds contributed would be used primarily to develop, produce, complete, and distribute the products being promoted by those campaigns.[19]

In August 2015, Defendants launched the first of their crowdfunding campaigns, using the Indiegogo platform and raising money to purportedly produce and distribute the "iBackPack," a high-tech backpack that would incorporate batteries and cables for charging laptops and phones, among other features.[20]  Indiegogo is a platform designed to help campaign owners "generate the starter capital" to develop their product and "find [their] first customers."[21]  Indiegogo's Terms of Use state that "Campaign Owners are legally bound to perform on any promise and/or commitment to Contributors (including delivering any Perks)."[22]  Defendants admit that their campaign homepage represented that consumers who backed the campaign at specified price points would be entitled to specific product packages:  for example, the homepage represented that a consumer who contributed $169 was entitled to an "iBackPack 1.0 Power Pack," which was to include a backpack, various batteries and charging cables, and a Bluetooth speaker, while a consumer who contributed $225 was entitled to those same materials with the addition of

---

[19] Dkt. 1 (Complaint) ¶¶ 9, 33; Dkt. 18 (Answer) ¶¶ 9, 33.  Consumer declarations affirm that this representation was material and affected consumers' decisions to back the campaigns.  *See, e.g.* Ex. 3, Declaration of Charles Aguillon ("Aguillon Decl.") ¶ 3; Ex. 5, Declaration of Billy De Almeida ("De Almeida Decl.") ¶ 3; Ex. 6, Declaration of Aaron Gunderson ("Gunderson Decl.") ¶¶ 2-3; Ex. 7, Declaration of Max Levine ("Levine Decl.") ¶ 3; Ex. 8, Declaration of Patrick Miller ("Miller Decl.") ¶¶ 2-4; Ex. 9, Declaration of Barry Muha ("Muha Decl.") ¶ 2; Ex. 10, Declaration of Brice Twombly ("Twombly Decl.") ¶ 3.
[20] Dkt. 1 (Complaint) ¶ 13; Dkt. 18 (Answer) ¶ 13; *see also* Ex. 1, Nolan Decl. Att. E (iBackPack Indiegogo campaign page).
[21] Dkt. 1 (Complaint) ¶ 13; Dkt. 18 (Answer) ¶ 13.
[22] *Id.*; *see also* Ex. 1, Nolan Decl. Att. C (Indiegogo's Terms of Use), at 2: ("If a Campaign Owner is unable to fulfill any of its commitments to Contributors (including delivery of any Perks), the Campaign Owner will work with the Contributors to reach a mutually satisfactory resolution, which may include returning Contributions.  Please note that if Campaign funds have been disbursed to the Campaign Owner, then it is the Campaign Owner's responsibility to issue refunds to Contributors.").

a WiFi modem.[23]  The campaign homepage included videos and photographs showcasing what appeared to be a developed prototype of an "iBackPack" and its various features,[24] and stated a delivery estimate of March 2016.[25]

In March 2016, despite not having delivered any products as part of their Indiegogo "iBackPack" campaign, Defendants launched a Kickstarter campaign to purportedly produce and distribute the "iBackPack 2.0," which was represented as an updated version of the original (still unproduced) iBackPack.[26]  Kickstarter's Terms of Use require that "[w]hen a project is successfully funded, the creator must complete the project and fulfill each reward."[27]  As with the Indiegogo campaign, and as Defendants admit, their Kickstarter campaign homepage represented that consumers who backed the campaign at specified price points would be entitled to specific product packages.[28] Defendants' Kickstarter campaign homepage included videos and photographs showcasing what appeared to be a developed prototype of the iBackPack 2.0 and its various features,[29] and stated a delivery estimate of September 2016.[30]

---

[23] Dkt. 1 (Complaint) ¶ 14; Dkt. 18 (Answer) ¶ 14.
[24] Dkt. 1 (Complaint) ¶ 13; Dkt. 18 (Answer) ¶ 13.
[25] Dkt. 1 (Complaint) ¶ 15; Dkt. 18 (Answer) ¶ 15.
[26] *Id.*
[27] Dkt. 1 (Complaint) ¶ 16; Dkt. 18 (Answer) ¶ 16; *see also* Ex. 1, Nolan Decl. Att. D (Kickstarter's Terms of Use) at 2 (when a project creator is unable to complete a project and fulfill rewards "they must make every reasonable effort to find another way of bringing the project to the best possible conclusion for backers," including explaining to backers what work has been done, how funds were used and what prevents them from finishing the project as planned; and offering to return any remaining funds to backers who have not received their reward, or else explaining how those funds will be used to complete the project in some alternate form).
[28] Dkt. 1 (Complaint) ¶ 17; Dkt. 18 (Answer) ¶ 17.
[29] Dkt. 1 (Complaint) ¶ 15; Dkt. 18 (Answer) ¶ 15.
[30] Dkt. 1 (Complaint) ¶ 17; Dkt. 18 (Answer) ¶ 17.

During the same period, Defendants also launched two other crowdfunding campaigns, both on Indiegogo.  First, in October 2015, Defendants launched a campaign to purportedly produce and distribute a shoulder bag (referred to on the campaign homepage as the "MOJO") that would incorporate batteries, cables, and other electronic components.[31]  Second, in February 2016, Defendants launched a campaign purportedly to produce and distribute a magnetic USB cable system (referred to on the campaign homepage as the "POW Smart Cable") that was purportedly twice as fast as standard USB cables,[32] as well as some other ancillary products.[33]  The respective campaign homepages for the "MOJO"[34] and "POW"[35] campaigns each represented that consumers who backed the campaign at specified price points would be entitled to specific product packages, and each included a video and photographs showcasing what appeared to be developed prototypes of the promoted products.

Through their campaigns, Defendants took in excess of $800,000 from more than 4,000 consumers:

- The "iBackPack" campaign raised $720,965 from 4,032 backers;[36]

- The "iBackPack 2.0" campaign raised $76,694 from 252 backers;[37]

---

[31] Dkt. 1 (Complaint) ¶ 22; Dkt. 18 (Answer) ¶ 22; Ex. 1, Nolan Decl. Att. G (MOJO campaign page).
[32] At his deposition, Monahan testified that he did not know whether any cables that he could theoretically provide were twice as fast as standard USB cables, did not know whether any manufacturer he had identified claimed its cables were twice as fast as standard USB cables, and did not know whether anybody tested those claims, or if they did test those claims what the results of those tests were.  Ex. 2, Monahan Depo. at 172:23-177:2.
[33] Dkt. 1 (Complaint) ¶ 24; Dkt. 18 (Answer) ¶ 24; Ex. 1, Nolan Decl. Att. H (POW campaign page).
[34] Ex. 1, Nolan Decl. Att. G (MOJO campaign page); Dkt. 1 (Complaint) ¶ 22; Dkt. 18 (Answer) ¶ 22.
[35] Ex. 1, Nolan Decl. Att. H (POW campaign page); Dkt. 1 (Complaint) ¶ 22; Dkt. 18 (Answer) ¶ 22.
[36] Ex. 1, Nolan Decl. Att. E (iBackPack Indiegogo campaign page); *see also* Dkt. 1 (Complaint) ¶ 19; Dkt. 18 (Answer) ¶ 19.

9

- The "MOJO" campaign raised $3,644 from 33 backers;[38] and

- The "POW" campaign raised $7,982 from 155 backers.[39]

Funds received from the crowdfunding campaigns were deposited in two accounts under Monahan's control: an account at Plains Capital Bank in the name of iBackPack of Texas, and a PayPal account in Monahan's name.[40]

ii.  **Defendants' Representations That They Would Use Campaign Funds Primarily to Develop, Produce, Complete, and Distribute the Advertised Products Were False.**

Despite their representations to backers, Defendants did not primarily use campaign contributions to develop, produce, complete, and distribute the products being promoted by those campaigns. Instead, Defendants used the funds primarily for Defendant Monahan's personal expenses and marketing efforts. To the extent that Defendants paid staff or contractors, those individuals were generally focused on marketing to obtain more campaign contributions rather than tasks relating to fulfilling the campaigns. Defendants did not take basic steps to fulfill their campaigns, such as ordering sufficient components to provide products.

Monahan regularly used funds from the iBackPack of Texas corporate account at Plains Capital Bank for personal purposes including:

- More than $97,000 to pay off his personal credit cards;[41]

---

[37] Dkt. 1 (Complaint) ¶ 18; Dkt. 18 (Answer) ¶ 18; Ex. 1, Nolan Decl. Att. F (iBackPack Kickstarter campaign page).
[38] Dkt. 1 (Complaint) ¶ 23; Dkt. 18 (Answer) ¶ 23; Ex. 1, Nolan Decl. Att. G (MOJO campaign page).
[39] Dkt. 1 (Complaint) ¶ 25; Dkt. 18 (Answer) ¶ 25; Ex. 1, Nolan Decl. Att. H (POW campaign page).
[40] Ex. 2, Monahan Depo. at 55:2–17; Ex. 1, Nolan Decl. ¶ 21; Ex. 12, Written Responses of Douglas Monahan to the FTC's Request for Production ("Monahan Written Responses") at 2-3.

- Two wire transfers totaling $275,000 to a bank account jointly held in the names of Monahan and his mother;[42]

- Over $66,000 in cash withdrawals;[43]

- More than $48,000 to purchase bitcoins;[44]

- Over $69,000 in debit card payments to business establishments that were clearly for personal use, including liquor stores, dry cleaners, and the office of Monahan's dentist.[45]

To the extent that campaign funds were not converted to personal use, they were largely expended on efforts to solicit additional campaign contributions, rather than to provide products in fulfillment of the contributions that Defendants had already received. Nearly $60,000 was paid for Facebook advertising, digital marketing, and to a press release distribution company.[46]  All, or nearly all, of the work performed by paid staff was promotional in nature, including upselling existing customers,[47] contacting consumers who had backed other campaigns,[48] and designing webpages and campaign

---

[41] Ex. 1, Nolan Decl. ¶ 23; *see also* Ex. 2, Monahan Depo. at 233:15-17 ("I use my credit cards for my own personal stuff, and so the business accounts are for business stuff.").

[42] Ex. 1, Nolan Decl. ¶ 23 & Att. T at 3-4; Ex. 2, Monahan Depo. at 225:3-229:25.

[43] Ex. 1, Nolan Decl. ¶ 23 &  Att. U.  Individuals who performed work for iBackPack of Texas were not aware of the company paying any workers or contractors using cash.  Ex. 3, Aguillon Decl. ¶ 7; Ex. 4, Felchak Decl. ¶ 5.

[44] Ex. 1, Nolan Decl. ¶ 23.  In response to discovery requests, Monahan did not identify the Coinbase account that he used to purchase bitcoin as a business-related account.  Ex. 12, Monahan Written Responses at 3-4.

[45] Ex. 1, Nolan Decl. ¶ 23 &  Att. V; *see also* Ex. 4, Declaration of Haley Felchak ("Felchak Decl.") ¶ 5.

[46] Ex. 1, Nolan Decl. ¶ 30.

[47] Ex. 4, Felchak Decl. ¶ 3; Ex. 3, Aguillon Decl. ¶ 12-13; Ex. 10, Twombly Decl. ¶ 4; Ex. 5, De Almeida Decl. ¶ 5; Ex. 6, Gunderson Decl. ¶ 5; Ex. 8, Miller Decl. ¶ 5.

[48] Ex. 1, Nolan Decl. ¶ 33 & Att. Q at 2, 6, 8, 17, 29, 31, 33, 35, 37, 38, 40, 43, 47, 49, 51, 54, 55, 57.

pages.[49]  Indeed, individuals who participated in iBackPack—including Defendant

Monahan—are unable to identify *any* paid staffer or contractor whose work focused on

creating the advertised products.[50]

Defendants also failed to take basic steps to fulfill their campaigns, such as

ordering sufficient components to provide completed products.  For example, Defendants

never ordered anywhere near enough bags to provide "iBackPacks" to their more than

four thousand backers.[51]  The same is true of other components.[52]  Those components and

products that Defendants did order were not used to make completed products, but

instead distributed to "beta testers" who were asked to post videos reviewing the

components,[53] which would further promote the campaigns.

Moreover, Defendants did not take any steps to produce the "MOJO" bag, an

omission that Monahan attributes to "forgetting" about the campaign:

Q.  What steps did you take towards producing the MOJO bag?

A.  I can't recall. . . .

Q.  Okay.  At what point did you decide that you weren't going to create

the MOJO bag?

---

[49] Ex. 2, Monahan Depo. at 67:3-68:2, 69:2-7; Ex. 3, Aguillon Decl. ¶ 14.  *See also* Ex. 1, Nolan Decl. ¶¶
31-32 (identifying payments totaling more than $133,000 to such individuals).

[50] Ex. 4, Felchek Decl. ¶ 4; Ex. 3, Aguillon Decl. ¶ 12-14, 16.  Even Monahan is unable to identify any
specific individuals tasked with creating campaign products, instead insisting that "everybody" that he
paid—such as telemarketers and website programmers—was engaged in product development.  *See, e.g.*,
Ex. 2, Monahan Depo. at 96:17–21 ("Q. You don't remember any specific person, though, that was
involved in the design of the backpack?  A. No. I mean, everybody – everybody was.").

[51] Ex. 2, Monahan Depo. at 99:9–20 (Monahan could not state how many bags he ordered but admitted it
to be no more than approximately 200); Aguillon Decl. ¶ 15.

[52] *See, e.g.*, Ex. 2, Monahan Depo. at 103:17–24, 104:25 to 105:3; 109:21 to 110:12, 236:8–13; Aguillon
Decl. ¶ 15.

[53] Ex. 6, Gunderson Decl. ¶ 4; Ex. 4, Felchak Decl. ¶ 6.

A. The MOJO bag was just forgotten about it. It wasn't intentional.

Q. You just forgot about the MOJO bag?

A. Uh-huh.

Q. So you received thousands of dollars from backers and you just

forgot to produce the bag?

A. Yes.[54]

The estimated delivery dates for Defendants' campaigns, and any revised delivery

dates for those campaigns,[55] have all long since passed, and no backers have received

their campaign products.[56]  Defendants have taken down their website, ibackpack.co, as

well their "iBackPack" Facebook page,[57] and have largely ceased communications to

campaign backers.[58]  Monahan emptied the iBackPack of Texas bank account at Plains

Capital Bank, withdrawing the last remaining funds in February 2017.[59]

---

[54] Ex. 2, Monahan Depo. at 165:2-166:1.
[55] Ex. 1, Nolan Decl. Att. I (iBackPack Indiegogo updates) at 51 (update on July 24, 2016 revising estimated delivery date to "Christmas, 2016"), 5 (update on January 11, 2017 revising estimated delivery date to "Fall 2017").
[56] Ex. 11, Interrogatory Responses of Douglas Monahan at 2.
[57] Ex. 6, Gunderson Decl. ¶ 11; Ex. 10, Twombly Decl. ¶ 8.
[58] Ex. 1, Nolan Decl. Att. I (iBackPack Indiegogo updates) (last update to backers on March 1, 2017); Ex. 1, Nolan Decl. Att. J (iBackPack Kickstarter updates) (last update on March 1, 2017); Ex. 1, Nolan Decl. Att. K (MOJO updates) (last update on September 23, 2016); Ex. 1, Nolan Decl. Att. L (POW updates) (last update on November 9, 2016); *see also* Ex. 6, Gunderson Decl. ¶¶ 13-14 (no communications received from iBackPack Indiegogo or Kickstarter campaigns since March 1, 2017); Ex. 8, Miller Decl. ¶¶ 8-9 (last communications received from POW and iBackPack campaigns were from October 2016 and February 2017, respectively); Ex. 10, Twombly Decl. ¶¶ 7-8 (last communications with POW and iBackPack campaigns in November 2016 and July 2017, respectively).
[59] Ex. 1, Nolan Decl. Att. T at 7, 8-10.  In December 2018, after having been contacted by the Federal Trade Commission concerning a potential law enforcement action, Defendants provided refunds to nearly all backers of the "POW" and "MOJO" campaigns.  Ex. 2, Monahan Depo. at 198:11-17.  The POW and MOJO campaigns represent approximately $11,600 of the more than $800,000 that Defendants raised through crowdfunding.  Ex. 1, Nolan Decl. ¶ 35.

13

### iii.    As Consumer Complaints Mounted, Defendants Made New Misrepresentations to Conceal Their Failure to Deliver Completed Products

As delivery estimates—and revised estimates—came and went on Defendants' campaigns without products actually shipping, mounting numbers of backer complaints were registered through the crowdfunding platforms,[60] threatening Defendants' ability to continue to crowdfund.  Defendants tried to silence at least one consumer who was critical of the campaign:  first by marking his contribution as having been refunded, even though it wasn't, so that he could no longer post comments to the campaign page; then, after the consumer donated $1 so he could continue to post comments, sending him an email with the title "Call Me Before This Gets Even Uglier" that threatened to sue the consumer and his employer for libel and slander.[61]

In late October 2016, Indiegogo informed Defendants that it was considering suspending their fundraising privileges for failure to deliver completed products.[62]  In response, Defendants lied to Indiegogo about the status of all three of their Indiegogo campaigns.

With regard to the iBackPack campaign, Monahan responded on November 1, 2016, stating that the iBackPack was in the "full production and shipping phase" and that "hundreds if not thousands of the backers have already received their perks as

---

[60] Ex. 1, Nolan Decl. ¶¶ 11–12 & Att. O.
[61] Ex. 6, Gunderson Decl. ¶¶ 7-12 & Att. B.
[62] Ex. 1, Nolan Decl. Att. P at 11.

promised."[63]  Those statements were false; to date no backers have received a completed iBackPack.[64]

Concerning the MOJO and POW campaigns, Monahan initially wrote to Indiegogo on October 21, 2016, stating that the "MOJO BAG IS DONE/FINISHED/ SHIPPED/OVER WITH."[65]  The same email also represented that "POW CABLES ARE DONE/FINISHED/NEARLY ALL SHIPPED/LAST ONES GOING OUT."[66]  Shortly thereafter, Monahan wrote to Indiegogo again on November 8, 2016, stating that "as far as I know [the MOJO and POW campaigns] are 100% satisfied."[67]  These statements were also false; neither the MOJO campaign nor the POW campaign have shipped any completed products to backers.[68]  Defendants marked some backers' contributions as fulfilled without having delivered completed products,[69] and told other POW and MOJO backers they needed to list their contribution as having been fulfilled *before* they could

---

[63] *Id*. at 15-16.

[64] Ex. 11, Interrogatory Responses of Douglas Monahan at 2; Ex. 2, Monahan Depo. at 137:8-25.

[65] Ex. 1, Nolan Decl. Att. P at 8-9 ("100% customer satisfaction is a tough thing to accomplish – but we did it.  100% of the backers for the MOJO bag should be satisfied.  We're not sure what sort of status label that now goes on our campaign – but CLOSED and CUSTOMERS SATISFIED would be appropriate.  We realize it is important for IGG to be able to recognize the campaigns that a) finalize all shipments and b) write you to announce same – hence this letter.").

[66] *Id*. at 9 ("We did the impossible.  And we are doing it again with the ibackpack.  THE MAGNETIC CABLES ARE FINISHED/ wrapped up/done/over with/mission accomplished.  The last few magnetic cable recipients should be sending in their full release and acknowledgement any day now.  We have a handful of individuals who are still waiting to receive their orders considering they wanted multiple units.  All of these individuals should be signing their full release and getting in charge[sic] of you via their IGG inbound email system or perhaps posting in the group chat.  The point is all the MAGNETIC CABLES are very close to being finally 100% shipped.  You should have received the video of the ship leaving China with the MOJO, IBACKPACK AND MAGNETIC CABLES BUNDLED TOGETHER.").

[67] *Id*. at 29-30 ("I need to determine the exact status of the campaigns and will be sending over same to you as soon as I have same.  We should have receipts for all of the shipments to the backers for:  a. MOJO Bag  b. POW CABLES.").

[68] Ex. 11, Interrogatory Responses of Douglas Monahan at 2.

[69] Ex. 10, Twombly Decl. ¶ 6.

receive the completed products, creating the impression those campaigns had fulfilled orders.[70]

Ultimately, Indiegogo suspended Defendants' fundraising privileges in November 2016.[71]  To this day, Defendants have not used the funds primarily for development, production, completion, and distribution and have yet to provide a single completed product to any consumer who contributed to the campaigns.

## VI.    LEGAL ARGUMENT

### A.    Summary Judgment Is Appropriate in This Case

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  For purposes of summary judgment, a fact is "material" only if it could affect the outcome of the litigation under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" only if there is a sufficient evidentiary basis on which a rational trier of fact could find for the non-moving party, *Steadman v. Texas Rangers*, 179 F.3d 360, 366 (5th Cir. 1999).  Once the FTC meets its initial burden of production, a defendant can successfully oppose summary judgment only by bringing forth admissible evidence that is "significantly probative," and not "merely colorable" of an alleged disputed fact.  *Hawking v. Ford Motor Credit Co.*, 210 F.3d 540, 545 (5th Cir. 2000).  Because there is no genuine dispute of fact, the FTC is entitled to summary judgment against Defendant Monahan.

---

[70] Ex. 5, De Almeida Decl. ¶¶ 6-7 & Att. A; Ex. 8, Miller Decl. ¶¶ 6-7 & Att. A.
[71] Ex. 1, Nolan Decl. Att. P at 26-27.

### B.    Jurisdiction And Venue Are Proper

This Court has jurisdiction over cases, such as this one, brought under the FTC Act.  15 U.S.C. §§ 45, 53(b).  The Court also has subject matter jurisdiction because this is a civil action arising under an Act of Congress regulating commerce and one in which an agency of the United States is plaintiff.  28 U.S.C. §§ 1331, 1337(a), 1345.  Venue is proper in this case because Defendants reside in and transact or have transacted business in the Southern District of Texas.  15 U.S.C. § 53(b); 28 U.S.C. § 1391(b), (c).

Defendants conducted their business operations nationwide, using the internet and electronic mail,[72] which constitute instrumentalities of interstate commerce.  *See, e.g.*, *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) (use of internet establishes use of instrumentalities of interstate commerce); *Finger Furniture Co. v. Mattress Firm, Inc.*, 2005 WL 1606934, at *4 (S.D. Tex. July 1, 2005) (same).  Thus, at all times material to the FTC's Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in the FTC Act.  15 U.S.C. § 44.

### C.    Defendants Violated Section 5 of the FTC Act by Deceiving Consumers Regarding the Use of Campaign Funds

#### i.    Section 5 Legal Standard

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  An act or practice is deceptive under Section 5 if it involves (1) a representation; (2) that is likely to mislead consumers; and (3) that is material.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Pantron I*

---

[72] *See, e.g.*, Dkt. 1 (Complaint) ¶¶ 8, 13; Dkt. 18 (Answer) ¶¶ 8, 13.

*Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *see also FTC v. Kennedy*, 574 F. Supp. 2d 714, 721-22 (S.D. Tex. 2008).

Representations can be either express or implied. *United States v. Commercial Recovery Systems, Inc.*, 179 F. Supp. 3d 728, 734 (E.D. Tex. 2016). A representation that is false is "likely to mislead." *In re Thompson Med. Co.*, 104 F.T.C. 648, 818-19 (1984), *petition for review denied*, 791 F.2d 189, 197 (D.C. Cir. 1986). A misrepresentation is material if it is likely to affect a consumer's decision to act. *Kennedy*, 574 F. Supp. 2d at 722; *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1201 (9th Cir. 2006). Claims that pertain to a central characteristic of the product or service offered are presumed to be material. *Fanning v. FTC*, 821 F.3d 164, 172-73 (1st Cir. 2016).

These elements—a representation that is false and material—are sufficient to establish a Section 5 violation and the FTC's right to obtain permanent injunctive relief. To obtain monetary relief, the FTC need not prove actual reliance by each consumer; instead, a presumption of actual reliance arises once the FTC has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased the defendant's product. *FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993).

18

     **ii.**    **Defendants Violated Section 5 of the FTC Act By Making Material Misrepresentations About How They Would Use Campaign Funds**

There is no genuine dispute that each of the three elements for a Section 5 violation are met in this case.

First, Defendants admit that they represented to consumers that they would use the funds raised by their crowdfunding campaigns primarily to develop, produce, complete, and distribute the products promoted by those campaigns.[73]  Those representations are clear on the face of the campaign homepages, each of which showcased developed products and represented that consumers who backed the campaign at specified price points would be entitled to receive specific product packages.[74]  Moreover, Defendants made those representations on crowdfunding platforms where funds are raised to develop the product and where campaign owners "are legally bound to perform on any promise and/or commitment to Contributors (including delivering any Perks)."[75]

Second, there is no genuine dispute that those representations were false: Defendants did not use the campaign funds primarily to develop, produce, complete, and distribute the products promoted by the campaigns.  Financial records demonstrate that Defendant Monahan instead used a substantial portion of the campaign funds for his own personal use.[76]  Those funds that were not converted for Monahan's personal use were largely used for marketing efforts to try to solicit

---

[73] Dkt. 1 (Complaint) ¶¶ 9, 33; Dkt. 18 (Answer) ¶¶ 9, 33.
[74] *See supra* section V.C.i.
[75] *See supra* sections V.B & V.C.i.
[76] *See supra* section V.C.ii.

additional campaign contributions, rather than to produce products to fulfill their obligation to backers.[77]  And Monahan's own testimony establishes that Defendants never took basic steps to fulfill the campaigns, such as ordering a sufficient quantity of parts, or doing *anything* to produce "MOJO" bags.[78]

Third, Defendants representations were plainly material in that they were likely to affect a consumer's decision whether to back Defendants' campaigns.  If consumers knew that their money would be used primarily for unrelated personal expenditures and marketing efforts, rather than on producing the products promoted by the campaign, it would likely affect their decision about whether to financially back the campaign.  Consumer declarations demonstrate the obvious conclusion that consumers would not have funded Defendants' campaigns if they knew those funds went primarily to personal and other expenses unrelated to producing the products. *See* fn 19.

Moreover, Defendants' misrepresentations were widely disseminated through the Internet, and consumers across the country paid money to back the Defendants' campaigns.[79]  Accordingly, Defendants have violated Section 5, and all relevant elements for permanent injunctive relief and monetary relief are satisfied.

---

[77] *Id.*
[78] *Id.*
[79] Ex. 1, Nolan Decl. Att. E (iBackPack Indiegogo campaign page); *id.* Att. F (iBackPack Kickstarter campaign page); *id.* Att. G (MOJO campaign page); *id.* Att. H (POW campaign page); Dkt. 1 (Complaint) ¶¶ 18, 19, 23, 25; Dkt. 18 (Answer) ¶¶ 18, 19, 23, 25.

20

### d.   Individual Liability

#### i.   Legal Standard

To obtain permanent injunctive relief against an individual for a company's violation of Section 5, the FTC must establish that the individual either (1) participated in the violative acts or practices; (2) played a role in controlling, directing, or formulating the policies and practices that resulted in violative acts or practices; or (3) had authority to control the violative acts or practices. *Commercial Recovery Systems*, 179 F. Supp. 3d at 736.

To hold an individual liable for monetary relief for consumer injury caused by a company's violation of Section 5, the FTC must additionally show that the individual either had actual knowledge of the violative acts or practices, was recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth. *Publishing Clearing House*, 104 F.3d at 1171; *Kennedy*, 574 F. Supp. 2d at 722 (noting that knowledge may be actual or constructive). The degree of participation in and control over business affairs is probative of knowledge. *FTC v. Nat'l Bus. Consultants, Inc.*, No. 89-1740, 1990 U.S. Dist. LEXIS 4875, at *2 (E.D. La. Apr. 20, 1990); *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1082 (C.D. Cal. 2012) (finding that an individual had the requisite knowledge of deceptive acts where the individual's "pervasive role and authority . . . extended to almost every facet of the company's business and operations").

There is no genuine dispute that Monahan's conduct satisfies the requirements for both injunctive relief and monetary relief.

21

### ii.     Monahan Exercised Pervasive Control Over iBackPack of Texas or Directly Participated in Its Deceptive Acts, and Had Knowledge of Those Acts

Monahan admits that he formulated, directed, controlled, had the authority to control, or participated in the acts or practices of iBackPack of Texas, LLC, including the acts and practices set forth in the Complaint.[80]  Nor could he make a colorable argument otherwise.  Monahan was the founder, CEO and sole shareholder of the corporate defendant.[81]  *See Publishing Clearing House, Inc.*, 104 F.3d at 1170 (individual's role as president and authority to sign documents on behalf of the corporation demonstrated that she had "authority to control"); *Commercial Recovery Systems*, 179 F. Supp. 3d at 736 (individual's role as corporate officer is probative of authority to control, especially in a small, closely held corporation).  He acknowledges that as CEO he "direct[ed] everything" and that he had sole control over the corporate defendant's financial accounts.[82]

Monahan also participated in iBackPack of Texas's deceptive acts.  He was directly involved in misrepresentations made to consumers.[83]  Because Monahan had sole control over, and access to, the corporation's financial accounts,[84] he is directly responsible for both converting a substantial portion of the campaign funds for his own personal use,[85] for spending much of what remained on marketing efforts in an attempt

---

[80] Dkt. 1 (Complaint) ¶ 7; Dkt. 18 (Answer) ¶ 7.
[81] *See supra* section V.a.iii.
[82] *Id.*
[83] *See supra* section V.a.iii.
[84] *See supra* section V.a.iii.
[85] *See supra* section V.c.ii.

solicit more campaign contributions,[86] and for declining to take basic steps to produce campaign products, such as ordering sufficient components to fulfill the campaigns.[87] Monahan was aware of mounting consumer complaints and, when questioned by a crowdfunding platform about the status of his campaigns, falsely claimed that he had shipped completed products to consumers.[88]  Given his pervasive role and authority in iBackPack of Texas—which extended to all aspects of the entity's activities—Monahan clearly had direct knowledge of the wrongful acts, and therefore can be held liable for monetary relief in connection with Defendants' activities.

## VII.   REQUEST FOR RELIEF

The FTC seeks relief against Monahan pursuant to Section 13(b) of the FTC Act, which expressly authorizes the issuance of a permanent injunction to prevent further violations of the FTC Act.  15 U.S.C. § 53(b) ("[I]n proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.").  It is well-established that Section 13(b)'s grant of authority is broad and encompasses injunctive, monetary, and ancillary relief.  *See, e.g., FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 718 (5th Cir. 1982) ("Section 13(b) carries with it the authorization for the district court to exercise the full range of equitable remedies traditionally available to it."); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 724 (S.D. Tex. 2008) (Hoyt, J.) (awarding permanent injunctive and monetary relief).

---

[86] *Id.*
[87] *Id.*
[88] *See supra* section V.c.iii.

23

As described more fully below, the relief sought in the proposed order is appropriate to remedy Defendant's past conduct and prevent future violations.

## A.    Injunctive Conduct Relief

A permanent injunction is appropriate where a defendant's past or present wrongdoing creates "some reasonable likelihood of future violations." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Sw. Sunsites*, 665 F.2d at 723 (injunction is appropriate where evidence "giv[es] rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint"). Prior violations are highly suggestive of the likelihood of future violations. *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980); *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). Injunctive relief for violations of the FTC Act need not be limited to the precise illegal practice or activity alleged in the complaint; defendants who have violated the act "must expect some fencing in." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965).

Here, it is clear from the record that there is a reasonable likelihood that Monahan will engage in future violations absent strong injunctive relief. Monahan's deceptive conduct was not a momentary lapse, but rather a multi-year, persistent effort to deceive consumers across four crowdfunding campaigns. And as backers' complaints mounted and Monahan faced scrutiny from the Indiegogo platform, Monahan doubled down on his misrepresentations, falsely claiming that products that had never even been produced had either already shipped or were about to ship.[89]  Moreover, the brazenness of Monahan's

---

[89] *See supra* section V.c.iii.

conduct—which involved converting hundreds of thousands of dollars of backer contributions to his personal use[90]—further suggests that Monahan is likely to engage in future violations if not restrained.

The proposed order contains two conduct relief provisions crafted to prevent future law violations.  Section I would permanently enjoin Monahan from engaging or participating in any crowdfunding activities.  Section II would enjoin Monahan from making, or assisting others in making, material misrepresentations in connection with the promoting or offering for sale any good or service.  The Section I ban goes directly to the core of Defendant's violations, while Section II would serve to broadly enjoin Monahan from misrepresentations.  Under the circumstances of this case, both provisions are well justified to prevent future violations.  Numerous courts in this Circuit have imposed similar bans[91] and prohibitions.[92]

## B.    Monetary Relief

The measure of equitable monetary relief in FTC consumer protection matters is the defendant's net revenues:  the amount consumers paid minus refunds.  *See FTC v.*

---

[90] *See supra* section V.c.ii.

[91] *See, e.g.*, *United States v. Commercial Recovery Sys., Inc.*, No. 15-036 (E.D. Tex. Apr. 18, 2016) (ordering ban on debt collection); *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 821 (N.D. Tex. 2008) (ordering ban on engaging in the credit repair business); *FTC v. Churchill*, No. 00-324 (S.D. Tex. Apr. 20, 2001) (Hittner, J.) (entering stipulated orders banning defendants from telemarketing and from credit repair services).

[92] *See, e.g.*, *United States v. Commercial Recovery Sys., Inc.*, No. 15-036 (E.D. Tex. Apr. 18, 2016) (summary judgment order prohibiting misrepresentations in connection with the sale of any product or service); *FTC v. IAB Mktg. Assocs., LP*, No. 14-458 (N.D. Tex. Oct. 10, 2014) (stipulated order prohibiting misrepresentations in connection with the marketing of goods or services); *FTC v. Medical-Billing.Com, Inc.*, No. 02-702 (N.D. Tex. Nov. 19, 2003) (same); *FTC v. Churchill*, No. 00-324 (S.D. Tex. Apr. 20, 2001) (Hittner, J.) (entering stipulated orders banning defendants from telemarketing and from credit repair services).

*Commerce Planet, Inc.*, 815 F.3d 593, 603 (9th Cir. 2016); *FTC v. Think All Publ'g, L.L.C.*, No. 07-011, 2008 U.S. Dist. LEXIS 18623, at *6 (E.D. Tex. Mar. 11, 2008).  The FTC bears the initial burden of providing the court with a reasonable approximation of customers' net losses, and then the burden shifts to the defendant to show that those figures are inaccurate.  *See Commerce Planet*, 815 F.3d at 603.

Here, Defendants deceived thousands of consumers throughout the United States.[93]  The amount of revenue generated by Defendants' scheme, net of refunds, totaled $797,502.20.[94]  Therefore, the Court should enter a judgment against Monahan for this amount, as set forth in Section III of the proposed order.

### C.   Standard FTC Order Provisions to Protect Consumers and to Monitor Defendant's Compliance

Section V of the proposed order would prohibit Monahan from disclosing, using, or benefitting from any consumer's information obtained in connection with their crowdfunding activities and requires Monahan to properly dispose of consumers' information.  These provisions will prevent Defendants' victims from finding themselves on "sucker lists" sold to other scam artists.  Courts of this Circuit routinely enter such provisions in FTC enforcement actions.[95]

---

[93] *See supra* section V.c.
[94] Ex. 1, Nolan Decl. ¶ 36.
[95] *E.g., United States v. Commercial Recovery Sys., Inc.,* No. 15-036 (E.D. Tex. Apr. 18, 2016) (imposing customer list provisions as part of an award of summary judgment); *FTC v. IAB Mktg. Assocs., LP,* No. 14-458 (N.D. Tex. Oct. 10, 2014) (entering stipulated order with customer list provisions); *FTC v. Medical-Billing.Com, Inc.,* No. 02-702 (N.D. Tex. Nov. 19, 2003) (same); *FTC v. Churchill,* No. 00-324 (S.D. Tex. Apr. 20, 2001) (Hittner, J.) (same).

The proposed order also contains monitoring, compliance reporting, and recordkeeping provisions.  Section VI of the proposed order requires Monahan to deliver copies of the order to his employees, agents, representatives, principals, and managers. Section VII requires Monahan to inform the FTC of, among other things, any changes in his business interests, employment or financial status that might affect his compliance obligations under the order.  Section VIII requires Monahan to create and maintain certain business records, while Section IX requires Monahan to submit reports and produce other material to the FTC in order to monitor compliance.  These provisions are designed to ensure Monahan's compliance with the terms of the proposed order, and have been routinely imposed by courts of this Circuit in FTC enforcement actions. [96]

## VIII. CONCLUSION

The material facts of this case—which are established primarily by Defendants' own admissions and documents—demonstrate that Defendants made material misrepresentations regarding their use of campaign funds.  The facts also demonstrate that Monahan controlled the corporation, and participated in and had knowledge of the deceptive acts.  As there is no genuine dispute regarding the material facts, the Court should grant the FTC's motion for summary judgment against Monahan, and enter its proposed order.

---

[96] *E.g., United States v. Commercial Recovery Sys., Inc.,* No. 15-036 (E.D. Tex. Apr. 18, 2016) (imposing monitoring and compliance provisions as part of an award of summary judgment); *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 821 (N.D. Tex. 2008) (same); *FTC v. IAB Mktg. Assocs., LP,* No. 14-458 (N.D. Tex. Oct. 10, 2014) (entering stipulated order with monitoring and compliance provisions); *FTC v. Medical-Billing.Com, Inc.,* No. 02-702 (N.D. Tex. Nov. 19, 2003) (same); *FTC v. Churchill,* No. 00-324 (S.D. Tex. Apr. 20, 2001) (Hittner, J.) (same).

Respectfully submitted,

Dated:  February 7, 2020

/s/  Patrick Roy
Patrick Roy, Attorney-in-Charge
D.C. Bar # 1023521
S.D. Texas (admitted *pro hac vice*)
proy@ftc.gov

Daniel O. Hanks
D.C. Bar # 495823
S.D. Texas (admitted *pro hac vice*)
dhanks@ftc.gov

Federal Trade Commission
600 Pennsylvania Ave NW, CC-10232
Washington, DC  20580
202-326-3477 (Roy); -2472 (Hanks)
Facsimile: 202-326-3768

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Patrick Roy, an attorney, hereby certify that on February 7, 2020, I caused to be served true copies of the foregoing Motion for Entry of Default Judgment Against Defendant iBackPack of Texas, LLC, and Supporting Memorandum through the CM/ECF System and by first-class mail.

/s/  Patrick Roy
Patrick Roy
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Phone: (202) 326-3477
proy@ftc.gov

Attorney for Plaintiff
Federal Trade Commission