# EXHIBIT 2

# In the Matter of:

# FTC v. iBackPack of Texas, et al.

*December 12, 2019*
*Douglas Monahan*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

**1**

```
 1           IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF TEXAS
 3                 GALVESTON DIVISION
 4   FEDERAL TRADE COMMISSION, )
 5              Plaintiff,     )
 6   VS.                       )  Case 3:19-cv-00160
 7   IBACKPACK OF TEXAS,       )
 8   LLC, a Texas limited      )
 9   liability company and     )
10   DOUGLAS MONAHAN,          )
11   individually and as an    )
12   officer of iBackPack of   )
13   Texas, LLC,               )
14          Defendants.        )
15        ORAL DEPOSITION OF DOUGLAS MONAHAN,
16     produced as a witness at the instance of the
17     Plaintiff and duly sworn, was taken in the
18     above styled and numbered cause on December 12,
19     2019, from 10:34 a.m. to 4:33 p.m., before
20     KATERI A. FLOT-DAVIS, CSR, CCR in and for the
21     State of Texas, reported by machine shorthand,
22     at the Texas Attorney General, 808 Travis Street,
23     Ste. 1520, Houston, Texas, pursuant to the
24     Federal Rules of Civil Procedure and the
25     provisions stated on the record herein.
```

**2**

```
 1              A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFF:
 4     PATRICK ROY, ESQ.
 5     DANIEL O. HANKS, ESQ.
 6     Federal Trade Commission
 7     600 Pennsylvania Avenue, N.W.
 8     Washington, DC 20580
 9     Proy@ftc.gov
10     Dhanks@ftc.gov
11
12     FOR THE DEFENDANT, IN PRO PER:
13     DOUGLAS MONAHAN
14     409 Colonial Drive
15     Friendswood, Texas 77546
16     Dwmonahan@gotech.org
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                      INDEX
 2
 3                                          PAGE
 4
 5
 6   DOUGLAS MONAHAN
 7
 8      Examination by Mr. Roy..........      9
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1                    EXHIBITS
 2
 3   NO.         DESCRIPTION               PAGE
 4
 5   Exhibit 1   Certificate of Formation
 6               Of iBackPack of Texas,
 7               A Texas Limited Liability
 8               Company, dated June 19,
 9               2015....................      15
10
11   Exhibit 2   Certificate of Formation
12               For-Profit Corporation,
13               DayBreak Data Marketing
14               Services, Inc., dated
15               4/28/11, ...............      26
16
17   Exhibit 3   Certificate of Formation
18               For-Profit Corporation,
19               MobileZapp Apps, Inc....      30
20
21   Exhibit 4   Electronic Restoration
22               Services Customer
23               Inventory Report(by
24               Bar Code)...............      38
25
```

1 (Pages 1 to 4)

FTC v. iBackPack of Texas, et al.                                                                12/12/2019

5

1       Exhibit 5   Defendant's Doug Monahan &
2                   IBackPack Initial
3                   Disclosures.............. 74
4
5       Exhibit 6   LinkedIn Profile for
6                   Francis Ronald Aldiano... 78
7
8       Exhibit 7   LinkedIn Profile for
9                   Ile Jugovski............ 82
10
11      Exhibit 8   E-mail string from Doug
12                  Monahan to Natasha
13                  Hoskins, dated June 12,
14                  2016.................... 122
15
16      Exhibit 9   E-mail string from Doug
17                  Monahan to Natasha
18                  Hoskins, dated October
19                  21, 2016................ 128
20
21      Exhibit 10  E-mail string from Doug
22                  Monahan to Ming Chiu,
23                  Dated October 28, 2016.. 133
24
25

7

1       Exhibit 18  Indiegogo POW-Super Smart
2                   USB Magnetic Cable
3                   System Web Page........... 179
4
5       Exhibit 19  Office of Comptroller
6                   Franchise Tax Account
7                   Status as of 11/22/2019
8                   For Lightning Strike
9                   Technologies, LLC......... 186
10
11      Exhibit 20  New Account Information
12                  For Lightning Strike
13                  Technologies, LLC......... 187
14
15      Exhibit 21  iBackPack of Texas, LLC,
16                  Profit & Loss, January
17                  2011 through September
18                  2019..................... 204
19
20      Exhibit 22  iBackPack of Texas, LLC,
21                  General Ledger, dated
22                  11/20/2019.............. 211
23
24      Exhibit 23  PlainsCapital Bank document,
25                  Dated 6/22/17............. 225

6

1       Exhibit 11  Indiegogo webpage document  139
2
3       Exhibit 12  Facebook Post by Doug
4                   Monahan, dated May 13,
5                   2016.................... 149
6
7       Exhibit 13  Facebook Post by
8                   Doug Monahan............ 152
9
10      Exhibit 14  E-mail string from Doug
11                  Monahan to Udayan,
12                  Dated June 8, 2016...... 157
13
14      Exhibit 15  Indiegogo MOJO- Bag,
15                  Battery, Cables, Plugs &
16                  Amp Sales Leads web
17                  Page.................... 166
18
19      Exhibit 16  Indiegogo POW-Super Smart
20                  USB Magnetic Cable
21                  System web page......... 173
22
23      Exhibit 17  E-mail string from Doug
24                  Monahan to Udayan Indiegogo,
25                  Dated January 17, 2016.... 177

8

1       Exhibit 24  USAA Federal Savings Bank
2                   Account Statement for
3                   Arleta June Keith or
4                   Doug Monahan.............. 228
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

9

1          P R O C E E D I N G S
2
3            - - - - -
4
5            DOUGLAS MONAHAN,
6    having been first duly sworn, testified as
7    follows:
8
9            MR. ROY:  I'll note for the record
10   that we're starting a little late this
11   morning because the deponent just showed
12   up a few minutes ago.
13           EXAMINATION
14   BY MR. ROY:
15     Q.  Good morning, Mr. Monahan.
16     A.  Good morning.
17     Q.  We've spoken over the phone many
18   times and met in person at a court hearing.
19           I'm Patrick Roy, an attorney with
20   the Federal Trade Commission.
21           Are you represented by counsel?
22     A.  No.
23     Q.  Have you ever had your deposition
24   taken before?
25     A.  Yes.

---

11

1      A.  All right.
2      Q.  If you're not sure of an answer or
3    you don't have a complete answer, then you
4    must still answer the question to the extent
5    you can.
6            Do you understand this?
7      A.  Yes.
8      Q.  And, as you can see, the court
9    reporter is recording everything that we say
10   here.
11           Because she can only record our
12   words, please answer each question with a
13   verbal response as opposed to a head nod or a
14   shake.
15           Do you understand?
16     A.  Yes, I do.
17     Q.  Also, to help the court reporter, I
18   ask that you please try to wait before I
19   finish asking a question before you answer it.
20   And I'll try not to talk over you, if you
21   please try not to talk over me, because she
22   can only record one person talking at a time.
23           Do you understand?
24     A.  Yes, I do.
25     Q.  All right.

---

10

1      Q.  How many times?
2      A.  At least a couple.
3      Q.  And do you remember when the last
4    time was?
5      A.  Fifteen years ago; twenty years
6    ago.
7      Q.  All right.
8            I will be asking you a series of
9    questions, to which you are under oath to
10   provide full and complete answers.
11           If you do not understand any
12   question I ask you, will you please let
13   me know before you respond and I will either
14   try to explain the question to you or try to
15   rephrase the question?
16     A.  Sure.
17     Q.  And you took an oath before we
18   started this morning.
19           Do you understand the nature of the
20   oath?
21     A.  To tell the truth, nothing but the
22   truth, so help me God.
23     Q.  Okay.
24           And it requires you to fully answer
25   each question, to the extent you can.

---

12

1            Have you taken, or do you intend to
2    take, any medication that would affect your
3    ability to testify accurately or honestly
4    today?
5      A.  No.
6      Q.  We will take a few brief breaks
7    today and a longer break for lunch.
8            If you need a break, you can ask to
9    do so.  I'll make sure to get you a break
10   soon.
11           Okay?
12     A.  Thank you.
13     Q.  Mr. Monahan, what is your current
14   address?
15     A.  409 Colonial Drive, Friendswood,
16   Texas.
17     Q.  And when did you move there?
18     A.  Roughly two years ago.  A year and
19   a half ago, maybe.
20     Q.  So in 2018?
21     A.  I believe so.
22     Q.  Summer of 2018?
23     A.  Around then, yeah.
24     Q.  And where did you live prior to
25   that?

---

3 (Pages 9 to 12)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

13

1    A.  In Austin.
2    Q.  What was your address there?
3    A.  4500 Steiner Ranch Boulevard.
4    Q.  And what date range did you live at
5  that address?
6    A.  I can't remember exactly.
7    Q.  Do you know approximately how long
8  or approximately what year you moved into that
9  address?
10   A.  No.
11   Q.  Was it prior to 2010?
12   A.  Yes.
13   Q.  Okay.
14       So you've been living at the
15  Steiner Ranch address since at least before
16  2010?
17   A.  No.  I'm not sure when I moved
18  there.
19   Q.  Do you remember if it was five
20  years ago?
21       At least five --
22   A.  Maybe.
23   Q.  -- years ago?
24   A.  Maybe.  It was -- it wasn't 20.
25   Q.  Okay.  All right.

---

14

1        Do you own a company called
2  iBackPack of Texas, LLC?
3    A.  Yes.
4    Q.  Are you the sole owner of the
5  company?
6    A.  I'm the -- it's a corporation.
7    Q.  Okay.
8        Does anyone else have an ownership
9  interest in the corporation?
10   A.  No.
11   Q.  Are you the chief executive
12  officer?
13   A.  Yes.
14   Q.  How did you come to own iBackPack
15  of Texas?
16       Did you start the company yourself?
17   A.  I founded it.
18   Q.  And when did you start iBackPack of
19  Texas?
20   A.  In, I believe, 2014.
21   Q.  2014.
22       Are you sure on the date or --
23   A.  No.
24   Q.  All right.
25       MR. ROY:  I'm introducing a

---

15

1  document marked as Exhibit No. 1.
2       (Exhibit No. 1 Marked)
3    Q.  (BY MR. ROY)  Okay.
4        This document is called a
5  certificate formation of iBackPack of Texas,
6  LLC.
7        Does this document refresh your
8  recollection on when iBackPack of Texas, LLC,
9  was started?
10   A.  I believe so.
11   Q.  And when was it started?
12   A.  It was filed with the Secretary of
13  State June 19th, 2015.
14   Q.  And is that when you started
15  working under the title, iBackPack of Texas?
16   A.  It was when it was incorporated.
17   Q.  Did you do any work on iBackPack of
18  Texas before it was incorporated?
19   A.  Yes.
20   Q.  When would that have begun?
21   A.  I can't remember the exact date.
22   Q.  Do you remember approximately how
23  long it would have been before you
24  incorporated the company?
25       Would it have been a year before

---

16

1  you incorporated the company?
2    A.  Probably.
3    Q.  Two years before you incorporated
4  the company?
5    A.  Maybe.
6    Q.  Three years before you incorporated
7  the company?
8    A.  No.
9    Q.  So somewhere between one or two
10  years before you incorporated the company?
11   A.  Yes.
12   Q.  Okay.
13       And did iBackPack of Texas launch
14  the iBackPack crowdfunding campaign on
15  Indiegogo?
16   A.  Yes.
17   Q.  Did it launch the MOJO campaign on
18  Indiegogo?
19   A.  Yes.
20   Q.  Did it launch the Pow campaign on
21  Indiegogo?
22   A.  Yes.
23   Q.  Did it launch the iBackPack
24  campaign on Kickstarter?
25   A.  Yes.

---

4 (Pages 13 to 16)

Monahan

FTC v. iBackPack of Texas, et al.                                                    12/12/2019

---

17

1      Q.  Did iBackPack of Texas sell, or
2  offer to sell, any goods or services besides
3  those products that were promoted on the four
4  crowdfunding campaigns?
5      A.  IBackPack never offered to sell
6  anything on the crowdfunding campaign.
7      Q.  Did iBackPack promote or offer to
8  sell any products outside of crowdfunding
9  campaigns?
10     A.  No.
11     Q.  And the products that were promoted
12 on the four crowdfunding --
13     A.  Excuse me.
14        That's not -- that question's --
15 that's -- please rephrase.
16     Q.  The -- did iBackPack of Texas sell
17 or offer to sell any goods outside of
18 crowdfunding?
19     A.  IBackPack is a startup -- or was a
20 startup.
21     Q.  Okay.
22        Did iBackPack offer any goods for
23 sale at a retail store?
24     A.  No.
25     Q.  Did it offer any products for sale

---

18

1  online?
2      A.  The products weren't finished, so
3  no.
4      Q.  Okay.
5        All right.  So you testified that
6  the company launched the four crowdfunding
7  campaigns.
8        Is that correct?
9      A.  Yes.
10     Q.  Did iBackPack of Texas have any
11 business besides those four crowdfunding
12 campaigns?
13     A.  iBackPack was working on a number
14 of other projects, yeah.
15     Q.  What were those other projects?
16     A.  Other technology products.
17     Q.  Could you list those other
18 projects?
19     A.  There are a great many different
20 products.
21     Q.  Could you provide a few examples of
22 those other products?
23     A.  There are a number of different
24 batteries.  There were light sticks.  There
25 were fans.  There were cables.  There were --

---

19

1  there are probably 30 different other products
2  that were included in the backpack.
3      Q.  Okay.
4        So these were products that were
5  included with the iBackPack; is that correct?
6      A.  As well as those to sell on their
7  own.
8      Q.  Okay.
9        Were those products ever offered
10 for sale outside of crowdfunding?
11     A.  They weren't offered for sale in
12 crowdfunding.
13     Q.  Okay.
14        Were they offered for sale outside
15 of crowdfunding?
16     A.  As I told you, they were in
17 development.
18     Q.  Okay.
19        So the answer to that question is
20 "No," then? (Sic)
21     A.  No. (Sic)
22     Q.  Okay.
23        Has iBackPack of Texas ever had a
24 physical premises anywhere?
25     A.  Yes.

---

20

1      Q.  Where did the company have physical
2  premises?
3      A.  My home.
4        I believe we had some -- we may
5  have had some storage space.
6      Q.  Where would the storage space have
7  been?
8      A.  In Austin.
9      Q.  Do you have an address for that?
10     A.  No.
11     Q.  So you operated out of your home.
12        Did any employees or contractors
13 operate out of that location?
14     A.  No.
15     Q.  Were any employees or contractors
16 local?
17     A.  Yes.
18     Q.  In Austin?
19     A.  Yes.
20     Q.  Which employees were local?
21     A.  I can't remember their names.
22     Q.  Do you remember approximately how
23 many?
24     A.  No.
25     Q.  Did you ever meet with any of your

---

5 (Pages 17 to 20)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

21

1    contractors or employees in person?
2         A.  Yes.
3         Q.  How frequently?
4         A.  I can't remember.
5         Q.  Which employees did you meet with
6    in person?
7         A.  I can't remember their names.
8         Q.  Do you remember approximately how
9    many of them you would have met with in
10   person?
11        A.  No.
12        Q.  Would these have been the local
13   ones in Austin?
14        A.  Yes.
15        Q.  Would you have met in person with
16   any of the employees who lived outside of
17   Austin?
18        A.  No.
19        Q.  Did iBackPack of Texas have any
20   vendors?
21        A.  (No Audible Response.)
22        Q.  Any vendors that sold you goods or
23   services?
24        A.  Those that sold us goods and
25   services?

---

22

1         Q.  Correct.
2         A.  Yes.
3         Q.  Were any of these vendors local?
4         A.  Possibly.
5         Q.  You don't know if any of those
6    vendors were local?
7         A.  No.
8         Q.  Did you ever meet with any of your
9    vendors in person?
10        A.  Possibly.
11        Q.  Would it have been the vendors that
12   were local, if there were any?
13        A.  Possibly.
14        Q.  Would you have met with any vendors
15   outside of Austin, Texas?
16        A.  Yes.
17        Q.  Who?
18        A.  I can't remember.
19        Q.  You would have traveled for these?
20        A.  Yes.
21        Q.  And you don't remember any trips
22   that you took to meet with any vendors?
23        A.  No.
24        Q.  Did you take any trips to China to
25   meet any vendors?

---

23

1         A.  No.
2         Q.  Okay.
3             Prior to starting iBackPack, what
4    did you do for work?
5         A.  I had a number of different
6    companies.
7         Q.  Okay.
8             So immediately before iBackPack,
9    which company would that have been?
10        A.  DayBreak Marketing.
11        Q.  And what goods or services does
12   DayBreak Marketing provide?
13        A.  Sales and marketing services.
14        Q.  Could you explain what that is,
15   please.
16        A.  Lead generation, websites, arcing.
17        Q.  So they create websites?
18        A.  Yes.
19        Q.  And they provide marketing for
20   other companies?
21        A.  Yes.
22        Q.  What type of marketing do they
23   provide for other companies?
24        A.  Technology.
25        Q.  Can you explain what "technology

---

24

1    marketing" means?
2         A.  Websites.
3         Q.  Okay.
4             So they create websites for other
5    companies?
6         A.  And marketing materials, yeah.
7         Q.  And by "marketing materials," what
8    do you mean?
9         A.  Brochures, literature, collateral.
10        Q.  Okay.
11            And what was the first item that
12   you said DayBreak Marketing did?
13            It was contact?
14        A.  Marketing.
15        Q.  You said they did lead generation?
16        A.  Lead generation, yeah.
17        Q.  Could you explain what lead
18   generation is -- what lead generation work
19   they did?
20        A.  Finding sales opportunities.
21        Q.  Could you describe what you mean by
22   "finding sales opportunities"?
23        A.  That is a description:  Finding
24   sales opportunities.
25        Q.  How did they find sales

---

6 (Pages 21 to 24)

FTC v. iBackPack of Texas, et al.                                                12/12/2019

---

25

1   opportunities?
2       A.  Through marketing.
3       Q.  Was it strictly by creating
4   websites?
5       A.  No.
6       Q.  Okay.
7           How else did they generate the
8   leads?
9       A.  Direct marketing.
10      Q.  So would that be mailers?
11      A.  Yes.
12      Q.  E-mail?
13      A.  Yes.
14      Q.  Is this creating contact lists?
15      A.  Yes.
16      Q.  Business-to-business contact lists
17  or consumers?
18      A.  B-to-B.
19      Q.  Any consumer contact lists?
20      A.  Possibly.
21      Q.  And what was your job title with
22  this company?
23      A.  CEO.
24      Q.  What did you -- what was your role
25  within the company?

---

26

1           What did you do for the company?
2       A.  Executive.
3       Q.  Were you involved directly with the
4   lead generation work?
5       A.  No.
6       Q.  Were you involved directly with the
7   sales marketing services?
8       A.  No.
9       Q.  Were you involved directly with
10  creating the websites?
11      A.  No.
12      Q.  And what dates was DayBreak in
13  operation?
14      A.  I can't remember.
15          MR. ROY:  I'm introducing an
16  exhibit marked as Exhibit No. 2.
17          (Exhibit No. 2 Marked)
18          MR. ROY:  This document is titled,
19  "Certificate of Formation For-Profit
20  Corporation," and the name of the entity
21  at the top is "DayBreak Data Marketing
22  Services, Inc."
23      Q.  (BY MR. ROY)  Mr. Monahan, does
24  this refresh your recollection on when the
25  company may have been in operation?

---

27

1       A.  No.
2       Q.  At the top right-hand corner of the
3   document it notes that this certificate was
4   filed at the Office of Secretary of State of
5   Texas --
6       A.  Oh.
7       Q.  -- on March 2nd, 2011.
8       A.  Yes.  I see it.
9       Q.  Is that when the company began?
10      A.  Possibly.
11      Q.  Do you think it may have begun
12  earlier than that?
13      A.  Yes.
14      Q.  Is it possible it started later
15  than that?
16      A.  No.
17      Q.  And do you remember when the
18  company stopped operating?
19      A.  No.
20      Q.  Is the company still in operation?
21      A.  It's not generating revenues.
22      Q.  Okay.
23          So it hasn't formally closed down
24  yet?
25      A.  No.

---

28

1       Q.  Do you remember when you stopped
2   doing work for the company?
3       A.  No.
4       Q.  Would it have been before you
5   started iBackPack of Texas?
6       A.  Possibly.
7       Q.  So you may have been doing work for
8   iBackPack of Texas and DayBreak Marketing at
9   the same time; is that correct?
10      A.  Possibly.
11      Q.  And were you the sole owner of
12  DayBreak?
13      A.  It was a corporation.  I owned
14  stock.
15      Q.  Did anyone else own stock in the
16  company?
17      A.  No.
18      Q.  So you were the sole owner of the
19  corporation then?
20      A.  I owned the stock.
21          I don't believe there's such a
22  thing as a sole owner of a corporation.
23      Q.  Okay.
24      A.  I was the sole stockholder.
25      Q.  Okay.

---

7 (Pages 25 to 28)

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

29

1          A.  I was the majority stockholder.
2              But I don't believe there's such a
3    thing as a sole owner.
4          Q.  Okay.
5              I think I understand.
6              Were there any other companies that
7    you opened prior to iBackPack of Texas?
8          A.  Yes.
9          Q.  And what was the company before
10   DayBreak Marketing?
11         A.  Well, SunsetDirect.
12         Q.  And when was SunsetDirect in
13   operation?
14         A.  I founded it in 1992.
15         Q.  Do you remember approximately when
16   you stopped doing business with SunsetDirect?
17         A.  Not exactly, no.  Maybe 2005, 2006.
18         Q.  Okay.
19             Were there any other companies that
20   would have been post-2010?
21         A.  Mobilezapp.
22         Q.  And what goods or services does
23   Mobilezapp provide?
24         A.  Mobile application development.
25   Software engineering.

---

30

1          Q.  Mobilezapp development, does that
2    refer to applications that might be on an
3    iPhone or Android device?
4          A.  Yes.
5          Q.  And you said "software
6    development."
7              Is that software development in
8    addition to the mobile applications?
9          A.  Yes.
10         Q.  So that would have been creating
11   software for computers; is that correct?
12         A.  For phones.
13         Q.  For phones.
14             And when did you start Mobilezapp?
15         A.  After Sunset.
16             MR. ROY:  I'm going to introduce
17   Exhibit -- a document marked as Exhibit
18   No. 3.
19             (Exhibit No. 3 Marked)
20             MR. ROY:  This document is labeled,
21   "Certificate of Formation For-Profit
22   Corporation," and at the top it notes
23   that the name of the entity is
24   "Mobilezapp APPs, Inc."
25         Q.  (BY MR. ROY)  Mr. Monahan, does

---

31

1    this refresh your recollection of when you
2    started Mobilezapp?
3          A.  Yes.
4          Q.  And when did you start Mobilezapp?
5          A.  It was incorporated, Secretary of
6    State, on August 11th, 2011.
7          Q.  And did you do any work with the
8    company prior to its incorporation?
9          A.  Yes.
10         Q.  Do you remember when you would have
11   started doing work with the company?
12         A.  Probably about a year.
13         Q.  That's about a year --
14             (Simultaneous speaking.)
15         A.  (Inaudible) -- I can't remember
16   exactly, but...
17         Q.  But approximately a year before it
18   was incorporated?
19         A.  No more than a year.  More than a
20   month, less than a year.
21         Q.  What was your job title with the
22   company?
23         A.  Chief executive officer.
24         Q.  And what roles did you perform?
25         A.  The role of the CEO.

---

32

1          Q.  Did you help to write the mobile
2    applications?
3          A.  No.
4          Q.  Did you help to write the software?
5          A.  Well, I'm not a coder, but I --
6    well, I wrote the algorithms.
7          Q.  And what did the algorithms do?
8          A.  The methodology.
9          Q.  The methodology for what, sir?
10         A.  For the software.  The
11   instruction -- "how" software.  The code tells
12   the computer how to do it.  I would tell the
13   coders how to make it do it.
14         Q.  Okay.
15             So this is, kind of --
16         A.  Road map.
17         Q.  Is this sort of, like, a design of
18   what you wanted the software to do?
19         A.  Yes.
20         Q.  And were you the sole owner or
21   stockholder for the company?
22         A.  Yes.
23         Q.  All right.
24             And were there any other companies
25   that you were involved in after 2010?

---

8 (Pages 29 to 32)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

33

1      A.  Sunset.  I'm still involved with
2  Sunset.
3      Q.  I thought you testified earlier
4  that you thought Sunset -- you stopped doing
5  business with them in 2005.
6      A.  I sold it, but I was still
7  involved.
8      Q.  Okay.
9         Who did you sell SunsetDirect to?
10     A.  To -- it was an investment group.
11     Q.  You don't remember their name?
12     A.  Huh-uh.  No.
13     Q.  And what work were you doing with
14  SunsetDirect?
15     A.  Lead generation.
16     Q.  Could you describe what your role
17  was in performing lead generation?
18     A.  I was CEO.
19     Q.  Okay.
20         And after -- well, let me go back.
21         Were there any other companies that
22  you were involved with after 2010?
23     A.  Possibly.
24     Q.  You don't remember?
25     A.  Not offhand.

---

34

1      Q.  Are there any companies that you're
2  currently involved with?
3      A.  Yes.
4      Q.  Which companies?
5      A.  GoTechnology.
6      Q.  And what does GoTechnology do?
7      A.  Marketing.
8      Q.  What type of marketing?
9      A.  Well, the company hasn't launched
10  yet, so it's just been engineering so far.
11         Are you asking me what we're doing
12  or what we're going to do?
13     Q.  What are you going to do?
14         What is the company going to do?
15     A.  Marketing.
16     Q.  What type of marketing is the
17  company going --
18         (Simultaneous speaking.)
19     A.  Advertising.
20     Q.  -- to do?
21         If you could please wait till I
22  finish the question so the court reporter can
23  make sure to --
24         (Simultaneous speaking.)
25     A.  Advertising.

---

35

1      Q.  Advertising on the Internet?
2      A.  It's difficult to explain.  It's
3  technology that -- that I created.
4      Q.  Okay.
5         And does that technology exist on
6  the Internet?
7      A.  No.
8      Q.  Is it something that operates over
9  the phone networks?
10     A.  It can.
11     Q.  And what type of technology is it?
12     A.  Communication.
13     Q.  So it's a way to communicate?
14     A.  Yes.
15     Q.  Audibly or writing?
16     A.  It's a -- not audibly.  It's not a
17  communication.  It's a -- like an e-mail of
18  sort, like, it's -- I mean, do you want me to
19  explain it or --
20     Q.  So it's a text-based marketing?
21     A.  No.
22         I mean, I don't want to get too
23  technical, but it's a -- it's a -- do you know
24  what an mpeg file, movie file, is?
25     Q.  Yes.

---

36

1      A.  Okay.  It's a movie file that has
2  code inside it that allows for API calls to be
3  made.
4      Q.  Okay.
5         And what is an API call?
6      A.  Application protocol interface.
7      Q.  And what's your job title with
8  GoTechnology?
9      A.  CEO.
10     Q.  Are you the sole stockholder?
11         (Simultaneous speaking.)
12     A.  Yeah.
13     Q.  Sorry?
14     A.  Yes.
15     Q.  And when did the company begin?
16     A.  Well, I incorporated just a few
17  months ago, maybe six months ago.  But I've
18  been working on the technology for awhile.
19     Q.  When you say you've been working on
20  the technology for awhile, you mean a few
21  years?
22     A.  Yeah.
23     Q.  Two or three years --
24     A.  Yeah.
25     Q.  -- approximately?

---

9 (Pages 33 to 36)

FTC v. iBackPack of Texas, et al.                                                   12/12/2019

---

37

1           A.  (No Audible Response.)
2           Q.  What state did you incorporate the
3   company in?
4           A.  Texas.
5           Q.  Are there any other companies that
6   you're currently doing work for?
7           A.  No.
8           Q.  All right.
9               Mr. Monahan, during the discovery
10  process you indicated that you lost documents
11  that were relevant to this litigation.
12              Is that correct?
13          A.  Yes.
14          Q.  What happened to the documents?
15          A.  Well, the computers were ruined.
16          Q.  How were the computers ruined?
17          A.  Water damage.
18          Q.  What was the source of the water
19  damage?
20          A.  Broken pipes.
21          Q.  How did the pipes break?
22          A.  What?
23          Q.  How did the pipes break?
24          A.  I'm not sure.  I mean, I didn't
25  break them, but -- I don't know.

---

38

1           Q.  When was the -- sorry.
2               When did the pipes break?
3           A.  September of 2017.
4           Q.  Which location did the water damage
5   happen?
6           A.  Steiner Ranch.
7           Q.  Okay.
8               So that was the address you gave us
9   earlier at 4500 Steiner Ranch; is that
10  correct?
11          A.  Yes.
12          Q.  Okay.
13          A.  September 24th.
14          Q.  September 24th, 2017?
15          A.  Yes.
16          Q.  Did you file an insurance claim?
17          A.  Yes.
18          Q.  With which insurer?
19          A.  USAA.
20          Q.  Did you receive compensation from
21  you insurer?
22          A.  Yes.
23              MR. ROY:  I'm introducing a
24  document that's going to be marked as
25  Exhibit No. 4.

---

39

1               (Exhibit No. 4 Marked)
2               MR. ROY:  This is a document from
3   Electronic Restoration Services.  It
4   calls itself a "Customer Inventory
5   Report."
6           Q.  (BY MR. ROY)  Mr. Monahan, are you
7   familiar with this document?
8           A.  Yes.
9           Q.  What is this document?
10          A.  It is an evaluation.
11          Q.  An evaluation of --
12              (Simultaneous speaking.)
13          A.  Electronics.
14          Q.  -- what?
15              Is this an evaluation of
16  electronics after the water damage?
17          A.  Yes.
18          Q.  It appears that you owned a number
19  of computers at the time of the incident.
20              Is that correct?
21          A.  Yes.
22          Q.  Why did you own so many different
23  computers?
24          A.  I love computers.
25          Q.  Did each computer serve a different

---

40

1   function?
2           A.  No.
3           Q.  Were each computer involved with
4   different tasks?
5           A.  Yes.
6           Q.  So your work for iBackPack, would
7   that have all been on one computer?
8           A.  It's difficult to say.
9           Q.  You're not sure if all the work you
10  did for iBackPack was done on one computer?
11          A.  It couldn't be done on one
12  computer, no.
13          Q.  Do you know how many different
14  computers you used for iBackPack work?
15          A.  Many.
16          Q.  Were there different functions you
17  would do on one computer versus another?
18          A.  The functions could vary, yes.
19          Q.  Could you please explain what
20  functions you might have done on one computer
21  as opposed to another.
22          A.  Well, I mean, it's -- it's too
23  broad to explain.  I mean, you got e-mail.
24  You got database.  You got, you know, a wide
25  variety.

---

10 (Pages 37 to 40)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                          12/12/2019

---

41

1      Q.   So would all of your e-mail have
2    been done on one computer?
3      A.   No.
4      Q.   Would all of your database work for
5    iBackPack have been done on one computer?
6      A.   No.
7      Q.   So would one set of e-mails exist
8    on two different computers?
9      A.   It could have.
10     Q.   Two or more different computers?
11     A.   Possibly.
12     Q.   And were all the computers that
13   were involved with iBackPack destroyed?
14     A.   No.
15     Q.   Do you know how many of the
16   computers that were involved with iBackPack
17   were destroyed?
18     A.   No.
19     Q.   How did it happen that some of the
20   computers were okay while some of the other
21   computers were a complete loss?
22     A.   I have no idea.
23     Q.   Okay.
24          You've also indicated that you
25   believe you were recently the victim of

---

42

1    computer hacking.
2          Is that correct?
3      A.   Definitely.
4      Q.   When do you believe this happened?
5      A.   It's been ongoing for the past nine
6    months or so.
7      Q.   What computers or e-mail accounts
8    do you believe this affected?
9      A.   My personal and -- my personal and
10   the iBackPack accounts, and my GoTechnology
11   accounts, too.
12     Q.   When you say your personal accounts
13   and iBackPack accounts and GoTechnology
14   accounts, you're referring to your -- the
15   e-mail accounts?
16     A.   Yes.
17     Q.   Has this affected anything besides
18   e-mail accounts?
19     A.   My bank.
20     Q.   And when you say it's affected your
21   bank, you mean that some of your sensitive
22   information might have been compromised?
23     A.   It was.
24     Q.   Has there been any other effect on
25   your computers?

---

43

1      A.   Yes.
2      Q.   Such as?
3      A.   Software has been compromised.
4      Q.   What software has been compromised?
5      A.   Well, I know Adobe for --
6    positively Adobe.  And I'm not sure about all
7    the others but, you know, if Adobe was
8    attacked, so I'm sure the others were, too.
9      Q.   Who did you contact to try to
10   resolve the situation?
11     A.   My bank.  You.  My ISP.
12     Q.   And were these communications by
13   phone or by e-mail?
14     A.   Both.
15          THE WITNESS:  Do you mind if I get
16   another cup of coffee?
17          MR. ROY:  I think we'll take a
18   break in -- just take a break in one
19   second.
20          THE WITNESS:  Okay.
21     Q.   (BY MR. ROY)  And what did your
22   ISPs say to you?
23     A.   They created a ticket.
24     Q.   Okay.
25          So they haven't been able to

---

44

1    resolve the issue?
2      A.   No.
3      Q.   But they did create a ticket for
4    it?
5      A.   Yes.
6      Q.   And which Internet service
7    providers were these?
8      A.   RackSpace and iPage.
9      Q.   Any others?
10     A.   No.
11     Q.   Okay.
12          Do you believe your gmail account
13   was hacked, as well?
14     A.   Possibly, yes.
15     Q.   Possibly?
16     A.   (No Audible Response.)
17     Q.   Do you have any reason to believe
18   that it was?
19     A.   Yes.
20     Q.   And what reasons?
21     A.   My bank account -- if someone can
22   get in my bank account, they certainly can get
23   in my gmail account.
24     Q.   Okay.
25          But you haven't seen any signs that

---

11 (Pages 41 to 44)

Monahan

FTC v. iBackPack of Texas, et al.                    12/12/2019

---

45

1    your gmail account was hacked?
2        A.  I've had problems with all my
3    e-mail.
4        Q.  Have you had problems with your
5    gmail?
6        A.  I've had problems with all my
7    e-mail.
8        Q.  I asked you specifically:  Have you
9    had problems with your gmail?
10       A.  I can't list each problem I've had
11   with each e-mail account.  It's so broad.
12       Q.  Okay.
13           I'm just asking about your gmail
14   account right now, if you've had any problems
15   with your gmail account.
16       A.  Yes.
17       Q.  And what problems is that?
18       A.  I can't remember.
19       Q.  You can't remember if you had any
20   problems with your gmail account?
21       A.  I've had problems with all my
22   e-mail accounts.
23       Q.  Okay.
24           But you don't specifically remember
25   any problems with your gmail account?

---

46

1        A.  No.
2            Actually, yes.  Somebody got in my
3    gmail account -- in my -- in my -- in my -- my
4    main Google account, and it would affect my
5    gmail.
6        Q.  What gave you indication that
7    someone may have gotten into your Google
8    account?
9        A.  There was a log-in from the
10   Philippines.
11       Q.  It gave you some kind of indication
12   that someone from the Philippines had logged
13   in?
14       A.  Yes.
15       Q.  Do you have any idea how your
16   accounts were hacked?
17       A.  No.
18       Q.  Any indication who may have hacked
19   your accounts?
20       A.  I have no proof.
21       Q.  So what gave you indications that
22   your e-mail accounts were hacked?
23       A.  I stopped getting e-mail.
24           THE WITNESS:  Take a brief break?
25           MR. ROY:  All right.  I think we'll

---

47

1    take a brief break.
2            Go off the record.
3            (Brief Recess Taken.)
4        Q.  (BY MR. ROY)  All right.
5            Mr. Monahan, we were talking about
6    your accounts being hacked earlier.
7        A.  Yes.
8        Q.  When did you stop receiving e-mail?
9            Do you remember?
10       A.  Not exactly.  I don't have an exact
11   date.
12       Q.  Was it more than three months ago?
13       A.  Yes.
14       Q.  More than one year ago?
15       A.  Possibly.
16       Q.  Okay.
17           Do you still have e-mails that were
18   sent -- that were received before then?
19       A.  No.
20       Q.  Those e-mails are no longer in your
21   e-mail account?
22       A.  Before a year ago?
23       Q.  The last time you received an
24   e-mail, would you still have that e-mail saved
25   in your account?

---

48

1        A.  Well, yes and no.  I mean, the
2    e-mail system that I have is such that when it
3    delivers the e-mail, it deletes it from the
4    server.
5        Q.  So when it delivers an e-mail, it
6    deletes it from the server.
7            So you have no records of any
8    e-mails that you've sent?
9        A.  I would have it on my machine, a
10   local copy, yes.
11       Q.  So on your local machine, you have
12   a copy of e-mails that you've sent?
13       A.  Unless the machine was compromised,
14   yes.
15       Q.  Do you have any reason to believe
16   the machine was compromised?
17       A.  Yeah.  My machines have been
18   hacked.
19       Q.  Have you checked through your sent
20   e-mail to see if you still have copies of
21   e-mails that you've sent?
22       A.  Yes.
23       Q.  And do you have copies of e-mails
24   that you've sent?
25       A.  It doesn't appear that I have all.

---

12 (Pages 45 to 48)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

49

1    Q.  Does it appear that you have most?
2    A.  I'm missing -- I think I'm missing
3  some, but I'm not sure.
4    Q.  You think you may be missing some,
5  but you're not --
6    (Simultaneous speaking.)
7    A.  Yeah.
8    Q.  And how about the e-mails?
9    So those are -- the e-mails that
10 you've sent, you have some copies of them
11 locally.  You're not sure if you have them
12 all.
13    How about the e-mails that you
14 received prior to the date when you stopped
15 receiving e-mails?
16    Do you still have those e-mails?
17    A.  Which ones?
18    You mean, like all e-mail?
19    Q.  E-mails that you've received, yes.
20    Do you have a copy of those
21 locally, as well?
22    A.  Unless -- well, I mean, I'm not
23 sure, to be -- unless the machine has been
24 compromised.
25    I mean, I don't -- I don't have an

---

50

1  inventory of e-mails that I can go back and
2  just look and see if they're all there.  I
3  know I've had significant problems.
4    So I can't say -- you know, you're
5  asking me:  Do I have them all?
6    I can't tell you yes or no.  I've
7  had significant problems with all of my
8  e-mails for the past -- well, ever since I've
9  been working with you guys and with, you
10 know...
11    Q.  Okay.
12    So you're not sure if you have all
13 of the e-mails that you received --
14    A.  No.
15    Q.  -- but you do have at least some
16 body of e-mails that you've received.
17    A.  Yes.
18    Q.  Okay.
19    And have you taken any steps to
20 back up or preserve these e-mails while we're
21 in litigation?
22    A.  I don't have a backup program, if
23 that's what you mean.
24    Q.  So you've mentioned that you've had
25 problems with your machines and you believe

---

51

1  it's possible that your local machine could
2  have been corrupted, but you're not taking any
3  steps to try to save those e-mails to any
4  other machines that might not be corrupted?
5    A.  I've copied -- I've -- I
6  occasionally copy from one machine to another,
7  yes.
8    Q.  How frequently?
9    A.  It's infrequent.  Maybe every
10 90 days.
11    Q.  And would you have done this with
12 your iBackPack e-mails, as well, before the
13 water pipe damage?
14    A.  It was the same process then, yeah.
15 I mean, it was -- everything was infrequent.
16    Q.  Okay.
17    So by "same process," you mean you
18 infrequently, maybe every 90 days or so, might
19 have backed up --
20    (Simultaneous speaking.)
21    A.  Sometimes --
22    Q.  -- e-mails?
23    A.  -- 30, sometimes 60.  It would just
24 depend upon the --
25    (Simultaneous speaking.)

---

52

1    Q.  Okay.
2    A.  -- load.
3    Q.  Okay.
4    I'll just remind you, we'll try not
5  to talk over each other so the court reporter
6  can get a clear record.
7    A.  Uh-huh.
8    Q.  Okay.
9    And you said before that the
10 indication -- your indication that your
11 accounts may have been hacked is that you're
12 not getting e-mails.
13    Is that the only indication that
14 your accounts have been hacked?
15    A.  No.  I saw a name inside my e-mail,
16 inside the log-in on the ISPs, that was not
17 mine.
18    Q.  Okay.
19    And were there any other
20 indications?
21    A.  Yes.  There were -- there was
22 software code written inside the ISP server
23 that I did not know.
24    Q.  Any other indications?
25    A.  I was told by the ISPs that they

---

13 (Pages 49 to 52)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

53

1    found IPs other than mine in my account.
2        Q.  Okay.
3            And with regards to your bank
4    accounts, what indications have there been
5    that your bank accounts have been compromised?
6        A.  I was missing money.  That's a
7    pretty good one.
8        Q.  Approximately how much money were
9    you missing?
10       A.  $900.
11       Q.  And which bank accounts would those
12   have been from?
13       A.  USAA.
14       Q.  Any other indications that your
15   bank accounts were compromised?
16       A.  Yes.
17           I received e-mail notices that
18   people have been -- someone has been changing
19   my passwords for all of my banks.
20           I have received text messages
21   notifying me that someone is changing my
22   passwords, when I was asleep.
23           I have been told by banks that they
24   have IP addresses outside the United States
25   coming in to my accounts.

---

54

1            I've been told that individuals
2    have called, pretending to be me, and have
3    been blocked.
4            And things like that.
5        Q.  Okay.
6            I'm going to ask you some questions
7    about the four crowdfunding campaigns.
8            So for the iBackPack Indiegogo
9    campaign, approximately when was that campaign
10   started?
11       A.  The campaign itself?
12       Q.  Yes.
13       A.  The seeking contributors or the --
14   the work on the backpack?
15       Q.  Seeking contributors.
16       A.  That was in late Summer of 2015, I
17   think.
18       Q.  And when did the fundraising end?
19       A.  I can't remember the exact date.
20           It would have been October.
21       Q.  October -- is that October of 2015
22   or 2016?
23       A.  2016, I believe.
24       Q.  And approximately how much money
25   did the iBackPack campaign raise?

---

55

1        A.  Around $800,000.
2        Q.  And where were the funds raised by
3    the iBackPack Indiegogo campaign deposited?
4        A.  PayPal.
5        Q.  Was that account used exclusively
6    for the iBackPack Indiegogo campaign?
7        A.  No.
8        Q.  Were the other campaigns -- did
9    their funds get deposited into the PayPal
10   account, as well?
11       A.  Yes.
12       Q.  So the MOJO campaign, the POW
13   campaign and the iBackPack Kickstarter
14   campaign --
15       A.  Yes.
16       Q.  -- they all got deposited into the
17   same account?
18       A.  Yes.
19       Q.  Okay.
20           And approximately when did the MOJO
21   campaign launch?
22       A.  What's -- what do you mean by
23   "launch"?
24           When -- when did we raise the money
25   or --

---

56

1        Q.  Yes.
2            When did you begin to raise the
3    money?
4        A.  I can remember.
5        Q.  Okay.
6            The FTC's complaint alleges that
7    the MOJO campaign launched October of 2015.
8            Does that seem accurate?
9        A.  Yes.
10       Q.  And do you remember when the MOJO
11   campaign fundraising period ended?
12       A.  Sixty -- sixty days after that,
13   maybe.
14       Q.  Do you remember how much money the
15   MOJO campaign raised?
16       A.  Very little.  Maybe $10,000.
17       Q.  And for the POW campaign, when did
18   you begin fundraising for the POW campaign?
19       A.  About the same time, I believe.
20       Q.  Okay.
21           The FTC's complaint alleges that
22   the POW campaign launched in February of 2016.
23           Does that seem accurate?
24       A.  It could be.
25       Q.  Do you remember when the

---

14 (Pages 53 to 56)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

57

1    fundraising period for POW ended?
2        A.  Probably 60 days after that.
3        Q.  And do you remember how much money
4    the POW Campaign raised?
5        A.  Ten, fifteen thousand dollars.
6        Q.  And the iBackPack Kickstarter
7    campaign, do you remember when you began
8    funding for that campaign?
9        A.  No.
10       Q.  Okay.
11           The FTC's complaint alleges that
12   the fundraising began March 9th, 2016.
13           Does that seem accurate to you?
14       A.  Yes.
15       Q.  And do you remember when the
16   fundraising period for Kickstarter iBackPack
17   campaign ended?
18       A.  Probably 60 days after.
19       Q.  And do you remember approximately
20   how much money the iBackPack Kickstarter
21   campaign raised?
22       A.  No.
23       Q.  What was your role with the
24   iBackPack Indiegogo campaign?
25       A.  CEO.

---

58

1        Q.  What functions did you perform as
2    CEO?
3        A.  CEO functions.
4        Q.  Did the iBackPack campaign have
5    vendors?
6        A.  Yes.
7        Q.  Did you communicate with those
8    vendors?
9        A.  Yes.
10       Q.  Who else would have communicated
11   with those vendors?
12       A.  Many people.
13       Q.  You don't remember who?
14       A.  Many people.  I mean, almost
15   everybody.
16       Q.  Did you direct or oversee those
17   communications?
18       A.  Sometimes.
19       Q.  Was there someone else who might
20   have directed or overseen those
21   communications?
22       A.  No.
23       Q.  Okay.
24           So what about for the iBackPack
25   Kickstarter campaign?

---

59

1            Would you have communicated with
2    vendors for that campaign, as well?
3        A.  Yes.
4        Q.  Would other employees have also
5    communicated with vendors there?
6        A.  I didn't have any employees.
7        Q.  Would any contractors have
8    communicated with the iBackPack --
9            (Simultaneous speaking.)
10       A.  Yes.
11       Q.  -- Kickstarter vendors?
12       A.  Yes.
13       Q.  And would you have directed or
14   overseen those communications?
15       A.  Yes.
16       Q.  Did the POW campaign have any
17   vendors?
18       A.  Yes.
19       Q.  And did you communicate with those
20   vendors?
21       A.  Yes.
22       Q.  Would other employees or
23   contractors have communicated with those
24   vendors, as well?
25       A.  Yes.

---

60

1        Q.  And did you direct or oversee those
2    communications?
3        A.  Yes.
4        Q.  Okay.
5            And with the MOJO campaign, did you
6    have vendors for the MOJO campaign?
7        A.  Yes.
8        Q.  Did you communicate with the
9    vendors for the MOJO campaign?
10       A.  Yes.
11       Q.  Would other contractors have
12   communicated the vendors for the MOJO
13   campaign?
14       A.  Yes.
15           I mean, I'm thinking about this.
16   It's like there are others, I said, just --
17   there are others who were working with me who
18   communicated, as well.
19           So if I'd said that nobody
20   communicated, then I'm wrong.  But it's not
21   like -- I didn't lead a team of people and
22   tell them what to say to the vendors.  People
23   just would contact the vendors.
24       Q.  They would just contact the vendors
25   on their own initiative?

---

15 (Pages 57 to 60)

FTC v. iBackPack of Texas, et al.                                                                    12/12/2019

---

61

1      A.  Uh-huh.
2      Q.  Would they orders products from the
3   vendors on their own initiative?
4      A.  They could have.
5      Q.  Would they have ordered the
6   products as they needed to?
7      A.  Uh-huh.
8      Q.  So if they ran out of a particular
9   component, they might have contacted the
10  vendor themselves?
11     A.  Or if they wanted a component, yes.
12     Q.  And is that true with all of the
13  campaigns or just with the MOJO campaign?
14     A.  With all.
15     Q.  And did the iBackPack campaign
16  communicate with backers?
17     A.  Yes.
18     Q.  Did you send communications to
19  backers?
20     A.  Sometimes.
21     Q.  Sometimes other contractors may
22  have sent communication to backers?
23     A.  Yes.
24     Q.  And did you direct or oversee those
25  communications?

---

62

1      A.  As CEO, your job is to direct
2   everything, but it's "yes" and "no."
3      Q.  Would anyone else have been
4   responsible for directing communications to
5   the backers?
6      A.  Yes, but -- not directing, but
7   making the communication.
8      Q.  So some of the contractors might
9   have communicated to backers on their own
10  initiative?
11     A.  Yeah.  All of them did.
12     Q.  And did you control the company's
13  financial accounts?
14        By "company," I mean iBackPack of
15  Texas.
16     A.  Yes.
17     Q.  Who else had access to the accounts
18  for iBackPack of Texas?
19     A.  No one.
20     Q.  So did you direct and oversee all
21  payments from the accounts?
22     A.  Yes.
23     Q.  And we already established earlier
24  that all of the funds for iBackPack,
25  Kickstarter, iBackPack Indiegogo, POW and

---

63

1   MOJO, all of those funds were deposited into
2   the same account.
3        Is that correct?
4      A.  Yes.
5      Q.  After those funds were deposited
6   into the iBackPack account, were they later
7   deposited into any other accounts?
8      A.  Yes.
9      Q.  Which other accounts?
10     A.  The corporate accounts, the banks.
11     Q.  When you say "the corporate
12  account," you mean the corporate iBackPack of
13  Texas account?
14     A.  Yes.
15     Q.  And was that account with
16  PlainsCapital Bank?
17     A.  Yes.
18     Q.  Were there any other corporate bank
19  accounts?
20     A.  I don't believe so.
21     Q.  For the iBackPack campaign, were
22  the products designed?
23        Did you design the products for the
24  iBackPack campaign?
25     A.  Yes.

---

64

1      Q.  Did anyone else help to design the
2   products for the iBackPack campaign?
3      A.  Yes.
4      Q.  Who else helped to design the
5   products for that campaign?
6      A.  A great many people.
7      Q.  You don't remember the names of all
8   the people who helped to design the
9   iBackPack --
10        (Simultaneous speaking.)
11     A.  Many.
12     Q.  -- campaign.
13     A.  It was a group effort.
14     Q.  And were the products already
15  designed prior to you launching the campaign?
16     A.  Are you referring to the campaign
17  as in the fundraising effort or --
18     Q.  Yes.
19        Were the products designed prior to
20  you launching the fundraising effort on the
21  iBackPack campaign?
22     A.  Yes.  Partially.
23     Q.  Could you explain what you mean by
24  "partially designed."
25     A.  They weren't finished.  The -- it's

---

16 (Pages 61 to 64)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

65

1  an ongoing process.  So, in other words, you
2  said, "were they designed?"
3      It makes it sound like they were
4  completely designed and, for these products,
5  it's an ongoing process.
6      Q.  So when you say "it's an ongoing
7  process," do you mean that there may have been
8  some tweaks made to it after it was launched?
9      A.  Yes.
10     Q.  So the major piece of it was
11 designed prior to launching the fundraising
12 campaign; is that correct?
13     A.  Yes.
14     Q.  And then some tweaks were made to
15 it after the fundraising campaign began?
16     A.  Yes.
17     Q.  All right.
18         So that was for the iBackPack
19 Indiegogo campaign.
20         Was the same true for the iBackPack
21 Kickstarter campaign?
22     A.  Yes.
23     Q.  So you designed the products along
24 with a team of individuals?
25     A.  Yes.

---

66

1      Q.  And the product was mostly designed
2  prior to launching --
3      A.  The fundraising campaign, yes.
4      Q.  And how about for the POW campaign?
5          Did you design the products for the
6  POW campaign?
7      A.  The same.
8      Q.  And other individuals helped with
9  you the design of the --
10         (Simultaneous speaking.)
11     A.  Yes.
12     Q.  -- POW products?
13     A.  Yes.
14     Q.  And the products -- the POW
15 products were designed prior to you launching
16 the fundraising campaign?
17     A.  Yes.
18     Q.  And with the MOJO campaign, you
19 designed the MOJO product?
20     A.  Yes.
21     Q.  Other individuals helped you design
22 the MOJO product?
23     A.  Yes.
24     Q.  And the products were already
25 designed prior to you launching the MOJO

---

67

1  fundraising campaign?
2      A.  Yes.
3      Q.  Was there a campaign page for the
4  iBackPack campaign?
5      A.  Yes.
6      Q.  Who created the campaign page for
7  iBackPack?
8      A.  The team.
9      Q.  Who's "the team"?
10     A.  The contractors.
11     Q.  Do you remember any of the
12 contractors' names?
13     A.  There are a great many.
14         Ivan was one.
15         Not offhand.
16     Q.  Okay.
17         What about for the iBackPack
18 Kickstarter campaign?
19         Was there a campaign page?
20     A.  Yes.
21     Q.  Would it have been the same team of
22 individuals?
23     A.  Yes.
24     Q.  For the MOJO campaign page?
25     A.  Same.

---

68

1      Q.  For the POW campaign page?
2      A.  Same.
3      Q.  And were you part of the team that
4  was trying to create the campaign page?
5      A.  Yes.
6      Q.  What did you -- what was your role
7  in the team, in creating the campaign pages?
8      A.  I'm CEO.
9      Q.  So did you design the campaign
10 pages?
11     A.  I'm not a designer.
12     Q.  Did you tell the team what things
13 to put on the campaign page?
14     A.  I am in charge of everything in the
15 company, so -- but it was a collaborative
16 effort.
17     Q.  And you had final say-so on what
18 was included in the campaign page; is that
19 correct?
20     A.  Yes.  It wasn't always followed,
21 but yes.
22     Q.  What do you mean, "it wasn't always
23 followed"?
24     A.  Contractors don't always do what
25 they're supposed to.

---

17 (Pages 65 to 68)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

69

1    Q.  Okay.
2         And was there also a website for
3    iBackPack?
4    A.  Yes.
5    Q.  Was it the same team of individuals
6    who created the website?
7    A.  Yes.
8    Q.  Was there a website for the POW?
9    A.  I don't think so.
10   Q.  Was there a website for MOJO?
11   A.  No.  I don't think so.
12   Q.  Were there any specific instances
13   you remember where the content on the campaign
14   page or on a web page was something you didn't
15   approve?
16   A.  There are many.
17   Q.  And did you change the campaign
18   page or website as a response to that?
19   A.  I would try to.
20   Q.  And if you were unsuccessful, did
21   you just leave it as it was?
22   A.  Well, I mean, I'd ask to have it
23   done again.  I mean, ultimately, I want it to
24   be the way I want it.  I want it to be
25   correct.

---

70

1    Q.  Okay.
2         Did the iBackPack campaign engage
3    in any marketing efforts?
4    A.  Yes.
5    Q.  What marketing efforts did the
6    iBackPack campaign take?
7    A.  Advertise.
8    Q.  Where did it advertise?
9    A.  Primarily Facebook, but perhaps
10   other social media, as well.
11   Q.  Any other marketing efforts?
12   A.  I'm sure, yes.
13   Q.  Do you remember what those other
14   marketing efforts were?
15   A.  E-mail, perhaps.  Phone calls.
16   Social media.
17   Q.  The phone calls, who would those
18   have been to?
19        Current customers or --
20   A.  Well, maybe not phone calls.  Just
21   general marketing.
22   Q.  What about the e-mails?
23        Would those have been to your
24   current customers or other customers?
25   A.  No.  There is no e-mail marketing.

---

71

1    I just say that -- I guess no e-mail
2    marketing, no phone calls, but, you know, just
3    general marketing.
4    Q.  Just general marketing?
5    A.  There wasn't one account that we
6    did only marketing with.
7    Q.  And what was your role in those
8    marketing efforts?
9    A.  I'm CEO.
10   Q.  So did you direct the marketing
11   efforts?
12   A.  As CEO, I direct everything.
13   Q.  Did you tell your contractors which
14   websites to advertise on?
15   A.  I would provide suggestions and
16   directions, yes.
17   Q.  Did you approve the content?
18   A.  Not always.
19   Q.  Did you usually approve the
20   content?
21   A.  I attempted to.
22   Q.  Was there anyone else who was in
23   charge of marketing efforts or approving the
24   content for marketing?
25   A.  There was no -- no one group leader

---

72

1    that did it, but everyone was responsible,
2    yes.
3    Q.  Okay.
4         Was there an app that was being
5    developed or was supposed to be being
6    developed for the iBackPack?
7    A.  Yes.
8    Q.  Who designed the app?
9    A.  It was a collaborative effort, but
10   there were several designers who led the
11   efforts more than others.
12   Q.  Do you remember who those designers
13   were?
14   A.  No.
15   Q.  Did you help to design the app?
16   A.  Yes.
17   Q.  Was a code ever written to create
18   the app?
19   A.  Not completely.
20   Q.  So the code was begun; is that
21   correct?
22   A.  Yes.  I believe, maybe.  It should
23   have been.
24   Q.  It should have been, but you're not
25   sure?

---

18 (Pages 69 to 72)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

73

1  A.  Yes.
2      Q.  And what exactly is the design for
3  the app?
4          And by that, what I mean is:  What
5  does designing the app entail?
6          Is that basically a first list of
7  what functions you'd want the app to have and
8  how it would look?
9      A.  Yes.
10     Q.  Was there any other software that
11 was developed for the iBackPack?
12     A.  There were a number of algorithms
13 created, but not finished.
14     Q.  And what were those algorithms
15 supposed to do?
16     A.  Computer instructions and
17 methodologies.
18     Q.  Computer instructions for what?
19     A.  Well, there are two parts to a
20 software program.  You first have to design
21 and then you have to code.
22         So there were -- a lot of designs
23 were made.
24     Q.  Okay.
25         So a lot of designs were made, but

74

1  no code was written?
2      A.  Yes.
3      Q.  Okay.
4          MR. ROY:  We're going to start
5      going through some of the individuals
6      you identified as contractors for the
7      campaign.
8          I'm producing a document being
9      marked as Exhibit No. 5.
10         (Exhibit No. 5 Marked)
11     Q.  (BY MR. ROY)  Mr. Monahan, this is
12 the initial disclosures that you provided to
13 the FTC.
14         Do you recognize this document?
15     A.  Yes.
16     Q.  And did you write this document?
17     A.  Yes.
18     Q.  Okay.
19         So on Page 2 there is a list of
20 what appears to be contractors that worked on
21 the campaigns; is that correct?
22     A.  Yes.
23     Q.  Okay.
24         So the first contractor on the list
25 is Duncan Bonnici.

75

1          And I apologize in advance if I
2  mispronounce any of the names.
3          Which campaigns did Duncan Bonnici
4  provide goods or services for?
5      A.  All.
6      Q.  And what goods or services did
7  Duncan Bonnici provide?
8      A.  It was a collaborative effort.
9  All.
10     Q.  So he did --
11         (Simultaneous speaking.)
12     A.  Design --
13     Q.  -- marketing --
14     A.  -- design, marketing, IT,
15 suggestions for copyrighting.
16         Anything and everything that we
17 needed.
18     Q.  And did he have a particular area
19 of expertise?
20     A.  IT.
21     Q.  Would that include programming?
22     A.  Yes.
23     Q.  Would it include anything else?
24     A.  Yes.
25     Q.  Such as what?

76

1      A.  Network configurations, as well as
2  helping write the copy for the website, and
3  just participating in the collaborative effort
4  to create the products and design the
5  products.
6      Q.  And how did you pay Duncan Bonnici
7  for the goods or services he provided?
8      A.  Via PayPal.
9      Q.  Did Duncan Bonnici have any
10 responsibility for ordering or providing
11 components for the iBackPack?
12     A.  Yes.
13     Q.  So he would have ordered components
14 for the iBackPack?
15     A.  Not for the backpack per se, but
16 for, like, software products or -- or anything
17 that we needed, he could help out with.
18     Q.  Did he order any goods or services
19 from any vendors?
20     A.  I believe so.
21     Q.  What types of vendors might he have
22 ordered goods or services from?
23     A.  Everybody was doing everything they
24 could to make the product sell.  I mean, it
25 could be a wide range.

19 (Pages 73 to 76)

FTC v. iBackPack of Texas, et al.                                                    12/12/2019

77

1      Q.  And does Duncan -- or did Duncan
2   Bonnici have any responsibility for assembling
3   any products?
4      A.  No.
5      Q.  Okay.
6         The third name on the list is
7   Francis Ronald Aldiano.
8      A.  Okay.
9      Q.  Which campaigns did Francis Aldiano
10  provide goods or services for?
11     A.  I believe all.
12     Q.  And what goods or services did he
13  provide?
14     A.  Creative and design services.
15  Copyrighting assistance.  And helping design,
16  write the copy.  Speak with end users.
17        Just anything and everything that
18  needed to be done.
19     Q.  Did he have any particular area of
20  expertise?
21     A.  It says "Creative and design
22  services," but, you know, I really don't
23  remember --
24     Q.  Okay.
25     A.  -- this guy.

78

1         MR. ROY:  Introducing a document to
2   be marked as Exhibit No. 6.
3         (Exhibit No. 6 Marked)
4      Q.  (BY MR. ROY)  Mr. Monahan, this is
5   a LinkedIn profile for Francis Ronald Aldiano,
6   and at the top it lists him as being involved
7   in social -- social media and creative
8   content.
9      A.  Okay.
10     Q.  Does that help refresh your
11  recollection at all about his area of
12  expertise or what goods or services he may
13  have provided?
14     A.  I mean, I guess he did social
15  media, too, I suppose.  But, you know,
16  everyone did everything, so...
17        We did not have one social media
18  person.  It was a -- everything was a
19  collaborative effort.
20     Q.  All right.
21        Mr. Monahan, the next name on the
22  list is Glauber Rodrigues de Alemeid.
23     A.  Okay.
24     Q.  Which campaigns did he provide
25  goods or services for?

79

1      A.  All.
2      Q.  And what goods or services did he
3   provide?
4      A.  Video.  Creative.
5      Q.  So he helped with videos?
6      A.  Uh-huh.
7      Q.  And these were videos that might
8   have been marketing or showcasing the
9   products?
10     A.  Yes.
11     Q.  Did he have any involvement or any
12  responsibility for assembling products?
13     A.  We were in beta, so no one had
14  any -- we weren't assembling products.  So the
15  answer would be no.
16     Q.  Okay.
17        Did he have any responsibility for
18  ordering goods or services from vendors?
19     A.  Not really.
20     Q.  Did he have any responsibility for
21  designing any of the products or components?
22     A.  He assisted with the designs, yes.
23     Q.  Okay.
24        Which designs did he assist with?
25     A.  It was a collaborative effort.  I

80

1   can't remember.
2      Q.  The next name on the list is Hector
3   Armenta.
4      A.  Okay.
5      Q.  Which campaigns did Hector Armenta
6   provide goods or services for?
7      A.  I don't recall.
8      Q.  Do you recall what goods or
9   services he provided?
10     A.  No.
11     Q.  The next name on the list is Hui Gu
12  Huang.
13     A.  Okay.
14     Q.  What goods or services did he
15  provide?
16     A.  "Creative and design services," is
17  what it says.
18        As I said, it was a collaborative
19  effort.  I can't remember exactly what this
20  person did.
21     Q.  So you don't know if he had any
22  responsibility for designing the products?
23     A.  Well, every person's name on this
24  list participated in the design. (Sic)
25     Q.  What about ordering goods or

20 (Pages 77 to 80)

Monahan

FTC v. iBackPack of Texas, et al.                                      12/12/2019

---

81

1    services from vendors?
2        A.  Everybody would order goods or
3    services as we needed for the project.
4        Q.  And what about assembling the
5    products?
6        A.  There was no assembly for any of
7    the products because the products were not
8    finished.
9        Q.  And did he have any -- did Hui Gu
10   Huang have any particular area of expertise?
11       A.  Not that I'm aware of.
12       Q.  All right.
13           The next name on the list is Ile
14   Jugovski.
15       A.  Okay.
16       Q.  Did Ile Jugovski have any
17   particular area of expertise?
18       A.  Creative.  Creative.
19       Q.  Can you elaborate what you mean by
20   "creative"?
21       A.  Design.
22       Q.  Product design?
23       A.  Product design.  Brochure design.
24   Layouts.
25       Q.  Okay.

---

82

1            MR. ROY:  I'm introducing document,
2    Exhibit 7.
3            (Exhibit No. 7 Marked)
4            MR. ROY:  This is a LinkedIn
5    profile for Ile Jugovski.  It lists his
6    area of expertise as senior UI/UX
7    designer.  And one of his prior
8    projects -- or companies listed him as
9    the VP in project management for
10   DayBreak.
11       Q.  (BY MR. ROY)  Does this refresh
12   your recollection at all about work that Ile
13   Jugovski might have done for the iBackPack
14   campaigns?
15       A.  Yes.
16           (Pause.)
17           Yes.
18       Q.  And what type of work did he do for
19   the iBackPack campaigns?
20       A.  It was -- everything was a
21   collaborative effort:  Design.  Copy writing.
22       Q.  So his area of expertise was in
23   design and copy writing?
24       A.  Design and copy writing, yes.
25       Q.  And did he also do work with

---

83

1    DayBreak?
2        A.  He says he did.
3        Q.  Do you remember him doing work with
4    DayBreak?
5        A.  I don't remember it.
6        Q.  The next name on the list is Ivana
7    Dunjerski.
8        A.  I don't remember that name.
9        Q.  Do you remember what Ivana
10   Dunjerski's area of expertise was?
11       A.  No.  I mean, it says on here it's
12   creative and design services, so I assume so.
13       Q.  Okay.
14           And that's a description that you
15   previously wrote, correct?
16       A.  Yes.
17       Q.  Okay.
18           So you don't currently remember if
19   Ivana Dunjerski had any particular area of
20   expertise?
21       A.  Well, everyone working for --
22   working with me as a contractor was
23   responsible for creative and design services
24   and -- and helping to design the product, and
25   any and everything.  It was a collaborative

---

84

1    effort, so...
2            I don't remember her, though --
3            (Simultaneous speaking.)
4        Q.  Okay.
5            And --
6        A.  -- or exactly what she did.  But
7    there really were no specialists.
8        Q.  Okay.
9            So nobody had any special technical
10   expertise in any area?
11       A.  Well, everyone has expertise in
12   areas, but nobody was hired specifically for
13   one particular reason.
14       Q.  Okay.
15       A.  I mean, everyone had to be
16   creative, everyone had to be technical, and
17   everyone had to be able to collaborate in the
18   process.
19       Q.  Okay.
20           And when you said that everyone
21   collaborated together -- you previously
22   indicated that you worked out of your home
23   office --
24       A.  Yes.
25       Q.  -- is that correct?

---

21 (Pages 81 to 84)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

85

1    A.  Yes.
2    Q.  And that you may have seen some
3    employees locally but, for the most part, you
4    worked out of your home by yourself; is that
5    correct?
6    A.  Yes.
7    Q.  Okay.
8    How did everyone collaborate
9    together?
10   A.  Via computers.
11   Q.  Through e-mail?
12   A.  No.
13   Q.  Through some kind of video system,
14   like Skype?
15   A.  Yes.
16   Q.  We may return to this later, but
17   for now I'd like to look at some of the
18   vendors.
19   And I'm starting on Page 4.  I
20   probably won't go through all the vendors,
21   but -- okay.
22   On Page 7 there is a vendor there
23   that's listed, Steadfast Mass 10.
24   A.  Okay.
25   Q.  What goods or services did that

86

1    vendor provide?
2    A.  I have no idea.
3    Q.  Okay.
4    But you listed them on your initial
5    disclosures as being a vendor?
6    A.  Yes.
7    Q.  So do you remember that they were a
8    vendor?
9    A.  No.
10   Q.  Then why did you list them on the
11   initial disclosures?
12   A.  I must have found their name in
13   a -- in the PayPal expenses.
14   Q.  Okay.
15   So because you saw their name on
16   PayPal expenses, you added them to the list of
17   vendors?
18   A.  Yes.
19   Q.  But you don't remember if they
20   provided any goods or services?
21   A.  No.  Nor do I remember adding them
22   to the list.
23   Q.  Okay.
24   Going back to Page 5, you listed
25   Facebook as one of the vendors.

87

1    A.  Yes.
2    Q.  What goods or services did Facebook
3    provide?
4    A.  Multiple.
5    Q.  And what were those multiple goods
6    or services that Facebook provided?
7    A.  Social media platform for
8    communication, as well as advertising.
9    Q.  Okay.
10   So you might have had a social
11   media presence on Facebook?
12   A.  Yes.
13   Q.  Did you have to pay Facebook for
14   that social media presence?
15   A.  We didn't have to.
16   Q.  But you did pay Facebook for
17   advertising?
18   A.  Yes.
19   Q.  Okay.
20   On Page 8 you list Yan Li.
21   A.  Okay.
22   Q.  Do you remember what goods or
23   services Yan Li provided?
24   A.  No.
25   Q.  Do you remember whether Yan Li

88

1    provided goods or services for the campaigns?
2    A.  He must have, or she must have,
3    because otherwise I wouldn't have listed it.
4    Q.  Okay.
5    You don't remember whether they
6    provided goods or services, specifically?
7    A.  They must have, because they're
8    paid.  I don't remember -- this list was
9    created by going through the people that we
10   paid.
11   Q.  And this is people that you paid
12   from PayPal; is that correct?
13   A.  Yes.
14   Q.  Okay.
15   Page 4 lists a David Breckon Payne.
16   A.  Yes.
17   Q.  Do you remember what goods or
18   services David Breckon Payne provided?
19   A.  Not enough.  I remember -- I
20   remember him.  He's a character.
21   I can't remember exactly what he
22   was supposed to do, but he -- yeah.
23   Q.  Okay.
24   A.  He was -- he provided collaborative
25   services to -- sorry for laughing.  He was

22 (Pages 85 to 88)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

89

1    just a very funny guy.
2         Q.  When you say "he provided
3    collaborative services," could you explain
4    what --
5         (Simultaneous speaking.)
6         A.  Copy writing.  Social media.
7    Suggestions for the product.  Comedic relief.
8         Q.  Okay.
9         You listed him on here as software
10   development.
11        A.  He must have been paid on PayPal
12   for software development.  He's not -- he is
13   not a coder.
14        Q.  Okay.
15        He's not a coder, but he's listed
16   here as software development?
17        A.  So he must have been -- he must
18   have been listed from PayPal for software
19   development.
20        But -- but everybody was
21   developing -- everyone was basically doing the
22   same thing, or at least a lot of the same
23   thing.
24        Q.  And Time Warner Cable is listed on
25   Page 7.

---

90

1         What goods or services did Time
2    Warner Cable provide?
3         A.  Internet connectivity.
4         Q.  Internet connectivity for which
5    location?
6         A.  For my home office.
7         Q.  Anywhere else?
8         A.  No.
9         Q.  Okay.
10        Is that Internet connection
11   something you would have used for personal use
12   as well as business use?
13        A.  Yes.
14        Q.  Okay.
15        Still on this page, right above
16   Time Warner Cable there's a Tampta
17   Bochorishvili.
18        A.  Okay.
19        Q.  Do you know what goods or services
20   Tampta Bochorishvili provided?
21        A.  No.
22        Q.  Okay.
23        She's listed here as "software
24   development."
25        Do you know why you would have

---

91

1    written "software development" next to that
2    name?
3         A.  It must have been listed in PayPal
4    that way.
5         Q.  Do you remember specifically if
6    Tampta provided any goods or services for the
7    campaigns?
8         A.  The name doesn't ring a bell.
9         Q.  Okay.
10        Page 4, Aleksander Bobic.
11        Do you remember what goods or
12   services Aleksander Bobic provided?
13        A.  I believe Aleksander Bobic is a
14   software developer.
15        Q.  Okay.
16        What software would he have worked
17   on for the campaigns?
18        A.  I believe he sold software.  He
19   created his own software, I believe.
20        Q.  Do you remember what that software
21   did?
22        A.  No.
23        Q.  All right.
24        On Page 5 there's a Freefall
25   Agency.

---

92

1         Do you remember what goods or
2    services Freefall Agency provided?
3         A.  No.
4         Q.  Do you remember if they provided
5    goods or services for the iBackPack campaigns?
6         A.  I assume they did.  They're listed
7    here.
8         Q.  Do you remember working with them
9    at all?
10        A.  No.
11        Q.  Going back on Page 4, you list
12   Amazon.
13        A.  Okay.
14        Q.  Do you remember what goods or
15   services you purchased from Amazon?
16        A.  No.
17        Q.  Do you know if it would have been
18   campaign-related or not?
19        A.  Yes.
20        I mean, I think Amazon provided
21   cloud services.  So we used Amazon for cloud
22   services.
23        And they had some other programs
24   that I wished to engage in, software
25   programming and a -- outsource teams to help

---

23 (Pages 89 to 92)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

93

1   do things that -- I think it was more of an
2   idea than it actually worked.
3           You could get certain things done
4   and pay -- I think Amazon offered -- for $100
5   you could have a thousand people work on
6   something, I think.  That was their program.
7       Q.  Okay.
8           So did you contract labor through
9   Amazon?
10      A.  I believe so.  Yeah.
11      Q.  What type of labor did those people
12  provide?
13      A.  I can't remember, other than -- if
14  I remember right, it was -- it was a new
15  program where you could have an army of people
16  working for very cheap, to do anything you
17  want.
18          And I thought it was a great idea,
19  so I signed up for it.  I can't remember if we
20  used it or not.
21      Q.  Okay.
22          And on Page 7 -- sorry to be
23  flipping back and forth between pages.
24          On Page 7 there is a company,
25  SC Media.

---

94

1           Do you remember what goods or
2   services SC Media provided?
3       A.  No.
4       Q.  Do you remember if SC Media
5   provided goods or services for iBackPack of
6   Texas?
7       A.  No.
8       Q.  Okay.
9       A.  But they must have, because we paid
10  them.
11      Q.  Okay.
12          And on Page 5 you list a Jason
13  DeFilippo.
14      A.  Yes.
15      Q.  Do you remember if Jason DeFelippo
16  provided goods or services for iBackPack of
17  Texas?
18      A.  Yes.
19      Q.  What goods or services did Jason
20  DeFelippo provide for iBackPack of Texas?
21      A.  Same thing:  Collaborative.
22      Q.  So by "collaborative," you mean he
23  may have worked on some design?
24      A.  Yes.
25      Q.  Anything else?

---

95

1       A.  Well, design, ideas, the same as
2   everybody else.
3       Q.  Okay.
4           So what distinguishes Jason
5   DeFelippo?
6           Why did you list him as a vendor as
7   opposed to a contractor?
8           Was there any difference between
9   the work he provided versus the work your
10  contractors provided?
11      A.  Because he has his own company.
12      Q.  Okay.
13      A.  The others worked independently.
14  Jason had his own company.
15      Q.  Was the same thing true for David
16  Breckon Payne?
17      A.  I don't know.
18      Q.  Okay.
19          Why is he listed with the vendors,
20  then, as opposed to the contractor?
21      A.  Well, he should be listed with
22  the -- he's incorrectly listed.
23      Q.  All right.
24          MR. ROY:  We've come to a good
25  stopping point, so why don't we take a

---

96

1   recess for lunch.  It's 12:23 right now.
2           THE WITNESS:  Okay.
3           (Lunch Recess Taken.)
4       Q.  (BY MR. ROY)  All right.
5           Mr. Monahan, I want to shift gears
6   a little bit and talk about some of the
7   components that were in the iBackPack.
8       A.  Okay.
9       Q.  So, starting off with the backpack
10  itself, was the backpack something that the
11  company designed or was that something that
12  you selected from a vendor?
13      A.  We designed it.
14      Q.  And do you remember who was
15  involved in designing the backpack?
16      A.  It was a collaborative effort.
17      Q.  You don't remember any specific
18  person, though, that was involved in the
19  design of the backpack?
20      A.  No.  I mean, everybody -- everybody
21  was.  And then we also took feedback from the
22  backers.
23      Q.  Was there a vendor for the
24  backpack?
25      A.  Yes.  A number of them, actually.

---

24 (Pages 93 to 96)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

97

1      Q.  Do you remember who the vendors
2   were?
3      A.  I can't remember their name.
4      Q.  Okay.
5          When you say there was a number of
6   vendors, would -- would one vendor have been
7   responsible for one part of the backpack and
8   one for another?
9      A.  Well, there -- there are so many
10  different components of the backpack, so, yes.
11     Q.  Okay.
12         And I'm referring -- when I'm
13  talking about the backpack, I'm trying to
14  refer to the backpack --
15         (Simultaneous speaking.)
16     A.  The bag?
17     Q.  -- itself -- yeah, the bag, and not
18  the batteries --
19     A.  Okay.  Okay.
20     Q.  -- or the Kevlar plate or the
21  speakers.
22         So the bag itself, was there one
23  particular vendor for that?
24     A.  Not one, because we -- not just
25  one.

98

1      Q.  Okay.
2          Do you remember who those vendors
3   were?
4      A.  No.
5      Q.  And when you say "not just one," do
6   you remember how many there were?
7      A.  I think there were four.  Because
8   we got samples from a number.
9      Q.  Okay.
10         So you think you received samples
11  from four different vendors?
12     A.  I think so.
13     Q.  And did you select one of those
14  vendors to go with?
15     A.  No.
16     Q.  Okay.
17         So you never selected a final
18  vendor for the backpack?
19     A.  The plan was to use multiple
20  vendors.
21     Q.  Was the plan for multiple vendors
22  all to produce the same bag, or --
23     A.  (Indicating)
24     Q.  You're nodding your head.  Is that
25  a "Yes"?

99

1      A.  Yes.  Sorry.
2      Q.  They weren't going to be one of
3   them responsible for the straps, one of them
4   responsible for the zippers --
5      A.  No.
6      Q.  No?
7      A.  No.
8      Q.  Okay.
9          Did you order any of the bags?
10     A.  Yes.
11     Q.  How many did you order?
12     A.  I don't know the exact number.  I
13  can give you a range.
14     Q.  Okay.
15         What's the range?
16     A.  There were 200 people in the beta
17  program, so it would be around 200.
18     Q.  Okay.
19         Approximately --
20     A.  Approximately 200.
21         I know that we shipped out
22  200 boxes.  And I don't know exactly how many
23  got what, but, yes.
24     Q.  Okay.
25         So did every beta tester receive a

100

1   bag?
2      A.  Not everyone.  But other people did
3   get bags.  So, I mean, my guess is it's around
4   200.
5      Q.  Okay.
6          And you received approximately 200
7   bags?
8      A.  I think so.
9      Q.  How many bags do you have in
10  inventory now?
11     A.  Two.
12     Q.  And where are those located?
13     A.  At my house.
14     Q.  And when you say at your house,
15  you're referring to --
16     A.  409 Colonial.  409 Colonial,
17  Friendswood.
18     Q.  All right.
19         How about for the Kevlar plate?
20         Was that a component that your
21  company designed or was that something you
22  selected from a vendor?
23     A.  A little of both.
24     Q.  Could you explain?
25     A.  Yes.  We -- we can't design the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

101

1    Kevlar itself, so we -- we chose a -- we
2    looked at a number of vendors, but we chose
3    the -- the Chinese military, of all things.
4    And we designed the curve to it, but they
5    designed the plates.
6        Q.  Okay.
7            And how did you -- when you say you
8    designed the curve, was that for aesthetic
9    appeal or was that for tactical performance
10   capability?
11       A.  Well, lumbar support.
12       Q.  Okay.
13       A.  The -- the Kevlar plate has dual
14   purposes.  It both supports the back by
15   providing support, I mean, because when you
16   get the straps on, you've got the plate.  And
17   we needed it curved like this (indicating) so
18   that it fits the back of the body.
19       Q.  And did anyone on your team have
20   expertise with ergonomic design or anything
21   related to lumbar support?
22       A.  They could have.
23       Q.  But you don't remember anyone
24   having any --
25           (Simultaneous speaking.)

---

102

1        A.  No.
2        Q.  -- expertise with that?
3            And you don't remember hiring
4    anyone specifically for that role?
5        A.  No, I don't.
6        Q.  All right.
7            The Bluetooth speakers --
8        A.  Uh-huh.
9        Q.  -- is that another component of the
10   backpack?
11       A.  Uh-huh.
12       Q.  Was that a component that iBackPack
13   of Texas designed or was something you
14   selected from the vendor?
15       A.  We selected from a vendor.
16       Q.  And which vendor did you select it
17   from?
18       A.  I don't recall.
19       Q.  Did you order any of the Bluetooth
20   speakers?
21       A.  Yes.
22       Q.  How many did you order?
23       A.  I don't recall.
24       Q.  Do you remember approximately how
25   many?

---

103

1        A.  No.
2        Q.  Was this also something that went
3    out with the beta testers?
4        A.  Some.
5        Q.  But not all the beta testers?
6        A.  Yes.
7        Q.  Do you know how many Bluetooth
8    speakers you have in inventory right now?
9        A.  Less than ten.
10       Q.  And where are those located?
11       A.  Friendswood.
12       Q.  That's your house in Friendswood?
13       A.  Yes.
14           (Counsel conferring.)
15       Q.  (BY MR. ROY)  Mr. Hanks just
16   reminded me...
17           I think I forgot to ask you:  With
18   regards to the Kevlar plates, how many of
19   those did you order?
20       A.  I don't recall the exact amount.
21           Do you want me to give you a range?
22       Q.  Yes.  A range would be helpful.
23       A.  Less than 50, more than 25, I
24   think.
25       Q.  Okay.

---

104

1            So between 25 and 50?
2        A.  Yes.
3        Q.  And is this a product that went out
4    to some of the beta testers?
5        A.  Yes.
6        Q.  And how many Kevlar plates do you
7    have in inventory right now?
8        A.  I'm not sure.  Less than ten.
9        Q.  And where are those located?
10       A.  Friendswood.
11       Q.  And the backpack also has a
12   component that's a WiFi 3G/4G hotspot; is that
13   correct?
14       A.  Yes.
15       Q.  Was this something that your
16   company designed or was it something you
17   selected from a vendor?
18       A.  We selected it from a vendor.
19       Q.  Which vendor did you select it
20   from?
21       A.  We didn't finalize the vendor.  But
22   we evaluated a number of them, and still are
23   evaluating.
24       Q.  Did you order any of the WiFi
25   hotspots?

---

26 (Pages 101 to 104)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

105

1      A.  Yes.
2      Q.  How many did you order?
3      A.  More than 10, less than 25.
4      Q.  Do you remember which vendor you
5  ordered those from?
6      A.  AT&T. T-Mobile.
7          I'm just guessing.  I don't
8  remember which ones.
9      Q.  Okay.
10         But you think it would have been
11  one of the big telephone companies?
12     A.  T-Mobile. Verizon. AT&T.
13     Q.  Okay.
14         And how many of those do you have
15  in inventory right now?
16     A.  It's a good question.  Ten, maybe.
17  Five.
18     Q.  And are those also at your house in
19  Friendswood?
20     A.  Yes.
21     Q.  Okay.
22         And there was a car charger that
23  was one of the components, as well?
24     A.  Yes.
25     Q.  Was this a component that was

---

106

1  designed by your company or something you
2  selected from a vendor?
3      A.  A combo of both.  It was one from a
4  vendor that we adapted.
5      Q.  Okay.
6          How did you adapt it?
7      A.  By asking for some additional
8  pieces that were not on the original piece.
9      Q.  Do you know what some of those
10  additional pieces were that you asked for?
11     A.  Yeah.  A light that comes on when
12  it's charging.  And then Lightning and --
13  Lightning and Android plugs.
14         So it has a cable, and we added
15  another one on.  So it's got two.  So it
16  supports Lightning.
17         And the other thing is that it's
18  adjustable.  So you can unscrew the -- car
19  chargers don't fit like they should, so we had
20  them adjust it.  It's a minor change.
21     Q.  And who is the vendor for the car
22  charger?
23     A.  I can't remember.
24     Q.  And how many car chargers did you
25  order?

---

107

1      A.  Hundreds.
2      Q.  And how many do you have in
3  inventory now?
4      A.  Maybe 25.
5      Q.  So is this also a product that went
6  out to some of the beta testers?
7      A.  Yes.
8      Q.  And the 25 that you have, are those
9  at your house in Friendswood, Texas?
10     A.  Yes.
11     Q.  Okay.
12         And there was a zipper cable; is
13  that correct?
14     A.  Yes.
15     Q.  Was this a component that your
16  company designed or something that you
17  selected from a vendor?
18     A.  Selected from a vendor.
19     Q.  And do you know which vendor that
20  was?
21     A.  No.
22     Q.  Was it one vendor?
23     A.  Yes.
24     Q.  Did you order any of the zipper
25  cables?

---

108

1      A.  Yes.
2      Q.  How many did you order?
3      A.  Hundreds.  Maybe more than 500,
4  less than a thousand.
5      Q.  And is that something that went out
6  to beta testers, as well?
7      A.  Yes.
8      Q.  How many do you have in inventory
9  now?
10     A.  Maybe a hundred, maybe two.
11     Q.  When you say "maybe two," do you
12  mean maybe 200?
13     A.  Maybe 200, yeah.
14     Q.  Okay.
15         And there were Bluetooth
16  headphones; is that correct?
17     A.  We never -- we never ordered any
18  Bluetooth headphones.  We were looking at it.
19     Q.  Okay.
20         Was it something that was offered
21  with the iBackPack?
22     A.  Not guaranteed.
23     Q.  When you say "not guaranteed," did
24  you represent that we -- that you might order
25  the headphones if you received a certain

---

27 (Pages 105 to 108)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

109

1    number of orders, or --
2        A.  I don't -- I don't recall.
3        Q.  Okay.
4        A.  I think it was just something that
5    we were looking at --
6        Q.  Okay.
7        A.  -- but never -- I don't believe we
8    ever promised it or included it with any
9    offers.  I just think it was something that we
10   wanted to do.
11       Q.  Okay.
12           So there was no vendor and you
13   didn't receive any of the Bluetooth
14   headphones?
15       A.  We got some samples, but not a
16   large quantity.
17       Q.  All right.
18           Do you remember who you received
19   samples from?
20       A.  No, I don't.
21       Q.  And there was also a wall charger;
22   is that correct?
23       A.  Yes.
24       Q.  Was this a component that you
25   designed or your company designed, or was this

110

1    something you selected from a vendor?
2        A.  Something we selected from a
3    vendor.
4        Q.  And do you remember which vendor
5    that was?
6        A.  No.
7        Q.  Did you make an order for wall
8    chargers?
9        A.  Yes.
10       Q.  How many did you order?
11       A.  I believe more than 200, less than
12   500.
13       Q.  Was this something that went to
14   beta testers, as well?
15       A.  Yes.
16       Q.  How many do you have in inventory
17   now?
18       A.  Less than ten.
19       Q.  And are those ten located at your
20   house in Friendswood, Texas?
21       A.  Yes, they are.
22       Q.  Are there any components that I
23   failed to go over for the iBackPack, that you
24   remember?
25       A.  A great many.

111

1        Q.  Do you remember any in particular?
2        A.  Yes.
3            There's the -- do you have a -- can
4    I see that?
5            There's a light stick, for one.
6            Do you want me to describe what it
7    did or just say "light stick"?
8        Q.  "Light stick" is sufficient.
9        A.  Okay.  It's a light stick and a
10   combo cable.  I mean, it's a -- it's a data
11   transfer and a charger.  You can transfer data
12   and you can charge, and it's got a light built
13   in.
14       Q.  And was this a component that your
15   company designed or something you ordered from
16   a vendor?
17       A.  We ordered from a vendor.
18       Q.  And which vendor did you order it
19   from?
20       A.  I can't recall.
21       Q.  And how many did you order?
22       A.  Too many.
23       Q.  Okay.
24       A.  Probably more than 2,000, less than
25   five...

112

1        Q.  More -- so between 2,000 and 5,000?
2        A.  I believe so.
3        Q.  And was this something that went to
4    beta testers?
5        A.  Yes.
6        Q.  How many do you have in inventory
7    now?
8        A.  Less than 500 and more than 100.
9        Q.  And are those also located at the
10   Friendswood --
11           (Simultaneous speaking.)
12       A.  Yes.
13       Q.  -- Texas, house?
14       A.  Yes, they are.
15       Q.  Okay.
16       A.  You want me to tell you some of the
17   other ones?
18       Q.  Yes.  I'd appreciate it.
19       A.  There's the -- a credit card
20   battery --
21       Q.  Okay.
22       A.  -- which has 3,000 milliamps per
23   hour.  It's U.S. -- it's Lightning and IOS and
24   Android support.
25           And -- and then there's also the

---

28 (Pages 109 to 112)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5525

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

113

1    power tube, which is a lipstick-type little
2    battery, that we ordered, more than -- I think
3    more than three, four hundred and less than a
4    thousand.  But a lot.  And it has 3,000
5    milliamps.
6                There is a fan that goes into the
7    Lightning plug and the Android plug, so that
8    if it's hot you can put it in and it will blow
9    your face.
10               And we ordered more than a
11   thousand, less than 5,000, of it.
12               We ordered more than a thousand
13   cables -- not the zipper cable, but another
14   cable -- that had lights, such that you could
15   see when you're -- if you look across the
16   room, you can see if your phone is charging or
17   if your phone is fully charged.
18               And so we ordered, like I said,
19   more than a thousand, less than five, of it.
20               There were hundreds of the --
21   what's called the mama battery.  It's a 20,000
22   milliamps per hour battery that has six ports
23   and dual charge capability.
24               And we shipped out more than -- I
25   think everyone in the beta got one, if not

---

114

1    two, of those.
2        Q.  So that would be --
3            (Simultaneous speaking.)
4        A.  I think --
5        Q.  -- approximately 200?
6        A.  I think we ordered more --
7    certainly more than 200 and less than 500 of
8    that battery.
9            And then we had -- there are four
10   different types of batteries that had lamps in
11   them.  One had a mirror and a lamp.  Two
12   others had just lamps.
13           And they were of different charges.
14   I think they -- two of them were 5,000 and two
15   were 10,000.
16       Q.  And were those standard with the
17   iBackPack?
18       A.  No.  They were -- they were
19   optional.
20       Q.  Okay.
21           The fan, do you remember who the
22   vendor was for the fan?
23       A.  No, I don't.
24       Q.  Do you know how many you have in
25   inventory now?

---

115

1        A.  More than 200, less than 500.
2        Q.  And those are in Friendswood,
3    Texas?
4        A.  Yes.
5        Q.  And the cable that you mentioned,
6    was that a standard part of the backpack?
7        A.  I can't recall.
8        Q.  Okay.
9            Do you remember -- was that
10   something that your company designed or was
11   that something that you ordered from the
12   vendor?
13       A.  We ordered it from the vendor.
14       Q.  And do you remember who the vendor
15   was?
16       A.  No.
17       Q.  Do you know how many you have in
18   inventory now?
19       A.  Less than 50.
20       Q.  Okay.
21           With the batteries -- you mentioned
22   a credit card battery.
23       A.  Yes.
24       Q.  Was that a battery that your
25   company designed or something you selected

---

116

1    from a --
2            (Simultaneous speaking.)
3        A.  We selected.
4        Q.  -- vendor?
5            Do you remember who the vendor was?
6        A.  No.
7        Q.  Do you remember how many you
8    ordered?
9        A.  I believe more than a thousand and
10   less than 5,000.
11       Q.  And were those something that beta
12   testers received?
13       A.  Yes.
14       Q.  How many do you have in inventory
15   now?
16       A.  I'm not sure if all -- if all got
17   one, but, I mean, I know hundreds of them did.
18       Q.  Okay.
19           Do you know --
20           (Simultaneous speaking.)
21       A.  Hundreds were shipped out, at
22   least.
23           Do I have any left?
24           Maybe ten.
25       Q.  All right.

---

29 (Pages 113 to 116)

Monahan

FTC v. iBackPack of Texas, et al.                                      12/12/2019

117

1        And did the design for the credit
2   card battery change at all over time?
3        A.  No.
4        Q.  Was this a lithium-ion battery?
5        A.  I'm not sure.
6        Q.  Okay.
7        And for the power tube lipstick
8   battery, I believe you said you ordered 300 to
9   a thousand of those; is that correct?
10       A.  Uh-huh.
11       Q.  Was this something that your
12  company designed or something you selected
13  from a vendor?
14       A.  We selected it.
15       Q.  Do you remember who the vendor was?
16       A.  No, I don't.
17       Q.  Do you know if the vendor for the
18  power tube battery would have been the same
19  vendor as for the credit card battery?
20       A.  I don't believe it was.
21       Q.  You believe they were different
22  vendors?
23       A.  Yes, I do.
24       Q.  Do you know how many you have in
25  inventory now?

118

1        A.  Of the power tube?
2        Q.  Yes.  That's correct.
3        How many of the power tube do you
4   have in inventory now?
5        A.  Between a hundred and 250, maybe.
6   I'm just guessing.
7        Q.  Okay.  It's helpful to get a range.
8   And I appreciate you letting me know when
9   you're a little uncertain about the number.
10       Did the design for the lipstick
11  battery change over time?
12       A.  No.
13       Q.  Or -- sorry --
14       A.  No.
15       Q.  Was this a lithium-ion battery?
16       A.  I'm not sure.
17       Q.  And was this something --
18       (Simultaneous speaking.)
19       A.  I think so.
20       Q.  Was this something the beta testers
21  received?
22       A.  Yes.
23       In regards to the batteries, with
24  the Chinese, you never know what you're going
25  to get.  I mean, they'll tell you one thing

119

1   and it's not what you order.
2        Q.  Okay.
3        So you do remember that the vendor
4   for the batteries was a Chinese company?
5        A.  Yes.
6        Q.  And that's for -- is that for all
7   of the batteries that were involved with the
8   backpack?
9        A.  I'm not sure if it was all, but a
10  lot.
11       Q.  Do you remember if the credit card
12  battery vendor was a Chinese company?
13       A.  I believe so.
14       Q.  Do you remember if the power tube
15  vendor was a Chinese company?
16       A.  I'm not sure.
17       Q.  And you mentioned there was a mama
18  battery that was 20,000mAh.
19       A.  Right.
20       Q.  And that you may have ordered
21  approximately 200 to 500 of those; is that
22  correct?
23       A.  Yes.
24       Q.  And you said that all of the beta
25  testers received one of those?

120

1        A.  I think so.
2        Q.  Was this a battery that iBackPack
3   of Texas designed or was this something you
4   selected from a vendor?
5        A.  We selected it.
6        Q.  And do you remember who the vendor
7   was?
8        A.  No, I don't.
9        Q.  Do you remember if the vendor was a
10  Chinese company?
11       A.  No, I don't.
12       Q.  Do you remember how many you have
13  in inventory now?
14       A.  The mama battery?
15       Q.  Yes.  That's correct.
16       A.  Less than ten.
17       Q.  And did the design used for the
18  mama battery change at all over time?
19       A.  No, it didn't.
20       Q.  And was this a lithium-ion battery?
21       A.  Yes.
22       Q.  And did that change over time, that
23  it was a lithium-ion battery?
24       A.  No.
25       Q.  Okay.

30 (Pages 117 to 120)

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

121

1           You mentioned you sent a number of
2    backers to your beta testers.
3           Did you solicit any feedback from
4    your beta testers regarding the batteries?
5        A.  Yes, we did.
6        Q.  What type of feedback did you
7    receive from you beta testers?
8        A.  Phone calls.  Posts on their
9    Facebook page.  Social media feedback.
10       Q.  And were their comments positive?
11   Negative?
12       A.  Very positive.  Yeah.
13       Q.  And did you end up making any
14   changes to the batteries based off of the
15   feedback?
16       A.  No.
17       Q.  And the batteries that the beta
18   testers received, were these the same
19   batteries that you had claimed to use with the
20   finished product?
21       A.  Well, we'd hoped to.  I mean,
22   that's the whole purpose of a beta program.
23       Q.  You hadn't made any decision to
24   switch from those batteries, though?
25       A.  We hadn't made -- I'm sorry.  What?

---

122

1        Q.  You hadn't changed batteries as a
2    result of the beta testing program; is that
3    correct?
4           You said --
5        A.  No, we -- the feedback was very
6    positive, but we didn't make any changes, no.
7        Q.  All right.
8           MR. ROY:  I'm introducing a
9    document we've marked as Exhibit 8.
10          (Exhibit No. 8 Marked)
11       Q.  (BY MR. ROY)  This is an e-mail
12   chain between Doug Monahan -- yourself -- and
13   Natasha Hoskins at Indiegogo.
14          Mr. Monahan, is that your e-mail
15   address at the top?
16       A.  Yes.
17       Q.  And do you remember writing this
18   e-mail to Natasha?
19       A.  No.
20       Q.  Do you have reason to believe
21   anyone else would have written in e-mail?
22       A.  No.
23       Q.  Okay.
24          On Page -- if you turn the page to
25   628 -- the next page --

---

123

1        A.  (Witness complies.)
2        Q.  -- the e-mail at the very bottom
3    begins -- it's an e-mail dated July 12th and
4    it goes over onto the next page, 629.
5        A.  Okay.
6           Okay.
7        Q.  Did you send beta packages to
8    Indiegogo?
9        A.  Yes.
10       Q.  And you would have sent those
11   beta -- according to this e-mail, you would
12   have sent those beta packages sometime around
13   July 2016.
14          Is that correct?
15       A.  I guess so.
16       Q.  Do you remember what was in the
17   beta packages that you sent to Indiegogo?
18       A.  No, I don't.
19       Q.  All right.
20          In the second paragraph on this
21   page you wrote:  "The lithium-ion batteries
22   that were causing the problems have been
23   identified and fortunately none of the brands
24   were sourced by us.  We only work with
25   manufacturers who are certified by the Chinese

---

124

1    Government, stricter export rules and
2    procedures.  Thus, you have nothing to worry
3    about with the package we sent you."
4           This sounds like you sent some
5    batteries to Indiegogo.
6           Is that correct?
7        A.  Yes.
8        Q.  Do you remember what types of
9    batteries you sent to Indiegogo?
10       A.  No.
11       Q.  Since you mention in the first
12   paragraph that you sent them beta boxes, is it
13   likely that you sent them the same batteries
14   that you sent your beta testers?
15       A.  They could be mixed.  They -- they
16   would have some -- I mean, I think that we
17   would have sent the Indiegogo team more and
18   better -- I mean, sort of a wider supply.
19       Q.  All right.
20          So you think it would have included
21   the --
22          (Simultaneous speaking.)
23       A.  We would --
24       Q.  -- credit card --
25       A.  -- we would have included

---

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

125

1    everything.
2        Q.  Okay.
3            So, by "everything," you mean the
4    credit card style battery --
5        A.  Yeah.
6        Q.  -- the lipstick style battery --
7        A.  Everything.
8        Q.  -- the mama battery?
9        A.  Yes.
10       Q.  Were there any other batteries?
11       A.  Yes.
12       Q.  What were the other batteries?
13       A.  I can't recall.
14       Q.  Was there a 50,000mAh monolith
15   battery?
16       A.  Yes.
17       Q.  Was that a battery that iBackPack
18   of Texas designed or was that something they
19   chose from a vendor?
20       A.  We chose from a vendor.
21       Q.  Do you remember who the vendor was?
22       A.  No, I don't.
23       Q.  Do you remember if it was a Chinese
24   company?
25       A.  No, I don't.

---

126

1        Q.  Did you order any of the 50,000mAh
2    batteries?
3        A.  Yes.  I'm sure we -- I don't
4    remember using it, though.  And I would
5    have...
6            So, I mean, we had to have ordered
7    them, but I don't remember using them.
8        Q.  Okay.
9            Do you remember how many you would
10   have ordered?
11       A.  No, I don't.
12       Q.  Do you remember distributing any to
13   Indiegogo or beta testers or anyone else?
14       A.  No, I don't.
15       Q.  And do you have any in inventory
16   right now?
17       A.  No, I don't.
18       Q.  Was this a lithium battery?
19       A.  I believe so.
20       Q.  And did the design for the
21   50,000mAh monolith battery change at all over
22   time?
23       A.  Not that I'm aware of.
24       Q.  And was there also an 8,000mAh
25   secondary battery?

---

127

1        A.  Yeah.  A number of them.
2        Q.  Were these batteries that iBackPack
3    of Texas designed or something they selected
4    from a vendor?
5        A.  We selected from a vendor.
6        Q.  Do you remember who the vendor was?
7        A.  No, I don't.
8        Q.  Did you order any of the secondary
9    batteries?
10       A.  Yes.
11       Q.  Do you remember how many you
12   ordered?
13       A.  No, I don't.
14       Q.  Do you know how many you have in
15   inventory right now?
16       A.  Less than 25.
17       Q.  Would these have been batteries
18   that you distributed to beta testers?
19       A.  Yes.
20       Q.  Would you have distributed these
21   batteries to Indiegogo?
22       A.  Yes.
23       Q.  Were these the lithium-ion
24   batteries?
25       A.  I believe so.

---

128

1        Q.  Did the design of these batteries
2    change at all over time?
3        A.  No.
4        Q.  And do you remember if this was a
5    Chinese vendor?
6        A.  Probably.
7            MR. ROY:  I'm going to going to
8        show you another document, marked as
9        Exhibit 9.
10           (Exhibit No. 9 Marked)
11           MR. ROY:  Okay.  This is an e-mail
12       chain between Doug Monahan and various
13       members of Indiegogo.
14           The title of this e-mail seems to
15       be: "Making sure you got the batteries
16       and products."
17       Q.  (BY MR. ROY)  Is that your e-mail
18   address at the top, Mr. Monahan?
19       A.  Yes.
20       Q.  Do you remember sending this
21   e-mail?
22       A.  No.
23       Q.  Do you have reason to believe
24   anyone else would have sent this e-mail?
25       A.  Yeah.

---

32 (Pages 125 to 128)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

129

1  Q.  What's that reason?
2  A.  It doesn't look like my writing or
3  my fonts.
4  Q.  Would any one of your contractors
5  have sent an e-mail from your account on your
6  behalf?
7  A.  Yes.
8  Q.  Would they have done so at your
9  request?
10  A.  With my permission, but not -- not
11  specifically my request.
12  Q.  Okay.
13  And it appears that -- from reading
14  this e-mail, that you sent more beta materials
15  to Indiegogo.
16  Is that correct?
17  A.  It appears so.
18  Q.  All right.
19  And does it appear that those
20  packages contain batteries, as well?
21  A.  It appears so.
22  Q.  Do you know what types of batteries
23  you would have sent to Indiegogo in October
24  of 2016?
25  A.  No, I don't.

---

130

1  Q.  Would you have sent credit card
2  style batteries?
3  A.  Perhaps.
4  Q.  Would it have been batteries that
5  you would have used for the finished
6  iBackPack?
7  A.  Yes -- maybe.  I mean, things
8  change.  So you never know.  It depends upon
9  how the beta program went.
10  Q.  Okay.
11  But these were batteries that you
12  were planning to use with the finished
13  iBackPack.
14  A.  Yeah.
15  Q.  That's why they were part of the
16  beta program.
17  A.  Yeah.
18  Q.  Okay.
19  A.  I don't believe I wrote this at
20  all.
21  Q.  Okay.
22  But you believe someone, a
23  contractor that worked for you, would have
24  written this at your request?
25  A.  Not at my request, but just did it.

---

131

1  Q.  You said earlier that they would
2  have done it with your permission.
3  A.  Well, without my permission, as
4  part of the job.  So like at USAA, the
5  insurance company, they have a whole division
6  of people who respond on behalf of the CEO.
7  Q.  Okay.
8  And why do you believe you didn't
9  write this particular e-mail?
10  A.  The fonts.
11  Q.  Anything else?
12  A.  The wording.
13  Q.  Okay.
14  What is it about the wording that
15  makes you believe you didn't write this
16  e-mail?
17  A.  It just doesn't sound like me.
18  And then at the very bottom, you
19  see it's got like Igogo 00655, it's got a
20  number.  That's not -- the formatting of this
21  is not -- is not the way I -- I just don't
22  format stuff like this.
23  Q.  And when you say you don't format
24  stuff like this, you mean -- you're referring
25  to the font?

---

132

1  You don't -- you use different
2  sized --
3  (Simultaneous speaking.)
4  A.  The fonts.
5  Q.  -- fonts?
6  A.  The number at the bottom of the
7  page.
8  The FOIA.  I don't even know was
9  that means.
10  Q.  And just to be clear, the "FOIA
11  confidential treatment requested" and the
12  Igogo number at the bottom are likely items
13  that were added to the e-mail.
14  This is material that was produced
15  by Indiegogo, so that would not have appeared
16  in the original e-mail?
17  A.  Oh, I see.  Okay.
18  Q.  Does that change your answer at
19  all?
20  A.  Well, it -- it doesn't change the
21  answer, but I definitely didn't recognize
22  those.
23  Now I -- I understand why.  I just
24  thought it was whoever wrote it added those
25  in.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

133

1       Q.   Okay.
2            So do you still believe that
3    someone else wrote this e-mail, or do you
4    think you might have written this e-mail?
5       A.   Well, I'm not sure.  I mean, I
6    can't say.  I'm not sure.  It doesn't look
7    like I did.  It doesn't look something
8    I'd write, but...
9       Q.   Okay.
10      A.   You know, somebody -- if I did
11   write it, which I don't remember, someone
12   changed the -- the fonts.  The format.
13      Q.   Okay.
14           MR. ROY:  Let me show you another
15   e-mail that's marked as Exhibit No. 10.
16           (Exhibit No. 10 Marked)
17           MR. ROY:  This is Exhibit No. 10.
18   This is an e-mail chain between Doug
19   Monahan and various members of
20   Indiegogo.
21      Q.   (BY MR. ROY)  Is that your e-mail
22   address at the top?
23      A.   Yes.
24      Q.   Okay.
25           Do you remember -- do you want to

---

134

1    take a minute to familiarize yourself with
2    this and see if you remember writing this
3    e-mail?
4            (Pause.)
5       A.   No, I don't.
6       Q.   You don't remember writing the
7    e-mail?
8       A.   No.
9       Q.   Do you have any reason to believe
10   you didn't write this e-mail?
11      A.   No.  But I don't have any reason to
12   believe I did, either.
13      Q.   Okay.
14           On the bottom, marks Igogo 202, so
15   the second page there, is that your name at
16   the bottom of the e-mail?
17      A.   Yes.
18      Q.   Do you think -- would your name
19   appearing there -- it's likely you would have
20   written this e-mail, or do you think someone
21   from your team might have written an e-mail on
22   your behalf?
23      A.   Someone from my team might have
24   written it on my behalf.  That's -- that's
25   standard.

---

135

1       Q.   You don't have any reason to
2    believe that you didn't write it, though?
3       A.   No.
4       Q.   Okay.
5            So did you tell Indiegogo in early
6    November or late October that the backpack had
7    been delayed in being delivered because of
8    problems with the battery?
9       A.   I don't recall.  Possibly.
10      Q.   Okay.
11           On Page -- if you look at the
12   bottom on Page Igogo 24 -- you're on that
13   page?
14      A.   Yes.
15      Q.   If you look at the bottom right, it
16   has --
17      A.   Okay.  Yes.
18      Q.   -- Bates marks.
19           So the third paragraph down begins:
20   "The batteries were also selected or built
21   from scratch.  Unfortunately, little did we
22   know, could have known, would have known that
23   the types of batteries we had chosen for every
24   single bag ran the risk of a major fire."
25           You go on to say:  "While we

---

136

1    planned on shipping far earlier, the chance
2    that someone could lose their life, be scarred
3    forever, we deemed far too risky.  In case
4    you're unfamiliar with the lithium-ion battery
5    snafu from earlier this year, please find a
6    list of the links in the PDF."
7            So does this appear to be saying
8    that the shipment of the backpack was delayed
9    because of problems with batteries?
10      A.   Yes.
11      Q.   And on Page 25, the next page over,
12   on the second full paragraph that begins,
13   "Additionally, I have spent three full hours
14   speaking with various departments at UPS and
15   DHL in order to obtain a list of the hundreds,
16   if not thousands, of the products that we have
17   already shipped.  We are well past the
18   prototype phase and are now in the full
19   production and shipping phase."...
20           And then continuing on Page 26, the
21   paragraph begins:  "Following Samsung's lead,
22   we have -- are positive the new batteries
23   being offered, shipped and provided to the
24   backers are 100 percent safe.  There are zero
25   chances of any of the products we are offering

---

34 (Pages 133 to 136)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

137

1    through IGG not being 100 percent safe.
2            "At a tremendous expense
3    financially, we've been thoroughly testing
4    each and every component again.  Each of those
5    tests are expensive, time-consuming, but
6    necessary, and have slowed down shipment of
7    perks.
8            "But despite all the battery
9    issues, as you'll see from the UPS documents,
10   hundreds, if not thousands, of the backers
11   have already received their perks as
12   promised."
13           Have any of the backers received
14   their perks, Mr. Monahan?
15       A.  We're still in beta.
16       Q.  Okay.
17           But here you seem to be telling
18   Indiegogo that you've already shipped perks to
19   consumers, as promised.
20           Is that correct?
21       A.  This letter does.
22       Q.  Okay.
23           But you hadn't shipped perks at the
24   time?
25       A.  No, we hadn't.

---

138

1        Q.  Okay.
2            Going back to Page 25, the third
3    full paragraph, at the end of the paragraph it
4    says: "Our taxes are paid and the corporate
5    structure is in good standing."
6        A.  Yes.
7        Q.  Has iBackPack of Texas, LLC, paid
8    its taxes for 2015?
9        A.  I don't recall.
10       Q.  Has iBackPack of Texas, LLC, paid
11   its taxes for any of the subsequent years?
12       A.  I don't recall.
13       Q.  Would your accountant have been
14   responsible for filing taxes on behalf of
15   iBackPack of Texas?
16       A.  Yes.
17       Q.  Would your accountant have
18   knowledge of whether iBackPack of Texas filed
19   its taxes?
20       A.  I would hope so.
21       Q.  Would you have any records of
22   iBackPack of Texas paying its taxes?
23       A.  Do I?
24       Q.  Yes.
25           Do you have any tax records for

---

139

1    iBackPack of Texas, LLC?
2        A.  Well, I remember sending you guys
3    the tax returns, so, yeah.
4        Q.  You sent the tax returns, but I
5    believe at the time you indicated that
6    iBackPack of Texas hadn't paid its taxes yet.
7        A.  Well -- I don't know.  I remember
8    sending the tax returns to you.
9        Q.  Okay.
10           But you don't recall whether the
11   taxes were paid?
12       A.  No, I don't.
13           (Exhibit No. 11 Marked)
14           MR. ROY:  I'm handing you a
15   document marked Exhibit No. 11.
16           THE WITNESS:  Are these for me?
17           MR. ROY:  Are you going to need to
18   keep these?
19           THE REPORTER:  Yes.
20           (Phone ringing.)
21           THE WITNESS:  Let me turn this off.
22           (Pause.)
23           THE WITNESS:  Okay.
24           MR. ROY:  Okay.
25           THE WITNESS:  Exhibit 11.

---

140

1            MR. ROY:  Exhibit 11.
2        Q.  (BY MR. ROY)  If you flip to the
3    green tab, it's also Page 9 on the top right.
4        A.  Yes.
5        Q.  This document is updates to the
6    iBackPack campaign.
7        A.  Okay.
8        Q.  The iBackPack Indiegogo campaign,
9    specifically.
10           Are you familiar with this document
11   at all, with the updates that are posted on
12   here?
13       A.  No.
14       Q.  Okay.
15           Do you know who Hector Armenta is?
16       A.  I saw the name earlier.
17       Q.  I believe he was listed on your
18   list of contractors.
19           Is that correct?
20       A.  Yes.
21       Q.  Okay.
22           So did he make posts or comments or
23   updates on behalf of iBackPack?
24       A.  Yes.  Apparently.
25       Q.  Okay.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

141

1          And this particular update is from
2    November 14th, 2016.
3          The first paragraph says:
4    "Regarding some of the comments that have been
5    made about myself and our company, I find it
6    rather necessary to update the status of the
7    project.  The main reason of the delay stands
8    on my decision of not shipping a product that
9    could cause great physical harm and even
10   death."
11        A.  Okay.
12        Q.  "Due to the rising problems of
13   battery systems catching fire, we did not mean
14   to cause any delays, but the safety of our
15   supporters... (sic)
16        "Unfortunately, this has resulted
17   to a huge loss of money, time and effort.  I
18   can assure you that this decision was not
19   easily made."
20        A.  Okay.
21        Q.  And on the next page, the paragraph
22   that begins, "There were problems..."
23        "No doubt, we were not able to
24   ascertain the exact issue.  I made the
25   decision as CEO of the company that I wasn't

---

142

1    going to ship the iBackPack with batteries
2    that possibly had major problems.
3         "Our backers were not happy.  Thus
4    we announced an updated planned shipment date
5    of December 2016."
6         And then on the Page 11 there, it's
7    signed, "Doug Monahan."
8         A.  Okay.
9         Q.  Did you write this update?
10        A.  I don't remember.
11        Q.  Do you have any reason to believe
12   you didn't write this update?
13        A.  Yes.
14        Q.  What reason is that?
15        A.  It's posted by Hector Armenta.
16        Q.  And would Hector Armenta have
17   written this post on your behalf or on behalf
18   of the company?
19        A.  On behalf of the company.
20        Q.  Okay.
21        So in November, iBackPack of Texas
22   was telling its backers that the product
23   wouldn't ship until December of 2016 because
24   of battery issues.
25        Is that correct?

---

143

1         A.  That's what this letter says, yes.
2         Q.  Is that what you told consumers at
3    the time?
4         A.  I don't remember telling consumers
5    anything.
6         Q.  Okay.
7         Do you remember telling backers
8    anything?
9         A.  Not me, personally.
10        Q.  Do you remember the company telling
11   the backers anything?
12        A.  From what I'm reading here -- I
13   mean, I have no idea what all these people
14   would say.
15        Q.  Do you remember making the decision
16   to delay the production of the iBackPack?
17        A.  Yeah.  For sure.  I definitely did
18   that.
19        Q.  Okay.
20        So while the company was telling
21   backers that production was delayed because of
22   battery issues, they were also telling
23   Indiegogo that the product was being shipped
24   and that all the perks were being satisfied;
25   is that correct?

---

144

1         A.  That's what these letters say.
2         Q.  Okay.
3         Let's go to the yellow tab, or
4    Page 5 of this document.
5         A.  Okay.
6         Q.  Okay.
7         And this is a comment on
8    January 11th, 2017.  It says it's posted by
9    Doug Monahan.
10        A.  Uh-huh.
11        Q.  Did you write this comment?
12        A.  Possibly.
13        Q.  Do you have any reason to believe
14   you didn't write this comment?
15        A.  No.
16        I have no reason to believe I did,
17   either, based upon all these other ones.
18        Q.  Who else would have had access to
19   your account that could have posted that on
20   your behalf?
21        A.  Everybody on the team.
22        Q.  And they would have done so at your
23   direction or with your permission?
24        A.  Not at my direction, but with
25   permission to answer questions.  I mean, I

---

36 (Pages 141 to 144)

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                          12/12/2019

---

145

1    believe they all posted as me.
2         Q.  And you authorized them to do so?
3         A.  Yes.
4         Q.  Okay.
5              This update says, "The iBackPack
6    has not been canceled.  It will be delivered
7    as soon as we feel the product is 100 percent
8    safe.  The anticipated delivery date is Fall
9    2017."
10        A.  Okay.
11        Q.  So it appears that here you're
12   still telling consumers that the batteries
13   still were not safe.
14             Is that correct?
15        A.  That's what this says.
16        Q.  Okay.
17             And then later on down you write,
18   at the end of this paragraph:  "We are not
19   going to ship the A backpack without the
20   electronic components, for that is not the
21   iBackPack."
22             Is that correct?
23        A.  That's what it says.
24        Q.  Had any consumers asked to receive
25   just the backpack?

---

146

1         A.  Yes.
2         Q.  And you decided not to ship them
3    just the backpack?
4         A.  Yes.
5         Q.  Okay.
6              Let's turn to Page 3.
7         A.  Okay.
8         Q.  It has a post, February 9th, 2017,
9    by Doug Monahan.
10             Do you want to take a second to
11   familiarize yourself with that?
12        A.  Okay.
13        Q.  Okay.
14             Did you write this post?
15        A.  I don't remember writing it.
16        Q.  Do you have any reason to believe
17   you didn't write it?
18        A.  Yes.
19        Q.  What reason is that?
20        A.  Because everybody on the team was
21   writing things with my name on them.  It
22   doesn't look -- didn't like my writing, but
23   you never know.
24        Q.  Okay.
25             In the first paragraph it says, "As

---

147

1    you may have noticed, there were some problems
2    with our website.  It was hacked."
3         A.  Yeah.
4         Q.  "A great majority of the problems
5    were fixed and the remaining are being worked
6    on.  You can access only the page that was put
7    up while the real site is being brought
8    completely back to life."
9              Could you explain what this hacking
10   incident was?
11        A.  I have no idea.
12        Q.  You have no idea what happened?
13        A.  Huh-uh.
14        Q.  Do you recall at all your website
15   being hacked?
16        A.  No.  I mean, it doesn't surprise
17   me, though.
18        Q.  It doesn't surprise you, but you
19   don't specifically remember your website being
20   hacked?
21        A.  I don't remember it.
22        Q.  Okay.
23             Mr. Monahan, you delivered various
24   batteries to the Federal Trade Commission in
25   February 2019 --

---

148

1         A.  Uh-huh.
2         Q.  -- is that correct?
3         A.  Yes.
4         Q.  Do you remember which batteries you
5    sent to the Federal Trade Commission?
6         A.  No.
7         Q.  Would these have been the same
8    batteries that you were considering using with
9    the finished iBackPack?
10        A.  The ones that we were considering,
11   yes.
12        Q.  So these might have been the same
13   batteries that beta testers had received and
14   Indiegogo had received?
15        A.  Yes.
16        Q.  Did you warn the FTC that those
17   batteries weren't safe to use?
18        A.  No.
19        Q.  Did you tell the FTC that those
20   batteries were safe to use?
21        A.  I don't believe so.
22             I would think they were, though,
23   because it had been years and none of them had
24   caught fire.
25        Q.  Okay.

---

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

149

1          So you don't believe there's any
2     problems with the batteries?
3          A.  I wouldn't have shipped them if I
4     thought there was a problem.
5          Q.  Okay.
6          What about the batteries that you
7     sent to the beta testers?
8          Did you ever warn beta testers not
9     to use those batteries?
10         A.  No.
11         Q.  Did you ever warn Indiegogo not to
12    use the batteries that they sent you?
13         A.  No.
14         Q.  Okay.
15         Going back to the type of battery
16    you used -- in those e-mails I showed you a
17    minute ago, you -- you or someone on your team
18    claimed that there were problems with
19    lithium-ion batteries.
20         Is that correct?
21         A.  Yes.
22         Q.  Okay.
23         So were lithium-ion batteries used
24    for all the batteries?
25         A.  I don't recall.

---

150

1          (Exhibit No. 12 Marked)
2          Q.  (BY MR. ROY)  I'm showing you a
3     document marked Exhibit 12.
4          A.  Are we done with this one?
5          Q.  Yes, we are.
6          A.  All right.
7          All right.  Got it.
8          Q.  This is a Facebook screenshot with
9     the name Doug Monahan.  The date is May 13th,
10    2016.
11         Is that your picture at the top?
12         A.  Yes, it is.
13         Q.  And is this your Facebook account
14    that wrote that message?
15         A.  I'm not sure.  I mean, I don't know
16    if it's Facebook.
17         I mean, are you positive this is
18    Facebook?
19         Q.  Yes.
20         A.  It looks like my Facebook account,
21    yeah.
22         Q.  Okay.
23         Did you write this post?
24         A.  I don't remember doing it.
25         Q.  Do you have any reason to believe

---

151

1     that it wasn't you who wrote the post?
2          A.  Yeah.
3          Q.  And what reason is that?
4          A.  Because I wasn't managing my
5     Facebook account.
6          Q.  Okay.
7          Who was managing your Facebook
8     account?
9          A.  It was just various people.
10         Q.  Various --
11         A.  Various.  Anybody who could get to
12    it.
13         Q.  Various contractors that worked for
14    you?
15         A.  Yes.
16         Q.  And they would have written posts
17    on there on behalf of iBackPack of Texas?
18         A.  Uh-huh.
19         Q.  Okay.
20         So this --
21         A.  "Yes," I mean.
22         Q.  So this comment says, "Lithium-ion
23    batteries have been causing huge issues.
24    Thank God we went with polymer batteries
25    versus lithium-ion.

---

152

1          "Sometimes you can just get lucky.
2     I wish I could say that I foresaw the
3     problems, but it was just luck.  The polymers
4     seemed better to me, smaller and more
5     powerful.  It never dawned on me the others
6     could possibly blow up or cause fires."
7          A.  Okay.
8          Q.  So, based on reading this document,
9     do you believe you may have used polymer
10    batteries instead of lithium-ion?
11         A.  No.
12         Q.  So then why did this comment
13    indicate that you used polymer batteries?
14         A.  I have no idea.
15         Q.  So you believe that this comment
16    was untruthful?
17         A.  Yes.
18         Q.  Okay.
19         (Exhibit No. 13 Marked)
20         MR. ROY:  I'm handing you a
21    document that's been marked Exhibit 13.
22         THE WITNESS:  What's this in
23    regards to?
24         I mean, which -- for -- I mean, it
25    says "polymer batteries," but it doesn't

---

38 (Pages 149 to 152)

FTC v. iBackPack of Texas, et al.                                          12/12/2019

---

153

1    say whether the -- this is for the beta
2    program.  It doesn't say, you know,
3    whether they're -- it doesn't say
4    anything.  It just says "polymer."
5        Do you know what it refers to?
6        MR. ROY:  I only know what's
7    written on there, Mr. Monahan.  It talks
8    about beta unit, though, I believe.
9        Q.  (BY MR. ROY)  You see there at the
10   top where it talks about beta units?
11       A.  Okay.
12       Q.  The document I handed you, that's
13   marked Exhibit 13 --
14       A.  Right.
15       Q.  -- this is a snapshot or screenshot
16   of the "Comments" section from the iBackPack
17   Indiegogo campaign.
18       A.  Okay.
19       Q.  Mr. Monahan, is that your account
20   that was used to write the top comment and the
21   bottom comment on this page?
22       A.  It appears so.
23       Q.  Okay.
24           And it indicates "Doug Monahan" and
25   "Project owner"?

---

154

1        A.  Uh-huh.
2        Q.  So that would appear to be your
3    account?
4        A.  Yes.
5        Q.  Okay.
6            Do you want to take a second to
7    familiarize yourself with the bottom comment?
8        A.  Would you read it to me?
9    I can't read it.
10       Q.  Okay.
11           It says, "The credit card style
12   batteries, 3,000mAh" --
13       A.  Uh-huh.
14       Q.  -- "lipstick style batteries, light
15   sticks and various other polymer-ion batteries
16   are on their way from Shenzhen."
17       A.  Uh-huh.
18       Q.  "Will be packaging and shipping as
19   quickly as possible."
20       A.  Okay.
21       Q.  "There are also six more Kevlar
22   plates coming our way for field testing."
23       A.  Okay.
24       Q.  Did you write this comment?
25       A.  I don't recall.

---

155

1        Q.  Do you have any reason to believe
2    you didn't write this comment?
3        A.  I can't be sure what was written by
4    me.  So my answer, if you're going to keep
5    asking me that question, will always be the
6    same, which is:  I don't know who wrote these.
7        So, yes, I mean -- ask me the
8    question again.
9        But, I mean, it's -- you're asking
10   me the same question.
11       Q.  Yes.
12       A.  I can't say I wrote it.  I can't
13   say I didn't.
14       Q.  Okay.
15           And --
16       A.  I don't recall writing it.
17       Q.  And who else would have had access
18   to your --
19           (Simultaneous speaking.)
20       A.  Anybody on the team.
21       Q.  If you could wait until I finish
22   the question.
23       A.  Oh, I'm sorry.
24       Q.  Who else would have had access to
25   your Indiegogo account that could have posted

---

156

1    that?
2        A.  Anyone on the team.
3        Q.  And they would have written that
4    comment on your behalf or on behalf of the
5    company?
6        A.  Yes.
7        Q.  With your permission?
8        A.  Yes.
9        Q.  Okay.
10           So that comment indicates that the
11   credit card style batteries, the lipstick
12   batteries and the light sticks and various
13   other batteries were polymer-ion.
14           Is that correct?
15       A.  I can't read it.  I suppose so.
16       Q.  I'll read it to you again, sir.
17       A.  Okay.
18       Q.  It says, "The credit card style
19   batteries, 3,000mAh, lipstick style batteries,
20   light sticks and various other polymer-ion
21   batteries are on their way from Shenzhen."
22       A.  Okay.
23       Q.  So does that indicate that the
24   batteries you purchased were polymer-ion
25   batteries?

---

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

157

1          A.  Yes, it does.
2          Q.  Were the batteries you ordered
3   polymer-ion batteries?
4          A.  No.  I don't believe so.
5          Q.  So this was an untruthful statement
6   when it was made?
7          A.  I -- I -- it appears so.
8          (Exhibit No. 14 Marked)
9          MR. ROY:  I'm handing you a
10  document that's marked Exhibit 14.
11         THE WITNESS:  Okay.
12         MR. ROY:  This is an e-mail chain
13  between Doug Monahan and Udayan from
14  Indiegogo.
15         THE WITNESS:  Okay.
16         Q.  (BY MR. ROY)  So on the first page
17  here -- well, first off:  Did you get a chance
18  to read part of the e-mail, Mr. Monahan?
19         A.  Yes.
20         Q.  Did you write this e-mail?
21         A.  I don't recall.
22         Q.  Do you have any reason to believe
23  you didn't write this e-mail?
24         A.  Yes.
25         Q.  What reason is that?

---

158

1          A.  Because everybody on the team was
2   writing everybody's e-mails.  I mean -- you
3   know.  It could have been written by me.  It
4   could have been written by someone else.
5          Q.  But you don't have any specific
6   reason to believe that this wasn't your
7   writing?
8          A.  Nor do I have a reason to believe
9   that it was.
10         Q.  Okay.
11            So in the third full paragraph
12  you (sic) wrote:  "Things are great at the
13  company.  We have a rock-solid customer
14  service team of seven people who are keeping
15  up with posts and starting our beta program
16  this week."
17         A.  Uh-huh.
18         Q.  "The lithium-ion battery snafu
19  where lithium-ion batteries started catching
20  on fire has slowed us down a bit, so we had to
21  switch all of our batteries from lithium-ion
22  to polymer.  But our backers understand."
23            So this e-mail indicates that your
24  company switched from lithium-ion battery to
25  polymer battery.

---

159

1             Is that correct?
2          THE WITNESS:  That's what it
3   indicates, yeah.
4             Well, let me see.  Let me read it.
5          (Pause.)
6             That's what it says.
7          Q.  (BY MR. ROY)  Did your company
8   switch from lithium-ion batteries to polymer
9   batteries?
10         A.  No.  I don't believe we could find
11  them.
12         Q.  So, once again, that was an
13  untruthful statement when it was made?
14         A.  I can't say it's untruthful.  I
15  don't remember writing it, nor -- I can't say.
16         Q.  But you do know for sure that the
17  company hadn't switched from polymer -- sorry.
18            But you do know for sure that the
19  company had not switched from lithium-ion
20  batteries to polymer batteries, correct?
21         A.  The company is in beta stage,
22  meaning beta is -- everything is being
23  evaluated.
24         Q.  Okay.
25         A.  That's what a beta program is.

---

160

1          Q.  Had the company switched from
2   lithium-ion batteries to polymer batteries?
3          A.  The company was testing every
4   battery we possibly could, lithium-ion,
5   polymer.
6          Q.  Testing batteries?
7          A.  Yes.
8          Q.  Had they switched batteries?
9          A.  You're switching batteries -- the
10  whole beta program is testing batteries and
11  switching batteries.
12         Q.  Okay.
13            You indicated earlier that the
14  company hadn't changed their batteries.
15         A.  I -- (pause)...
16            The great majority of the batteries
17  are lithium, and polymer batteries are very
18  good, too.
19            But there's -- I can't answer that.
20         Q.  And which batteries are you saying
21  were polymer batteries?
22         A.  I'm not saying any are polymer.
23  I'm saying this says that polymer batteries...
24         Q.  Okay.
25            Were you aware that there were

---

40 (Pages 157 to 160)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

161

1    problems with lithium-ion batteries in --
2         (Simultaneous speaking.)
3    A.  Very much so.
4    Q.  -- In June of 2016?
5    A.  Very much so, yeah.
6    Q.  Did you make efforts to switch from
7    lithium-ion batteries to a different type of
8    battery --
9         (Simultaneous speaking.)
10    A.  I would --
11    Q.  -- in --
12    A.  -- I would have recommended it,
13    yeah.
14    Q.  You would have recommended it.
15    Weren't you the CEO of the company?
16    A.  Yeah.
17    Q.  So did you tell people to change to
18    a different type of battery?
19    A.  Yes.
20    Q.  And did you change to a different
21    type of battery?
22    A.  No.  We never got our batteries.
23    Are you talking about the beta
24    program?
25    Q.  I'm talking about the batteries

---

162

1    that you were going to use with the iBackPack.
2    A.  It wasn't finalized.
3    Q.  Okay.
4    And the battery --
5    A.  Until we ship, no decision is
6    final.
7    Q.  So there is no final battery?
8    A.  No.
9    Q.  And did you ever order enough
10    batteries for all the consumers -- for all the
11    backers?
12    A.  No.
13    Q.  Okay.
14    A.  You know, until you -- no.
15    MR. ROY:  Why don't we take a
16    break.
17         (Brief Recess Taken.)
18    MR. ROY:  Okay.
19    Mr. Monahan, it is 3:03.  We
20    started that break twenty minutes ago.
21    Just so you know, we're entitled to
22    seven hours of deposition time.  I hope
23    we don't need to take all that time, but
24    in the interest of getting all of us out
25    of here at a reasonable hour, if we

---

163

1    could keep any future breaks to a
2    smaller timeframe.
3    THE WITNESS:  It's six hours.
4    MR. ROY:  Seven hours, sir.
5    THE WITNESS:  Six.
6    MR. ROY:  I'm not going to argue
7    with you right now, Mr. Monahan.
8    THE WITNESS:  Well, I read the
9    Texas Rules of Civil Disclosure right
10    before I came here.
11    MR. ROY:  And we are in Federal
12    Court.
13    THE WITNESS:  We're in Texas.
14    Q.  (BY MR. ROY)  Mr. Monahan, could
15    you describe what the MOJO bag is or what it
16    was supposed to?
17    A.  No.  Let's talk about the issue
18    about Texas --
19    Q.  Mr. Monahan, I'm conducting the
20    deposition today, not you.
21    A.  Well, I'm leaving in (sic)
22    six hours, so...
23    Q.  Could you describe what the MOJO
24    bag is or what it was supposed to be?
25    A.  It's a -- a -- not very well.  It's

---

164

1    a bag.
2    Q.  Was this a bag that iBackPack of
3    Texas designed or something that you selected
4    from a vendor?
5    A.  A combination of both.
6    Q.  Could you explain?
7    A.  Part of it was designed and part of
8    it was found.
9    Q.  Okay.
10    Which part of it was found?
11    A.  I can't recall.
12    Q.  Which part of it was designed?
13    A.  I can't recall.
14    Q.  Did you identify a vendor to create
15    the iBack- -- sorry.
16    Did you identify a vendor to create
17    the MOJO bag?
18    A.  Numerous vendors were selected.
19    Q.  When you say "numerous vendors were
20    selected," do you mean you picked one to
21    create the final product or you sampled
22    numerous vendors?
23    A.  We sampled numerous vendors.
24    Q.  Did you select a vendor to produce
25    the final bag?

---

41 (Pages 161 to 164)

Monahan

FTC v. iBackPack of Texas, et al.                                     12/12/2019

---

165

1    A.  No.
2    Q.  What steps did you take towards
3  producing the MOJO bag?
4    A.  I can't recall.
5    Q.  You can't recall any steps that you
6  took to create the bag?
7    A.  There was a beta program, just like
8  the others.
9    Q.  Did you make a decision not to
10  produce the MOJO bag?
11    A.  No.
12    Q.  So you might still create the MOJO
13  bag?
14    A.  No.
15      We refunded everybody's money.
16    Q.  Okay.
17      At what point did you decide that
18  you weren't going to create the MOJO bag?
19    A.  The MOJO bag was just forgotten
20  about it.  It wasn't intentional.
21    Q.  You just forgot about the MOJO bag?
22    A.  Uh-huh.
23    Q.  So you received thousands of
24  dollars from backers and you just forgot to
25  produce the bag?

---

166

1    A.  Yes.
2    Q.  Okay.
3      MR. ROY:  I'm going to show you --
4  (pause) --
5      THE REPORTER:  Fifteen.
6      MR. ROY:  I'm going to show you a
7  document marked Exhibit 15.
8      (Exhibit No. 15 Marked)
9      MR. ROY:  These are updates on the
10  iBack- -- I'm sorry.
11      These are updates on the MOJO
12  Indiegogo campaign.
13    Q.  (BY MR. ROY)  If you turn to the
14  second page, there is an update there.  It
15  says that it's posted by Doug Monahan,
16  September 23rd, 2016.
17      Did you write this update,
18  Mr. Monahan?
19    A.  I don't recall.
20    Q.  Do you have any reason to believe
21  you didn't write this update?
22    A.  Yes.
23    Q.  What reason is that?
24    A.  Because everyone on the team was
25  authorized to send out letters with my name on

---

167

1  it.
2    Q.  So you believe that this post would
3  have been written either by yourself or by one
4  of the contractors who performed work for
5  iBackPack of Texas?
6    A.  Yes.
7    Q.  Okay.
8      And in this update you write:  "We
9  are in the progress (sic) of manufacturing the
10  iBackPack and would like to be able to close
11  out this campaign.  In the spirit of fairness
12  to all of those who pledged for the MOJO
13  product, we are willing to offer the iBackPack
14  the same.  If you're interested in same, send
15  an e-mail to Hayley.Belcheck@iBackPack.mobi,
16  the following statement..."
17      So did you offer MOJO users the
18  opportunity to accept an iBackPack instead of
19  the MOJO?
20    A.  It appears this letter does.
21    Q.  Do you remember making such an
22  offer?
23    A.  Me personally?
24    Q.  Do you remember the company making
25  an offer?

---

168

1    A.  No.
2    Q.  Is that something that would have
3  been required to receive your authorization?
4    A.  No.
5    Q.  Anyone on your team would have been
6  authorized to make this kind of offer?
7    A.  Yes.
8    Q.  So as of September 23rd, 2016, you
9  or people within --
10      MR. ROY:  Wait a second for the
11  sirens.
12      (Pause.)
13      MR. ROY:  Okay.
14    Q.  (BY MR. ROY)  So as of
15  September 23rd, 2016, you or members of your
16  team still remembered the MOJO; is that
17  correct?
18    A.  Obviously.  Someone wrote this
19  letter.
20    Q.  Okay.
21      And since they were offering to
22  provide the iBackPack instead, it seems that
23  they are trying to close the MOJO campaign.
24      Is that correct?
25    A.  No.  It doesn't appear they were

---

42 (Pages 165 to 168)

Monahan

FTC v. iBackPack of Texas, et al.                                                    12/12/2019

169

1  trying to close it.  It appears they were
2  trying to swap bags out.
3      Q.  Let me read the first sentence
4  again.  It says, "We are in the progress (sic)
5  of manufacturing the iBackPack and would like
6  to be able to close out this campaign."
7      A.  Okay.
8      Q.  So it appears that they're trying
9  to close the MOJO campaign.
10      Is that correct?
11      A.  It appears they would -- or they're
12  saying they would like to be able to.
13      Q.  Okay.
14      At this point in time, why didn't
15  iBackPack of Texas offer MOJO backers a
16  refund?
17      A.  I don't recall.
18      Q.  Why did you offer MOJO backers to
19  receive an iBackPack instead of a MOJO bag?
20      A.  I don't recall.
21      Q.  Did every single one of the MOJO
22  backers accept the offer to accept an
23  iBackPack instead of a MOJO bag?
24      A.  I don't recall.
25      Q.  Did you offer a refund to any of

170

1  the consumers who refused to accept the
2  iBackPack instead of the MOJO?
3      A.  I don't recall.
4      Q.  Do you recall anything about the
5  MOJO campaign?
6      A.  Yes.
7      Q.  What did the backers have to do in
8  order to accept an iBackPack instead of a
9  MOJO?
10      Did they have to sign some sort of
11  a release form?
12      A.  I'm not sure.  I have no idea.
13      Q.  Were they asked to list the MOJO
14  campaign as having been fulfilled?
15      A.  I don't know.
16      Q.  All right.
17      Could you describe what products
18  you were offering for the POW campaign?
19      A.  (No Audible Response.)
20      MR. ROY:  If you'd like to hand
21  that back to the court reporter, Mr.
22  Monahan, we're done with that exhibit
23  right now.
24      THE WITNESS:  Okay.  Yeah.
25      The POW campaign was a cable, I

171

1  believe.
2      Q.  (BY MR. ROY)  Okay.
3      And what did the cable do?
4      A.  It was a reversible cable, I
5  believe.  You could -- magnetized, and you
6  could -- it could go in upside down or right
7  side up.
8      Q.  Okay.
9      And was this -- was this a product
10  that iBackPack of Texas designed or something
11  that you selected from a vendor?
12      A.  A combination of both.
13      Q.  Okay.
14      Could you explain?
15      A.  Yeah.
16      The -- I believe we found a vendor
17  that could adapt -- (inaudible) --
18      (Siren interruption.)
19      THE REPORTER:  Hold on one second.
20      (Pause.)
21      (The record was read.)
22      THE WITNESS:  -- who had elements
23  of what we thought was the perfect
24  cable, but not all complete.
25      So I believe that we made

172

1  recommendations and said, "This is what
2  we would like," and then they adapted
3  it.
4      Q.  (BY MR. ROY)  Okay.
5      So you had a vendor identified for
6  the POW cables?
7      A.  Yes.
8      Q.  Do you remember who that vendor
9  was?
10      A.  No, I don't.
11      Q.  And what steps did you take towards
12  producing the POW cables?
13      A.  We designed it and looked for
14  vendors.
15      Q.  Did you order any POW cables?
16      A.  I believe so.
17      Q.  How many did you order?
18      A.  I'm not sure.  I'd say more than 50
19  and less than 500.
20      Q.  And did you receive all those POW
21  cables?
22      A.  I believe so.
23      Q.  And did the POW cables transfer
24  data twice as fast as standard USB cables?
25      A.  I don't know.

43 (Pages 169 to 172)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

173

1      Q.  Did they charge electronic devices
2  twice as fast as standard USB cables?
3      A.  They could have.
4      Q.  What do you mean when you say,
5  "they could have"?
6      A.  I mean, they could have.  I mean,
7  they could have charged things twice as fast.
8      Q.  You don't know, though?
9      A.  No.
10     (Exhibit No. 16 Marked)
11     MR. ROY:  I'm handing you an
12  exhibit marked Exhibit 16.
13     This is the campaign page for POW
14  on Indiegogo.
15     THE WITNESS:  Okay.
16     Q.  (BY MR. ROY)  Are you familiar with
17  this campaign page?
18     A.  I recognize the pictures.
19     Q.  Okay.
20     And did you have input on the
21  campaign page?
22     A.  Yes.
23     Q.  Did you sign off on what was
24  included in the campaign page?
25     A.  Perhaps.

---

174

1      Q.  You don't recall if you signed off
2  on what was written in this campaign page?
3      A.  No.
4      Q.  Okay.
5      I want you to turn to Page 4,
6  please.
7      A.  Okay.
8      Q.  Towards the bottom of the page
9  there's a graphic there, and it says, "2X
10  Faster Charging."
11     A.  Uh-huh.
12     Q.  So did you have any reason to
13  believe that these cables charged devices
14  twice as fast as normal USB cables?
15     A.  We believed what the manufacturers
16  told us.
17     Q.  What did the manufacturers tell
18  you?
19     A.  I don't recall.
20     Probably that they charged two
21  times faster.
22     Q.  Okay.
23     And below that there's another
24  graphic that says, "2X Faster Data Transfer."
25     A.  Uh-huh.

---

175

1      Q.  Do you have any reason to believe
2  that the power cables transferred data twice
3  as fast as normal cables?
4      A.  If this is what the manufacturer
5  said, yes.
6      Q.  You don't recall the manufacturer
7  saying that, though?
8      A.  I don't recall the manufacturer not
9  saying it.
10     Q.  But you don't recall the
11  manufacturer saying it, either?
12     A.  No.
13     Q.  And did you ever test the cables to
14  see if they charged devices twice as fast as
15  normal cables?
16     A.  I believe so.
17     Q.  And what were the results of those
18  tests?
19     A.  I mean, I believed it was true.  I
20  didn't personally test any of them.
21     Q.  You didn't personally test any of
22  them?
23     A.  No.
24     Q.  Did anyone else test any of them?
25     A.  I believe so.

---

176

1      Q.  And do you know what the results of
2  those tests were?
3      A.  I believe they were positive.
4      Q.  But you're not sure?
5      You're not sure if anyone actually
6  tested them?
7      A.  No -- I mean, I know people told me
8  they tested them.
9      Q.  Did anyone tell you that they were
10  twice as fast?
11     A.  I don't remember them saying
12  exactly that.  Maybe it was faster.  Maybe it
13  was slower.  I don't remember.  I don't
14  recall.
15     Q.  Do you know who would have tested
16  those?
17     A.  Any one of the contractors or, if
18  we sent some out to the -- to beta people,
19  they could have tested it, too.
20     So I have no idea.
21     Q.  Okay.
22     So you have no idea who might have
23  tested them?
24     A.  No.
25     Q.  Or if they tested them, or what the

---

44 (Pages 173 to 176)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

177

1    results of those tests were?
2        A.  No.
3        Q.  Okay.
4            And did you file one or more
5    patents on this product?
6        A.  (No Audible Response.)
7        Q.  "No"?
8        A.  (No Audible Response.)
9            (Exhibit No. 17 Marked)
10           MR. ROY:  I'm handing you a
11   document marked Exhibit 17.
12           This is an e-mail chain between
13   Doug Monahan and Udayan@Indiegogo.
14           THE WITNESS:  Okay.
15       Q.  (BY MR. ROY)  Mr. Monahan, is that
16   your e-mail address at the top?
17       A.  Yes, it is.
18       Q.  Okay.
19           Did you write this e-mail?
20       A.  I don't remember writing it.
21       Q.  Do you have any reason to believe
22   you didn't write it?
23       A.  Yes.
24       Q.  What reason is that?
25       A.  Because many people were using my

---

178

1    e-mail to write letters and post things on the
2    Internet.
3        Q.  Okay.
4            And when you say "many people," do
5    you mean many contractors that worked for
6    iBackPack of Texas?
7        A.  Yes.
8        Q.  So you believe either you or
9    someone at iBackPack of Texas wrote this
10   e-mail?
11       A.  Yes.
12       Q.  Okay.
13           The paragraph that begins, "I have
14   several campaigns..."
15           So the last sentence there says,
16   "The name of the similar product on KS is
17   ZNAPS, but they are already riddled with
18   delays.  We won't be having such delays with
19   our POW product, as well as introducing a
20   brand new technology.  Filing patents
21   already."
22           You indicated a minute ago that you
23   didn't file any patents on the POW product; is
24   that correct?
25       A.  Yes.

---

179

1        Q.  So was this an untruthful statement
2    when it was written?
3        A.  I'm not sure about that.
4        Q.  You're not sure whether you filed
5    patents or not?
6        A.  It doesn't say "filed patents."  It
7    says "filing patents."
8        Q.  So do you believe you were filing
9    patents for the POW product?
10       A.  Someone could have been preparing
11   for filing patents, I guess.
12       Q.  Are you aware of anyone filing any
13   patents or preparing to file patents?
14       A.  No.
15           (Exhibit No. 18 Marked)
16           MR. ROY:  Mr. Monahan, I am handing
17   you a document marked Exhibit No. 18.
18           THE WITNESS:  Okay.
19           MR. ROY:  This document is updates
20   that were written to the POW Indiegogo
21   campaign.
22           THE WITNESS:  Okay.
23       Q.  (BY MR. ROY)  So if you turn to
24   Page 9 -- there's a numbering at the top right
25   of the screen, the top right of the corner of

---

180

1    the page.
2        A.  All right.
3        Q.  So the bottom of the page there,
4    actually, it starts with August 12th, posted
5    by Doug Monahan.
6            And if you flip over to Page 10, it
7    says, "Hi everybody.  Good news.  The magnetic
8    cables are finally on their way here.
9    Everybody is going to receive all the perks
10   you were promised within the next six weeks or
11   so, or on time."
12       A.  What page?
13       Q.  The heading of the post is on
14   Page 9, but the -- the text I just read is
15   from Page 10.
16       A.  Okay.
17       Q.  The text indicated that this is
18   posted by Doug Monahan.
19           Do you believe that this post was
20   written by you or by one of the contractors
21   who worked for iBackPack of Texas?
22       A.  Yes.
23       Q.  And there, you or one of your
24   contractors indicated that the magnetic cables
25   are on their way there and everyone would be

---

45 (Pages 177 to 180)

Monahan

FTC v. iBackPack of Texas, et al.                    12/12/2019

---

181

1    receiving their perks within six weeks or so.
2         Do you know what the basis of that
3    representation was?
4         A.  No.
5         Q.  All right.
6         If you flip to Page 9, similarly,
7    there's a post posted by Doug Monahan on
8    September 23rd.
9         A.  Hold on a second.  I want to read
10   this.
11        (Pause.)
12        Okay.  So now, what?
13        Q.  Page 9, there's another post there,
14   September 23rd, 2016, posted by Doug Monahan.
15        A.  Okay.
16        (Pause.)
17        Okay.
18        Q.  It says, "We have 500 of the cables
19   here soon, according to our manufacturing
20   partners.  We would like to get all shipped to
21   all right away.  We wish to close out this
22   campaign so we can focus on the iBackPack and
23   the technology it includes.  Send an e-mail to
24   Hayley.Belcheck@iBackPack.mobi with your
25   updated shipping address, and we'll get the

---

182

1    products to you ASAP."
2         Do you believe that you or
3    someone -- one of the contractor who worked
4    for iBackPack of Texas, posted this update?
5         A.  I know I didn't post this.  So I
6    suppose someone on the team must have.
7         Q.  Someone on the team must have,
8    because only other people on your team would
9    have had access to your Indiegogo account; is
10   that correct?
11        A.  Yes.
12        Q.  So somebody on your team posted
13   that 500 of the cables would be there soon,
14   according to the --
15        (Simultaneous speaking.)
16        A.  Well, it --
17        Q.  -- manufacturer?
18        A.  -- appears so, you know.
19        Q.  Well, is that what they wrote?
20        A.  Yes.
21        Q.  Okay.
22        Do you know what the basis for that
23   representation was?
24        A.  No.
25        Q.  And then on Page 5.

---

183

1         A.  All right.
2         Q.  Hector Armenta wrote a post on
3    November 9th, 2016.
4         You previously indicated that he
5    was a contractor for iBackPack of Texas.
6         Is that correct?
7         A.  Yes, it is.
8         Q.  So this appears to be a post that
9    was written on behalf of iBackPack of Texas.
10        Is that correct?
11        A.  Yes, it is.
12        Q.  Okay.
13        And in it, he writes, halfway down
14   the first paragraph, "I believe you were
15   offered and over 140 of the 157 backers have
16   accepted to receive an updated version of the
17   POW magnetic cable from a strategic partner of
18   ours versus POW."
19        A.  Okay.
20        Q.  Was there a strategic partner?
21        A.  Let me read it.
22        (Pause.)
23        There could have been.
24        Q.  You don't know if there was a
25   strategic partner, though?

---

184

1         A.  No.
2         Q.  Do you know -- was iBackPack of
3    Texas expecting to receive POW cables from the
4    manufacturer?
5         A.  I can't -- don't remember.
6         Let me read this a second.
7    (Reading inaudibly to self.)
8         I have no idea what this is about.
9         So what's the question?
10        Q.  Was iBackPack of Texas expecting a
11   manufacturer to ship POW cables to them?
12        A.  I believe so, yeah.
13        Q.  Do you know who that vendor was, or
14   manufacturer was?
15        A.  No.
16        Q.  And did you receive the products?
17        A.  I don't remember.  I know we got
18   some.  I don't remember how many, though.
19        Q.  In the -- I believe earlier you
20   testified that you received between 50 and 500
21   POW cables.
22        Did you ship any of those POW
23   cables to backers?
24        A.  I don't believe so.  We may have.
25   I don't know.

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Monahan

FTC v. iBackPack of Texas, et al.                                              12/12/2019

---

185

1
2
3          Q.   And this was an e-mail that appears
4    to have been written by Doug Monahan to
5    members of Indiegogo's team, and your
6    signature is at the bottom.
7          I believe you previously testified
8    that either you or one of the members of your
9    team would have written this e-mail.
10         Is that correct?
11    A.   Yes.
12    Q.   Okay.
13         In the first paragraph you're
14    talking about POW cables there.
15    A.   Okay.
16    Q.   Partway down you say, "The products
17    have been ordered.  They have been paid for.
18    They work exactly as promised and all of us
19    are quite excited to see them."
20         Further down, it says, "The invoice
21    and proof of shipment of products was sent out
22    to you last week.  We were able to get the
23    product through a strategic partner, Lightning
24    Strikes."
25    A.   Okay.

---

186

1          Q.   Do you know who Lightning Strike
2    is, Mr. Monahan?
3     A.   I know the name, Lightning Strikes.
4     Q.   How do you know the name, Lightning
5    Strikes?
6     A.   Because it's one of the products
7    that we -- we were building to include in the
8    iBackPack.  I'm not aware of a company called
9    Lightning Strike, though.
10        (Pause.)
11        So what's your question about this?
12    Q.   I was asking if you were familiar
13    with a company called Lightning Strikes.
14    A.   No.
15        MR. ROY:  I'm handing you a
16    document that's marked Exhibit No. 19.
17        (Exhibit No. 19 Marked)
18        MR. ROY:  This is a Franchise Tax
19    Account Status that came from the Texas
20    Office of the Comptroller.
21        THE WITNESS:  Okay.
22        MR. ROY:  And it's for a company
23    called Lightning Strike Technologies,
24    LLC.
25        THE WITNESS:  Okay.

---

187

1          Q.   (BY MR. ROY)  Do you see at the
2    very -- towards the bottom there it lists a
3    registered agent name, Arleta Keith?
4     A.   Yes.
5     Q.   Do you know Arleta Keith,
6    Mr. Monahan?
7     A.   Yes, I do.
8     Q.   Who is Arleta Keith?
9     A.   That's my mother.
10    Q.   Are you aware if your mother had a
11    company called Lightning Strike Technologies
12    or registered for a company called Lightning
13    Strikes?
14    A.   No.
15    Q.   Okay.
16        Might have this been a company you
17    registered?
18    A.   It could have been.
19    Q.   But you're not sure?
20    A.   I don't remember doing this.
21        (Exhibit No. 20 Marked)
22        MR. ROY:  I'm handing you another
23    document, Mr. Monahan, that's marked
24    Exhibit No. 20.
25        THE WITNESS:  Okay.

---

188

1          MR. ROY:  And this is a signature
2    card from PlainsCapital Bank.
3         THE WITNESS:  Okay.
4         MR. ROY:  The last four of the
5    account number are 8100.
6         THE WITNESS:  Okay.
7         MR. ROY:  The title of the account
8    is Lightning Strike Technologies, LLC.
9         THE WITNESS:  Okay.
10    Q.   (BY MR. ROY)  In the middle of the
11    page it has a taxpayer identification number
12    certification.  It is signed by Doug Monahan.
13    A.   Uh-huh.
14    Q.   Is that your signature,
15    Mr. Monahan?
16    A.   Yes, it is.
17    Q.   And at the bottom of the page there
18    is another signature, "Business Authorized
19    Signer," and it's signed by Doug Monahan.
20        Is that your signature,
21    Mr. Monahan?
22    A.   Yes, it is.
23    Q.   And the e-mail address that appears
24    towards the middle of the page,
25    Doug.Monahan@DayBreak-Texas.com, was that an

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Monahan

FTC v. iBackPack of Texas, et al.                                        12/12/2019

---

189

1   e-mail address you used?
2       A.  Yeah, it is.
3       Q.  Okay.
4           Does this refresh your recollection
5   at all about starting a company called
6   Lightning Strike Technologies?
7       A.  Yeah -- I mean, I don't remember
8   doing it, but obviously it was done.
9       Q.  Okay.
10          You don't remember starting the
11  company?
12      A.  No.
13      Q.  But this is your name that appears
14  in the bank account?
15      A.  That's true.
16      Q.  And your mother's name was on the
17  registered agent?
18      A.  You're right about that.
19      Q.  So do you believe that was your
20  company or your mother's company?
21      A.  Mine.
22      Q.  Okay.
23          And if we can turn back to the POW
24  updates, Exhibit No. 18, and we were on
25  Page 5.

---

190

1       A.  Okay.
2       Q.  So Hector Armenta is talking about
3   how 140 of the 157 backers have accepted to
4   receive an updated version of the POW magnetic
5   cables from a strategic partner of ours.
6           And it appears in the next
7   paragraph -- if you turn to the next page,
8   actually, on Page 6, he seems to be asking for
9   an e-mail.
10          He says, "We realize almost
11  everyone has already accepted the offer, but
12  we need you to further solidify the deal by
13  sending me e-mail saying: 'Sure, Hector, I
14  accept,' to list the e-mail address and the
15  subject line."
16      A.  Okay.
17      Q.  So it appears to be asking backers
18  to send an e-mail authorizing iBackPack of
19  Texas to send POW cables from a strategic
20  partner instead of from iBackPack.
21          Is that correct?
22      A.  That's what it appears to offer,
23  yes.
24      Q.  Okay.
25          Do you know if consumers were

---

191

1   required to list the POW campaign as being
2   fulfilled in order to receive the POW cable
3   from a strategic partner?
4       A.  No, I don't.
5       Q.  Is there any reason why you would
6   have required permission from consumers to
7   have a different manufacturer fulfill the
8   order?
9       A.  Not that I'm aware of.
10      Q.  And you indicated that you didn't
11  ship the POW cables to any consumers.
12          Is that correct?
13      A.  I'm not sure about that.
14      Q.  You're not sure whether you shipped
15  the POW cables to any consumers?
16      A.  We may have.
17      Q.  You may have?
18      A.  Yeah.
19      Q.  Do you know when you would have?
20      A.  No.
21      Q.  Did you offer a refund to POW
22  consumers?
23      A.  We gave a refund.
24      Q.  And that was in November or
25  December of 2018; is that correct?

---

192

1       A.  I believe so.
2       Q.  Okay.
3           Did you tell Indiegogo that you had
4   successfully shipped products to the POW and
5   MOJO backers?
6       A.  I don't remember saying that.
7       Q.  I'm going to refer back to an
8   exhibit that was previously marked, Exhibit
9   No. 9.
10      A.  Okay.
11      Q.  All right.
12          And on -- I believe this was an
13  exhibit you previously indicated that either
14  you or someone on your team would have
15  written.
16          Is that correct?
17      A.  Is this the same thing we looked at
18  earlier?
19      Q.  Yes.
20      A.  I mean, earlier in the day?
21      Q.  Yes.
22          Let me --
23      A.  No, I don't think so.  This is --
24  yeah -- okay.  Okay.
25      Q.  So, do you believe that either you

---

48 (Pages 189 to 192)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

193

1    or someone on your team wrote this e-mail?
2        A.  It appears that way.
3        Q.  Do you have any reason to believe
4    that you or someone on your team didn't write
5    the e-mail?
6        A.  No.
7        Q.  And it appears it's from the
8    iBackPack.mobi e-mail account for Doug
9    Monahan.
10       A.  Okay.
11       Q.  Who would have had access to that
12   e-mail account?
13       A.  Any of the contractors.
14       Q.  Okay.
15           So this e-mail appears to have come
16   from either one of the contractors or from
17   yourself.
18           Is that correct?
19       A.  It would appear that way.
20       Q.  All right.
21           On Page -- the second page of this,
22   towards the bottom of the page it says -- are
23   you on the second page, Mr. Monahan?
24       A.  Yes.
25       Q.  Towards the bottom of the page, it

---

194

1    says, in big letters, "MOJO bag is done,
2    finished, shipped, over with."
3        A.  Okay.
4        Q.  "100 percent customer satisfaction
5    is a tough thing to accomplish, but we did."
6            So this appears to be saying that
7    the MOJO campaign was completely satisfied.
8            Is that correct?
9        A.  It appears that's what it -- "MOJO
10   bag is done, finished, shipped, over with."
11           Yeah, that's what it appears to
12   say.
13       Q.  Was the MOJO campaign 100 percent
14   satisfied, shipped, over with?
15       A.  I don't believe so.
16       Q.  You indicated earlier that none of
17   the MOJO backers had received the product.
18           Is that correct?
19       A.  I don't believe so.
20       Q.  Sorry.
21           You don't believe that the campaign
22   was satisfied?
23       A.  No, I don't believe so.
24       Q.  And you don't believe that you
25   shipped any MOJO products to any consumers?

---

195

1        A.  No, I don't believe we shipped MOJO
2    products, but I know that we shipped other
3    products.
4        Q.  What other products did you ship?
5        A.  A lot of the batteries and...
6        Q.  Were those for beta testing?
7        A.  Yes.
8        Q.  Okay.
9            This third page, Igogo 657, it
10   says, "POW cables are done, finished, nearly
11   all shipped.  Last ones going out."
12           So this --
13       A.  Yeah.
14       Q.  -- appears again to be saying that
15   the POW cables have been shipped to the
16   backers.
17           Is that correct?
18       A.  Yeah.
19           They may have been, though.  I
20   mean, there are only a hundred of them that
21   were ordered.
22       Q.  Okay.
23           But you're not sure whether they
24   were shipped to backers or not?
25       A.  Or funds contributed for.

---

196

1            No, I'm not sure.  It wouldn't have
2    been hard, though.
3        Q.  Okay.
4            And one of the products you offered
5    on the POW campaign was a -- was a car
6    charger.
7        A.  Uh-huh.
8        Q.  Was that the same car charger that
9    was to be provided on the iBackPack?
10       A.  Do you have a description of it?
11           (Pause)
12           Are we done with this (indicating)?
13       Q.  Yes.
14       A.  Are we done with this (indicating),
15   too?
16       Q.  Yes.
17       A.  Can I have a copy of all this?
18       Q.  I believe the court reporter is
19   going to require those.
20           (Brief Recess Taken.)
21       Q.  (BY MR. ROY)  You had asked what
22   the description of the car charger was.
23           I'm reading this from the POW
24   campaign page on Indiegogo.
25       A.  Okay.

---

49 (Pages 193 to 196)

Monahan

FTC v. iBackPack of Texas, et al.                                12/12/2019

197

1        Q.  It says, "Our car charger is quite
2    simply the best on the market today.  It has
3    micro-USB, Lightning USB, built-in retractable
4    cable, 1 1A and 1 2.1A output."
5        A.  Okay.
6        Q.  "Visit iBackPack.co or W" -- "or
7    POWcables.com for photos of the technology."
8        A.  Okay.
9        Q.  Does that appear to be the same car
10   charger that you offered with the iBackPack
11   campaign?
12       A.  Yes.
13       Q.  And you previously indicated that
14   you received car chargers.
15           Is that correct?
16           That you ordered and received
17   car --
18       A.  We --
19       Q.  -- chargers?
20       A.  -- received quite a few, yeah.
21       Q.  Okay.
22           Did you provide any of the backers,
23   that pledged money to receive a car charger
24   through the POW campaign, with a car charger?
25       A.  I guess so.

198

1        Q.  You don't remember if you shipped
2    any car chargers to any of those backers?
3        A.  I don't remember them being
4    shipped, but I don't remember them not being
5    shipped, either.
6            I mean, I'd be -- I'd be surprised
7    if they weren't shipped because of the
8    quantity that we had.  I believe we ordered
9    hundreds of them.  It's a really good charger.
10       Q.  Okay.
11           You started providing POW and MOJO
12   backers with a refund in November or December
13   of 2018; is that correct?
14       A.  Yes.
15       Q.  Was that after the FTC contacted
16   you about a potential lawsuit regarding the
17   four crowdfunding campaigns?
18       A.  Yes.
19       Q.  All right.
20           We're going to go over some of the
21   financial information --
22       A.  Okay.
23       Q.  -- and clarify a few items that
24   came up during discovery.
25       A.  Okay.

199

1        Q.  Which financial accounts were used
2    in connection with the iBackPack campaign?
3        A.  PlainsCapital.
4        Q.  PlainsCapital Bank?
5        A.  Yes.
6        Q.  And was the PayPal account used
7    with the iBackPack campaign, as well?
8        A.  Yes.
9        Q.  Were any other accounts?
10       A.  I don't believe so.
11       Q.  Okay.
12           Would it be the same accounts for
13   the MOJO campaign?
14       A.  Yes.
15       Q.  And the same accounts for the POW
16   campaign?
17       A.  Yes.
18       Q.  And the same accounts for the
19   iBackPack Indiegogo campaign?
20       A.  Yes.
21       Q.  Okay.
22           Did you use Bitcoin to pay for any
23   goods or services for any of the campaigns?
24       A.  Yes.
25       Q.  How frequently did you use Bitcoin?

200

1        A.  Infrequently.
2        Q.  Once a month?
3        A.  Yeah.  Once a month or so, or
4    maybe.  Yeah, probably no more than once a
5    month.
6        Q.  Okay.
7            How much -- approximately how much
8    money did you spend for campaigns using
9    Bitcoin funds?
10       A.  I don't recall.
11       Q.  Which vendors or contractors did
12   you pay using Bitcoin?
13       A.  I'm not sure.
14       Q.  You're not sure?
15       A.  (No Audible Response.)
16       Q.  Okay.
17           A second ago I asked what financial
18   accounts you used in connection with the
19   campaigns.
20           You didn't mention the Bitcoin
21   account.
22           Why is that?
23       A.  Well, I just forgot all about it.
24       Q.  Okay.
25           And in your interrogatory responses

50 (Pages 197 to 200)

201

1   to us, where we asked what accounts were used
2   in connection with the campaigns, you didn't
3   list the Bitcoin account there, either --
4       A.   Uh-huh.
5       Q.   -- is that correct?
6       A.   Uh-huh.
7       Q.   Why not?
8       A.   Well, I mean, I just forgot about
9   it.  I mean, it's not one that we use on a
10  regular basis.
11      Q.   Okay.
12          And you didn't provide any of your
13  Bitcoin account statements with your RFP
14  responses regarding expenditures made on
15  behalf of the iBackPack campaigns?
16      A.   I just forgot about it.  I mean,
17  it's -- it's coin-based.  It's easy to get.  I
18  mean, it wasn't intentional.
19      Q.   Did you use cash to pay for any
20  goods or services for the campaigns?
21      A.   Yes.
22      Q.   How frequently?
23      A.   Quite a bit, actually.
24      Q.   Approximately how much money did
25  you use?

202

1       A.   I'm not sure.  It would be listed
2   there.
3       Q.   Okay.
4          Which vendors or employees did you
5   pay using cash?
6       A.   It would be listed there.  I don't
7   know.
8       Q.   It would be listed where?
9       A.   I gave you guys all the paperwork.
10  I mean, all the -- everything was -- my CPA
11  went through everything.  So --
12      Q.   Okay.
13      A.   -- whatever he said.  I've given it
14  to you already.
15      Q.   But if it's a cash payment, I'm not
16  sure -- we wouldn't have records for that,
17  would we?
18      A.   No.  He would.
19      Q.   He would have documents reflecting
20  cash payments made?
21      A.   I believe so.
22      Q.   Okay.
23          And who is your CPA?
24      A.   His name is Ron Meyer.
25      Q.   Ron Meyer.

203

1       Does he work out of Austin, Texas?
2       A.   Uh-huh.
3       Q.   Do you happen to know his office
4   address?
5       A.   I know his phone.
6       Q.   That's okay.
7          What's his phone number?
8       A.   Area Code (512)476-4577.
9       Q.   Okay.
10          And you testified earlier that most
11  of your contractors worked remotely.  You
12  didn't have too many interactions with them.
13          How did you pay them in cash, if
14  you didn't see them very frequently?
15      A.   I didn't.
16      Q.   You didn't pay them in cash?
17      A.   Huh-uh.
18      Q.   Okay.
19          And what about your -- your
20  vendors?
21          Did you pay your vendors in cash?
22      A.   Only those in Austin that I would
23  see.
24      Q.   Only those in Austin?
25      A.   Yeah.

204

1       Q.   And you don't recall which vendors
2   those were?
3       A.   No.
4       Q.   Or what goods or services you might
5   have purchased from them?
6       A.   No.
7          (Exhibit No. 32 Marked)
8          MR. ROY:  I'm handing you a
9   document that's been marked Exhibit 21.
10          THE WITNESS:  Okay.
11          MR. ROY:  The title of this
12  document is, "iBackPack of Texas, LLC,
13  Profit and Loss January 2011 through
14  September 2019."
15          THE WITNESS:  Okay.
16      Q.   (BY MR. ROY)  Are you familiar with
17  this document, Mr. Monahan?
18      A.   Yes.
19      Q.   What is this document?
20      A.   It's an iBackPack of Texas, LLC,
21  Profit and Loss January 2011 through
22  September 2019.
23      Q.   Was this a document that you
24  produced in discovery to the Federal Trade
25  Commission?

51 (Pages 201 to 204)

Monohan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

205

1        A.  Yes.
2        Q.  Who prepared this document?
3        A.  My CPA.
4        Q.  And what were your instructions to
5    your CPA.
6        A.  To provide -- come up with all the
7    numbers, to, you know, take all transactions
8    and put them in a spreadsheet so that they
9    could be reported.
10       Q.  And does this profit and loss
11   statement represent the finances for just
12   iBackPack of Texas?
13       A.  It appears to.
14       Q.  Do you know whether it does or not?
15       A.  No.  I mean, my CPA gave it to me.
16   I would assume he's correct.
17       Q.  Okay.
18           And what were your instructions to
19   your CPA?
20           Did you tell him to produce a
21   profit and loss statement for just iBackPack
22   of Texas, or did you tell him to produce a
23   profit and loss statement for all of your
24   companies?
25       A.  I told him to do all the companies

---

206

1    and each one individually, as well, and
2    myself, too.
3        Q.  Okay.
4            So is this document, then, all of
5    your companies, including iBackPack of Texas,
6    and you individually?
7        A.  I'm not sure what this represents.
8    I mean, this is iBackPack of Texas, LLC.  So,
9    obviously, we'd have to ask my CPA exactly
10   what this is.
11       Q.  Okay.
12           And there are -- there are
13   transactions here for January through December
14   of 2011.
15           Do you see that at the top?
16       A.  Yeah.
17       Q.  And it lists merchandise sales of
18   $189,000.
19       A.  Uh-huh.
20       Q.  Did iBackPack of Texas have any
21   sales in 2011?
22       A.  You'd have to ask my CPA.
23       Q.  You don't know if your company had
24   any sales in 2011?
25       A.  This was prepared by my CPA.

---

207

1        Q.  I understand.
2        A.  Any question about this, we are
3    going to have to ask him.
4        Q.  I'm not asking about this -- I'll
5    ask you specifically, then:  Did iBackPack of
6    Texas have any sales in 2011?
7        A.  IBackPack of Texas wasn't founded
8    until 2014.
9        Q.  So is that a, "No, iBackPack of
10   Texas didn't have any sales in 2011"?
11       A.  It would be difficult to do, but
12   I'm not a CPA, so...
13       Q.  So you think it's possible your
14   company had sales before it was founded?
15       A.  That would be difficult to do.
16       Q.  So, Mr. Monahan, does this appear
17   to be the profit and loss for just iBackPack
18   of Texas, or do you believe this may include
19   all of your other companies and your personal
20   expenses, as well?
21       A.  I believe that iBackPack of Texas,
22   for eight years here, is an accurate
23   representation.
24           And -- I don't know.  We'd have to
25   ask my CPA.  I didn't do this.

---

208

1        Q.  But you did run your company; is
2    that correct?
3        A.  Yes, I did.
4        Q.  So you do know what your company's
5    activities were in 2011, or if your company
6    had activities in 2011?
7        A.  Yes.
8        Q.  And you previously indicated that
9    iBackPack of Texas didn't have any sales, that
10   you never sold any products.
11           Is that correct?
12       A.  Yes.
13       Q.  And you only -- you only raised --
14   you offered --
15       A.  We didn't get money until -- I
16   guess it's an accounting deal.  I don't know.
17       Q.  So this appears to not be the
18   profit and loss for iBackPack of Texas, then.
19   Because you're saying it would be impossible
20   to --
21       A.  No.  I mean, I'm saying we're going
22   to many ask my CPA.  I don't know.  I know
23   that you can -- that when you're dealing with
24   the IRS, you can carry things forward, you can
25   carry things back.  Maybe he's done something

---

52 (Pages 205 to 208)

209

1    like that here.
2        Q.  Okay.
3            But you didn't have any sales in
4    2011 for iBackPack of Texas.
5        A.  No.
6        Q.  And you wouldn't have had expenses
7    for iBackPack of Texas in 2011?
8        A.  I don't know how he did it or what
9    it represents.
10       Q.  Can you answer my question?
11           I asked if you had any expenses for
12   iBackPack in 2011.
13       A.  This appears to be, you know, an
14   accounting issue.
15       Q.  I'm not asking if, for accounting
16   purposes --
17       A.  I can't answer that.  I mean, he's
18   a CPA.  I'm not.  I didn't do this.
19       Q.  I understand that, Mr. Monahan.
20   I'm not asking you if you had any expenses for
21   accounting purposes or for tax purposes.  I'm
22   asking if iBackPack of Texas had any expenses
23   in 2011.
24       A.  If this is what -- if this is a
25   profit and loss statement, and he's a CPA,

210

1    then I would assume that we're going to have
2    to ask him.
3        Q.  You don't know if your company had
4    any expenses in 2011?
5        A.  Any question regarding this, we're
6    going to have to ask the CPA.
7        Q.  I'm not asking about the document.
8    I'm asking about your company.
9        A.  I can't answer that question.
10       Q.  You can't answer whether your
11   company had expenses?
12       A.  You're asking me an accounting
13   question.
14       Q.  No.  I'm asking you about your
15   company.
16           Did your company have expenses?
17       A.  You're asking me an accounting
18   question.
19       MR. ROY:  All right.
20           Let the record reflect that
21   Mr. Monahan is refusing to answer the
22   question.
23       THE WITNESS:  You haven't asked me
24   a question I can answer.
25       MR. ROY:  Mr. Monahan, I'm handing

211

1    you a document that's being marked
2    Exhibit No. 22.
3        (Exhibit No. 22 Marked)
4        MR. ROY:  I'm handing you a
5    document that's been marked Exhibit
6    No. 22.
7        THE WITNESS:  Okay.
8        MR. ROY:  It says, "iBackPack of
9    Texas, LLC, General Ledger, All
10   Transactions."
11       THE WITNESS:  Okay.
12       Q.  (BY MR. ROY)  Are you familiar with
13   this document, Mr. Monahan?
14       A.  No, I haven't seen this before.
15   Is it from the spreadsheet?
16       Q.  This is the spreadsheet that you
17   e-mailed to the FTC --
18       A.  Okay.
19       Q.  -- during discovery.
20       A.  I mean, I got the spreadsheet, but
21   I've never printed it out.
22       Q.  Okay.
23           Does this document provide the
24   underlying details that were used to generate
25   the profit and loss statement?

212

1        A.  I believe so.
2        Q.  Okay.
3            And who prepared this document?
4        A.  My CPA.
5        Q.  And what were your instructions to
6    your CPA in creating this document?
7        A.  To figure out where all the money
8    went and put together the -- the tax returns
9    and the paperwork for it, you know.  Get
10   everything we need to provide to you, as well
11   as to the government.
12       Q.  Okay.
13           So are all four campaigns included
14   in this profit and loss statement?
15       A.  I don't know.  I haven't gone
16   through this.
17       Q.  Okay.
18           All right.  Let's -- let's go to
19   the very end.  The last page is Page 105.
20   Let's go to Page 104, the second-to-the-last
21   page.
22       A.  All right.
23       (Pause.)
24           All right.  I'm there.
25       Q.  Okay.

53 (Pages 209 to 212)

Monahan

FTC v. iBackPack of Texas, et al.                                   12/12/2019

213

1          There's a section there that's
2    labeled, "Officer Draw," towards the bottom of
3    the page.
4          Do you see that?
5        A.  No.
6        Q.  In --
7        A.  What page?
8        Q.  -- on the left-hand side, you can
9    see in bold letters.  It's on Page 104.
10       A.  Is it this page (indicating)?
11       Q.  Yes.
12          On the right-hand side there, it
13   says, "Officer Draw."
14       A.  Okay.
15       Q.  Okay?
16          Well, actually, turn to the next
17   page.
18          Well, on this page, do you see the
19   column labeled "Split"?
20          It lists numerous accounts on
21   there, including an account that says,
22   "Frost XX 0083 Mobilezapp USA, Inc."
23       A.  No, I can't...
24          Oh, here.
25       Q.  That's Page 105.  You're on Page

214

1    105.  I'll go to Page 105.
2          At the top there it says -- there's
3    a bank account there, it says, "Frost XX
4    0641 DayBreak Design."
5        A.  Okay.
6        Q.  You testified earlier that
7    transactions came from your PlainsCapital Bank
8    account and your PayPal account.
9          Did any transactions for the
10   campaigns come out of the DayBreak Design
11   Frost bank account?
12       A.  I'm not sure.  I don't believe so.
13   I mean, I don't know.  Not that I'm aware of.
14       Q.  Okay.
15          So it appears that this general
16   ledger may include more than just iBackPack
17   transactions.
18          Is that correct?
19       A.  You got me here.  I have no idea.
20   I'm not a CPA.  I have no idea.
21       Q.  Okay.
22          Under "Officer Draw" -- we're still
23   in the "Officer Draw" section.
24       A.  Right.
25       Q.  The name for one of the

215

1    transactions is Jack Brown Cleaners.
2          Do you know what type of company
3    Jack Brown Cleaners is?
4        A.  It's a dry cleaners.
5        Q.  And did they provide goods or
6    services to you?
7        A.  Yes.
8        Q.  For you personally?
9        A.  I guess.  Yeah.
10       Q.  Okay.
11          What about --
12       A.  I mean, I've never been there,
13   but...
14       Q.  You've never been to Jack Brown
15   Cleaners?
16       A.  No.
17       Q.  So do you know why --
18       A.  Maybe like 20 years ago.
19       Q.  Okay.
20          What about Capitol Pain Institute?
21          Do you know was that company is?
22       A.  Yeah.  That is a -- that's that
23   pain management doctor that gave me all that
24   Dilaudid.
25       Q.  And what about Four Points Dental?

216

1        A.  Yeah.  Yeah.
2        Q.  Do you know was that company is?
3        A.  Yeah.  Uh-huh.
4        Q.  Is that your dentist's office?
5        A.  Yeah.
6        Q.  Okay.
7          So the transactions that appear
8    under "Officer Draw," this appears to be money
9    that didn't go directly to you, but rather
10   went to personal bills that you needed to pay.
11          Is that correct?
12       A.  Yeah.
13       Q.  Okay.
14          So there would have been no set
15   schedule for these payments.  They came up as
16   they were needed; is that correct?
17       A.  That's true.
18       Q.  And there's no set amount for these
19   payments.  It was the amount that you needed
20   in order to pay some of these personal
21   expenses?
22       A.  You've got to ask my CPA.  I've
23   never seen this before.
24       Q.  Okay.
25          Did you receive a regular salary

54 (Pages 213 to 216)

Monahan

FTC v. iBackPack of Texas, et al.                                          12/12/2019

---

217

1     from your company, iBackPack of Texas?
2        A.  No, I did not.
3        Q.  Okay.
4           But money was used to pay for your
5     personal expenses; is that correct?
6        A.  Out of my draw, yes.  It appears
7     so, yeah.
8        Q.  Okay.
9           So is it fair to say that you
10    didn't receive regularly scheduled
11    compensation from iBackPack of Texas?
12       A.  I didn't receive paychecks, but it
13    could have been transferred into my account
14    per my CPA.  I don't know.
15       Q.  You just used the money from the
16    corporate account as you needed to pay for
17    your personal expenses?
18       A.  No.  No.  I'm not saying that.
19       Q.  Okay.
20       A.  You're going to have to ask my CPA
21    about this.  You're asking me stuff that I
22    don't know.  I'm not a CPA, just like I'm not
23    a lawyer.  I don't know.
24       Q.  Okay.
25       A.  Whatever he did, obviously, it's

---

218

1     correct because he's a CPA.
2           Call him.
3        Q.  Okay.
4           And you testified you didn't
5     receive a paycheck from iBackPack of Texas.
6        A.  I didn't endorse a paycheck, That's
7     true.  But that doesn't mean that he didn't
8     transfer money into an account for me.
9           Anything about this, we are going
10    have to ask the CPA.  I am totally clueless
11    here.
12       Q.  Okay.
13           Were you compensated for your work
14    at iBackPack of Texas?
15       A.  I lost money with the iBackPack
16    program, so I -- essentially, no.  I mean, I'm
17    out hundreds of thousands of dollars.  I've
18    lost money.
19           So how can you possibly say I was
20    compensated when I haven't received any money?
21       Q.  I didn't say --
22       A.  I'm at a loss.
23       Q.  I didn't say you were compensated,
24    Mr. Monahan.  I asked you if you were
25    compensated.

---

219

1           Were you compensated for your work
2     by iBackPack of Texas?
3        A.  No.  I've lost money.
4        Q.  Okay.
5           So the money that went to pay for
6     things like Jack Brown Cleaners, Capitol Pain
7     Institute, Four Points Dental, was this money
8     that went towards repaying money that you
9     contributed?
10       A.  Probably.  I know that even before
11    we -- even before we raised money, I put in
12    hundreds of thousands of dollars.
13       Q.  Okay.
14           Probably, but you're not sure, if
15    this was money that went towards repaying
16    money you contributed to the campaigns?
17       A.  I'm not a CPA.
18       Q.  I'm not asking if you're a CPA,
19    sir.
20           I'm asking if this is money that
21    went to repay you for money you contributed to
22    the campaigns.
23       A.  It must have.
24       Q.  It must have, why?
25       A.  It must have been.

---

220

1        Q.  Why must it have been?
2        A.  Because that's how my CPA put it.
3     Right?
4        Q.  Do you know how much money you
5     contributed to the campaigns?
6        A.  Not exactly.
7        Q.  Okay.
8           Do you have any records that
9     reflect those payments?
10       A.  It's all here.  So, yes, I do.
11    Right here.
12       Q.  Okay.
13           Do you know how much money you took
14    out of the campaigns for personal expenses?
15       A.  I don't believe I took any money
16    out for personal expenses.
17       Q.  I thought you just testified a
18    minute ago that Four Points Dental was your
19    dentist?
20       A.  That's true, but -- but it's -- you
21    need to talk to my CPA.
22       Q.  Mr. Monahan, your CPA is not at
23    this deposition.
24       A.  Well, you're asking me questions
25    that I'm not able to answer.

---

55 (Pages 217 to 220)

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

221

1      Q.  I'm asking you if the Four Points
2   Dental expense was a personal expense.
3      A.  Yes.
4      Q.  Okay.
5          So you took money out of the
6   campaigns for personal expenses.
7      A.  No.
8      Q.  All right.
9          We're going to move to Page 58.
10          (Pause.)
11          All right.  We'll go to Page 86,
12   Mr. Monahan.
13      A.  Okay.
14      Q.  And towards the bottom, in the
15   left-hand side -- it's in bold -- there's this
16   category called, "Meals and Entertainment."
17      A.  Okay.
18      Q.  And then, starting at Page 87, so
19   on the next page, there are transactions that
20   are listed here for Schlotski's.
21      A.  Okay.
22      Q.  What type of business is
23   Schlotski's?
24      A.  It's a sandwich shop.
25      Q.  Okay.

---

222

1          And I see one for Olive Garden.
2          What type of business is Olive
3   Garden?
4      A.  It is a restaurant.
5      Q.  And I see one for Twin Liquors.
6          What type of business is Twin
7   Liquors?
8      A.  It is a liquor store.
9      Q.  Okay.
10          And there's one here for Steiner
11   Ranch Liquor Store.
12          What type of business is Steiner
13   Ranch Liquor Store?
14      A.  It's a veterinarian.
15          No, it's a liquor store.  Of course
16   it is.  I'm being silly.
17          MR. ROY:  Let the record reflect
18   that Mr. Monahan told a funny joke.
19          Okay.  And then, turning towards
20   Page 93.
21      A.  Okay.  I'm there.
22      Q.  Okay.
23          This is a section that's labeled,
24   "Office Supplies."
25      A.  Okay.

---

223

1      Q.  And turning towards the next page,
2   on Page 94, towards the bottom, there's some
3   transactions there for a company called HEB.
4          What type of company is HEB?
5      A.  It's a big grocery store.
6      Q.  Okay.
7      A.  But, obviously, they sell office
8   supplies, too.
9      Q.  Okay.
10          Do you believe you purchased
11   groceries from there or office supplies?
12      A.  I've never bought any groceries at
13   HEB.
14      Q.  Okay.
15      A.  I haven't even been in an HEB
16   for -- maybe it's been 30 years ago.
17      Q.  So you have no idea who made that
18   transaction at HEB, that's listed on there?
19      A.  Someone working for me.
20      Q.  Okay.
21          What about Randall's?
22          Do you know what type of company
23   Randall's is?
24      A.  They're a grocery store.
25      Q.  Do they also sell office supplies

---

224

1   or are they --
2          (Simultaneous speaking.)
3      A.  I think --
4      Q.  -- strictly groceries?
5      A.  -- so.
6      Q.  And is this a grocery store you've
7   frequented before?
8      A.  Randall's?
9      Q.  Yes.
10      A.  I've been to it.
11      Q.  How recently?
12      A.  Twenty years ago.
13      Q.  Okay.
14      A.  Maybe ten.
15      Q.  All right.
16          I'm going to turn to a section
17   that's labeled, "Manufacturing" on Page 72.
18      A.  What page are we on here?
19          I can't read this.
20          Is this Page 90 (indicating)?
21      Q.  Yes.  It's Page 93.
22          We're turning towards Page 73.
23      A.  Okay.  All right.  I'm there.
24      Q.  Okay.
25          This is a section that's called,

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

Monahan

FTC v. iBackPack of Texas, et al.                                              12/12/2019

---

225

1    "Manufacturing."
2         A.  Okay.
3         Q.  And you see the second line from
4    the top, there's a transaction there, it's a
5    wire out for $150,000.
6         A.  Okay.
7         Q.  And that wire appears to have been
8    on May 18th, 2016.
9         A.  Okay.
10        Q.  Do you know what that transaction
11   was for?
12        A.  No.
13        Q.  Okay.
14             And the transaction after that is a
15   $125,000 wire out on May 19th, 2016.
16        A.  Uh-huh.
17        Q.  Do you know was that transaction
18   was for?
19        A.  No.
20             (Exhibit No. 23 Marked)
21             MR. ROY:  I'm handing you an
22   exhibit that's labeled --
23             THE WITNESS:  This one?
24             MR. ROY:  Yes.
25             I'm handing you a document that's

---

226

1    marked Exhibit 23.
2             THE WITNESS:  Okay.
3             MR. ROY:  These are wire transfers
4    that came to and from the iBackPack
5    PlainsCapital Bank account.
6             THE WITNESS:  Okay.
7         Q.  (BY MR. ROY)  If you can flip to
8    the green tab.
9         A.  Got it.
10        Q.  Okay.
11             The top of the page is
12   "PlainsCapital Bank," and you can see in
13   "Debit Info" it lists iBackPack of Texas, LLC.
14   And the credit is going to a USAA Federal
15   Savings Bank.
16        A.  Uh-huh.
17        Q.  And the bottom it lists the
18   beneficiary as Arleta Keith, with an account
19   ending 4644.
20        A.  Uh-huh.
21        Q.  And the amount of the transaction
22   is $150,000.
23        A.  Uh-huh.
24        Q.  Does this refresh your recollection
25   on what the $150,000 wire transfer was for?

---

227

1         A.  No.
2         Q.  Okay.
3             You don't know anything about this
4    wire transfer?
5         A.  Well, I -- no.  I mean, I don't
6    remember making it, but...
7         Q.  Okay.
8             And you testified earlier that
9    Arleta Keith is your mother?
10        A.  Yes.
11        Q.  So you appear to be wiring $150,000
12   to your mother.
13        A.  That's what this appears to be.
14        Q.  Okay.
15             And are you also list names on the
16   USAA bank account that ends 4644? (Sic)
17        A.  No.
18        Q.  You're not? (Sic)
19        A.  No.
20        Q.  Okay.
21             The next page after the page --
22        A.  I don't think so.
23        Q.  The next --
24        A.  Maybe I am.  I don't know.
25        Q.  Okay.

---

228

1             The next page after the page with
2    the green tab, this is another wire transfer.
3    The bank is PlainsCapital Bank.  The amount is
4    $125,000.  The date is May 19th, 2016.
5         A.  Okay.
6         Q.  And it's going to USAA Federal
7    Savings Bank.  The beneficiary again is listed
8    as Arleta Keith, and the account ending 4644.
9             Do you have any recollection about
10   what this $125,000 wire transfer was for?
11        A.  I mean, I -- -- I I see the
12   transaction.
13        Q.  Okay.
14             But you don't recall the
15   transaction?
16        A.  No.
17        Q.  And the account is USAA account
18   ending in 4644.
19             You don't recall whether you were a
20   name on that bank account?
21        A.  No.  I know I was on that bank
22   account.  I'm not sure if I am now.  I may be.
23   I can't remember.
24        Q.  All right.
25             (Exhibit No. 24 Marked)

---

57 (Pages 225 to 228)

FTC v. iBackPack of Texas, et al.                                                          12/12/2019

---

229

1          MR. ROY:  I am handing you a
2    document that's been marked Exhibit
3    No. 24.
4          THE WITNESS:  Okay.
5          MR. ROY:  And this is a USAA bank
6    statement for the account ending 4644.
7    The date on the bank statement is
8    November 22nd, 2017.
9          THE WITNESS:  Okay.
10         MR. ROY:  And at the top it has
11   listed on there, "Arleta June Keith or
12   Doug Monahan."
13         THE WITNESS:  Uh-huh.
14   **Q.   (BY MR. ROY)  Does this refresh**
15   **your recollection at all about whether you**
16   **were named on the account?**
17         A.   Well, I was named on the account
18   then.
19   **Q.   Okay.**
20         A.   You were asking me earlier if I was
21   on the account now.
22         I don't think so.
23   **Q.   Do you recall whether you were**
24   **named on the account in May 2016?**
25         A.   I believe so.

---

230

1    **Q.   Mr. Monahan, if we can turn back to**
2    **the general ledger for a moment.**
3          A.   Okay.
4    **Q.   And that was, I believe, marked**
5    **Exhibit 22.**
6          A.   Okay.
7    **Q.   So if you could turn to Page 54 on**
8    **this document.**
9          A.   Okay.
10   **Q.   Okay.**
11         A.   I'm close to it.  Well, I don't
12   have that page, it looks like.
13         Hold on here.
14         Okay.  I got it.
15   **Q.   Okay.**
16         **Towards the top there's a section**
17   **that's labeled, "Member Contribution."**
18         A.   Okay.
19   **Q.   Do you see that?**
20         A.   Where is it?
21   **Q.   Not at the very top of the page,**
22   **but towards the middle.**
23         A.   Okay.  Right there.  Okay.  I see
24   it.
25   **Q.   "Member Contribution."**

---

231

1          A.   Okay.
2    **Q.   And then there are various**
3    **transactions that are listed underneath there.**
4          A.   Okay.
5    **Q.   Okay.**
6          A.   I see them.
7    **Q.   You testified earlier that if there**
8    **was a record of the money you contributed to**
9    **the campaigns, it would be in the general**
10   **ledger.**
11         **Is this where that record would be?**
12         A.   Well, I don't know about right
13   here, but somewhere in the 150 pages, I would
14   think it would be.
15   **Q.   But you don't know if it's in the**
16   **"Member Contribution" section?**
17         A.   No.
18   **Q.   You don't know where else it would**
19   **be in the general ledger?**
20         A.   No.  It would be in one of these
21   150 pages, or maybe a combination of all of
22   them.
23         MR. ROY:  Take a five-minute break.
24         (Brief Recess Taken.)
25         MR. ROY:  All right.  We are back

---

232

1    on the record.
2    **Q.   (BY MR. ROY)  Okay.**
3          **Mr. Monahan, you testified earlier**
4    **that the money the crowdfunding -- the money**
5    **you received through the crowdfunding**
6    **campaigns went into your PayPal account and to**
7    **your PlainsCapital Bank account.**
8          **Is that correct?**
9          A.   Yes.
10   **Q.   Okay.**
11         **Was that only used for crowdfunding**
12   **purposes, those bank accounts?**
13         **Were those bank accounts only used**
14   **for crowdfunding purposes?**
15         A.   No.
16   **Q.   What else?**
17         A.   They were used to pay all the
18   vendors and pay the contractors.
19   **Q.   Okay.**
20         **But they were only used to pay**
21   **vendors and contractors for the crowdfunding**
22   **campaigns; is that correct?**
23         **They weren't used for any of your**
24   **other companies?**
25         A.   Well, that's not true.  I mean,

---

58 (Pages 229 to 232)

Monahan

FTC v. iBackPack of Texas, et al.                                          12/12/2019

233

1   the -- I use PayPal to pay any business
2   expenses that I have.  And occasionally it
3   pays for some personal, but not much.
4       Q.  Okay.
5           So that PayPal account might have
6   been used to pay some personal expenses, it
7   might have been used to pay expenses for some
8   of your other businesses?
9       A.  Yeah.  But not a great deal.  Yeah.
10      Q.  And what about the PlainsCapital
11  Bank account?
12          Would that have been used to pay
13  for any expenses outside of the crowdfunding
14  campaigns?
15      A.  No.  I mean, I use my credit cards
16  for my own personal stuff, and so the business
17  accounts are for the business stuff.
18      Q.  Okay.
19          So you wouldn't are had any GoTech,
20  Mobilezapp or DayBreak expenses that would
21  have come out of the PlainsCapital Bank
22  account?
23      A.  Not directly.  I mean, unless
24  PlainsCapital is reimbursing me for money that
25  I put into -- money I put into Mobilezapp -- I

234

1   mean, to iBackPack.
2       Q.  Okay.
3           But you're not aware of any
4   expenses related to GoTech and Mobilezapp that
5   would have come out of your PlainsCapital Bank
6   account?
7       A.  No.
8       Q.  Okay.
9           And you testified earlier that you
10  ordered -- that you had identified vendors for
11  some of the components and that you had
12  ordered a certain number of components from
13  those vendors.
14          Is that correct?
15      A.  That what?
16      Q.  You testified earlier that for some
17  of the components, you had ordered components
18  from your vendors and you had actually
19  received components.
20      A.  Yeah.  Yeah.  Quite a few.
21      Q.  Okay.
22          Do you have any records that
23  reflect the orders from those vendors?
24      A.  Yeah.  They're in PayPal.
25      Q.  The records are in PayPal?

235

1       A.  Uh-huh.
2       Q.  Invoices?
3       A.  Maybe.  If they sent invoices.
4       Q.  Anything that would indicate how
5   many of the product you ordered or what you
6   ordered?
7       A.  If it's in PayPal, it's there, I'm
8   sure.  They would provide that.
9           I mean, I don't actually have -- I
10  don't have actual, like, hard-copy invoices.
11  But the -- all the transactions are in PayPal,
12  and vendors can send invoices to PayPal, too,
13  and have descriptions there.
14      Q.  And if they -- if the vendors sent
15  invoices to PayPal, would that be something
16  that was reflected in the spreadsheet that you
17  sent us?
18      A.  I would hope so.  Yeah.
19      Q.  Just the transaction or the actual
20  inventory would be included in there?
21      A.  Well, I asked him to put
22  everything, so I would hope he'd have
23  everything.
24      Q.  And outside of PayPal, do you have
25  any records that would document what

236

1   components you ordered, how much?
2       A.  No.
3       Q.  Okay.
4           And it sounds like there were over
5   4,000 backers for the iBackPack.
6           Is that correct?
7       A.  Yes.
8       Q.  It sounds like for many of those
9   components, you never ordered 4,000 units.
10          Why didn't you order enough
11  components for the -- all the backers to
12  receive?
13      A.  We hadn't even gotten out of beta.
14      Q.  Okay.
15          So are you still in beta?
16      A.  Now we are.  I mean, the whole
17  project's been held up because of this
18  lawsuit.  But the iBackPack project is not
19  over.
20      Q.  Not over.  Okay.
21          So are you still in the beta phase?
22      A.  I suppose, I mean, if you want to
23  call it that.  We're on hold.  Until this
24  lawsuit is finished up, everything is just on
25  hold.

59 (Pages 233 to 236)

Monahan

FTC v. iBackPack of Texas, et al.                                                    12/12/2019

---

237

1    Q.  Okay.
2        So --
3    A.  I never, ever, said that this
4    program is canceled.  Ever.
5    Q.  So have you finalized who your
6    vendors are for your batteries?
7    A.  No.
8    Q.  And -- let's see.
9        It's December 12, 2019, right now.
10   That campaign launched in August of 2015.
11       So it's been over four years and
12   you still haven't finalized who the vendor is
13   for that campaign?
14   A.  IBackPack was started to ship
15   10,000 backpacks a month, not to ship
16   4,400 units without any sort of support
17   mechanisms.
18   Q.  So are you saying you're not
19   capable of producing a smaller number of
20   backpacks?
21   A.  I'm saying that we're not going to
22   produce anything until we have an
23   infrastructure in place so that we can
24   support.
25       It's not just about sending out

---

238

1    4,400 bags and saying, "Here."
2        What if they have a problem with
3    the bag?
4        What if the -- what if the strap
5    breaks?
6        I mean, the whole point of starting
7    this company is to build a company, not to
8    ship 4,000 backpacks.  These people did not
9    buy 4,000 -- did not buy any backpacks.  They
10   contributed money for me to build a company.
11   Q.  So are you saying you're not going
12   to ship backpacks until you have 10,000
13   orders?
14   A.  No, I didn't say that.  I'm saying
15   that until we have the systems in place in
16   order to support the backers, as well as to
17   continue to sell backpacks, we can't do
18   anything.
19   Q.  Because you're worried that there
20   won't be customer support if something happens
21   to the backpack, or if a repair needs to be
22   made?
23   A.  Well, yeah.  Of course I am.
24   Q.  Well, right now, nobody has a
25   BackPack.

---

239

1    A.  Well, maybe they would if I -- if I
2    weren't in here talking to you.
3    Q.  Okay.
4        Have you finalized the vendors for
5    the other components for the iBackPack?
6    A.  Everything is on hold.  No.
7    Q.  Okay.
8        And you said you're still trying to
9    produce the iBackPack.
10       Is that correct?
11   A.  I'm going to produce the iBackPack,
12   yes.  We're going to ship the backpack.
13   Q.  Okay.
14       What efforts have you made since
15   November 2016 to produce and distribute the
16   iBackPack?
17   A.  Since the 16th?
18   Q.  Since November 2016.
19       What efforts have you taken since
20   November 2016 to produce and distribute the
21   iBackPack?
22   A.  To the 4,400 people or to build the
23   company?
24       The whole purpose of starting the
25   backpack is to build the company, not to ship

---

240

1    4,400 units.
2    Q.  Okay.
3        What --
4    A.  So every single thing I've done
5    since that time has been to support this.
6    Sitting here, talking to you, is to support
7    the efforts to ship these bags.
8    Q.  And these -- by "these bags," you
9    mean these 4,400 bags?
10   A.  Yes.
11   Q.  So what specific steps have you
12   taken to try to produce the backpacks since
13   November 2016?
14   A.  We're not -- a start is to build a
15   company, not to ship 4,400 units.
16   Q.  So is your testimony today that you
17   have not taken any steps --
18       (Simultaneous speaking.)
19   A.  No --
20   Q.  -- since November 2016?
21   A.  No.  I've taken many, many steps.
22   Q.  Okay.
23       What are those steps?
24   A.  Well, far too many to list here.
25   Q.  Well, let's -- let's start with the

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

---

241

1    first step.
2         A.  How about sitting here with you,
3    talking about it?
4         How about every single letter that
5    I've written to you, explaining to you what
6    I've done?
7         Every single meeting that we've had
8    is to keep this going.
9    Q.  Okay.
10        So outside of the iBackPack
11   litigation, what steps have you taken to try
12   to produce the backpack?
13        A.  We haven't been producing the
14   backpack.  I've been working on the
15   infrastructure and the systems in place.  It
16   is start a company.
17        The whole point is to not just ship
18   bags to people.  If we ship bags to people,
19   they'll have no customer service.  That's not
20   the reason we -- that I did this.
21        And that's not what iBackPack
22   and -- I mean, that's not what Indiegogo and
23   Kickstarter have on their website.  The whole
24   purpose for people going there is to start a
25   company, not just to ship product.  It's not

---

242

1    Walmart.
2    Q.  Okay.
3         So what efforts have you taken
4    since November 2016 to build the
5    infrastructure?
6         A.  Well, thank you.
7         My gosh.  Way too many to list
8    here.
9    Q.  Can you list any here?
10        A.  Sure.
11        Go through here (indicating).
12        MR. ROY:  So let the record reflect
13   that Mr. Monahan lifted up and put down
14   the general ledger.
15        THE WITNESS:  Here's a listing of
16   every single expense that we've had.
17   Q.  (BY MR. ROY)  Can you identify any
18   specific steps that you've taken?
19        A.  Yes.
20        You need to go through and read
21   those.
22   Q.  Well, I'm asking if you can
23   identify any.
24        A.  Yes.
25   Q.  What specific steps?

---

243

1         A.  It's far too long to mention.
2    Q.  All right.
3         MR. ROY:  I think we'll go off
4    record.
5         (Brief Recess Taken.)
6         MR. ROY:  I think we're done.
7         (Deposition concluded.)

---

244

1              CHANGES AND SIGNATURE
2    WITNESS NAME:  DOUGLAS MONAHAN
3    DATE OF DEPOSITION:  DECEMBER 12, 2019
4    PAGE    LINE    CHANGE       REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18        I, DOUGLAS MONAHAN, have read the
19   foregoing deposition and hereby affix my
20   signature that same is true and correct,
21   except as noted above.
22
23
24   _____
25   DOUGLAS MONAHAN

---

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

FTC v. iBackPack of Texas, et al.                                    12/12/2019

245

```
1
2
3      THE STATE OF _____)
4      COUNTY OF _____)
5
6           Before me,
7      _____, on this day
8      personally appeared DOUGLAS MONAHAN, known to
9      me (or proved to me under oath or through
10     _____) (description of
11     identity card or other document) to be the
12     person whose name is subscribed to the
13     foregoing instrument and acknowledged to me
14     that they executed the same for the purposes
15     and consideration therein expressed.
16           Given under my hand and seal of
17     office this _____ day of
18     _____, _____.
19
20
21     _____
22     NOTARY PUBLIC IN AND FOR
23     THE STATE OF _____
24     COMMISSION EXPIRES: _____
25
```

246

```
1              REPORTER'S CERTIFICATION
2
3           I, Kateri A. Flot-Davis, Certified
4      Shorthand Reporter in and for the State of
5      Texas, hereby certify to the following:
6         That the witness, DOUGLAS MONAHAN, was duly
7      sworn by the officer and that the transcript
8      of the oral deposition is a true record of the
9      testimony given by the witness;
10        I further certify that I am neither counsel
11     for, related to, nor employed by any of the
12     parties or attorneys in the action in which
13     this proceeding was taken, and further that I
14     am not financially or otherwise interested in
15     the outcome of the action.
16        Certified to by me this 17th day of December,
17     2019.
18
19
20
21     s/Kateri A. Flot-Davis
22     Kateri A. Flot-Davis
23     Texas CSR No. 8462
24     Expiration Date: 12-31-22
25
```

62 (Pages 245 to 246)

FTC v. iBackPack of Texas, et al.

12/12/2019

[247]

---

**A**

**a.m** 1:19
**ability** 12:3
**able** 43:25 84:17
 141:23 167:10
 169:6,12 185:22
 220:25
**accept** 167:18
 169:22,22 170:1,8
**accept,'** 190:14
**accepted** 183:16
 190:3,11
**access** 62:17 144:18
 147:6 155:17,24
 182:9 193:11
**accomplish** 194:5
**account** 7:6,11 8:2
 44:12,21,22,23
 45:1,11,14,15,20
 45:25 46:3,4,8
 47:21,25 53:1 55:5
 55:10,17 63:2,6,12
 63:13,15 71:5
 129:5 144:19
 150:13,20 151:5,8
 153:19 154:3
 155:25 182:9
 186:19 188:5,7
 189:14 193:8,12
 199:6 200:21
 201:3,13 213:21
 214:3,8,8,11
 217:13,16 218:8
 226:5,18 227:16
 228:8,17,17,20,22
 229:6,16,17,21,24
 232:6,7 233:5,11
 233:22 234:6
**accountant** 138:13
 138:17
**accounting** 208:16
 209:14,15,21
 210:12,17
**accounts** 42:7,10,11
 42:12,13,14,15,18
 45:22 46:16,19,22

47:6 52:11,14 53:4
 53:5,11,15,25
 62:13,17,21 63:7,9
 63:10,19 199:1,9
 199:12,15,18
 200:18 201:1
 213:20 232:12,13
 233:17
**accurate** 56:8,23
 57:13 207:22
**accurately** 12:3
**acknowledged**
 245:13
**action** 246:12,15
**activities** 208:5,6
**actual** 235:10,19
**adapt** 106:6 171:17
**adapted** 106:4 172:2
**added** 86:16 106:14
 132:13,24
**adding** 86:21
**addition** 30:8
**additional** 106:7,10
**Additionally** 136:13
**address** 12:14 13:2
 13:5,9,15 20:9
 38:8 122:15
 128:18 133:22
 177:16 181:25
 188:23 189:1
 190:14 203:4
**addresses** 53:24
**adjust** 106:20
**adjustable** 106:18
**Adobe** 43:5,6,7
**advance** 75:1
**advertise** 70:7,8
 71:14
**advertising** 34:19
 34:25 35:1 87:8,17
**aesthetic** 101:8
**affect** 12:2 46:4
**affix** 244:19
**Agency** 91:25 92:2
**agent** 187:3 189:17
**ago** 9:12 10:5,6
 12:18,19 13:20,23

36:17,17 47:12,14
 47:22 149:17
 162:20 178:22
 200:17 215:18
 220:18 223:16
 224:12
**Aldiano** 5:6 77:7,9
 78:5
**Aleksander** 91:10
 91:12,13
**Alemeid** 78:22
**algorithms** 32:6,7
 73:12,14
**alleges** 56:6,21
 57:11
**allows** 36:2
**Amazon** 92:12,15
 92:20,21 93:4,9
**amount** 103:20
 216:18,19 226:21
 228:3
**Amp** 6:16
**Android** 30:3
 106:13 112:24
 113:7
**announced** 142:4
**answer** 10:24 11:2,3
 11:4,12,19 19:19
 79:15 132:18,21
 144:25 155:4
 160:19 209:10,17
 210:9,10,21,24
 220:25
**answers** 10:10
**anticipated** 145:8
**Anybody** 151:11
 155:20
**API** 36:2,5
**apologize** 75:1
**app** 72:4,8,15,18
 73:3,5,7
**Apparently** 140:24
**appeal** 101:9
**appear** 48:25 49:1
 129:19 136:7
 154:2 168:25
 193:19 197:9

207:16 216:7
 227:11
**appeared** 132:15
 245:8
**appearing** 134:19
**appears** 39:18 74:20
 129:13,17,21
 145:11 153:22
 157:7 167:20
 169:1,8,11 182:18
 183:8 185:3
 188:23 189:13
 190:6,17,22 193:2
 193:7,15 194:6,9
 194:11 195:14
 205:13 208:17
 209:13 214:15
 216:8 217:6 225:7
 227:13
**application** 29:24
 36:6
**applications** 30:2,8
 32:2
**appreciate** 112:18
 118:8
**approve** 69:15
 71:17,19
**approving** 71:23
**approximately** 13:7
 13:8 15:22 20:22
 21:8 29:15 31:17
 36:25 53:8 54:9,24
 55:20 57:19 99:19
 99:20 100:6
 102:24 114:5
 119:21 200:7
 201:24
**Apps** 4:19 30:24
**arcing** 23:16
**area** 75:18 77:19
 78:11 81:10,17
 82:6,22 83:10,19
 84:10 203:8
**areas** 84:12
**argue** 163:6
**Arleta** 8:3 187:3,5,8
 226:18 227:9

228:8 229:11
**Armenta** 80:3,5
 140:15 142:15,16
 183:2 190:2
**army** 93:15
**ASAP** 182:1
**ascertain** 141:24
**asked** 45:8 106:10
 145:24 170:13
 196:21 200:17
 201:1 209:11
 210:23 218:24
 235:21
**asking** 10:8 11:19
 34:11 45:13 50:5
 106:7 155:5,9
 186:12 190:8,17
 207:4 209:15,20
 209:22 210:7,8,12
 210:14,17 217:21
 219:18,20 220:24
 221:1 229:20
 242:22
**asleep** 53:22
**assembling** 77:2
 79:12,14 81:4
**assembly** 81:6
**assist** 79:24
**assistance** 77:15
**assisted** 79:22
**assume** 83:12 92:6
 205:16 210:1
**assure** 141:18
**AT&T** 105:6,12
**attacked** 43:8
**attempted** 71:21
**attorney** 1:22 9:19
**attorneys** 246:12
**Audible** 21:21 37:1
 44:16 170:19
 177:6,8 200:15
**audibly** 35:15,16
**August** 31:6 180:4
 237:10
**Austin** 13:1 20:8,18
 21:13,17 22:15
 203:1,22,24

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[248]

**authorization** 168:3
**authorized** 145:2
  166:25 168:6
  188:18
**authorizing** 190:18
**Avenue** 2:7
**aware** 81:11 126:23
  160:25 179:12
  186:8 187:10
  191:9 214:13
  234:3
**awhile** 36:18,20

**B**

**B-to-B** 25:18
**back** 33:20 50:1,20
  86:24 92:11 93:23
  101:14,18 138:2
  147:8 149:15
  170:21 189:23
  192:7 208:25
  230:1 231:25
**backed** 51:19
**backers** 61:16,19,22
  62:5,9 96:22 121:2
  136:24 137:10,13
  142:3,22 143:7,11
  143:21 158:22
  162:11 165:24
  169:15,18,22
  170:7 183:15
  184:23 190:3,17
  192:5 194:17
  195:16,24 197:22
  198:2,12 236:5,11
  238:16
**backpack** 19:2
  54:14 76:15 96:9
  96:10,15,19,24
  97:7,10,13,14
  98:18 102:10
  104:11 115:6
  119:8 135:6 136:8
  145:19,25 146:3
  238:21,25 239:12
  239:25 241:12,14
**backpacks** 237:15

237:20 238:8,9,12
  238:17 240:12
**backup** 50:22
**bag** 6:14 97:16,17
  97:22 98:22 100:1
  135:24 163:15,24
  164:1,2,17,25
  165:3,6,10,13,18
  165:19,21,25
  169:19,23 194:1
  194:10 238:3
**bags** 99:9 100:3,7,9
  169:2 238:1 240:7
  240:8,9 241:18,18
**bank** 7:24 8:1 42:19
  42:21 43:11 44:21
  44:22 53:3,5,11,15
  63:16,18 188:2
  189:14 199:4
  214:3,7,11 226:5
  226:12,15 227:16
  228:3,3,7,20,21
  229:5,7 232:7,12
  232:13 233:11,21
  234:5
**banks** 53:19,23
  63:10
**Bar** 4:24
**based** 121:14 144:17
  152:8
**basically** 73:6 89:21
**basis** 181:2 182:22
  201:10
**Bates** 135:18
**batteries** 18:24
  97:18 114:10
  115:21 118:23
  119:4,7 121:4,14
  121:17,19,24
  122:1 123:21
  124:5,9,13 125:10
  125:12 126:2
  127:2,9,17,21,24
  128:1,15 129:20
  129:22 130:2,4,11
  135:20,23 136:9
  136:22 142:1

145:12 147:24
  148:4,8,13,17,20
  149:2,6,9,12,19,23
  149:24 151:23,24
  152:10,13,25
  154:12,14,15
  156:11,12,13,19
  156:19,21,24,25
  157:2,3 158:19,21
  159:8,9,20,20
  160:2,2,6,8,9,10
  160:11,14,16,17
  160:20,21,23
  161:1,7,22,25
  162:10 195:5
  237:6
**battery** 6:15 112:20
  113:2,21,22 114:8
  115:22,24 117:2,4
  117:8,18,19
  118:11,15 119:12
  119:18 120:2,14
  120:18,20,23
  125:4,6,8,15,17
  126:18,21,25
  135:8 136:4 137:8
  141:13 142:24
  143:22 149:15
  158:18,24,25
  160:4 161:8,18,21
  162:4,7
**began** 27:9 57:7,12
  65:15
**begins** 123:3 135:19
  136:12,21 141:22
  178:13
**begun** 15:20 27:11
  72:20
**behalf** 129:6 131:6
  134:22,24 138:14
  140:23 142:17,17
  142:19 144:20
  151:17 156:4,4
  183:9 201:15
**believe** 12:21 14:20
  15:10 20:4 28:21
  29:2 41:25 42:4,8

44:12,17 48:15
  50:25 54:23 56:19
  63:20 72:22 76:20
  77:11 91:13,18,19
  93:10 109:7
  110:11 112:2
  116:9 117:8,20,21
  119:13 122:20
  126:19 127:25
  128:23 130:19,22
  131:8,15 133:2
  134:9,12 135:2
  139:5 140:17
  142:11 144:13,16
  145:1 146:16
  148:21 149:1
  150:25 152:9,15
  153:8 155:1 157:4
  157:22 158:6,8
  159:10 166:20
  167:2 171:1,5,16
  171:25 172:16,22
  174:13 175:1,16
  175:25 176:3
  177:21 178:8
  179:8 180:19
  182:2 183:14
  184:12,19,24
  185:7 189:19
  192:1,12,25 193:3
  194:15,19,21,23
  194:24 195:1
  196:18 198:8
  199:10 202:21
  207:18,21 212:1
  214:12 220:15
  223:10 229:25
  230:4
**believed** 174:15
  175:19
**bell** 91:8
**beneficiary** 226:18
  228:7
**best** 197:2
**beta** 79:13 99:16,25
  103:3,5 104:4
  107:6 108:6

110:14 112:4
  113:25 116:11
  118:20 119:24
  121:2,4,7,17,22
  122:2 123:7,11,12
  123:17 124:12,14
  126:13 127:18
  129:14 130:9,16
  137:15 148:13
  149:7,8 153:1,8,10
  158:15 159:21,22
  159:25 160:10
  161:23 165:7
  176:18 195:6
  236:13,15,21
**better** 124:18 152:4
**big** 105:11 194:1
  223:5
**bills** 216:10
**bit** 96:6 158:20
  201:23
**Bitcoin** 199:22,25
  200:9,12,20 201:3
  201:13
**blocked** 54:3
**blow** 113:8 152:6
**Bluetooth** 102:7,19
  103:7 108:15,18
  109:13
**Bobic** 91:10,12,13
**Bochorishvili** 90:17
  90:20
**body** 50:16 101:18
**bold** 213:9 221:15
**Bonnici** 74:25 75:3
  75:7 76:6,9 77:2
**bottom** 123:2
  131:18 132:6,12
  134:14,16 135:12
  135:15 153:21
  154:7 174:8 180:3
  185:6 187:2
  188:17 193:22,25
  213:2 221:14
  223:2 226:17
**bought** 223:12
**Boulevard** 13:3

FTC v. iBackPack of Texas, et al.                                      12/12/2019

[249]

**boxes** 99:22 124:12
**brand** 178:20
**brands** 123:23
**break** 12:7,8,9
   37:21,23,25 38:2
   43:18,18 46:24
   47:1 162:16,20
   231:23
**breaks** 12:6 163:1
   238:5
**Breckon** 88:15,18
   95:16
**brief** 12:6 46:24
   47:1,3 162:17
   196:20 231:24
   243:5
**broad** 40:23 45:11
**Brochure** 81:23
**Brochures** 24:9
**Broken** 37:20
**brought** 147:7
**Brown** 215:1,3,14
   219:6
**build** 238:7,10
   239:22,25 240:14
   242:4
**building** 186:7
**built** 111:12 135:20
**built-in** 197:3
**business** 18:11
   29:16 33:5 90:12
   188:18 221:22
   222:2,6,12 233:1
   233:16,17
**Business-to-busin...**
   25:16
**businesses** 233:8
**buy** 238:9,9

————————
                **C**
————————
**C** 2:1 9:1
**cable** 6:20 7:2 89:24
   90:2,16 106:14
   107:12 111:10
   113:13,14 115:5
   170:25 171:3,4,24
   183:17 191:2

197:4
**cables** 6:15 18:25
   107:25 113:13
   172:6,12,15,21,23
   172:24 173:2
   174:13,14 175:2,3
   175:13,15 180:8
   180:24 181:18
   182:13 184:3,11
   184:21,23 185:14
   190:5,19 191:11
   191:15 195:10,15
**call** 36:5 218:2
   236:23
**called** 14:1 15:4
   54:2 113:21 186:8
   186:13,23 187:11
   187:12 189:5
   221:16 223:3
   224:25
**calls** 36:2 39:4 70:15
   70:17,20 71:2
   121:8
**campaign** 16:14,17
   16:20,24 17:6 54:9
   54:9,11,25 55:3,6
   55:12,13,14,21
   56:7,11,15,17,18
   56:22 57:4,7,8,17
   57:21,24 58:4,25
   59:2,16 60:5,6,9
   60:13 61:13,15
   63:21,24 64:2,5,12
   64:15,16,21 65:12
   65:15,19,21 66:3,4
   66:6,16,18 67:1,3
   67:4,6,18,19,24
   68:1,4,7,9,13,18
   69:13,17 70:2,6
   74:7 140:6,8
   153:17 166:12
   167:11 168:23
   169:6,9 170:5,14
   170:18,25 173:13
   173:17,21,24
   174:2 179:21
   181:22 191:1

194:7,13,21 196:5
   196:24 197:11,24
   199:2,7,13,16,19
   237:10,13
**campaign-related**
   92:18
**campaigns** 17:4,9
   18:7,12 54:7 55:8
   61:13 74:21 75:3
   77:9 78:24 80:5
   82:14,19 88:1 91:7
   91:17 92:5 178:14
   198:17 199:23
   200:8,19 201:2,15
   201:20 212:13
   214:10 219:16,22
   220:5,14 221:6
   231:9 232:6,22
   233:14
**canceled** 145:6
   237:4
**capability** 101:10
   113:23
**capable** 237:19
**Capitol** 215:20
   219:6
**car** 105:22 106:18
   106:21,24 196:5,8
   196:22 197:1,9,14
   197:17,23,24
   198:2
**card** 112:19 115:22
   117:2,19 119:11
   124:24 125:4
   130:1 154:11
   156:11,18 188:2
   245:11
**cards** 233:15
**carry** 208:24,25
**case** 1:6 136:3
**cash** 201:19 202:5
   202:15,20 203:13
   203:16,21
**catching** 141:13
   158:19
**category** 221:16
**caught** 148:24

**cause** 1:18 141:9,14
   152:6
**causing** 123:22
   151:23
**CCR** 1:20
**CEO** 25:23 31:25
   33:18 36:9 57:25
   58:2,3 62:1 68:8
   71:9,12 131:6
   141:25 161:15
**certain** 93:3 108:25
   234:12
**certainly** 44:22
   114:7
**certificate** 4:5,11,17
   15:5 26:19 27:3
   30:21
**certification** 188:12
   246:1
**certified** 123:25
   246:3,16
**certify** 246:5,10
**chain** 122:12 128:12
   133:18 157:12
   177:12
**chance** 136:1 157:17
**chances** 136:25
**change** 69:17
   106:20 117:2
   118:11 120:18,22
   126:21 128:2
   130:8 132:18,20
   161:17,20 244:4
**changed** 122:1
   133:12 160:14
**changes** 121:14
   122:6 244:1
**changing** 53:18,21
**character** 88:20
**charge** 68:14 71:23
   111:12 113:23
   173:1
**charged** 113:17
   173:7 174:13,20
   175:14
**charger** 105:22
   106:22 109:21

111:11 196:6,8,22
   197:1,10,23,24
   198:9
**chargers** 106:19,24
   110:8 197:14,19
   198:2
**charges** 114:13
**charging** 106:12
   113:16 174:10
**cheap** 93:16
**checked** 48:19
**chief** 14:11 31:23
**China** 22:24
**Chinese** 101:3
   118:24 119:4,21
   119:15 120:10
   123:25 125:23
   128:5
**Chiu** 5:22
**chose** 101:1,2
   125:19,20
**chosen** 135:23
**Civil** 1:24 163:9
**claim** 38:16
**claimed** 121:19
   149:18
**clarify** 198:23
**cleaners** 215:1,3,4
   215:15 219:6
**clear** 52:6 132:10
**close** 167:10 168:23
   169:1,6,9 181:21
   230:11
**closed** 27:23
**cloud** 92:21,21
**clueless** 218:10
**code** 4:24 32:11 36:2
   52:22 72:17,20
   73:21 74:1 203:8
**coder** 32:5 89:13,15
**coders** 32:13
**coffee** 43:16
**coin-based** 201:17
**collaborate** 84:17
   85:8
**collaborated** 84:21
**collaborative** 68:15

FTC v. iBackPack of Texas, et al.                                          12/12/2019

[250]

72:9 75:8 76:3
78:19 79:25 80:18
82:21 83:25 88:24
89:3 94:21,22
96:16
**collateral** 24:9
**Colonial** 2:14 12:15
100:16,16
**column** 213:19
**combination** 164:5
171:12 231:21
**combo** 106:3 111:10
**come** 14:14 95:24
193:15 205:6
214:10 233:21
234:5
**Comedic** 89:7
**comes** 106:11
**coming** 53:25
154:22
**comment** 144:7,11
144:14 151:22
152:12,15 153:20
153:21 154:7,24
155:2 156:4,10
**comments** 121:10
140:22 141:4
153:16
**Commission** 1:4 2:6
9:20 147:24 148:5
204:25 245:24
**communicate** 35:13
58:7 59:19 60:8
61:16
**communicated**
58:10 59:1,5,8,23
60:12,18,20 62:9
**communication**
35:12,17 61:22
62:7 87:8
**communications**
43:12 58:17,21
59:14 60:2 61:18
61:25 62:4
**companies** 23:6,20
23:23 24:5 29:6,19
32:24 33:21 34:1,4

37:5 82:8 105:11
205:24,25 206:5
207:19 232:24
**company** 1:9 4:8
14:1,5,16 15:24
16:1,4,7,10 18:6
20:1 23:9 25:22,25
26:1,25 27:9,18,20
28:2,16 29:9 31:8
31:11,22 32:21
34:9,14,17 36:15
37:3 62:14 68:15
93:24 95:11,14
96:11 100:21
104:16 106:1
107:16 109:25
111:15 115:10,25
117:12 119:4,12
119:15 120:10
125:24 131:5
141:5,25 142:18
142:19 143:10,20
156:5 158:13,24
159:7,17,19,21
160:1,3,14 161:15
167:24 186:8,13
186:22 187:11,12
187:16 189:5,11
189:20,20 206:23
207:14 208:1,5
210:3,8,11,15,16
215:2,21 216:2
217:1 223:3,4,22
238:7,7,10 239:23
239:25 240:15
241:16,25
**company's** 62:12
208:4
**compensated**
218:13,20,23,25
219:1
**compensation** 38:20
217:11
**complaint** 56:6,21
57:11
**complete** 10:10 11:3
41:21 171:24

**completely** 65:4
72:19 147:8 194:7
**complies** 123:1
**component** 61:9,11
100:20 102:9,12
104:12 105:25
107:15 109:24
111:14 137:4
**components** 76:11
76:13 79:21 96:7
97:10 105:23
110:22 145:20
234:11,12,17,17
234:19 236:1,9,11
239:5
**compromised** 42:22
43:3,4 48:13,16
49:24 53:5,15
**Comptroller** 7:5
186:20
**computer** 32:12
39:25 40:3,7,10,12
40:17,20 41:2,5
42:1 73:16,18
**computers** 30:11
37:15,16 39:19,23
39:24 40:14 41:8
41:10,12,16,20,21
42:7,25 85:10
**concluded** 243:7
**conducting** 163:19
**conferring** 103:14
**confidential** 132:11
**configurations** 76:1
**connection** 90:10
199:2 200:18
201:2
**connectivity** 90:3,4
**consideration**
245:15
**considering** 148:8
148:10
**consumer** 25:19
**consumers** 25:17
137:19 143:2,4
145:12,24 162:10
170:1 190:25

191:6,11,15,22
194:25
**contact** 24:13 25:14
25:16,19 43:9
60:23,24
**contacted** 61:9
198:15
**contain** 129:20
**content** 69:13 71:17
71:20,24 78:8
**continue** 238:17
**continuing** 136:20
**contract** 93:8
**contractor** 74:24
83:22 95:7,20
130:23 182:3
183:5
**contractors** 20:12
20:15 21:1 59:7,23
60:11 61:21 62:8
67:10 68:24 71:13
74:6,20 95:10
129:4 140:18
151:13 167:4
176:17 178:5
180:20,24 193:13
193:16 200:11
203:11 232:18,21
**contractors'** 67:12
**contributed** 195:25
219:9,16,21 220:5
231:8 238:10
**Contribution**
230:17,25 231:16
**contributors** 54:13
54:15
**control** 62:12
**copied** 51:5
**copies** 48:20,23
49:10
**copy** 48:10,12 49:20
51:6 76:2 77:16
82:21,23,24 89:6
196:17
**copyrighting** 75:15
77:15
**corner** 27:2 179:25

**corporate** 63:10,11
63:12,18 138:4
217:16
**corporation** 4:12,18
14:6,9 26:20 28:13
28:19,22 30:22
**correct** 18:8 19:5
22:1 28:9 30:11
37:12 38:10 39:20
42:2 63:3 65:12
68:19 69:25 72:21
74:21 83:15 84:25
85:5 88:12 104:13
107:13 108:16
109:22 117:9
118:2 119:22
120:15 122:3
123:14 124:6
129:16 137:20
140:19 142:25
143:25 145:14,22
148:2 149:20
156:14 159:1,20
168:17,24 169:10
178:24 182:10
183:6,10 185:10
190:21 191:12,25
192:16 193:18
194:8,18 195:17
197:15 198:13
201:5 205:16
208:2,11 214:18
216:11,16 217:5
218:1 232:8,22
234:14 236:6
239:10 244:20
**corrupted** 51:2,4
**counsel** 9:21 103:14
246:10
**COUNTY** 245:4
**couple** 10:2
**course** 222:15
238:23
**court** 1:1 9:18 11:8
11:17 34:22 52:5
163:12 170:21
196:18

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[251]

**CPA** 202:10,23
205:3,5,15,19
206:9,22,25
207:12,25 208:22
209:18,25 210:6
212:4,6 214:20
216:22 217:14,20
217:22 218:1,10
219:17,18 220:2
220:21,22
**create** 23:17 24:4
44:3 68:4 72:17
76:4 164:14,16,21
165:6,12,18
**created** 35:3 43:23
67:6 69:6 73:13
88:9 91:19
**creating** 25:3,14
26:10 30:10 68:7
212:6
**creative** 77:14,21
78:7 79:4 80:16
81:18,18,20 83:12
83:23 84:16
**credit** 112:19
115:22 117:1,19
119:11 124:24
125:4 130:1
154:11 156:11,18
226:14 233:15
**crowdfunding** 16:14
17:4,6,8,12,18
18:6,11 19:10,12
19:15 54:7 198:17
232:4,5,11,14,21
233:13
**CSR** 1:20 246:23
**cup** 43:16
**current** 12:13 70:19
70:24
**currently** 34:2 37:6
83:18
**curve** 101:4,8
**curved** 101:17
**customer** 4:22 39:4
158:13 194:4
238:20 241:19

**customers** 70:19,24
70:24

———— **D** ————
**D** 9:1
**damage** 37:17,19
38:4 39:16 51:13
**DANIEL** 2:5
**data** 4:13 26:21
111:10,11 172:24
174:24 175:2
**database** 40:24 41:4
**date** 13:4 14:22
15:21 47:11 49:14
54:19 142:4 145:8
150:9 228:4 229:7
244:3 246:24
**dated** 4:8,14 5:13,18
5:23 6:4,12,25
7:21,25 123:3
**dates** 26:12
**David** 88:15,18
95:15
**dawned** 152:5
**day** 192:20 245:7,17
246:16
**DayBreak** 4:13
23:10,12 24:12
26:12,21 28:8,12
29:10 82:10 83:1,4
214:4,10 233:20
**days** 51:10,18 56:12
57:2,18
**DC** 2:8
**de** 78:22
**deal** 190:12 208:16
233:9
**dealing** 208:23
**death** 141:10
**Debit** 226:13
**December** 1:18
142:5,23 191:25
198:12 206:13
237:9 244:3
246:16
**decide** 165:17
**decided** 146:2

**decision** 121:23
141:8,18,25
143:15 162:5
165:9
**deemed** 136:3
**DeFelippo** 94:15,20
95:5
**DEFENDANT** 2:12
**Defendant's** 5:1
**Defendants** 1:14
**DeFilippo** 94:13
**definitely** 42:3
132:21 143:17
**delay** 141:7 143:16
**delayed** 135:7 136:8
143:21
**delays** 141:14
178:18,18
**deletes** 48:3,6
**delivered** 135:7
145:6 147:23
**delivers** 48:3,5
**delivery** 145:8
**Dental** 215:25 219:7
220:18 221:2
**dentist** 220:19
**dentist's** 216:4
**departments** 136:14
**depend** 51:24
**depends** 130:8
**deponent** 9:11
**deposited** 55:3,9,16
63:1,5,7
**deposition** 1:15 9:23
162:22 163:20
220:23 243:7
244:3,19 246:8
**describe** 24:21
33:16 111:6
163:15,23 170:17
**description** 4:3
24:23 83:14
196:10,22 245:10
**descriptions** 235:13
**design** 32:17 63:23
64:1,4,8 66:5,9,21
68:9 72:15 73:2,20

75:12,14 76:4
77:14,15,21 80:16
80:24 81:21,22,23
81:23 82:21,23,24
83:12,23,24 94:23
95:1 96:19 100:25
101:20 117:1
118:10 120:17
126:20 128:1
214:4,10
**designed** 63:22
64:15,19,24 65:2,4
65:11,23 66:1,15
66:19,25 72:8
96:11,13 100:21
101:4,5,8 102:13
104:16 106:1
107:16 109:25,25
111:15 115:10,25
117:12 120:3
125:18 127:3
164:3,7,12 171:10
172:13
**designer** 68:11 82:7
**designers** 72:10,12
**designing** 73:5
79:21 80:22 96:15
**designs** 73:22,25
79:22,24
**despite** 137:8
**destroyed** 41:13,17
**details** 211:24
**developed** 72:5,6
73:11
**developer** 91:14
**developing** 89:21
**development** 19:17
29:24 30:1,6,7
89:10,12,16,19
90:24 91:1
**device** 30:3
**devices** 173:1
174:13 175:14
**Dhanks@ftc.gov**
2:10
**DHL** 136:15
**difference** 95:8

**different** 18:19,23
19:1 23:5 39:22,25
40:4,13,16 41:8,10
97:10 98:11
114:10,13 117:21
132:1 161:7,18,20
191:7
**difficult** 35:2 40:8
207:11,15
**Dilaudid** 215:24
**direct** 25:9 58:16
60:1 61:24 62:1,20
71:10,12
**directed** 58:20
59:13
**directing** 62:4,6
**direction** 144:23,24
**directions** 71:16
**directly** 26:3,6,9
216:9 233:23
**Disclosure** 163:9
**disclosures** 5:3
74:12 86:5,11
**discovery** 37:9
198:24 204:24
211:19
**distinguishes** 95:4
**distribute** 239:15,20
**distributed** 127:18
127:20
**distributing** 126:12
**DISTRICT** 1:1,2
**division** 1:3 131:5
**doctor** 215:23
**document** 6:1 7:24
15:1,4,7 26:18
27:3 30:17,20
38:24 39:2,7,9
74:8,14,16 78:1
82:1 122:9 128:8
139:15 140:5,10
144:4 150:3 152:8
152:21 153:12
157:10 166:7
177:11 179:17,19
186:16 187:23
204:9,12,17,19,23

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[252]

205:2 206:4 210:7
211:1,5,13,23
212:3,6 225:25
229:2 230:8
235:25 245:11
**documents** 37:10,14
137:9 202:19
**doing** 28:2,7 29:16
31:11 33:4,13
34:11 37:6 76:23
83:3 89:21 150:24
187:20 189:8
**dollars** 57:5 165:24
218:17 219:12
**doubt** 141:23
**Doug** 5:1,11,16,21
6:3,8,10,23 8:4
122:12 128:12
133:18 142:7
144:9 146:9 150:9
153:24 157:13
166:15 177:13
180:5,18 181:7,14
185:4 188:12,19
193:8 229:12
**Doug.Monahan@...**
188:25
**DOUGLAS** 1:10,15
2:13 3:6 9:5 244:2
244:18,25 245:8
246:6
**draw** 213:2,13
214:22,23 216:8
217:6
**Drive** 2:14 12:15
**dry** 215:4
**dual** 101:13 113:23
**Due** 141:12
**duly** 1:17 9:6 246:6
**Duncan** 74:25 75:3
75:7 76:6,9 77:1,1
**Dunjerski** 83:7,19
**Dunjerski's** 83:10
**Dwmonahan@got...**
2:16

**E**

**E** 2:1,1 9:1,1
**e-mail** 5:11,16,21
6:10,23 25:12
35:17 40:23 41:1
42:7,15,18 43:13
45:3,7,11,22 46:22
46:23 47:8,21,24
47:24 48:2,3,5,20
49:18 52:15 53:17
70:15,25 71:1
85:11 122:11,14
122:18,21 123:2,3
123:11 128:11,14
128:17,21,24
129:5,14 131:9,16
132:13,16 133:3,4
133:15,18,21
134:3,7,10,16,20
134:21 157:12,18
157:20,23 158:23
167:15 177:12,16
177:19 178:1,10
181:23 185:3,9
188:23 189:1
190:9,13,14,18
193:1,5,8,12,15
**e-mailed** 211:17
**e-mails** 41:7 47:17
47:20 48:8,12,21
48:23 49:8,9,13,15
49:16,19 50:1,8,13
50:16,20 51:3,12
51:22 52:12 70:22
149:16 158:2
**earlier** 27:12 33:3
38:9 47:6 62:23
131:1 136:1,5
140:16 160:13
184:19 192:18,20
194:16 203:10
214:6 227:8
229:20 231:7
232:3 234:9,16
**early** 135:5
**easily** 141:19
**easy** 201:17
**effect** 42:24

**effort** 64:13,17,20
68:16 72:9 75:8
76:3 78:19 79:25
80:19 82:21 84:1
96:16 141:17
**efforts** 70:3,5,11,14
71:8,11,23 72:11
161:6 239:14,19
240:7 242:3
**eight** 207:22
**either** 10:13 134:12
144:17 167:3
175:11 178:8
185:8 192:13,25
193:16 198:5
201:3
**elaborate** 81:19
**electronic** 4:21 39:3
145:20 173:1
**electronics** 39:13,16
**elements** 171:22
**employed** 246:11
**employees** 20:12,15
20:20 21:1,5,16
59:4,6,22 85:3
202:4
**ended** 56:11 57:1,17
**endorse** 218:6
**ends** 227:16
**engage** 70:2 92:24
**engineering** 29:25
34:10
**entail** 73:5
**Entertainment**
221:16
**entitled** 162:21
**entity** 26:20 30:23
**ergonomic** 101:20
**ESQ** 2:4,5
**essentially** 218:16
**established** 62:23
**evaluated** 104:22
159:23
**evaluating** 104:23
**evaluation** 39:10,11
39:15
**everybody** 58:15

76:23 81:2 89:20
95:2 96:20,20
144:21 146:20
158:1 180:7,9
**everybody's** 158:2
165:15
**exact** 15:21 47:10
54:19 99:12
103:20 141:24
**exactly** 13:6 29:17
31:16 47:10 73:2
80:19 84:6 88:21
99:22 176:12
185:18 206:9
220:6
**Examination** 3:8
9:13
**examples** 18:21
**excited** 185:19
**exclusively** 55:5
**Excuse** 17:13
**executed** 245:14
**executive** 14:11 26:2
31:23
**exhibit** 4:5,11,17,21
5:1,5,8,11,16,21
6:1,3,7,10,14,19
6:23 7:1,5,11,15
7:20,24 8:1 15:1,2
26:16,16,17 30:17
30:17,19 38:25
39:1 74:9,10 78:2
78:3 82:2,3 122:9
122:10 128:9,10
133:15,16,17
139:13,15,25
140:1 150:1,3
152:19,21 153:13
157:8,10 166:7,8
170:22 173:10,12
173:12 177:9,11
179:15,17 186:16
186:17 187:21,24
189:24 192:8,8,13
204:7,9 211:2,3,5
225:20,22 226:1
228:25 229:2

230:5
**EXHIBITS** 4:1
**exist** 35:5 41:7
**expecting** 184:3,10
**expenditures** 201:14
**expense** 137:2 221:2
221:2 242:16
**expenses** 86:13,16
207:20 209:6,11
209:20,22 210:4
210:11,16 216:21
217:5,17 220:14
220:16 221:6
233:2,6,7,13,20
234:4
**expensive** 137:5
**expertise** 75:19
77:20 78:12 81:10
81:17 82:6,22
83:10,20 84:10,11
101:20 102:2
**Expiration** 246:24
**EXPIRES** 245:24
**explain** 10:14 23:14
23:25 24:17 35:2
35:19 40:19,23
64:23 89:3 100:24
147:9 164:6
171:14
**explaining** 241:5
**export** 124:1
**expressed** 245:15
**extent** 10:25 11:4

**F**

**face** 113:9
**Facebook** 6:3,7 70:9
86:25 87:2,6,11,13
87:16 121:9 150:8
150:13,16,18,20
151:5,7
**failed** 110:23
**fair** 217:9
**fairness** 167:11
**Fall** 145:8
**familiar** 39:7 140:10
173:16 186:12

Mohahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[253]

**204**:16 **211**:12
**familiarize 134**:1
146:11 154:7
**fan 113**:6 114:21,22
**fans 18**:25
**far 34**:10 136:1,3
240:24 243:1
**fast 172**:24 173:2,7
174:14 175:3,14
176:10
**faster 174**:10,21,24
176:12
**February 56**:22
146:8 147:25
**Federal 1**:4,24 2:6
8:1 9:20 147:24
148:5 163:11
204:24 226:14
228:6
**feedback 96**:21
121:3,6,9,15 122:5
**feel 145**:7
**field 154**:22
**fifteen 10**:5 57:5
166:5
**figure 212**:7
**file 35**:24,24 36:1
38:16 177:4
178:23 179:13
**filed 15**:12 27:4
138:18 179:4,6
**filing 138**:14 178:20
179:7,8,11,12
**final 68**:17 98:17
162:6,7 164:21,25
**finalize 104**:21
**finalized 162**:2
237:5,12 239:4
**finally 180**:8
**finances 205**:11
**financial 62**:13
198:21 199:1
200:17
**financially 137**:3
246:14
**find 24**:25 136:5
141:5 159:10

**finding 24**:20,22,23
**finish 11**:19 34:22
155:21
**finished 18**:2 64:25
73:13 81:8 121:20
130:5,12 148:9
194:2,10 195:10
236:24
**fire 135**:24 141:13
148:24 158:20
**fires 152**:6
**first 9**:6 24:11 73:20
74:24 124:11
141:3 146:25
157:16,17 169:3
183:14 185:13
241:1
**fit 106**:19
**fits 101**:18
**five 13**:19,21 105:17
111:25 113:19
**five-minute 231**:23
**fixed 147**:5
**flip 140**:2 180:6
181:6 226:7
**flipping 93**:23
**Flot-Davis 1**:20
246:3,21,22
**focus 181**:22
**FOIA 132**:8,10
**followed 68**:20,23
**following 136**:21
167:16 246:5
**follows 9**:7
**font 131**:25
**fonts 129**:3 131:10
132:4,5 133:12
**For-Profit 4**:12,18
26:19 30:21
**foregoing 244**:19
245:13
**foresaw 152**:2
**forever 136**:3
**forgot 103**:17
165:21,24 200:23
201:8,16
**forgotten 165**:19

**form 170**:11
**formally 27**:23
**format 131**:22,23
133:12
**formation 4**:5,11,17
15:5 26:19 30:21
**formatting 131**:20
**forth 93**:23
**fortunately 123**:23
**forward 208**:24
**found 53**:1 86:12
164:8,10 171:16
**founded 14**:17
29:14 207:7,14
**four 17**:3,12 18:6,11
54:7 98:7,11 113:3
114:9 188:4
198:17 212:13
215:25 219:7
220:18 221:1
237:11
**Franchise 7**:6
186:18
**Francis 5**:6 77:7,9
78:5
**Freefall 91**:24 92:2
**frequented 224**:7
**frequently 21**:3 51:8
199:25 201:22
203:14
**Friendswood 2**:15
12:15 100:17
103:11,12 104:10
105:19 107:9
110:20 112:10
115:2
**Frost 213**:22 214:3
214:11
**FTC 74**:13 148:16
148:19 198:15
211:17
**FTC's 56**:6,21 57:11
**fulfill 191**:7
**fulfilled 170**:14
191:2
**full 10**:10 136:12,13
136:18 138:3

158:11
**fully 10**:24 113:17
**function 40**:1
**functions 40**:16,18
40:20 58:1,3 73:7
**funding 57**:8
**fundraising 54**:18
56:11,18 57:1,12
57:16 64:17,20
65:11,15 66:3,16
67:1
**funds 55**:2,9 62:24
63:1,5 195:25
200:9
**funny 89**:1 222:18
**further 185**:20
190:12 246:10,13
**future 163**:1

―――――――――
**G**
―――――――――

**G 9**:1
**GALVESTON 1**:3
**Garden 222**:1,3
**gears 96**:5
**general 1**:22 7:21
70:21 71:3,4 211:9
214:15 230:2
231:9,19 242:14
**generate 25**:7
211:24
**generating 27**:21
**generation 23**:16
24:15,16,18,18
26:4 33:15,17
**getting 46**:23 52:12
162:24
**give 99**:13 103:21
**given 202**:13 245:16
246:9
**Glauber 78**:22
**gmail 44**:12,23 45:1
45:5,9,13,15,20,25
46:3,5
**go 33**:20 47:2 50:1
85:20 98:14
110:23 135:25
144:3 171:6

**198**:20 212:18,20
214:1 216:9
221:11 242:11,20
243:3
**God 10**:22 151:24
**goes 113**:6 123:4
**going 30**:16 34:12
34:13,14,17 38:24
54:6 74:4,5 86:24
88:9 92:11 99:2
118:24 128:7,7
138:2 139:17
142:1 145:19
149:15 155:4
162:1 163:6
165:18 166:3,6
180:9 192:7
195:11 196:19
198:20 207:3
208:21 210:1,6
217:20 218:9
221:9 224:16
226:14 228:6
237:21 238:11
239:11,12 241:8
241:24
**good 9**:15,16 53:7
95:24 105:16
138:5 160:18
180:7 198:9
**goods 17**:2,17,22
21:22,24 23:11
29:22 75:4,6 76:7
76:18,22 77:10,12
78:12,25 79:2,18
80:6,8,14,25 81:2
85:25 86:20 87:2,5
87:22 88:1,6,17
90:1,19 91:6,11
92:1,5,14 94:1,5
94:16,19 199:23
201:20 204:4
215:5
**Google 46**:4,7
**gosh 242**:7
**GoTech 233**:19
234:4

Monahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[254]

GoTechnology 34:5
  34:6 36:8 42:10,13
gotten 46:7 236:13
government 124:1
  212:11
graphic 174:9,24
great 18:19 64:6
  67:13 93:18
  110:25 141:9
  147:4 158:12
  160:16 233:9
green 140:3 226:8
  228:2
groceries 223:11,12
  224:4
grocery 223:5,24
  224:6
group 33:10 64:13
  71:25
Gu 80:11 81:9
guaranteed 108:22
  108:23
guess 71:1 78:14
  100:3 123:15
  179:11 197:25
  208:16 215:9
guessing 105:7
  118:6
guy 77:25 89:1
guys 50:9 139:2
  202:9

**H**

hacked 44:13 45:1
  46:16,18,22 47:6
  48:18 52:11,14
  147:2,15,20
hacking 42:1 147:9
half 12:19
halfway 183:13
hand 170:20 245:16
handed 153:12
handing 139:14
  152:20 157:9
  173:11 177:10
  179:16 186:15
  187:22 204:8

210:25 211:4
  225:21,25 229:1
Hanks 2:5 103:15
happen 38:5 41:19
  203:3
happened 37:14
  42:4 147:12
happens 238:20
happy 142:3
hard 196:2
hard-copy 235:10
harm 141:9
Hayley.Belcheck...
  167:15 181:24
head 11:13 98:24
heading 180:13
headphones 108:16
  108:18,25 109:14
hearing 9:18
HEB 223:3,4,13,15
  223:18
Hector 80:2,5
  140:15 142:15,16
  183:2 190:2,13
held 236:17
help 10:22 11:17
  32:1,4 64:1 72:15
  76:17 78:10 92:25
helped 64:4,8 66:8
  66:21 79:5
helpful 103:22
  118:7
helping 76:2 77:15
  83:24
Hi 180:7
hired 84:12
hiring 102:3
hold 171:19 181:9
  230:13 236:23,25
  239:6
home 20:3,11 84:22
  85:4 90:6
honestly 12:3
hope 138:20 162:22
  235:18,22
hoped 121:21
Hoskins 5:13,18

122:13
hot 113:8
hotspot 104:12
hotspots 104:25
hour 112:23 113:22
  162:25
hours 136:13 162:22
  163:3,4,22
house 100:13,14
  103:12 105:18
  107:9 110:20
  112:13
Houston 1:23
Huang 80:12 81:10
huge 141:17 151:23
Huh-uh 33:12
  147:13 203:17
Hui 80:11 81:9
hundred 108:10
  113:3 118:5
  195:20
hundreds 107:1
  108:3 113:20
  116:17,21 136:15
  137:10 198:9
  218:17 219:12

**I**

iBack- 164:15
  166:10
iBackPack 1:7,12
  4:6 5:2 7:15,20
  14:2,14,18 15:5,8
  15:15,17 16:13,14
  16:23 17:1,5,7,16
  17:19,22 18:10,13
  19:5,23 21:19 23:3
  23:8 28:5,8 29:7
  40:6,10,14 41:5,13
  41:16 42:10,13
  51:12 54:8,25 55:3
  55:6,13 57:6,16,20
  57:24 58:4,24 59:8
  61:15 62:14,18,24
  62:25 63:6,12,21
  63:24 64:2,9,21
  65:18,20 67:4,7,17

69:3 70:2,6 72:6
  73:11 76:11,14
  82:13,19 92:5 94:5
  94:16,20 96:7
  102:12 108:21
  110:23 114:17
  120:2 125:17
  127:2 130:6,13
  138:7,10,15,18,22
  139:1,6 140:6,8,23
  142:1,21 143:16
  145:5,21 148:9
  151:17 153:16
  162:1 164:2 167:5
  167:10,13,18
  168:22 169:5,15
  169:19,23 170:2,8
  171:10 178:6,9
  180:21 181:22
  182:4 183:5,9
  184:2,10 186:8
  190:18,20 196:9
  197:10 199:2,7,19
  201:15 204:12,20
  205:12,21 206:5,8
  206:20 207:5,7,9
  207:17,21 208:9
  208:18 209:4,7,12
  209:22 211:8
  214:16 217:1,11
  218:5,14,15 219:2
  226:4,13 234:1
  236:5,18 237:14
  239:5,9,11,16,21
  241:10,21
iBackPack.co 197:6
iBackPack.mobi
  193:8
idea 41:22 46:15
  86:2 93:2,18
  143:13 147:11,12
  152:14 170:12
  176:20,22 184:8
  214:19,20 223:17
ideas 95:1
identification
  188:11

identified 74:6
  123:23 172:5
  234:10
identify 164:14,16
  242:17,23
identity 245:11
IGG 137:1
Igogo 131:19 132:12
  134:14 135:12
  195:9
Ile 5:9 81:13,16 82:5
  82:12
immediately 23:8
impossible 208:19
inaudible 31:15
  171:17
inaudibly 184:7
incident 39:19
  147:10
include 75:21,23
  186:7 207:18
  214:16
included 19:2,5
  68:18 109:8
  124:20,25 173:24
  212:13 235:20
includes 181:23
including 206:5
  213:21
incorporate 37:2
incorporated 15:16
  15:18,24 16:1,3,6
  16:10 31:5,18
  36:16
incorporation 31:8
incorrectly 95:22
independently
  95:13
INDEX 3:1
indicate 152:13
  156:23 235:4
indicated 37:10
  41:24 84:22 139:5
  160:13 178:22
  180:17,24 183:4
  191:10 192:13
  194:16 197:13

Mohahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[255]

208:8
**indicates** 153:24
  156:10 158:23
  159:3
**indicating** 98:23
  101:17 196:12,14
  213:10 224:20
  242:11
**indication** 46:6,11
  46:18 52:10,10,13
**indications** 46:21
  52:20,24 53:4,14
**Indiegogo** 6:1,14,19
  6:24 7:1 16:15,18
  16:21 54:8 55:3,6
  57:24 62:25 65:19
  122:13 123:8,17
  124:5,9,17 126:13
  127:21 128:13
  129:15,23 132:15
  133:20 135:5
  137:18 140:8
  143:23 148:14
  149:11 153:17
  155:25 157:14
  166:12 173:14
  179:20 182:9
  192:3 196:24
  199:19 241:22
**Indiegogo's** 185:5
**individually** 1:11
  206:1,6
**individuals** 54:1
  65:24 66:8,21
  67:22 69:5 74:5
**Info** 226:13
**information** 7:11
  42:22 198:21
**infrastructure**
  237:23 241:15
  242:5
**infrequent** 51:9,15
**infrequently** 51:18
  200:1
**initial** 5:2 74:12
  86:4,11
**initiative** 60:25 61:3

62:10
**input** 173:20
**inside** 36:2 52:15,16
  52:22
**instance** 1:16
**instances** 69:12
**Institute** 215:20
  219:7
**instruction** 32:11
**instructions** 73:16
  73:18 205:4,18
  212:5
**instrument** 245:13
**insurance** 38:16
  131:5
**insurer** 38:18,21
**intend** 12:1
**intentional** 165:20
  201:18
**interactions** 203:12
**interest** 14:9 162:24
**interested** 167:14
  246:14
**interface** 36:6
**Internet** 35:1,6 44:6
  90:3,4,10 178:2
**interrogatory**
  200:25
**interruption** 171:18
**introduce** 30:16
**introducing** 14:25
  26:15 38:23 78:1
  82:1 122:8 178:19
**inventory** 4:23 39:4
  50:1 100:10 103:8
  104:7 105:15
  107:3 108:8
  110:16 112:6
  114:25 115:18
  116:14 117:25
  118:4 120:13
  126:15 127:15
  235:20
**investment** 33:10
**invoice** 185:20
**invoices** 235:2,3,10
  235:12,15

involved 26:3,6,9
  32:25 33:1,7,22
  34:2 40:3 41:13,16
  78:6 96:15,18
  119:7
**involvement** 79:11
**IOS** 112:23
**IP** 53:24
**iPage** 44:8
**iPhone** 30:3
**IPs** 53:1
**IRS** 208:24
**ISP** 43:11 52:22
**ISPs** 43:22 52:16,25
**issue** 44:1 141:24
  163:17 209:14
**issues** 137:9 142:24
  143:22 151:23
**item** 24:11
**items** 132:12 198:23
**Ivan** 67:14
**Ivana** 83:6,9,19

───────────
         **J**
───────────
**Jack** 215:1,3,14
  219:6
**January** 6:25 7:16
  144:8 204:13,21
  206:13
**Jason** 94:12,15,19
  95:4,14
**job** 25:21 31:21 36:7
  62:1 131:4
**joke** 222:18
**Jugovski** 5:9 81:14
  81:16 82:5,13
**July** 123:3,13
**June** 4:8 5:13 6:12
  8:3 15:13 161:4
  229:11

───────────
         **K**
───────────
**Kateri** 1:20 246:3
  246:22
**keep** 139:18 155:4
  163:1 241:8
**keeping** 158:14

**Keith** 8:3 187:3,5,8
  226:18 227:9
  228:8 229:11
**Kevlar** 97:20 100:19
  101:1,13 103:18
  104:6 154:21
**Kickstarter** 16:24
  55:13 57:6,16,20
  58:25 59:11 62:25
  65:21 67:18
  241:23
**kind** 32:15 46:11
  85:13 168:6
**know** 10:13 13:7
  22:5 35:23 37:25
  40:13,24 41:15
  43:5,7 50:3,4,10
  71:2 77:22 78:15
  80:21 90:19,25
  92:17 95:17 99:12
  99:21,22 103:7
  106:9 107:19
  114:24 115:17
  116:17,19 117:17
  117:24 118:8,24
  127:14 129:22
  130:8 132:8
  133:10 135:22
  139:7 140:15
  146:23 150:15
  153:2,5,6 155:6
  158:3 159:16,18
  162:14,21 170:15
  172:25 173:8
  176:1,7,15 181:2
  182:5,18,22
  183:24 184:2,13
  184:17,25 186:1,3
  186:4 187:5
  190:25 191:19
  195:2 202:7 203:3
  203:5 205:7,14
  206:23 207:24
  208:4,16,22,22
  209:8,13 210:3
  212:9,15 214:13
  215:2,17,21 216:2

217:14,22,23
  219:10 220:4,13
  223:22 225:10,17
  227:3,24 228:21
  231:12,15,18
**knowledge** 138:18
**known** 135:22,22
  245:8
**KS** 178:16

───────────
         **L**
───────────
**labeled** 30:20 213:2
  213:19 222:23
  224:17 225:22
  230:17
**labor** 93:8,11
**lamp** 114:11
**lamps** 114:10,12
**large** 109:16
**late** 9:10 54:16
  135:6
**laughing** 88:25
**launch** 16:13,17,20
  16:23 55:21,23
**launched** 18:6 34:9
  56:7,22 65:8
  237:10
**launching** 64:15,20
  65:11 66:2,15,25
**lawsuit** 198:16
  236:18,24
**lawyer** 217:23
**Layouts** 81:24
**lead** 23:16 24:15,16
  24:17,18 26:4
  33:15,17 60:21
  136:21
**leader** 71:25
**leads** 6:16 25:8
**leave** 69:21
**leaving** 163:21
**led** 72:10
**ledger** 7:21 211:9
  214:16 230:2
  231:10,19 242:14
**left** 116:23
**left-hand** 213:8

FTC v. iBackPack of Texas, et al.                                              12/12/2019

[256]

221:15
**let's** 144:3 146:6
    163:17 212:18,18
    212:20 237:8
    240:25,25
**letter** 137:21 143:1
    167:20 168:19
    241:4
**letters** 144:1 166:25
    178:1 194:1 213:9
**letting** 118:8
**Li** 87:20,23,25
**liability** 1:9 4:7
**life** 136:2 147:8
**lifted** 242:13
**light** 18:24 106:11
    111:5,7,8,9,12
    154:14 156:12,20
**Lightning** 7:8,12
    106:12,13,16
    112:23 113:7
    185:23 186:1,3,4,9
    186:13,23 187:11
    187:12 188:8
    189:6 197:3
**lights** 113:14
**limited** 1:8 4:7
**line** 190:15 225:3
    244:4
**LinkedIn** 5:5,8 78:5
    82:4
**links** 136:6
**lipstick** 117:7
    118:10 125:6
    154:14 156:11,19
**lipstick-type** 113:1
**liquor** 222:8,11,13
    222:15
**Liquors** 222:5,7
**list** 18:17 45:10 73:6
    74:19,24 77:6
    78:22 80:2,11,24
    81:13 83:6 86:10
    86:16,22 87:20
    88:8 92:11 94:12
    95:6 136:6,15
    140:18 170:13

190:14 191:1
    201:3 227:15
    240:24 242:7,9
**listed** 82:8 85:23
    86:4,24 88:3 89:9
    89:15,18,24 90:23
    91:3 92:6 95:19,21
    95:22 140:17
    202:1,6,8 221:20
    223:18 228:7
    229:11 231:3
**listing** 242:15
**lists** 25:14,16,19
    78:6 82:5 88:15
    187:2 206:17
    213:20 226:13,17
**literature** 24:9
**lithium** 126:18
    160:17
**lithium-ion** 117:4
    118:15 120:20,23
    123:21 127:23
    136:4 149:19,23
    151:22,25 152:10
    158:18,19,21,24
    159:8,19 160:2,4
    161:1,7
**litigation** 37:11
    50:21 241:11
**little** 9:10 56:16 96:6
    100:23 113:1
    118:9 135:21
**live** 12:24 13:4
**lived** 21:16
**living** 13:14
**LLC** 1:8,13 7:9,13
    7:15,20 14:2 15:6
    15:8 138:7,10
    139:1 186:24
    188:8 204:12,20
    206:8 211:9
    226:13
**load** 52:2
**local** 20:16,20 21:12
    22:3,6,12 48:10,11
    51:1
**locally** 49:11,21

85:3
**located** 100:12
    103:10 104:9
    110:19 112:9
**location** 20:13 38:4
    90:5
**log-in** 46:9 52:16
**logged** 46:12
**long** 13:7 15:23
    243:1
**longer** 12:7 47:20
**look** 50:2 73:8 85:17
    113:15 129:2
    133:6,7 135:11,15
    146:22
**looked** 101:2 172:13
    192:17
**looking** 108:18
    109:5
**looks** 150:20 230:12
**lose** 136:2
**loss** 7:16 41:21
    141:17 204:13,21
    205:10,21,23
    207:17 208:18
    209:25 211:25
    212:14 218:22
**lost** 37:10 218:15,18
    219:3
**lot** 73:22,25 89:22
    113:4 119:10
    195:5
**love** 39:24
**luck** 152:3
**lucky** 152:1
**lumbar** 101:11,21
**lunch** 12:7 96:1,3

————————————
**M**
**machine** 1:21 48:9
    48:11,13,16 49:23
    51:1,6
**machines** 48:17
    50:25 51:4
**magnetic** 6:20 7:2
    180:7,24 183:17
    190:4

**magnetized** 171:5
**mailers** 25:10
**main** 46:4 141:7
**major** 65:10 135:24
    142:2
**majority** 29:1 147:4
    160:16
**making** 62:7 121:13
    128:15 143:15
    167:21,24 227:6
**mama** 113:21
    119:17 120:14,18
    125:8
**management** 82:9
    215:23
**managing** 151:4,7
**manufacturer** 175:4
    175:6,8,11 182:17
    184:4,11,14 191:7
**manufacturers**
    123:25 174:15,17
**manufacturing**
    167:9 169:5
    181:19 224:17
    225:1
**map** 32:16
**March** 27:7 57:12
**marked** 15:1,2
    26:16,17 30:17,19
    38:24 39:1 74:9,10
    78:2,3 82:3 122:9
    122:10 128:8,10
    133:15,16 139:13
    139:15 150:1,3
    152:19,21 153:13
    157:8,10 166:7,8
    173:10,12 177:9
    177:11 179:15,17
    186:16,17 187:21
    187:23 192:8
    204:7,9 211:1,3,5
    225:20 226:1
    228:25 229:2
    230:4
**market** 197:2
**marketing** 4:13
    23:10,12,13,19,22

24:1,6,7,12,14
    25:2,9 26:7,21
    28:8 29:10 34:7,8
    34:15,16 35:20
    70:3,5,11,14,21,25
    71:2,3,4,6,8,10,23
    71:24 75:13,14
    79:8
**marks** 134:14
    135:18
**Mass** 85:23
**material** 132:14
**materials** 24:6,7
    129:14
**Meals** 221:16
**mean** 24:8,21 35:18
    35:22 36:20 37:24
    40:22,23 42:21
    48:1 49:18,22,25
    50:23 51:15,17
    55:22 58:14 60:15
    62:14 63:12 64:23
    65:7 68:22 69:22
    69:23 73:4 76:24
    78:14 81:19 83:11
    84:15 92:20 94:22
    96:20 100:3
    101:15 108:12
    111:10 116:17
    118:25 121:21
    124:16,18 125:3
    126:6 130:7
    131:24 133:5
    141:13 143:13
    144:25 147:16
    150:15,17 151:21
    152:24,24 155:7,9
    158:2 164:20
    173:4,6,6 175:19
    176:7 178:5 189:7
    192:20 195:20
    198:6 201:8,9,16
    201:18 202:10
    205:15 206:8
    208:21 209:17
    211:20 214:13
    215:12 218:7,16

FTC v. iBackPack of Texas, et al.                    12/12/2019

227:5 228:11
232:25 233:15,23
234:1 235:9
236:16,22 238:6
240:9 241:22
**meaning** 159:22
**means** 24:1 132:9
**mechanisms** 237:17
**media** 70:10,16 78:7
78:15,17 87:7,11
87:14 89:6 93:25
94:2,4 121:9
**medication** 12:2
**meet** 20:25 21:5
22:8,22,25
**meeting** 241:7
**Member** 230:17,25
231:16
**members** 128:13
133:19 168:15
185:5,8
**mention** 124:11
200:20 243:1
**mentioned** 50:24
115:5,21 119:17
121:1
**merchandise** 206:17
**message** 150:14
**messages** 53:20
**met** 9:18 21:9,15
22:14
**methodologies**
73:17
**methodology** 32:8,9
**Meyer** 202:24,25
**micro-USB** 197:3
**middle** 188:10,24
230:22
**military** 101:3
**milliamps** 112:22
113:5,22
**mind** 43:15
**mine** 52:17 53:1
189:21
**Ming** 5:22
**minor** 106:20
**minute** 134:1

149:17 178:22
220:18
**minutes** 9:12 162:20
**mirror** 114:11
**mispronounce** 75:2
**missing** 49:2,2,4
53:6,9
**mixed** 124:15
**mobile** 29:24 30:8
32:1
**MobileZapp** 4:19
29:21,23 30:1,14
30:24 31:2,4
213:22 233:20,25
234:4
**MOJO** 16:17 55:12
55:20 56:7,10,15
60:5,6,9,12 61:13
63:1 66:18,19,22
66:25 67:24 69:10
163:15,23 164:17
165:3,10,12,18,19
165:21 166:11
167:12,17,19
168:16,23 169:9
169:15,18,19,21
169:23 170:2,5,9
170:13 192:5
194:1,7,9,13,17,25
195:1 198:11
199:13
**MOJO-** 6:14
**moment** 230:2
**Monahan** 1:10,15
2:13 3:6 5:1,12,17
5:22 6:4,8,11,24
8:4 9:5,15 12:13
26:23 30:25 37:9
39:6 47:5 74:11
78:4,21 96:5
122:12,14 128:12
128:18 133:19
137:14 142:7
144:9 146:9
147:23 150:9
153:7,19,24
157:13,18 162:19

163:7,14,19
166:15,18 170:22
177:13,15 179:16
180:5,18 181:7,14
185:4 186:2 187:6
187:23 188:12,15
188:19,21 193:9
193:23 204:17
207:16 209:19
210:21,25 211:13
218:24 220:22
221:12 222:18
229:12 230:1
232:3 242:13
244:2,18,25 245:8
246:6
**money** 53:6,8 54:24
55:24 56:3,14 57:3
57:20 141:17
165:15 197:23
200:8 201:24
208:15 212:7
216:8 217:4,15
218:8,15,18,20
219:3,5,7,8,11,15
219:16,20,21
220:4,13,15 221:5
231:8 232:4,4
233:24,25 238:10
**monolith** 125:14
126:21
**month** 31:20 200:2
200:3,5 237:15
**months** 36:17,17
42:6 47:12
**morning** 9:11,15,16
10:18
**mother** 187:9,10
227:9,12
**mother's** 189:16,20
**move** 12:17 221:9
**moved** 13:8,17
**movie** 35:24 36:1
**mpeg** 35:24
**multiple** 87:4,5
98:19,21

|   | **N** |   |
| --- | --- | --- |

**N** 2:1 9:1
**N.W** 2:7
**name** 26:20 30:23
33:11 52:15 77:6
78:21 80:2,11,23
81:13 83:6,8 86:12
86:15 91:2,8 97:3
134:15,18 140:16
146:21 150:9
166:25 178:16
186:3,4 187:3
189:13,16 202:24
214:25 228:20
244:2 245:12
**named** 229:16,17,24
**names** 20:21 21:7
64:7 67:12 75:2
227:15
**Natasha** 5:12,17
122:13,18
**nature** 10:19
**nearly** 195:10
**necessary** 137:6
141:6
**need** 12:8 139:17
162:23 190:12
212:10 220:21
242:20
**needed** 61:6 75:17
76:17 77:18 81:3
101:17 216:10,16
216:19 217:16
**needs** 238:21
**Negative** 121:11
**neither** 246:10
**Network** 76:1
**networks** 35:9
**never** 17:5 98:17
108:17,17 109:7
118:24 130:8
146:23 152:5
161:22 208:10
211:21 215:12,14
216:23 223:12
236:9 237:3

**new** 7:11 93:14
136:22 178:20
**news** 180:7
**nine** 42:5
**nod** 11:13
**nodding** 98:24
**normal** 174:14
175:3,15
**NOTARY** 245:22
**note** 9:9
**noted** 244:21
**notes** 27:3 30:22
**noticed** 147:1
**notices** 53:17
**notifying** 53:21
**November** 135:6
141:2 142:21
183:3 191:24
198:12 229:8
239:15,18,20
240:13,20 242:4
**number** 18:13,23
23:5 39:18 73:12
96:25 97:5 98:8
99:12 101:2
104:22 109:1
118:9 121:1 127:1
131:20 132:6,12
188:5,11 203:7
234:12 237:19
**numbered** 1:18
**numbering** 179:24
**numbers** 205:7
**numerous** 164:18
164:19,22,23
213:20

|   | **O** |   |
| --- | --- | --- |

**O** 2:5 9:1
**oath** 10:9,17,20
245:9
**obtain** 136:15
**obviously** 168:18
189:8 206:9
217:25 223:7
**occasionally** 51:6
233:2

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[258]

**October** 5:18,23
  54:20,21,21 56:7
  129:23 135:6
**offer** 17:2,7,17,22
  17:25 167:13,17
  167:22,25 168:6
  169:15,18,22,25
  190:11,22 191:21
**offered** 17:5 19:9,11
  19:14 93:4 108:20
  136:23 183:15
  196:4 197:10
  208:14
**offering** 136:25
  168:21 170:18
**offers** 109:9
**offhand** 33:25 67:15
**office** 7:5 27:4 84:23
  90:6 186:20 203:3
  216:4 222:24
  223:7,11,25
  245:17
**officer** 1:12 14:12
  31:23 213:2,13
  214:22,23 216:8
  246:7
**Oh** 27:6 132:17
  155:23 213:24
**okay** 10:23 12:11
  13:13,25 14:7 15:3
  16:12 17:21 18:4
  19:3,8,13,18,22
  23:2,7 24:3,10
  25:6 27:22 28:23
  28:25 29:4,18
  32:14 33:8,19 35:4
  36:1,4 38:7,12
  41:20,23 43:20,24
  44:11,24 45:12,23
  47:16 50:11,18
  51:16 52:1,3,8,18
  53:2 54:5 55:19
  56:5,20 57:10
  58:23 60:4 67:16
  69:1 70:1 72:3
  73:24 74:3,18,23
  77:5,8,24 78:9,23

79:16,23 80:4,13
81:15,25 83:13,17
84:4,8,14,19 85:7
85:21,24 86:3,14
86:23 87:9,19,21
88:4,14,23 89:8,14
90:9,14,18,22 91:9
91:15 92:13 93:7
93:21 94:8,11 95:3
95:12,18 96:2,8
97:4,11,19,19 98:1
98:9,16 99:8,14,18
99:24 100:5 101:6
101:12 103:25
105:9,13,21 106:5
107:11 108:14,19
109:3,6,11 111:9
111:23 112:15,21
114:20 115:8,20
116:18 117:6
118:7 119:2
120:25 122:23
123:5,6 125:2
126:8 128:11
129:12 130:10,18
130:21 131:7,13
132:17 133:1,9,13
133:24 134:13
135:4,10,17
137:16,22 138:1
139:9,23,24 140:7
140:14,21,25
141:11,20 142:8
142:20 143:6,19
144:2,5,6 145:4,10
145:16 146:5,7,12
146:13,24 147:22
148:25 149:5,14
149:22 150:22
151:6,19 152:7,18
153:11,18,23
154:5,10,20,23
155:14 156:9,17
156:22 157:11,15
158:10 159:24
160:12,24 162:3
162:13,18 164:9

165:16 166:2
167:7 168:13,20
169:7,13 170:24
171:2,8,13 172:4
173:15,19 174:4,7
174:22 176:21
177:3,14,18 178:3
178:12 179:18,22
180:16 181:12,15
181:17 182:21
183:12,19 185:12
185:15,25 186:21
186:25 187:15,25
188:3,6,9 189:3,9
189:22 190:1,16
190:24 192:2,10
192:24,24 193:10
193:14 194:3
195:8,22 196:3,25
197:5,8,21 198:10
198:22,25 199:11
199:21 200:6,16
200:24 201:11
202:3,12,22 203:6
203:9,18 204:10
204:15 205:17
206:3,11 209:2
211:7,11,18,22
212:2,12,17,25
213:14,15 214:5
214:14,21 215:10
215:19 216:6,13
216:24 217:3,8,19
217:24 218:3,12
219:4,13 220:7,12
221:4,13,17,21,25
222:9,19,21,22,25
223:6,9,14,20
224:13,23,24
225:2,6,9,13 226:2
226:6,10 227:2,7
227:14,20,25
228:5,13 229:4,9
229:19 230:3,6,9
230:10,14,15,18
230:23,23 231:1,4
231:5 232:2,10,19

233:4,18 234:2,8
234:21 236:3,14
236:20 237:1
239:3,7,13 240:2
240:22 241:9
242:2
**Olive** 222:1,2
**once** 159:12 200:2,3
  200:4
**ones** 21:13 49:17
  105:8 112:17
  144:17 148:10
  195:11
**ongoing** 42:5 65:1,5
  65:6
**online** 18:1
**opened** 29:7
**operate** 20:13
**operated** 20:11
**operates** 35:8
**operating** 27:18
**operation** 26:13,25
  27:20 29:13
**opportunities** 24:20
  24:22,24 25:1
**opportunity** 167:18
**opposed** 11:13
  40:21 95:7,20
**optional** 114:19
**oral** 1:15 246:8
**order** 76:18 81:2
  99:9,11 102:19,22
  103:19 104:24
  105:2 106:25
  107:24 108:2,24
  110:7,10 111:18
  111:21 119:1
  126:1 127:8
  136:15 162:9
  170:8 172:15,17
  191:2,8 216:20
  236:10 238:16
**ordered** 61:5 76:13
  76:22 105:5
  108:17 111:15,17
  113:2,10,12,18
  114:6 115:11,13

116:8 117:8
119:20 126:6,10
127:12 157:2
185:17 195:21
197:16 198:8
234:10,12,17
235:5,6 236:1,9
**ordering** 76:10
  79:18 80:25
**orders** 61:2 109:1
  234:23 238:13
**original** 106:8
  132:16
**outcome** 246:15
**output** 197:4
**outside** 17:8,17
  19:10,14 21:16
  22:15 53:24
  233:13 235:24
  241:10
**outsource** 92:25
**oversee** 58:16 60:1
  61:24 62:20
**overseen** 58:20
  59:14
**owned** 28:13,20
  39:18
**owner** 14:4 28:11,18
  28:22 29:3 32:20
  153:25
**ownership** 14:8

_____

**P**

**P** 2:1,1 9:1
**p.m** 1:19
**package** 124:3
**packages** 123:7,12
  123:17 129:20
**packaging** 154:18
**page** 3:3 4:3 6:17,21
  7:3 67:3,6,19,24
  68:1,4,13,18 69:14
  69:14,18 74:19
  85:19,22 86:24
  87:20 88:15 89:25
  90:15 91:10,24
  92:11 93:22,24

94:12 121:9
122:24,24,25
123:4,21 132:7
134:15 135:11,12
135:13 136:11,11
136:20 138:2
140:3 141:21
142:6 144:4 146:6
147:6 153:21
157:16 166:14
173:13,17,21,24
174:2,5,8 179:24
180:1,3,6,12,14,15
181:6,13 182:25
188:11,17,24
189:25 190:7,8
193:21,21,22,23
193:25 195:9
196:24 212:19,19
212:20,21 213:3,7
213:9,10,17,18,25
213:25 214:1
221:9,11,18,19
222:20 223:1,2
224:17,18,20,21
224:22 226:11
227:21,21 228:1,1
230:7,12,21 244:4
**pages** 68:7,10 93:23
231:13,21
**paid** 88:8,10,11
89:11 94:9 138:4,7
138:10 139:6,11
185:17
**pain** 215:20,23
219:6
**paperwork** 202:9
212:9
**paragraph** 123:20
124:12 135:19
136:12,21 138:3,3
141:3,21 145:18
146:25 158:11
178:13 183:14
185:13 190:7
**part** 68:3 85:3 97:7
115:6 130:15

131:4 157:18
164:7,7,10,12
**partially** 64:22,24
**participated** 80:24
**participating** 76:3
**particular** 61:8
75:18 77:19 81:10
81:17 83:19 84:13
97:23 111:1 131:9
141:1
**parties** 246:12
**partner** 183:17,20
183:25 185:23
190:5,20 191:3
**partners** 181:20
**parts** 73:19
**Partway** 185:16
**passwords** 53:19,22
**patents** 177:5
178:20,23 179:5,6
179:7,9,11,13,13
**Patrick** 2:4 9:19
**pause** 82:16 134:4
139:22 159:5
160:15 166:4
168:12 171:20
181:11,16 183:22
186:10 196:11
212:23 221:10
**pay** 76:6 87:13,16
93:4 199:22
200:12 201:19
202:5 203:13,16
203:21 216:10,20
217:4,16 219:5
232:17,18,20
233:1,6,7,12
**paycheck** 218:5,6
**paychecks** 217:12
**paying** 138:22
**payment** 202:15
**payments** 62:21
202:20 216:15,19
220:9
**Payne** 88:15,18
95:16
**PayPal** 55:4,9 76:8

86:13,16 88:12
89:11,18 91:3
199:6 214:8 232:6
233:1,5 234:24,25
235:7,11,12,15,24
**pays** 233:3
**PDF** 136:6
**Pennsylvania** 2:7
**people** 53:18 58:12
58:14 60:21,22
64:6,8 88:9,11
93:5,11,15 99:16
100:2 131:6
143:13 151:9
158:14 161:17
168:9 176:7,18
177:25 178:4
182:8 238:8
239:22 241:18,18
241:24
**percent** 136:24
137:1 145:7 194:4
194:13
**perfect** 171:23
**perform** 31:24 58:1
**performance** 101:9
**performed** 167:4
**performing** 33:17
**period** 56:11 57:1
57:16
**perks** 137:7,11,14
137:18,23 143:24
180:9 181:1
**permission** 129:10
131:2,3 144:23,25
156:7 191:6
**person** 9:18 11:22
21:1,6,10,15 22:9
78:18 80:20 96:18
245:12
**person's** 80:23
**personal** 42:9,9,12
90:11 207:19
216:10,20 217:5
217:17 220:14,16
221:2,6 233:3,6,16
**personally** 143:9

167:23 175:20,21
215:8 245:8
**phase** 136:18,19
236:21
**Philippines** 46:10
46:12
**phone** 9:17 35:9
43:13 70:15,17,20
71:2 113:16,17
121:8 139:20
203:5,7
**phones** 30:12,13
**photos** 197:7
**physical** 19:24 20:1
141:9
**picked** 164:20
**picture** 150:11
**pictures** 173:18
**piece** 65:10 106:8
**pieces** 106:8,10
**pipe** 51:13
**pipes** 37:20,21,23
38:2
**place** 237:23 238:15
241:15
**PlainsCapital** 7:24
63:16 188:2 199:3
199:4 214:7 226:5
226:12 228:3
232:7 233:10,21
233:24 234:5
**Plaintiff** 1:5,17 2:3
**plan** 98:19,21
**planned** 136:1 142:4
**planning** 130:12
**plate** 97:20 100:19
101:13,16
**plates** 101:5 103:18
104:6 154:22
**platform** 87:7
**please** 10:12 11:12
11:18,21 17:15
23:15 34:21 40:19
136:5 174:6
**pledged** 167:12
197:23
**plug** 113:7,7

**plugs** 6:15 106:13
**point** 95:25 165:17
169:14 238:6
241:17
**Points** 215:25 219:7
220:18 221:1
**polymer** 151:24
152:9,13,25 153:4
158:22,25 159:8
159:17,20 160:2,5
160:17,21,22,23
**polymer-ion** 154:15
156:13,20,24
157:3
**polymers** 152:3
**ports** 113:22
**positive** 121:10,12
122:6 136:22
150:17 176:3
**positively** 43:6
**possible** 27:14 51:1
154:19 207:13
**possibly** 22:4,10,13
25:20 27:10 28:6
28:10 33:23 41:11
44:14,15 47:15
135:9 142:2
144:12 152:6
160:4 218:19
**post** 6:3,7 142:17
146:8,14 150:23
151:1 167:2 178:1
180:13,19 181:7
181:13 182:5
183:2,8
**post-2010** 29:20
**posted** 140:11
142:15 144:8,19
145:1 155:25
166:15 180:4,18
181:7,14 182:4,12
**posts** 121:8 140:22
151:16 158:15
**potential** 198:16
**Pow** 16:20 55:12
56:17,18,22 57:1,4
59:16 62:25 66:4,6

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[260]

66:12,14 68:1 69:8
170:18,25 172:6
172:12,15,20,23
173:13 178:19,23
179:9,20 183:17
183:18 184:3,11
184:21,22 185:14
189:23 190:4,19
191:1,2,11,15,21
192:4 195:10,15
196:5,23 197:24
198:11 199:15
**POW-Super** 6:19
7:1
**POWcables.com**
197:7
**power** 113:1 117:7
117:18 118:1,3
119:14 175:2
**powerful** 152:5
**premises** 19:24 20:2
**prepared** 205:2
206:25 212:3
**preparing** 179:10
179:13
**presence** 87:11,14
**preserve** 50:20
**pretending** 54:2
**pretty** 53:7
**previously** 83:15
84:21 183:4 185:7
192:8,13 197:13
208:8
**Primarily** 70:9
**printed** 211:21
**prior** 12:24 13:11
23:3 29:7 31:8
49:14 64:15,19
65:11 66:2,15,25
82:7
**PRO** 2:12
**probably** 16:2 19:1
31:12 57:2,18
85:20 111:24
128:6 174:20
200:4 219:10,14
**problem** 45:10

149:4 238:2
**problems** 45:2,4,6,9
45:14,17,20,21,25
50:3,7,25 123:22
135:8 136:9
141:12,22 142:2
147:1,4 149:2,18
152:3 161:1
**Procedure** 1:24
**procedures** 124:2
**proceeding** 246:13
**process** 37:10 51:14
51:17 65:1,5,7
84:18
**produce** 98:22
164:24 165:10,25
205:20,22 237:22
239:9,11,15,20
240:12 241:12
**produced** 1:16
132:14 204:24
**producing** 74:8
165:3 172:12
237:19 241:13
**product** 66:1,19,22
76:24 81:22,23
83:24 89:7 104:3
107:5 121:20
141:8 142:22
143:23 145:7
164:21 167:13
171:9 177:5
178:16,19,23
179:9 185:23
194:17 235:5
241:25
**production** 136:19
143:16,21
**products** 17:3,8,11
17:25 18:2,16,20
18:22 19:1,4,9
61:2,6 63:22,23
64:2,5,14,19 65:4
65:23 66:5,12,14
66:15,24 76:4,5,16
77:3 79:9,12,14,21
80:22 81:5,7,7

128:16 136:16,25
170:17 182:1
184:16 185:16,21
186:6 192:4
194:25 195:2,3,4
196:4 208:10
**profile** 5:5,8 78:5
82:5
**profit** 7:16 204:13
204:21 205:10,21
205:23 207:17
208:18 209:25
211:25 212:14
**program** 50:22
73:20 93:6,15
99:17 121:22
122:2 130:9,16
153:2 158:15
159:25 160:10
161:24 165:7
218:16 237:4
**programming** 75:21
92:25
**programs** 92:23
**progress** 167:9
169:4
**project** 81:3 82:9
141:7 153:25
236:18
**project's** 236:17
**projects** 18:14,15,18
82:8
**promised** 109:8
137:12,19 180:10
185:18
**promote** 17:7
**promoted** 17:3,11
**proof** 46:20 185:21
**protocol** 36:6
**prototype** 136:18
**proved** 245:9
**provide** 10:10 18:21
23:12,19,23 29:23
71:15 75:4,7 77:10
77:13 78:24 79:3
80:6,15 86:1 87:3
90:2 93:12 94:20

168:22 197:22
201:12 205:6
211:23 212:10
215:5 235:8
**provided** 74:12 76:7
78:13 80:9 86:20
87:6,23 88:1,6,18
88:24 89:2 90:20
91:6,12 92:2,4,20
94:2,5,16 95:9,10
136:23 196:9
**providers** 44:7
**providing** 76:10
101:15 198:11
**provisions** 1:25
**Proy@ftc.gov** 2:9
**PUBLIC** 245:22
**purchased** 92:15
156:24 204:5
223:10
**purpose** 121:22
239:24 241:24
**purposes** 101:14
209:16,21,21
232:12,14 245:14
**pursuant** 1:23
**put** 68:13 113:8
147:6 205:8 212:8
219:11 220:2
233:25,25 235:21
242:13

――――――――
**Q**
**quantity** 109:16
198:8
**question** 10:12,14
10:15,25 11:4,12
11:19 19:19 34:22
105:16 155:5,8,10
155:22 184:9
186:11 207:2
209:10 210:5,9,13
210:18,22,24
**question's** 17:14
**questions** 10:9 54:6
144:25 220:24
**quickly** 154:19

**quite** 185:19 197:1
197:20 201:23
234:20

――――――――
**R**
**R** 2:1 9:1
**RackSpace** 44:8
**raise** 54:25 55:24
56:2
**raised** 55:2 56:15
57:4,21 208:13
219:11
**ran** 61:8 135:24
**Ranch** 13:3,15 38:6
38:9 222:11,13
**Randall's** 223:21,23
224:8
**range** 13:4 76:25
99:13,15 103:21
103:22 118:7
**read** 154:8,9 156:15
156:16 157:18
159:4 163:8 169:3
171:21 180:14
181:9 183:21
184:6 224:19
242:20 244:18
**reading** 129:13
143:12 152:8
184:7 196:23
**real** 147:7
**realize** 190:10
**really** 77:22 79:19
84:7 198:9
**reason** 44:17 48:15
84:13 122:20
128:23 129:1
134:9,11 135:1
141:7 142:11,14
144:13,16 146:16
146:19 150:25
151:3 155:1
157:22,25 158:6,8
166:20,23 174:12
175:1 177:21,24
191:5 193:3
241:20 244:4

Mohahan

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[261]

reasonable 162:25
reasons 44:20
recall 80:7,8 102:18
    102:23 103:20
    109:2 111:20
    115:7 125:13
    135:9 138:9,12
    139:10 147:14
    149:25 154:25
    155:16 157:21
    164:11,13 165:4,5
    166:19 169:17,20
    169:24 170:3,4
    174:1,19 175:6,8
    175:10 176:14
    200:10 204:1
    228:14,19 229:23
receive 38:20 99:25
    109:13 121:7
    145:24 168:3
    169:19 172:20
    180:9 183:16
    184:3,16 190:4
    191:2 197:23
    216:25 217:10,12
    218:5 236:12
received 47:18,23
    49:14,19 50:13,16
    53:17,20 98:10
    100:6 108:25
    109:18 116:12
    118:21 119:25
    121:18 137:11,13
    148:13,14 165:23
    184:20 194:17
    197:14,16,20
    218:20 232:5
    234:19
receiving 47:8 49:15
    181:1
recess 47:3 96:1,3
    162:17 196:20
    231:24 243:5
recognize 74:14
    132:21 173:18
recollection 15:8
    26:24 31:1 78:11

82:12 189:4
226:24 228:9
229:15
recommendations
    172:1
recommended
    161:12,14
record 1:25 9:9
    11:11,22 47:2 52:6
    171:21 210:20
    222:17 231:8,11
    232:1 242:12
    243:4 246:8
recording 11:9
records 48:7 138:21
    138:25 202:16
    220:8 234:22,25
    235:25
refer 30:2 97:14
    192:7
referring 42:14
    64:16 97:12
    100:15 131:24
refers 153:5
reflect 210:20 220:9
    222:17 234:23
    242:12
reflected 235:16
reflecting 202:19
refresh 15:7 26:24
    31:1 78:10 82:11
    189:4 226:24
    229:14
refund 169:16,25
    191:21,23 198:12
refunded 165:15
refused 170:1
refusing 210:21
regarding 121:4
    141:4 198:16
    201:14 210:5
regards 53:3 103:18
    118:23 152:23
registered 187:3,12
    187:17 189:17
regular 201:10
    216:25

regularly 217:10
reimbursing 233:24
related 101:21
    234:4 246:11
release 170:11
relevant 37:11
relief 89:7
remaining 147:5
remember 10:3 13:6
    13:19 15:21,22
    20:21,22 21:4,7,8
    22:18,21 26:14
    27:17 28:1 29:15
    31:10,15 33:11,24
    45:18,19,24 47:9
    54:19 56:4,10,14
    56:25 57:3,7,15,19
    58:13 64:7 67:11
    69:13 70:13 72:12
    77:23 80:1,19 83:3
    83:5,8,9,18 84:2
    86:7,19,21 87:22
    87:25 88:5,8,17,19
    88:20,21 91:5,11
    91:20 92:1,4,8,14
    93:13,14,19 94:1,4
    94:15 96:14,17
    97:1,3 98:2,6
    101:23 102:3,24
    105:4,8 106:23
    109:18 110:4,24
    111:1 114:21
    115:9,14 116:5,7
    117:15 119:3,11
    119:14 120:6,9,12
    122:17 123:16
    124:8 125:21,23
    126:4,7,9,12 127:6
    127:11 128:4,20
    133:11,25 134:2,6
    139:2,7 142:10
    143:4,7,10,15
    146:15 147:19,21
    148:4 150:24
    159:15 167:21,24
    172:8 176:11,13
    177:20 184:5,17

184:18 187:20
189:7,10 192:6
198:1,3,4 227:6
228:23
remembered 168:16
remind 52:4
reminded 103:16
remotely 203:11
repair 238:21
repay 219:21
repaying 219:8,15
rephrase 10:15
    17:15
Report 39:5
Report(by 4:23
reported 1:21 205:9
reporter 11:9,17
    34:22 52:5 139:19
    166:5 170:21
    171:19 196:18
    246:4
REPORTER'S
    246:1
represent 108:24
    205:11
representation
    181:3 182:23
    207:23
represented 9:21
represents 206:7
    209:9
request 129:9,11
    130:24,25
requested 132:11
require 196:19
required 168:3
    191:1,6
requires 10:24
resolve 43:10 44:1
respond 10:13 131:6
response 11:13
    21:21 37:1 44:16
    69:18 170:19
    177:6,8 200:15
responses 200:25
    201:14
responsibility 76:10

77:2 79:12,17,20
80:22
responsible 62:4
    72:1 83:23 97:7
    99:3,4 138:14
restaurant 222:4
Restoration 4:21
    39:3
result 122:2
resulted 141:16
results 175:17 176:1
    177:1
retail 17:23
retractable 197:3
return 85:16
returns 139:3,4,8
    212:8
revenues 27:21
reversible 171:4
RFP 201:13
riddled 178:17
right 10:7 11:1,25
    13:25 14:24 18:5
    32:23 37:8 45:14
    46:25 47:4 65:17
    78:20 81:12 90:15
    91:23 93:14 95:23
    96:1,4 100:18
    102:6 103:8 104:7
    105:15 109:17
    116:25 119:19
    122:7 123:19
    124:19 126:16
    127:15 129:18
    135:15 140:3
    150:6,7 153:14
    163:7,9 170:16,23
    171:6 179:24,25
    180:2 181:5,21
    183:1 189:18
    192:11 193:20
    198:19 210:19
    212:18,22,24
    214:24 220:3,11
    221:8,11 224:15
    224:23 228:24
    230:23 231:12,25

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[262]

237:9 238:24
243:2
**right-hand** 27:2
213:12
**ring** 91:8
**ringing** 139:20
**rising** 141:12
**risk** 135:24
**risky** 136:3
**Road** 32:16
**rock-solid** 158:13
**Rodrigues** 78:22
**role** 25:24 31:25
33:16 57:23 68:6
71:7 102:4
**roles** 31:24
**Ron** 202:24,25
**Ronald** 5:6 77:7
78:5
**room** 113:16
**Roughly** 12:18
**Roy** 2:4 3:8 9:9,14
9:19 14:25 15:3
26:15,18,23 30:16
30:20,25 38:23
39:2,6 43:17,21
46:25 47:4 74:4,11
78:1,4 82:1,4,11
95:24 96:4 103:15
122:8,11 128:7,11
128:17 133:14,17
133:21 139:14,17
139:24 140:1,2
150:2 152:20
153:6,9 157:9,12
157:16 159:7
162:15,18 163:4,6
163:11,14 166:3,6
166:9,13 168:10
168:13,14 170:20
171:2 172:4
173:11,16 177:10
177:15 179:16,19
179:23 186:15,18
186:22 187:1,22
188:1,4,7,10
196:21 204:8,11

204:16 210:19,25
211:4,8,12 222:17
225:21,24 226:3,7
229:1,5,10,14
231:23,25 232:2
242:12,17 243:3,6
**ruined** 37:15,16
**rules** 1:24 124:1
163:9
**run** 208:1

---

**S**

**S** 2:1 9:1
**s/Kateri** 246:21
**safe** 136:24 137:1
145:8,13 148:17
148:20
**safety** 141:14
**salary** 216:25
**sale** 17:23,25 19:10
19:11,14
**sales** 6:16 23:13
24:20,22,24,25
26:7 206:17,21,24
207:6,10,14 208:9
209:3
**sampled** 164:21,23
**samples** 98:8,10
109:15,19
**Samsung's** 136:21
**sandwich** 221:24
**satisfaction** 194:4
**satisfied** 143:24
194:7,14,22
**save** 51:3
**saved** 47:24
**Savings** 8:1 226:15
228:7
**saw** 52:15 86:15
140:16
**say-so** 68:17
**saying** 136:7 160:20
160:22,23 169:12
175:7,9,11 176:11
190:13 192:6
194:6 195:14
208:19,21 217:18

237:18,21 238:1
238:11,14
**says** 77:21 80:17
83:2,11 138:4
141:3 143:1 144:8
145:5,15,23
146:25 151:22
152:25 153:4
154:11 156:18
159:6 160:23
166:15 169:4
174:9,24 178:15
179:7 180:7
181:18 185:20
190:10 193:22
194:1 195:10
197:1 211:8
213:13,21 214:2,3
**SC** 93:25 94:2,4
**scarred** 136:2
**schedule** 216:15
**scheduled** 217:10
**Schlotski's** 221:20
221:23
**scratch** 135:21
**screen** 179:25
**screenshot** 150:8
153:15
**se** 76:15
**seal** 245:16
**second** 43:19 123:20
134:15 136:12
146:10 154:6
166:14 168:10
171:19 181:9
184:6 193:21,23
200:17 225:3
**second-to-the-last**
212:20
**secondary** 126:25
127:8
**Secretary** 15:12
27:4 31:5
**section** 153:16 213:1
214:23 222:23
224:16,25 230:16
231:16

**see** 11:8 27:8 48:20
50:2 111:4 113:15
113:16 131:19
132:17 134:2
137:9 153:9 159:4
175:14 185:19
187:1 203:14,23
206:15 213:4,9,18
222:1,5 225:3
226:12 228:11
230:19,23 231:6
237:8
**seeking** 54:13,15
**seen** 44:25 85:2
211:14 216:23
**select** 98:13 102:16
104:19 164:24
**selected** 96:12 98:17
100:22 102:14,15
104:17,18 106:2
107:17,18 110:1,2
115:25 116:3
117:12,14 120:4,5
127:3,5 135:20
164:3,18,20
171:11
**self** 184:7
**sell** 17:1,2,5,8,16,17
19:6 33:9 76:24
223:7,25 238:17
**send** 61:18 123:7
166:25 167:14
181:23 190:18,19
235:12
**sending** 128:20
139:2,8 190:13
237:25
**senior** 82:6
**sensitive** 42:21
**sent** 47:18 48:8,12
48:19,21,24 49:10
61:22 121:1
123:10,12,17
124:3,4,9,12,13,14
124:17 128:24
129:5,14,23 130:1
139:4 148:5 149:7

149:12 176:18
185:21 235:3,14
235:17
**sentence** 169:3
178:15
**September** 7:17
38:3,13,14 166:16
168:8,15 181:8,14
204:14,22
**series** 10:8
**serve** 39:25
**server** 48:4,6 52:22
**service** 44:6 158:14
241:19
**services** 4:14,22
17:2 21:23,25
23:11,13 26:7,22
29:22 39:3 75:4,6
76:7,18,22 77:10
77:12,14,22 78:12
78:25 79:2,18 80:6
80:9,14,16 81:1,3
83:12,23 85:25
86:20 87:2,6,23
88:1,6,18,25 89:3
90:1,19 91:6,12
92:2,5,15,21,22
94:2,5,16,19
199:23 201:20
204:4 215:6
**set** 41:7 216:14,18
**seven** 158:14 162:22
163:4
**shake** 11:14
**Shenzhen** 154:16
156:21
**shift** 96:5
**ship** 142:1,23
145:19 146:2
162:5 184:11,22
191:11 195:4
237:14,15 238:8
238:12 239:12,25
240:7,15 241:17
241:18,25
**shipment** 136:8
137:6 142:4

FTC v. iBackPack of Texas, et al.

12/12/2019

[263]

185:21
shipped 99:21
113:24 116:21
136:17,23 137:18
137:23 143:23
149:3 181:20
191:14 192:4
194:2,10,14,25
195:1,2,11,15,24
198:1,4,5,7
shipping 136:1,19
141:8 154:18
181:25
shop 221:24
shorthand 1:21
246:4
show 128:8 133:14
166:3,6
showcasing 79:8
showed 9:11 149:16
showing 150:2
sic 19:20,21 80:24
141:15 158:12
163:21 167:9
169:4 227:16,18
side 171:7 213:8,12
221:15
sign 170:10 173:23
signature 185:6
188:1,14,18,20
244:1,20
signed 93:19 142:7
174:1 188:12,19
Signer 188:19
significant 50:3,7
signs 44:25
silly 222:16
similar 178:16
similarly 181:6
simply 197:2
Simultaneous 31:14
34:18,24 36:11
39:12 49:6 51:20
51:25 59:9 64:10
66:10 75:11 84:3
89:5 97:15 101:25
112:11 114:3

116:2,20 118:18
124:22 132:3
155:19 161:2,9
182:15 224:2
240:18
single 135:24 169:21
240:4 241:4,7
242:16
sir 32:9 156:16
163:4 219:19
Siren 171:18
sirens 168:11
site 147:7
sitting 240:6 241:2
situation 43:10
six 36:17 113:22
154:21 163:3,5,22
180:10 181:1
sixty 56:12,12
sized 132:2
Skype 85:14
slowed 137:6 158:20
slower 176:13
smaller 152:4 163:2
237:19
Smart 6:19 7:1
snafu 136:5 158:18
snapshot 153:15
social 70:10,16 78:7
78:7,14,17 87:7,10
87:14 89:6 121:9
software 29:25 30:5
30:7,11 32:4,10,11
32:18 43:3,4 52:22
73:10,20 76:16
89:9,12,16,18
90:23 91:1,14,16
91:18,19,20 92:24
sold 21:22,24 33:6
91:18 208:10
sole 14:4 28:11,18
28:22,24 29:3
32:20 36:10
solicit 121:3
solidify 190:12
somebody 46:2
133:10 182:12

soon 12:10 145:7
181:19 182:13
sorry 36:13 38:1
88:25 93:22 99:1
118:13 121:25
155:23 159:17
164:15 166:10
194:20
sort 32:17 35:18
124:18 170:10
237:16
sound 65:3 131:17
sounds 124:4 236:4
236:8
source 37:18
sourced 123:24
SOUTHERN 1:2
space 20:5,6
Speak 77:16
speakers 97:21
102:7,20 103:8
speaking 31:14
34:18,24 36:11
39:12 49:6 51:20
51:25 59:9 64:10
66:10 75:11 84:3
89:5 97:15 101:25
112:11 114:3
116:2,20 118:18
124:22 132:3
136:14 155:19
161:2,9 182:15
224:2 240:18
special 84:9
specialists 84:7
specific 69:12 96:17
158:5 240:11
242:18,25
specifically 45:8,24
84:12 88:6 91:5
102:4 129:11
140:9 147:19
207:5
spend 200:8
spent 136:13
spirit 167:11
Split 213:19

spoken 9:17
spreadsheet 205:8
211:15,16,20
235:16
stage 159:21
standard 114:16
115:6 134:25
172:24 173:2
standing 138:5
stands 141:7
start 14:16,18 30:14
31:4 74:4 240:14
240:25 241:16,24
started 10:18 15:9
15:11,14 27:14
28:5 31:2,11 54:10
158:19 162:20
198:11 237:14
starting 9:10 23:3
85:19 96:9 158:15
189:5,10 221:18
238:6 239:24
starts 180:4
startup 17:19,20
state 1:21 15:13
27:4 31:6 37:2
245:3,23 246:4
stated 1:25
statement 8:2 157:5
159:13 167:16
179:1 205:11,21
205:23 209:25
211:25 212:14
229:6,7
statements 201:13
States 1:1 53:24
status 7:7 141:6
186:19
Ste 1:23
Steadfast 85:23
Steiner 13:3,15 38:6
38:9 222:10,12
step 241:1
steps 50:19 51:3
165:2,5 172:11
240:11,17,21,23
241:11 242:18,25

stick 111:5,7,8,9
sticks 18:24 154:15
156:12,20
stock 28:14,15,20
stockholder 28:24
29:1 32:21 36:10
stop 47:8
stopped 27:18 28:1
29:16 33:4 46:23
49:14
stopping 95:25
storage 20:5,6
store 17:23 222:8,11
222:13,15 223:5
223:24 224:6
strap 238:4
straps 99:3 101:16
strategic 183:17,20
183:25 185:23
190:5,19 191:3
Street 1:22
stricter 124:1
strictly 25:3 224:4
Strike 7:8,12 186:1
186:9,23 187:11
188:8 189:6
Strikes 185:24
186:3,5,13 187:13
string 5:11,16,21
6:10,23
structure 138:5
stuff 131:22,24
217:21 233:16,17
style 125:4,6 130:2
154:11,14 156:11
156:18,19
styled 1:18
subject 190:15
subscribed 245:12
subsequent 138:11
successfully 192:4
sufficient 111:8
suggestions 71:15
75:15 89:7
Summer 12:22
54:16
Sunset 30:15 33:1,2

FTC v. iBackPack of Texas, et al.                                    12/12/2019

[264]

33:4
SunsetDirect 29:11
  29:12,16 33:9,14
supplies 222:24
  223:8,11,25
supply 124:18
support 101:11,15
  101:21 112:24
  237:16,24 238:16
  238:20 240:5,6
supporters 141:15
supports 101:14
  106:16
suppose 78:15
  156:15 182:6
  236:22
supposed 68:25 72:5
  73:15 88:22
  163:16,24
sure 10:16 11:2 12:9
  13:17 14:22 34:23
  37:24 40:9 43:6,8
  49:3,11,23 50:12
  70:12 72:25 104:8
  116:16 117:5
  118:16 119:9,16
  126:3 128:15
  133:5,6 143:17
  150:15 155:3
  159:16,18 170:12
  172:18 176:4,5
  179:3,4 187:19
  190:13 191:13,14
  195:23 196:1
  200:13,14 202:1
  202:16 206:7
  214:12 219:14
  228:22 235:8
  242:10
surprise 147:16,18
surprised 198:6
swap 169:2
switch 121:24
  158:21 159:8
  161:6
switched 158:24
  159:17,19 160:1,8

switching 160:9,11
sworn 1:17 9:6
  246:7
system 6:21 7:3 48:2
  85:13
systems 141:13
  238:15 241:15

―――――― T ――――――

T-Mobile 105:6,12
tab 140:3 144:3
  226:8 228:2
tactical 101:9
take 12:2,6 22:24
  43:17,18 46:24
  47:1 70:6 95:25
  134:1 146:10
  154:6 162:15,23
  165:2 172:11
  205:7 231:23
taken 1:17 9:24 12:1
  47:3 50:19 96:3
  162:17 196:20
  231:24 239:19
  240:12,17,21
  241:11 242:3,18
  243:5 246:13
talk 11:20,21 52:5
  96:6 163:17
  220:21
talking 11:22 47:5
  97:13 161:23,25
  185:14 190:2
  239:2 240:6 241:3
talks 153:7,10
Tampta 90:16,20
  91:6
tasks 40:4
tax 7:6 138:25 139:3
  139:4,8 186:18
  209:21 212:8
taxes 138:4,8,11,14
  138:19,22 139:6
  139:11
taxpayer 188:11
team 60:21 65:24
  67:8,9,21 68:3,7

68:12 69:5 101:19
  124:17 134:21,23
  144:21 146:20
  149:17 155:20
  156:2 158:1,14
  166:24 168:5,16
  182:6,7,8,12 185:5
  185:9 192:14
  193:1,4
teams 92:25
technical 35:23 84:9
  84:16
Technologies 7:9,13
  186:23 187:11
  188:8 189:6
technology 18:16
  23:24,25 35:3,5,11
  36:18,20 178:20
  181:23 197:7
telephone 105:11
tell 10:21 32:12 50:6
  60:22 68:12 71:13
  112:16 118:25
  135:5 148:19
  161:17 174:17
  176:9 192:3
  205:20,22
telling 137:17
  142:22 143:4,7,10
  143:20,22 145:12
tells 32:11
ten 57:5 103:9 104:8
  105:16 110:18,19
  116:24 120:16
  224:14
test 175:13,20,21,24
tested 176:6,8,15,19
  176:23,25
tester 99:25
testers 103:3,5
  104:4 107:6 108:6
  110:14 112:4
  116:12 118:20
  119:25 121:2,4,7
  121:18 124:14
  126:13 127:18
  148:13 149:7,8

testified 9:6 18:5
  33:3 184:20 185:7
  203:10 214:6
  218:4 220:17
  227:8 231:7 232:3
  234:9,16
testify 12:3
testimony 240:16
  246:9
testing 122:2 137:3
  154:22 160:3,6,10
  195:6
tests 137:5 175:18
  176:2 177:1
Texas 1:2,7,8,13,21
  1:22,23 2:15 4:6,7
  7:15,20 12:16 14:2
  14:15,19 15:5,8,15
  15:18 16:13 17:1
  17:16 18:10 19:23
  21:19 22:15 27:5
  28:5,8 29:7 37:4
  62:15,18 63:13
  94:6,17,20 102:13
  107:9 110:20
  112:13 115:3
  120:3 125:18
  127:3 138:7,10,15
  138:18,22 139:1,6
  142:21 151:17
  163:9,13,18 164:3
  167:5 169:15
  171:10 178:6,9
  180:21 182:4
  183:5,9 184:3,10
  186:19 190:19
  203:1 204:12,20
  205:12,22 206:5,8
  206:20 207:6,7,10
  207:18,21 208:9
  208:18 209:4,7,22
  211:9 217:1,11
  218:5,14 219:2
  226:13 246:5,23
text 53:20 180:14,17
text-based 35:20
thank 12:12 151:24

242:6
thing 28:22 29:3
  89:22,23 94:21
  95:15 106:17
  118:25 192:17
  194:5 240:4
things 54:4 68:12
  93:1,3 101:3 130:7
  146:21 158:12
  173:7 178:1
  208:24,25 219:6
think 27:11 29:5
  43:17 46:25 49:2,4
  54:17 69:9,11
  92:20 93:1,4,6
  98:7,10,12 100:8
  103:17,24 105:10
  109:4,9 113:2,25
  114:4,6,14 118:19
  120:1 124:16,20
  133:4 134:18,20
  148:22 192:23
  207:13 224:3
  227:22 229:22
  231:14 243:3,6
thinking 60:15
third 77:6 135:19
  138:2 158:11
  195:9
thoroughly 137:3
thought 33:3,4
  93:18 132:24
  149:4 171:23
  220:17
thousand 57:5 93:5
  108:4 113:4,11,12
  113:19 116:9
  117:9
thousands 136:16
  137:10 165:23
  218:17 219:12
three 16:6 36:23
  47:12 113:3
  136:13
ticket 43:23 44:3
till 34:21
time 10:4 11:22 28:9

Mohanan

FTC v. iBackPack of Texas, et al.                                           12/12/2019

[265]

39:19 47:23 56:19
89:24 90:1,16
117:2 118:11
120:18,22 126:22
128:2 137:24
139:5 141:17
143:3 162:22,23
169:14 180:11
240:5
**time-consuming**
137:5
**timeframe** 163:2
**times** 9:18 10:1
174:21
**title** 15:15 25:21
31:21 36:7 128:14
188:7 204:11
**titled** 26:18
**today** 12:4,7 163:20
197:2 240:16
**told** 19:16 52:25
53:23 54:1 143:2
174:16 176:7
205:25 222:18
**top** 26:21 27:2 30:22
78:6 122:15
128:18 133:22
140:3 150:11
153:10,20 177:16
179:24,25 206:15
214:2 225:4
226:11 229:10
230:16,21
**totally** 218:10
**tough** 194:5
**Trade** 1:4 2:6 9:20
147:24 148:5
204:24
**transaction** 223:18
225:4,10,14,17
226:21 228:12,15
235:19
**transactions** 205:7
206:13 211:10
214:7,9,17 215:1
216:7 221:19
223:3 231:3

235:11
**transcript** 246:7
**transfer** 111:11,11
172:23 174:24
218:8 226:25
227:4 228:2,10
**transferred** 175:2
217:13
**transfers** 226:3
**traveled** 22:19
**Travis** 1:22
**treatment** 132:11
**tremendous** 137:2
**trips** 22:21,24
**true** 61:12 65:20
95:15 175:19
189:15 216:17
218:7 220:20
232:25 244:20
246:8
**truth** 10:21,22
**try** 10:14,14 11:18
11:20,21 43:9 51:3
52:4 69:19 240:12
241:11
**trying** 68:4 97:13
168:23 169:1,2,8
239:8
**tube** 113:1 117:7,18
118:1,3 119:14
**turn** 122:24 139:21
146:6 166:13
174:5 179:23
189:23 190:7
213:16 224:16
230:1,7
**turning** 222:19
223:1 224:22
**tweaks** 65:8,14
**twenty** 10:5 162:20
224:12
**twice** 172:24 173:2,7
174:14 175:2,14
176:10
**Twin** 222:5,6
**two** 12:18 16:3,9
36:23 41:8,10

73:19 100:11
106:15 108:10,11
114:1,11,14,14
174:20
**type** 23:22 34:8,16
35:11 82:18 93:11
121:6 149:15
161:7,18,21 215:2
221:22 222:2,6,12
223:4,22
**types** 76:21 114:10
124:8 129:22
135:23

———————
**U**
———————
**U.S** 112:23
**Udayan** 6:11,24
157:13
**Udayan@Indiegogo**
177:13
**Uh-huh** 52:7 61:1,7
79:6 102:8,11
117:10 144:10
148:1 151:18
154:1,13,17
158:17 165:22
174:11,25 188:13
196:7 201:4,6
203:2 206:19
216:3 225:16
226:16,20,23
229:13 235:1
**UI/UX** 82:6
**ultimately** 69:23
**uncertain** 118:9
**underlying** 211:24
**underneath** 231:3
**understand** 10:11
10:19 11:6,15,23
29:5 132:23
158:22 207:1
209:19
**unfamiliar** 136:4
**Unfortunately**
135:21 141:16
**unit** 153:8
**United** 1:1 53:24

**units** 153:10 236:9
237:16 240:1,15
**unscrew** 106:18
**unsuccessful** 69:20
**untruthful** 152:16
157:5 159:13,14
179:1
**update** 141:1,6
142:9,12 145:5
166:14,17,21
167:8 182:4
**updated** 142:4
181:25 183:16
190:4
**updates** 140:5,11,23
166:9,11 179:19
189:24
**UPS** 136:14 137:9
**upside** 171:6
**USA** 213:22
**USAA** 8:1 38:19
53:13 131:4
226:14 227:16
228:6,17 229:5
**USB** 6:20 7:2 172:24
173:2 174:14
197:3
**use** 90:11,12 98:19
121:19 130:12
132:1 148:17,20
149:9,12 162:1
199:22,25 201:9
201:19,25 233:1
233:15
**users** 77:16 167:17
**usually** 71:19

———————
**V**
———————
**variety** 40:25
**various** 128:12
133:19 136:14
147:23 151:9,10
151:11,13 154:15
156:12,20 231:2
**vary** 40:18
**vendor** 61:10 85:22
86:1,5,8 95:6

96:12,23 97:6,23
98:18 100:22
102:14,15,16
104:17,18,19,21
105:4 106:2,4,21
107:17,18,19,22
109:12 110:1,3,4
111:16,17,18
114:22 115:12,13
115:14 116:4,5
117:13,15,17,19
119:3,12,15 120:4
120:6,9 125:19,20
125:21 127:4,5,6
128:5 164:4,14,16
164:24 171:11,16
172:5,8 184:13
237:12
**vendors** 21:20,22
22:3,6,9,11,14,22
22:25 58:5,8,11
59:2,5,11,17,20,24
60:6,9,12,22,23,24
61:3 76:19,21
79:18 81:1 85:18
85:20 86:17,25
95:19 97:1,6 98:2
98:11,14,20,21
101:2 117:22
164:18,19,22,23
172:14 200:11
202:4 203:20,21
204:1 232:18,21
234:10,13,18,23
235:12,14 237:6
239:4
**verbal** 11:13
**Verizon** 105:12
**version** 183:16
190:4
**versus** 40:17 95:9
151:25 183:18
**veterinarian** 222:14
**victim** 41:25
**video** 79:4 85:13
**videos** 79:5,7
**Visit** 197:6

Monahan

FTC v. iBackPack of Texas, et al.

12/12/2019

[266]

**VP** 82:9
**VS** 1:6

_____
**W**
**W** 197:6
**wait** 11:18 34:21
  155:21 168:10
**wall** 109:21 110:7
**Walmart** 242:1
**want** 35:18,22 69:23
  69:24,24 73:7
  93:17 96:5 103:21
  111:6 112:16
  133:25 146:10
  154:6 174:5 181:9
  236:22
**wanted** 32:18 61:11
  109:10
**warn** 148:16 149:8
  149:11
**Warner** 89:24 90:2
  90:16
**Washington** 2:8
**wasn't** 13:24 68:20
  68:22 71:5 141:25
  151:1,4 158:6
  162:2 165:20
  201:18 207:7
**water** 37:17,18 38:4
  39:16 51:13
**way** 35:13 69:24
  91:4 131:21
  154:16,22 156:21
  180:8,25 193:2,19
  242:7
**we'll** 43:17 46:25
  52:4 181:25
  221:11 243:3
**we're** 9:10 34:11,12
  50:20 74:4 137:15
  162:21 163:13
  170:22 198:20
  208:21 210:1,5
  214:22 221:9
  224:22 236:23
  237:21 239:12
  240:14 243:6

**we've** 9:17 95:24
  122:9 137:3 241:7
  242:16
**web** 6:16,21 7:3
  69:14
**webpage** 6:1
**website** 69:2,6,8,10
  69:18 76:2 147:2
  147:14,19 241:23
**websites** 23:16,17
  24:2,4 25:4 26:10
  71:14
**week** 158:16 185:22
**weeks** 180:10 181:1
**went** 103:2 104:3
  107:5 108:5
  110:13 112:3
  130:9 151:24
  202:11 212:8
  216:10 219:5,8,15
  219:21 232:6
**weren't** 18:2 19:11
  64:25 79:14 99:2
  148:17 161:15
  165:18 198:7
  232:23 239:2
**wide** 40:24 76:25
**wider** 124:18
**WiFi** 104:12,24
**willing** 167:13
**wire** 225:5,7,15
  226:3,25 227:4
  228:2,10
**wiring** 227:11
**wish** 73:6 152:2
  181:21
**wished** 92:24
**witness** 1:16 43:15
  43:20 46:24 96:2
  123:1 139:16,21
  139:23,25 152:22
  157:11,15 159:2
  163:3,5,8,13
  170:24 171:22
  173:15 177:14
  179:18,22 186:21
  186:25 187:25

188:3,6,9 204:10
  204:15 210:23
  211:7,11 225:23
  226:2,6 229:4,9,13
  242:15 244:2
  246:6,9
**wording** 131:12,14
**words** 11:12 65:1
**work** 15:17 23:4
  24:18 26:4 28:2,7
  31:7,11 33:13 37:6
  40:6,9,14 41:4
  54:14 82:12,18,25
  83:3 93:5 95:9,9
  123:24 167:4
  185:18 203:1
  218:13 219:1
**worked** 74:20 84:22
  85:4 91:16 93:2
  94:23 95:13
  130:23 147:5
  151:13 178:5
  180:21 182:3
  203:11
**working** 15:15
  18:13 36:18,19
  50:9 60:17 83:21
  83:22 92:8 93:16
  223:19 241:14
**worried** 238:19
**worry** 124:2
**wouldn't** 88:3
  142:23 149:3
  196:1 202:16
  209:6 233:19
**write** 32:1,4 52:23
  74:16 76:2 77:16
  131:9,15 133:8,11
  134:10 135:2
  142:9,12 144:11
  144:14 145:17
  146:14,17 150:23
  153:20 154:24
  155:2 157:20,23
  166:17,21 167:8
  177:19,22 178:1
  193:4

**writes** 183:13
**writing** 35:15 82:21
  82:23,24 89:6
  122:17 129:2
  134:2,6 146:15,21
  146:22 155:16
  158:2,7 159:15
  177:20
**written** 52:22 72:17
  74:1 91:1 122:21
  130:24 133:4
  134:20,21,24
  142:17 151:16
  153:7 155:3 156:3
  158:3,4 167:3
  174:2 179:2,20
  180:20 183:9
  185:4,9 192:15
  241:5
**wrong** 60:20
**wrote** 32:6 83:15
  123:21 130:19
  132:24 133:3
  150:14 151:1
  155:6,12 158:12
  168:18 178:9
  182:19 183:2
  193:1

_____
**X**
**XX** 213:22 214:3

_____
**Y**
**Yan** 87:20,23,25
**yeah** 12:23 18:14
  24:6,16 36:12,22
  36:24 48:17 49:7
  51:14 62:11 88:22
  93:10 97:17
  106:11 108:13
  121:12 125:5
  127:1 128:25
  130:14,17 139:3
  143:17 147:3
  150:21 151:2
  159:3 161:5,13,16
  170:24 171:15

184:12 189:2,7
  191:18 192:24
  194:11 195:13,18
  197:20 200:3,4
  203:25 206:16
  215:9,22 216:1,1,3
  216:5,12 217:7
  233:9,9 234:20,20
  234:24 235:18
  238:23
**year** 12:18 13:8
  15:25 31:12,13,17
  31:19,20 47:14,22
  136:5
**years** 10:5,5 12:18
  13:20,23 16:3,6,10
  36:21,23 138:11
  148:23 207:22
  215:18 223:16
  224:12 237:11
**yellow** 144:3

_____
**Z**
**zero** 136:24
**zipper** 107:12,24
  113:13
**zippers** 99:4
**ZNAPS** 178:17

_____
**0**
**00655** 131:19
**0083** 213:22
**0641** 214:4

_____
**1**
**1** 4:5 15:1,2 197:4,4
**10** 5:21 85:23 105:3
  133:15,16,17
  180:6,15
**10,000** 56:16 114:15
  237:15 238:12
**10:34** 1:19
**100** 93:4 112:8
  136:24 137:1
  145:7 194:4,13
**104** 212:20 213:9
**105** 212:19 213:25

FTC v. iBackPack of Texas, et al.                                   12/12/2019

[267]

214:1,1
**11** 6:1 139:13,15,25
    140:1 142:6
**11/20/2019** 7:22
**11/22/2019** 7:7
**11th** 31:6 144:8
**12** 1:18 5:13 6:3
    150:1,3 237:9
    244:3
**12-31-22** 246:24
**12:23** 96:1
**122** 5:14
**125,000** 225:15
    228:4,10
**128** 5:19
**12th** 123:3 180:4
**13** 6:4,7 152:19,21
    153:13
**133** 5:23
**139** 6:1
**13th** 150:9
**14** 6:10 157:8,10
**140** 183:15 190:3
**149** 6:5
**14th** 141:2
**15** 4:9 6:14 166:7,8
**150** 231:13,21
**150,000** 225:5
    226:22,25 227:11
**152** 6:8
**1520** 1:23
**157** 6:12 183:15
    190:3
**16** 6:19 173:10,12
**166** 6:17
**16th** 239:17
**17** 6:23,25 177:9,11
**173** 6:21
**177** 6:25
**179** 7:3
**17th** 246:16
**18** 7:1 179:15,17
    189:24
**186** 7:9
**187** 7:13
**189,000** 206:18
**18th** 225:8

**19** 4:8 7:5 186:16,17
**1992** 29:14
**19th** 15:13 225:15
    228:4
**1A** 197:4

_____

**2**

**2** 4:11 26:16,17
    74:19
**2,000** 111:24 112:1
**2.1A** 197:4
**20** 7:11 13:24
    187:21,24 215:18
**20,000** 113:21
**20,000mAh** 119:18
**200** 99:16,17,20,22
    100:4,6 108:12,13
    110:11 114:5,7
    115:1 119:21
**2005** 29:17 33:5
**2006** 29:17
**2010** 13:11,16 32:25
    33:22
**2011** 7:17 27:7 31:6
    204:13,21 206:14
    206:21,24 207:6
    207:10 208:5,6
    209:4,7,12,23
    210:4
**2014** 14:20,21 207:8
**2015** 4:9 15:13
    54:16,21 56:7
    138:8 237:10
**2016** 5:14,19,23 6:5
    6:12,25 54:22,23
    56:22 57:12
    123:13 129:24
    141:2 142:5,23
    150:10 161:4
    166:16 168:8,15
    181:14 183:3
    225:8,15 228:4
    229:24 239:15,18
    239:20 240:13,20
    242:4
**2017** 38:3,14 144:8
    145:9 146:8 229:8

**2018** 12:20,22
    191:25 198:13
**2019** 1:19 7:18
    147:25 204:14,22
    237:9 244:3
    246:17
**202** 134:14
**204** 7:18
**20580** 2:8
**21** 5:19 7:15 204:9
**211** 7:22
**22** 7:20 211:2,3,6
    230:5
**225** 7:25
**228** 8:4
**22nd** 229:8
**23** 7:24 225:20
    226:1
**23rd** 166:16 168:8
    168:15 181:8,14
**24** 8:1 135:12
    228:25 229:3
**24th** 38:13,14
**25** 103:23 104:1
    105:3 107:4,8
    127:16 136:11
    138:2
**250** 118:5
**26** 4:15 136:20
**28** 5:23
**2nd** 27:7
**2X** 174:9,24

_____

**3**

**3** 4:17 30:18,19
    146:6
**3,000** 112:22 113:4
**3,000mAh** 154:12
    156:19
**3:03** 162:19
**3:19-cv-00160** 1:6
**30** 4:19 19:1 51:23
    223:16
**300** 117:8
**32** 204:7
**38** 4:24
**3G/4G** 104:12

**2018** 12:20,22
**4**

**4** 4:21 38:25 39:1
    85:19 88:15 91:10
    92:11 174:5
**4,000** 236:5,9 238:8
    238:9
**4,400** 237:16 238:1
    239:22 240:1,9,15
**4/28/11** 4:15
**4:33** 1:19
**409** 2:14 12:15
    100:16,16
**4500** 13:3 38:9
**4644** 226:19 227:16
    228:8,18 229:6

_____

**5**

**5** 5:1 74:9,10 86:24
    91:24 94:12 144:4
    182:25 189:25
**5,000** 112:1 113:11
    114:14 116:10
**50** 103:23 104:1
    115:19 172:18
    184:20
**50,000mAh** 125:14
    126:1,21
**500** 108:3 110:12
    112:8 114:7 115:1
    119:21 172:19
    181:18 182:13
    184:20
**512)476-4577** 203:8
**54** 230:7
**58** 221:9

_____

**6**

**6** 5:5 78:2,3 190:8
**6/22/17** 7:25
**60** 51:23 57:2,18
**600** 2:7
**628** 122:25
**629** 123:4
**657** 195:9

_____

**7**

**7** 5:8 82:2,3 85:22

89:25 93:22,24
**72** 224:17
**73** 224:22
**74** 5:3
**77546** 2:15
**78** 5:6

_____

**8**

**8** 5:11 6:12 87:20
    122:9,10
**8,000mAh** 126:24
**800,000** 55:1
**808** 1:22
**8100** 188:5
**82** 5:9
**8462** 246:23
**86** 221:11
**87** 221:18

_____

**9**

**9** 3:8 5:16 128:9,10
    140:3 179:24
    180:14 181:6,13
    192:9
**90** 51:10,18 224:20
**900** 53:10
**93** 222:20 224:21
**94** 223:2
**9th** 57:12 146:8
    183:3

# EXHIBIT 3

## DECLARATION OF CHARLES AGUILLON
## PURSUANT TO 28 U.S.C. § 1746

I, Charles C. Aguillon, make the following statement:

1.     I am a U.S. citizen over the age of eighteen residing in Austin, Texas.  I have personal knowledge of the facts stated herein.

2.     In about September or October of 2015, I came across a crowdfunding campaign on the Indiegogo website for a product called the "iBackPack."  One of my hobbies is technology and I like to keep an eye out for tech products to buy and tech projects to back.  I had backed a number of crowdfunding campaigns prior to encountering the iBackPack campaign.

3.     The iBackPack campaign page intrigued me because it advertised a lot of features that other backpacks didn't offer at the time.  I thought the iBackPack would be a nice gift for one of my sons, who was finishing high school and on his way to college.  The campaign page stated that the product would be ready in March 2016.  I decided to back the campaign because I believed the money that I contributed was going to be used to develop and produce the iBackPack, which I was hoping to receive as a perk.

4.     Sometime later, I and other backers were invited to become "testers" for the campaign.  I thought that sounded interesting, so I signed up to be a tester.  I first received a package of materials to test sometime in the spring of 2016, probably March.  I and the other testers were encouraged to try out the components that were sent to us and post online reviews.

5.      When I received my "tester" box, I noticed that the return address was quite close to my home.  I decided to reach out to Doug Monahan, who was running the iBackPack campaign, and offer to help out.  Monahan accepted my offer and I went over to his home to meet with him.  I met Monahan at his home because that's where he was operating the campaign; in the months I spent helping Monahan, I never saw or heard about any other business location.

6.      I ended up spending a fair bit of time trying to help out Monahan with the iBackPack campaign, especially over the summer of 2016.  (I work as a teacher and I had more time available to help in the summer.)  I stopped trying to help Monahan with the campaign around September or October of 2016.  In the months that I was helping Monahan, I tested components and gave feedback, packed boxes of components for testers, ran errands like bringing tester boxes to the post office to be mailed, organized physical components, and organized databases and lists.

7.      I was never an employee of Monahan or iBackPack; the things I did for Monahan and the crowdfunding campaigns were done as a volunteer.  I was never paid by Monahan for my time, but he would reimburse me if I ran errands for him that I paid out of pocket.  To the extent that Monahan made reimbursements to me, they were done by PayPal.  In my experience, Monahan didn't ever pay me or anyone else involved in the campaign by cash.

8.      One of the first things I tried to accomplish when I started helping Monahan with the iBackPack campaign was to bring some basic organization to what looked like a total mess.  Monahan's home had boxes and components (such as batteries)

scattered everywhere.  I organized the physical components relating to the campaign that were present around Monahan's home.

9.     I also put in work to organize important records that were either a jumble or not being kept at all.  I straightened out problems in a database of backers, I figured out quantities of components that would need to be ordered to provide products for backers, and I created shipping lists, such as a list of which backers should be sent "POW" cables.

10.     I also packed boxes to ship to "testers."  To the best of my recollection, nearly all testers were sent a package of one large battery, one smaller "credit card" battery, two "light sticks," two sets of two different cables, and two small USB fans.  At one point, a small group of about ten to fifteen testers—including me—were provided "prototype" backpacks that had some, but not all, of the features that were supposed to be part of the full iBackPack.  These were not completed iBackPacks.  To the best of my knowledge, no one was ever sent completed products.

11.     If I hadn't done these tasks for Monahan—organizing physical inventory, organizing records and keeping track of obligations, packing and shipping tester boxes— I'm not sure how or if they would have gotten done.  In the months that I helped with the iBackPack campaign, I never saw anyone that Monahan had hired to handle these tasks.

12.     I can only remember seeing two people who worked locally on Monahan's crowdfunding campaigns.  One was a woman named Haley Felchak.  The other was a woman whose first name was Lucille; I can't remember her last name.  From what I could see, a big part of these women's jobs involved contacting backers to try to get them

to upgrade to a more expensive package of products or buy "extras," like additional batteries.

13.     Before Haley Felchak and Lucille were responsible for contacting backers to try to get them to upgrade to more expensive product packages, Monahan had used a call center located in the Philippines to call his backers to try to upsell them. Based on what Monahan told me, I got the impression that his relationship with the Philippine call center had ended badly, and that he thought they were cheating him somehow. In my experience helping with Monahan's campaigns, he was always putting a lot of effort into trying to sell more products, even though he hadn't produced any products yet. From how he acted, it seemed to me that Monahan was always more interested in selling than in finalizing the products.

14.     Other than Haley Felchak and Lucille, everyone that Monahan paid while I was trying to help on his campaigns seemed to be overseas somewhere. I was aware that some overseas people were tasked with creating or editing videos, some were tasked with web design and web content, and some were tasked with designing packaging.

15.     In addition, Monahan also ordered components from suppliers overseas. Starting around July 2016, I got involved with keeping track of what had been ordered and what needed to be ordered for the campaigns. From my knowledge of and experience with the campaigns, although he ordered a variety of components, Monahan never ordered enough components to actually fulfill his campaigns. For example, in my experience, Monahan never ordered enough bags provide iBackPacks to the more than four thousand people who had backed the campaign.

16.     I wasn't aware of anyone overseas or in the United States who Monahan had paid to design or create completed campaign products.  Monahan was ordering components from overseas, and he had people overseas who were creating or editing videos, working on websites, and designing packaging, but in the months that I helped with the iBackPack campaign, I never saw anyone that Monahan had hired to generally handle developing or producing the products advertised in the iBackPack, "iBackPack 2.0," "MOJO," or "POW" crowdfunding campaigns.

17.     While I was helping with the campaigns, I saw lots of complaints from backers who weren't getting their products.  Monahan was aware of these complaints.  I remember that at one point after I had started helping with the campaigns, Monahan told me that he was getting a lot of unhappy e-mails from backers and, as a consequence, was trying not to post updates to the campaign websites under his own name.

18.     In 2016, there was a widely-publicized problem with certain types of lithium batteries exploding on airplanes.  Monahan directed people working on the campaigns, including me, to say that the iBackPack hadn't shipped because of this lithium battery problem.  It's true that, during the campaign, Monahan spent some time making sure that the batteries he had been buying were not the same type that posed a risk of explosion, but, from everything I saw, the risk of exploding batteries was not why the products never shipped.  It's not as if everything else was ready except for the batteries.  To the contrary, there were some parts of the iBackPack project that had never made any progress:  for example, from what I saw, I don't think Monahan or anyone else

ever did anything at all to follow up on the WiFi hotspot that was supposed to be a part of the iBackPack.

19.     About a month before I stopped helping Monahan's campaigns, Monahan became interested in a new idea or company that he called "Lightning Strike."  Monahan became very focused on Lightning Strike and seemed to lose whatever interest he may have had in fulfilling his crowdfunding campaigns.  To the extent that I encountered anyone working for Monahan after he came up with "Lightning Strike," those people now seemed to be working on "Lightning Strike" rather than the unfinished crowdfunding campaigns.

20.     Around late September or early October of 2016, I stopped helping Monahan with his crowdfunding campaigns.  Two of the last things I did for Monahan before leaving were to assemble (i) a list of backers who should be sent "POW" cables; and (ii) information on the bags he needed to order to fulfill iBackPack orders.  Monahan gave me the impression that he wasn't going to act on either of those issues.  I left because I felt like the iBackPack project wasn't really going anywhere, and that Monahan would never buy all the necessary components and produce the products.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _____23rd Of January_____, 2020, at Austin, Texas.

_____

Charles C. Aguillon

# EXHIBIT 4

## DECLARATION OF HALEY FELCHAK

### PURSUANT TO 28 U.S.C. § 1746

I, Haley Felchak, make the following statement:

1.     I am a U.S. citizen over the age of 18 residing in Wheat Ridge, Colorado.  I have personal knowledge of the facts stated herein.

2.     From approximately August 2016 to October 2016, I worked as the executive assistant to Douglas Monahan, Chief Executive Officer of iBackPack of Texas, LLC.  It was my understanding that the company's business included providing certain specified products to "backers" who had contributed money to crowdfunding campaigns that the company had run.

3.     My duties for the company included conducting live webinars for backers of the "iBackPack" campaign to try to induce them to purchase additional products, calling our current backers to try to upsell them on upgraded products, and responding to consumer inquiries and complaints.  Monahan told me who to contact, and what to say to them.

4.     My work did not involve developing or producing any of the products advertised in the "iBackPack," "iBackPack 2.0," "MOJO," or "POW" crowdfunding campaigns.  Although I had some interactions with others who were hired or paid by iBackPack of Texas, LLC, or Douglas Monahan, I was not aware of anyone who was hired or paid to develop or produce any of the products advertised in the "iBackPack," "iBackPack 2.0," "MOJO," or "POW" crowdfunding campaigns.

5.     As Monahan's executive assistant, I had access to certain financial accounts, and Monahan regularly directed me to order food deliveries and dry cleaning services to his apartment using iBackPack funds.  I have no reason to believe that iBackPack of Texas, LLC, ever used cash, bitcoin, or Mr. Monahan's personal credit cards to purchase goods or services for any of the campaigns.

6.     At some point during my time at iBackPack, various potential components for "iBackPacks" were sent to backers so that they could write positive reviews on the iBackPack website.  The company did not, however, send these backers or any other backers completed products.

7.     The company received many complaints from backers about not receiving their products as expected, which I saw, as did Monahan.  Douglas Monahan instructed me and other workers to tell backers that the "iBackPack" was behind schedule because a backup lithium battery accessory was in danger of catching on fire.  After seeing many consumers complain, I told Monahan that he should produce and distribute "iBackPacks" to backers without these batteries, which he could send to backers at a later date. Monahan did not follow my suggestion.

8.     On or about October 2016, Douglas Monahan started a new business project called Lightning Strike that was promoting a slim exterior phone battery that could fit within a phone case.  From my interactions with Monahan, I concluded that he was no longer paying attention to any of his crowdfunding campaigns—which still had not sent completed products to backers—as he tried to get Lightning Strike off the ground.

9.      By October 2016, I came to believe that Monahan had no intention of providing backers with finished products, and I quit my job with iBackPack of Texas, LLC.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on ___February   1___, 2020, at Wheat Ridge, Colorado.

*Haley Felchak*
Haley Felchak

# EXHIBIT 5

## DECLARATION OF BILLY DE ALMEIDA

### PURSUANT TO 28 U.S.C. § 1746

I, Billy De Almeida, make the following statement:

1.      I am a U.S. citizen over the age of 18 residing in Edison, New Jersey.  I have personal knowledge of the facts stated herein.

2.      I pledged money to the iBackPack and MOJO campaigns on Indiegogo.com in order to receive, as perks, two iBackPacks, and a MOJO bag.

3.      When I contributed money to the two campaigns, I believed that the money would be used to produce the products and possibly to make some design improvements to the products as well.  I would not have contributed money to the two campaigns if I believed that the money wasn't going to be used to produce the products.

4.      For the iBackPack campaign, I signed on to be a beta tester.  As a beta tester, I received a 20,000 mAh battery that the campaign called the "Mama" battery, as well as some charging cables.  The campaign never warned me that the battery I had received was dangerous or that I should stop using it.

5.      The iBackPack campaign frequently sent me emails and live video feeds promoting their products and trying to encourage me to purchase an upgrade.  As a result of this marketing effort, I did pledge additional money to receive a 50,000 mAh monolith battery.

6.      The MOJO campaign sent an update claiming that they were having trouble trying to produce the MOJO bag, and offering to provide MOJO backers with an

iBackPack instead of the MOJO bag.  Since the value of the iBackPack was greater than the value of the MOJO bag, and since it seemed iBackPack of Texas was unable to produce the MOJO bag, I agreed to accept the offer.

7.      On October 10, 2016, I received an email from Charles.aguillon@ibackpack.mobi sending me a link to accept the offer to receive an iBackPack in place of the MOJO bag.  I forwarded a copy of this email to FTC attorney Patrick Roy on August 11, 2017.  A true and correct copy of the email is attached to this declaration as **Attachment A**.

8.      Approximately one year ago, I received an email from the MOJO campaign offering to provide me with a refund if I agreed to sign a release form.  I signed the release form and did receive a refund for the pledge I made to the MOJO campaign.  I have never received a refund for the money I contributed to the iBackPack campaign.

9.      Outside of the beta program, I have not received any perks from either the iBackPack or MOJO campaign.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on ___12 / 21___, 2019, at Edison, New Jersey.

Billy De Almeida

ATTACHMENT A

**Roy, Patrick**

| | |
|---|---|
| **From:** | Billy De Almeida <badboybill45@gmail.com> |
| **Sent:** | Friday, August 11, 2017 1:01 PM |
| **To:** | Roy, Patrick |
| **Subject:** | Fwd: Link for MOJO fulfillment |

---------- Forwarded message ----------
From: "charles.aguillon@ibackpack.mobi" <charles.aguillon@ibackpack.mobi>
Date: Oct 10, 2016 10:38 PM
Subject: Link for MOJO fulfillment
To: <charles.aguillon@ibackpack.mobi>
Cc:

My apologies--here is the link to fulfillment information:

https://docs.google.com/forms/d/e/1FAIpQLSdEKOU-hxZ25b1zM4t6vt9nJrZlFiV3h8c3YvIaRNjFMfClwg/viewform

1

# EXHIBIT 6

# DECLARATION OF AARON GUNDERSON

## PURSUANT TO 28 U.S.C. § 1746

I, Aaron Gunderson, make the following statement:

1.      I am a U.S. citizen over the age of 18 residing in Fargo, ND.  I have personal knowledge of the facts stated herein.

2.      In August 2015, I contributed money to the iBackPack Indiegogo campaign in order to receive an iBackPack as a perk.  I contributed to the campaign because I believed the money that I contributed was going to be used to develop and produce the iBackPack, which I was hoping to receive as a perk.

3.      In, or about April, 2016, iBackPack of Texas was offering a 2 for 1 deal on the iBackPack 2.0 Kickstarter campaign, where for the same pledge backers could receive two iBackPack 2.0s instead of one.  I pledged additional money to the Kickstarter campaign page in order to receive two iBackPack 2.0s.  As with the iBackPack Indiegogo campaign, I contributed to the iBackPack Kickstarter campaign because I believed the money that I contributed was going to be used to develop and produce the iBackPack 2.0, which I was hoping to receive as a perk.

4.      I signed on to become a "beta tester" for the iBackPack campaign and received a 20,000 mAh battery "mama battery", 3 credit card batteries, approximately three zipper cables, numerous USB stick lights, and a backpack without the components.  The company never warned me that any of the batteries were unsafe to use.  As part of

the deal to receive a beta package, iBackPack of Texas asked me to post promotional
reviews of the components that I received.

5.      iBackPack of Texas regularly wrote posts on Indiegogo and emails to try to
get backers to contribute additional money to upgrade our perk to the iBackPack 2.0.

6.      On May 13, 2016, Doug Monahan wrote a post on the iBackPack Facebook
page indicating that iBackPack of Texas was going to use polymer ion batteries in the
iBackPack.  I took a screenshot of that Facebook post on, or about, January 8, 2017.  I
forwarded a copy of that screenshot to FTC attorney Patrick Roy in August, 2017.  A true
and correct copy of that screenshot is included with this declaration as **Attachment A**.

7.      During 2016, I posted many comments on the campaign pages questioning
iBackPack of Texas about many of the promises they made to backers, but then later
deleted the comments where they made those promises, including promising third party
discounts, a two-for-one offer on Kickstarter, and offering Indiegogo backers a free
upgrade to the iBackPack 2.0 offered on Kickstarter.

8.      On August 4, 2016, iBackPack of Texas marked my Indiegogo pledge as
having been refunded, even though I never received a refund from the company.  By
marking my campaign pledge as having been refunded, they were able to block me from
posting any more comments to the iBackPack Indiegogo page.

9.      On August 6, 2016, I donated $1.00 to the campaign so that I could
continue to write in the comments section on the iBackPack Indiegogo campaign page.

10.     In early January, 2017, iBackPack of Texas posted an update saying that
delivery of the iBackPack would be delayed until Fall 2017 due to problems with the

lithium ion batteries, which were purportedly the same batteries Samsung had been using that were having safety issues.  I wrote several more posts on the iBackPack Indiegogo page pointing to prior inconsistent statements that iBackPack of Texas made about the batteries they were going to use, and relaying other information I had learned from Samsung indicating that iBackPack of Texas was not using their batteries.

11.     Around this same time, the iBackPack of Texas Facebook page, and the ibackpack.co website were both taken down and no longer accessible.

12.     On January 12, 2017, I received an email from Doug Monahan threatening to sue me, and the hospital that employed me, for libel.  I took a screenshot of that email and forwarded it to FTC attorney Patrick Roy in August, 2017.  A true and correct copy of that email is included with this declaration as **Attachment B**.

13.     The last communication I received from the iBackPack Kickstarter campaign was an update posted to the campaign page in March, 2017.

14.     The last communication I received from the iBackPack Indiegogo campaign was an update posted to the campaign page, also in March, 2017.

15.     I never received an iBackPack or iBackPack 2.0 as a perk, nor did I receive any refunds.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _____1/21/20_____, 2020, at Fargo, ND.

Aaron Gunderson

# ATTACHMENT  A

••○○○ Verizon 🛜          4:50 PM          ◀ ✸ 48% 🔋

< 🔍 İBackPack polymer

 **Doug Monahan**
May 13, 2016 · 🌐

Up early today working on getting our iBackPack
BETA units out the door - https://ibackpack.co/beta/
- Lithium Ion batteries have been causing huge issues
- thank god we went with Polymer Batteries vs.
Lithium Ion - sometimes you can just get lucky. I wish I
could say that I foresaw the problems - but it was just
luck - the polymer seemed better to me - smaller and
more powerful - it never dawned on me the others
could possibly blow up or cause fires.

**Beta | IBackPack**
ibackpack.co

 7                           2 Comments

 Share

# ATTACHMENT  B

**From:** doug monahan [mailto:doug.monahan@daybreak-texas.com]
**Sent:** Thursday, January 12, 2017 6:04 PM
**To:** kidzmd@outlook.com
**Subject:** Call Me Before This Gets Even Uglier

Aaron,

Please give me a phone call. My number is 512-565-2524. This whole issue with you is about to get quite ugly. You are libeling me, slandering my name and I've had it with your behavior. You have received the perk promised with Indiegogo iBackPack, with all of the trappings, and I am not sure what your problem may be – but I'm shocked that a physician would behave in such a childish and potentially self destructive behavior.

I'm writing you out of a courtesy. Rather than a) filing suit against you personally, b) your clinic, c) whatever hospitals you may be associated with – I thought I would give you one last chance to start acting like a physician vs. the children you take care of.

This phone number and letter is for you only. I have questions regarding physical care and thus HIPAA laws should provide some level of protection from you posting my phone number to the world.

Doug Monahan
512-565-2524

# EXHIBIT 7

## DECLARATION OF MAX LEVINE

### PURSUANT TO 28 U.S.C. § 1746

I, Max Levine, make the following statement:

1.      I am a U.S. citizen over the age of 18 residing in Glendale, CA.  I have personal knowledge of the facts stated herein.

2.      On or about February, 2016, I pledged money to the POW campaign on Indiegogo.com in order to receive ten POW cables as a perk.

3.      When I contributed money to the campaign, I was under the impression that my money would be used towards the production of the POW cables.  I would not have contributed money to the campaign if I thought that my money wasn't going to be used for producing the POW cables.

4.      On or about September 2016, the campaign began sending updates telling backers that another business would be providing the cables.

5.      On February 23, 2017, I received an email from info@iBackPack.mobi apologizing for the delay in delivering products and indicating that the "major problems that we are facing with our batteries is what is definitely causing this set back."  I forwarded a copy of this email to FTC attorney Patrick Roy on September 7, 2017.  A true and correct copy of the email is attached to this declaration as **Attachment A**.

6.      On November 28, 2018 I received an email from refunds@pow-cables.com asking me to sign a release form in order to receive a full refund.  I forwarded a copy of this email to Patrick Roy on December 3, 2018.  A true and correct copy of the email I

received is attached to this declaration as **Attachment B**. I did not complete or submit the release form as requested.

       7.     On December 10, 2018 I received a refund, with the money being deposited into my paypal account. The message accompanying the refund asked me to send a full release, but also indicated that by accepting the funds I had de-facto accepted the release. A true and correct copy of the paypal refund message is attached to this declaration as **Attachment C**. I did not send a release form to iBackPack of Texas.

       8.     I have not received any POW cables from the campaign.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on ___12/21/19___, 2019, at Glendale, CA.

_____

Max Levine

# ATTACHMENT A

**Roy, Patrick**

| | |
|---|---|
| **From:** | Max Levine <maxnl2@gmail.com> |
| **Sent:** | Thursday, September 07, 2017 2:33 PM |
| **To:** | Roy, Patrick |
| **Subject:** | Fwd: Sorry for the inconvenience. |

Max Levine
Maxnl2@GMail.com
248-990-0091

> Begin forwarded message:
>
> **From:** info@ibackpack.mobi
> **Subject: Re: Sorry for the inconvenience.**
> **Date:** February 24, 2017 at 6:00:08 AM PST
> **To:** "Max Levine" <maxnl2@gmail.com>
>
> That is true man and we do apologies for the lack of communication.
>
> A post will be updated via indiegogo.
>
> -----Original Message-----
> From: "Max Levine" <maxnl2@gmail.com>
> Sent: Thursday, February 23, 2017 10:15am
> To: info@iBackpack.mobi
> Subject: Re: Sorry for the inconvenience.
>
> I believe you owe a response to your supporters. You have not posted any updates on the
> IndieGogo campaign in 4 months and at that point you stated that the cables would be shipped
> asap, in another update 4 months ago you stated that you were hoping to ship the product that
> month.
>
> You have repeatedly ignored my emails, my Facebook posts, and my tweets on twitter to you.
> You have not updated the campaign online in any way in 4 months and you have not responded
> to the comments on the campaign at all. You also ignored my message to the campaign owner
> Doug Monahan. You have clearly passed the estimated August 2016 ship date, and I believe we
> are owed at least an update.
>
> https://www.indiegogo.com/projects/pow-super-smart-usb-magnetic-cable-system--2
>
> Max Levine
> Maxnl2@GMail.com
> 248-990-0091

On Feb 23, 2017, at 9:08 AM, info@iBackpack.mobi wrote:

Dear Max,

The iBackpack team do apologies for any inconvenience caused. We are sincerely sorry for the lack of communication.

As promised your goods will be delivered but the major problems that we are facing with our batteries is what is definitely causing this set back. However We plan on shipping the product this Fall. Thank you for your support and once again we do apologies.

Sincerely,
iBackpack Team.

# ATTACHMENT B

**Roy, Patrick**

| | |
|---|---|
| **From:** | Max Levine <maxnl2@gmail.com> |
| **Sent:** | Wednesday, November 28, 2018 9:37 PM |
| **To:** | Roy, Patrick |
| **Subject:** | Doug Monahan Pow Cables / iBackPack Fwd: Your $160 refund - Pow Cables |

Hello,

About a year ago you contacted me regarding an investigation into the Pow Cables campaign and Doug Monahan (who also started the iBackpack campaign).

Today I received the below email from the campaign after receiving no contact from them in over a year. It doesn't look like any updates have been posted to the Indiegogo campaign.
Just thought I'd forward this over in case it's helpful in any way.

Thanks,
-Max

Max Levine
Maxnl2@GMail.com
248-990-0091

Begin forwarded message:

**From:** pow cables refunds <refunds@pow-cables.com>
**Subject: Your $160 refund - Pow Cables**
**Date:** November 28, 2018 at 1:06:33 PM PST
**To:** "maxnl2@gmail.com" <maxnl2@gmail.com>

Hi Max,

Happy Holidays!  We've got good news! Roughly three years ago you donated/pledged for perks/rewards via our crowd funding campaign for the POW CABLES. Our records indicate you did not receive your perk. The program has not been cancelled and you are under no obligation to accept a refund. However, for a limited time, rather than waiting for the perks/product/service, we are offering you a full-refund. You simply need to you sign and return the attached acceptance/release form.   We are prepared to forward the full amount of your pledge/donation, including any monies contributed to cover shipping costs.

A little extra money, especially during the Holiday Season is never a bad thing.  Your refund will be sent to you via PayPal - most likely within 48 hours, thus it is very important you provide us with the correct PayPal address. As mentioned above, the campaign is not, nor ever has been cancelled. However, there are a great many factors that have substantially delayed the project. Rather than provide you with a list of reasons the project has been delayed - we are instead providing you with an opportunity to receive a full refund.

1

Should you wish to receive the POW CABLES vs. a refund simply say so in the PayPal field below. We aren't going to give up our plans to fully develop, manufacture and ship a superior product to you regardless of how long it may take.

However, with that said, those who accept the offer for a full refund will receive same provided they sign the release below and return within the next several days.

We hope you have a fabulous holiday season in 2018.

**Holiday Cheers To You,**

**The POW CABLES Team**
*****************************************

**TO RECEIVE A REFUND:**
1. Hit the reply button on this email.
2. Type your name, and date.
3. Give us your correct, updated PayPal address.
4. Copy and paste the following: I, (your name), would rather have a full-refund now vs. receive the POW CABLES later. My PayPal is (put your PayPal here). Please accept my returned email and typed name as my digital signature. I've read and understand the release.

**BELOW IS THE FULL RELEASE. YOU CAN ACCEPT THE TERMS BY HITTING REPLY AND FOLLOWING THE INSTRUCTIONS. IF YOU WISH TO RECEIVE YOUR PERK ONCE THE PRODUCT IS FINISHED - YOU CAN ALSO PUT THAT IN YOUR REPLY.**

**RELEASE**

**I've decided to accept the refund vs. wait for the products to be finished and released.** By accepting the monies, I hereby release, hold harmless, waive any damage and agree not to attempt to pursue litigation or suits against the campaigner, owner, officers, administrators, heirs, assigns, firms, employers, employees, associations, partnerships and others associated with the campaign.

Despite not receiving my product as I had hoped, I found the marketing materials, claims, etc. to be accurate, truthful and correct. I realize and understand creating a product from scratch can be a difficult process and found no deception or omission in any of the marketing materials and believe the campaign was carried out with full honesty and transparency. I am not a linguist, a contract attorney nor consider myself to be an crowd-funding expert - but feel that a full refund is a fair enough deal.

Admittedly, I was excited about receiving the perk, but I understand in the crowd funding world there are many unknowns that can substantially delay a project. I also understand that working with manufacturers overseas can be tedious and can delay the manufacturing process. I am satisfied the monies I donated were used for the development, manufacturing and distribution of the product. The return of 100% of my contribution/donation further convinces me all actions and practices were fair, honest, above board and compliant with city, county, Parrish, state or federal laws.

2

I agree to keep the terms of this agreement confidential. I have no ill will for the company, its creator or the collective members of the team and wish everyone a wonderful Holiday Season.

I'm signing this release willingly, not under duress and much more excited about how I am going to be spending my refund vs. engulfed with anger or resentment for the delay.  The crowd funding experience provides me with an intangible knowledge regarding how difficult it can be to create a product.

Overall, I appreciate the chance to not only receive a perk, gift or product but the educational value of the processes as well. I realize that for the most part, and in this case, via backing a crowd funding campaign, I am supporting the entrepreneurial dream. While it would have been ideal to have received the perk much earlier, I appreciate and accept the offer of a full refund - as well as the fact the corporate officers, founders and others haven't given up on meeting their obligations as a campaigner. I understand there can be a great many factors to affect a campaign. The great majority of the campaigners are individuals, with limited resources and many times are dealing with unscrupulous offshore vendors. It only takes one mistake that can significantly impact the failure or success of a campaign. I respect the fact that, although this campaign is late, at least the team is doing their best to release the product and honor their original commitments.

Despite issues with the campaigners' website I've never been told or heard from the campaigner the project was cancelled. The fact that I am being offered a refund, or the opportunity to choose to receive the perk further reinforces my belief in crowd-funding and in this case - the dedication of the campaigner and his or her team to never give up, continue their efforts for years if required and allowing me to choose my preferred outcome.   I understand that I am not obligated to accept a refund and should I wish, I have the option to wait for the product to be finalized, manufactured and shipped to me. I realize there are many unknowns with all crowd funding campaigns and understood this fact when making a donation/contribution.

The fact that the campaigner is willing to continue efforts further reinforces my belief that my monies were/are being used per the Indiegogo rules and regulations as well as those of my city, county, Parrish, state or federal government. It's easy. Send back the signed release and receive your monies within 48 hours - if not sooner. You must make sure your PayPal email address is valid in order to receive the funds.

For more info check out: https://pow-cables.com

# ATTACHMENT  C

Max Levine
Maxnl2@GMail.com
248-990-0091

Begin forwarded message:

**From:** "service@paypal.com" <service@paypal.com>
**Subject: You've got money**
**Date:** December 10, 2018 at 9:18:03 PM PST
**To:** Max Levine <Maxnl2@GMail.com>

Hello, Max Levine



# REFUND PROCESSING sent you $170.25 USD

Note from REFUND PROCESSING:

" Happy Holidays! We've got great news! you supported the POW CABLES campaign via a small pledge/donation. Our records indicate you did not receive a perk. We are including a full return of your "

donation. We've even covered the 3% paypal processing charge for you! We can all use a little bit of extra cash at the Holiday Season! Please send us a full release; however, by accepting these funds there is a de-facto acceptance of the release. Send the full release to: refunds@pow-cables. com and stating: I (name here) release POW CABLES, its parent company, officers, directors and campaigners from any and all liabilities, indemnify & hold harmless campaigner. The marketing materials were honest, straight-forward the antithesis of deceptive. Use of funds were in accordance with Indiegogo rules, regulations, guidelines as well as city, state, county & federal laws. Thanks - (PUT YOUR NAME & DATE HERE)

Transaction Details

Transaction ID: 9FB73329L71800527

December 10, 2018

Money received                                    $170.25 USD

Fee                    $5.24 USD

**Total**                    **$165.01 USD**

Don't see the money in your account?
Don't worry -- sometimes it just takes a few minutes for it to show up.

Get the Details



Help & Contact  |  Security  |  Apps

   

PayPal is committed to preventing fraudulent emails. Emails from PayPal will always contain your full name. Learn to identify phishing.

Please don't reply to this email. To get in touch with us, click **Help & Contact**.

Copyright © 1999-2018 PayPal, Inc. All rights reserved. PayPal is located at 2211 N. First St., San Jose, CA 95131.

PayPal PPC000955:1.19.0.33:f2279d4fda618

# EXHIBIT 8

## DECLARATION OF PATRICK MILLER

### PURSUANT TO 28 U.S.C. § 1746

I, Patrick Miller, make the following statement:

1.      I am a U.S. citizen over the age of 18 residing in Citrus Heights, California. I have personal knowledge of the facts stated herein.

2.      In August, 2015, I contributed money to the iBackPack campaign in order to receive an iBackPack as a perk.  I believed that the iBackPack was already in production, and my expectation was that by contributing money to the campaign I would receive an iBackPack.

3.      In February, 2016, I contributed money to the POW campaign in order to receive POW cables as a perk.  I also believed that the POW cables were already in production, and that my order just needed to be fulfilled.

4.      It was important to me that the money I contributed to both the iBackPack and POW campaigns would be used to produce the products I was expecting to receive.

5.      The iBackPack campaign contacted me at least twice by email, and at least once by phone to try to get me to upgrade my order.  As a result of those efforts, I did contribute additional money in September 2016 to receive an upgraded version of the iBackPack.

6.      In, or about, October 2016, the POW campaign informed backers that they needed our consent in order to have a "strategic partner" provide the cables in fulfillment of our campaign pledges instead of iBackPack of Texas.  Before we could receive the

cables from a strategic partner, we were asked to list our campaign contributions as having been fulfilled.  I received an email from the POW campaign on October 10, 2016 asking me to list my campaign contribution as having been fulfilled.  I forwarded a copy of that email to FTC attorney Patrick Roy on January 6, 2020.  A true and correct copy of that email is included in this declaration as **Attachment A**.

7.    I visited the link that was included with the email and listed my contribution as having been fulfilled so that I could receive the POW cables.

8.    The last communication I received from the POW campaign was an update posted to the campaign page on October 11, 2016.

9.    The last communication I received from the iBackPack campaign was an update posted to the campaign page on February 9, 2017.

10.    I never received an iBackPack or the POW cables that I contributed money to receive.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _18 Jan 2020_, 2020, at Citrus Heights, CA.

Patrick Miller

# ATTACHMENT  A

**Roy, Patrick**

| | |
|---|---|
| **From:** | Patrick Miller <dernic@yahoo.com> |
| **Sent:** | Monday, January 06, 2020 10:19 AM |
| **To:** | Roy, Patrick |
| **Subject:** | Fw: POW Cable Fulfillment |

Email received regarding POW cables

Sent from Yahoo Mail on Android

----- Forwarded Message -----
**From:** "charles.aguillon@ibackpack.mobi" <charles.aguillon@ibackpack.mobi>
**To:** "charles.aguillon@ibackback.mobi" <charles.aguillon@ibackback.mobi>
**Sent:** Mon, Oct 10, 2016 at 19:22
**Subject:** POW Cable Fulfillment
Dear POW supporter,

We are in the final stages for fulfillment of this campaign. You will receive your cables. We are confirming addresses in case any of them have changed. Please fill out this form to acknowledge that you will receive your cables. A quick note that the cables will come with one of our partner company logos—the Lightning Strike. For more information on that product line, visit www.lightning-strike.co.

https://docs.google.com/forms/d/e/1FAIpQLSfdrbWv15CjfWYoBGPCokBHSNf_Rkfij0G0NE6hbKh0eAeArA/viewform

Thank you for your support of our campaign!!!

# EXHIBIT 9

## DECLARATION OF BARRY MUHA

### PURSUANT TO 28 U.S.C. § 1746

I, Barry Muha, make the following statement:

     1.     I am a U.S. citizen over the age of 18 residing in Medina, OH.  I have personal knowledge of the facts stated herein.

     2.     In February, 2016, I contributed money to the POW campaign in order to receive a car charger as a perk.  I contributed to the campaign because I wanted the car charger and I believed my money was going to be used to produce the car charger.

     3.     I never received a car charger from the POW campaign.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on _8 Jan_____, 2020, at Medina, OH.

_____
Barry Muha

# EXHIBIT 10

## DECLARATION OF BRICE TWOMBLY

PURSUANT TO 28 U.S.C. § 1746

I, Brice Twombly, make the following statement:

1.     I am a U.S. citizen over the age of 18 residing in Henderson, Colorado.  I have personal knowledge of the facts stated herein.

2.     In November 2015, I contributed money to the iBackPack campaign in order to receive an iBackPack as a perk.  In February, 2016, I contributed money to the POW campaign in order to receive POW cables as a perk.  In April, 2016, I contributed money to the Kickstarter campaign in order to receive an iBackPack 2.0 as a perk.

3.     The only reason I contributed money towards those campaigns was because I believed that the money would go directly towards producing the products, which I had wanted to receive, and not towards anything else.

4.     The iBackPack campaign emailed me approximately every six weeks during the first eight months of the campaign to try to induce me to contribute additional money to upgrade my order, or to order additional products.  I did contribute additional money to the iBackPack campaign in February 2016 in order to receive a more powerful battery, and again in May 2016 in order to upgrade from the iBackPack 1.0 to the iBackPack 2.0.

5.     I received some components from the iBackPack campaign for "beta testing," including a credit card style battery, USB lights and a USB fan.  The components were of a poor quality.  The credit card style battery, for example, ran out of

power after a few minutes of charging a device.  The iBackPack campaign never warned me that the battery might be dangerous to use.

6.     In, or about, October 2016, I received an email from Indiegogo saying they were aware that some of the contributions for the POW campaign had been marked as fulfilled by the campaign instead of the backer and that they were looking into the situation.  I checked my status on Indiegogo and realized that my POW contribution had been marked as fulfilled, even though I did not personally mark the contribution as having been fulfilled and I had never received the product.

7.     The last communication I received from the POW campaign was in, or about, November 2016.  The last communication I received from the iBackPack campaign was a Skype call with Monahan in June 2017.

8.     By August 2017 the website for iBackPack.co was taken down, and emails that I tried to send to the company bounced back as undeliverable.

9.     I never received a refund from iBackPack of Texas for the money I contributed to the iBackPack and POW campaigns.  I was, however, able to successfully dispute some of the charges with my credit card company for the Kickstarter campaign.  I also never received completed products from any of the campaigns.

I state under penalty of perjury that the foregoing statement is true and correct.

Executed on  1-28                    , 2020, at Henderson, CO.

Brice Twombly

# EXHIBIT 11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

Federal Trade Commission,

     Plaintiff,

     v.

iBackPack of Texas, LLC, *et al.*,

     Defendants.

Civil Action No. 3:19-cv-00160

Judge Jeffrey V. Brown

Magistrate Judge Andrew M. Edison

**DEFENDANT'S FIRST SET OF ANSWERS TO**

**PLAINTIFF'S INTERROGATORIES**

Pursuant to Federal Rule of Civil Procedure 33, Defendant, the iBackPack of

Texas, LLC, et. al and Douglas Monahan provide our answers to the Federal Trade

1

Commission's first set of interrogatories, by Douglas Monahan, Attorney Pro Se. Our answers are under oath and served to the FTC within 30 days of service from Plaintiff.

By the agreement of the parties, as reflected in their Joint Discovery/Case Management Plan [Dkt. #16], the sworn responses are served by electronic mail (sent to proy@ftc.gov and dhanks@ftc.gov), and/or next-day delivery service (sent to Federal Trade Commission, Attn: Patrick Roy, 600 Pennsylvania Ave NW, Mail Drop CC-10232, Washington, DC, 20580)

In order to aid the reader, Defendant's have left the instructions and interrogatory questions to be answered in this document. Defendant's answers are immediately below Plantiff's questions or have been sent to FTC electronically. Electronic submissions were provided by the FTC, they are supposedly secure. Submission provided electronically provide all of the information requested – or additional information has been manually added to this submission.

## INTERROGATORIES

Identify all Crowdfunding Backers to whom Defendants provided completed products— as distinct from prototypes, testing components, beta products, or otherwise uncompleted products—in fulfillment of the Crowdfunding Backer's pledge or contribution to the crowdfunding campaign and the completed product(s) received by each.

**DEFENDANT'S ANSWER:** None.

EXPLANATION: We have provided a list of all backers we have from the campaign. In addition, we have provided a list of the BETA users. These BETA users were tasked with testing the products and submitting their opinions, recommendations and suggestions on how to make the products better. We have provided some information from the Indiegogo and Kickstarter website that furthers explains to the court the fact that none of the backers were purchasing a product. In fact, it clearly says on the Indiegogo and Kickstarter websites same. Backers, while hoping to get a perk, are not only backing the project for the hope of a perk, but to better understand the entrepreneurial spirit, how to manufacturer and market a product and the great many other aspects involved when someone comes up with an idea, attempts to bring it to market and involves the participation of backers. The educational process exceeds the value of the perk in a great many cases.

**The backers understood there is a risk they may not receive their perk.** They are well educated, financially secure individuals, average age of backers is 18 to 50. These are not the elderly, not the uneducated and not the poor. To the best of our abilities, we have kept the backers informed. In fact, Defendant's provided videos of the beta products in production, testing, development and design. We kept adapting the product based upon the thousands of suggestions received from the backers. Our goal was to include the backers throughout the creative, design and development process to allow them to learn as much as possible.

Additionally, by giving backers a chance to contribute ideas they would be able to assist, and did, the creative process. The campaign has not been cancelled.

iBackPack was only in Beta Stage of the development process thus none of the backers have received the iBackPack, the myriad of batteries, cables and accessories that came with the product. However, hundreds did receive the Beta component. The purpose of the iBackPack project was to build a company to provide iBackPack and other related accessories for a great many years – not as a one time sale to backers. Those backing the project understood this goal.  Below are quotes from the Indiegogo and Kickstarter website.

Quotes from the Indiegogo site are below:

"With Indiegogo, you have the opportunity to support entrepreneurs and new technology from the earliest stages of development. Be sure to evaluate every campaign closely and contribute at a level you can afford in the event is unable to complete the project as planned. Browse campaigns, read the stories from the entrepreneurs themselves, evaluate the stage of development and any potential product risks – and then fund the project that you want to succeed.

https://support.indiegogo.com/hc/en-us/articles/526816-How-to-Evaluate-a-Campaign

It is important to understand that backing a campaign and claiming a perk are **not the same as buying an item online**. Instead, supporting a crowdfunding idea on a platform like Indiegogo means you are helping a work-in-progress project, idea or

4

cause. We want to let our community dream big, so we don't have criteria for what kind of project can become an Indiegogo campaign, other than what's outlined in our Terms of Use. That said, we know that deciding to support a project can seem daunting, so here are a few links to help you get started:

With Indiegogo, you have the opportunity to support entrepreneurs and new technology from the earliest stages of development. Be sure to evaluate every campaign closely and contribute at a level you can afford in the event that the team is unable to complete the project as planned.

Browse campaigns, read the stories from the entrepreneurs themselves, evaluate the stage of development and any potential production risks — and then fund the projects that you want to help succeed.

https://support.indiegogo.com/hc/en-us/articles/206389917-Does-Indiegogo-Guarantee-Perks-
Indiegogo is unable to guarantee that projects will succeed or that perks will be delivered or deemed satisfactory.

By contributing to a campaign you are supporting an idea, project, or cause you care about and want to help make happen.Like anyone getting in on an early-stage project, you accept the risk that the project may experiences changes, delays, unforeseen challenges, and it's possible that a project you fund might not come to

5

fruition. We leave it up to you to **make your own judgment** about a campaign's merits before making a contribution.

However, if a project is unable to deliver the perks or promises made in the campaign, Indiegogo will look at how the campaigner communicates to determine whether the campaign owner is keeping their community updated about their progress- even if the project falls through.

While Indiegogo cannot compel a campaigner to act in a certain way, if a campaigner is uncommunicative or does not work with contributors, we may take steps to restrict the campaigner's ability to use the platform in the future.

https://support.indiegogo.com/hc/en-us/articles/526766-How-do-I-claim-a-Perk-

What are perks? Many campaigns offer perks as thank-you's to backers, in exchange for different contribution amounts. Perks can be objects, acknowledgement, a thank you, services, events or anything that does not violate our Terms of Use.

Perks are listed on the right side of the Campaign page, under the "Back It" button. If you do not see any perks listed, the campaign owner may have decided not to offer any perks.

Please note: Perks are offers made and managed solely by campaign owners, not Indiegogo. Indiegogo does not guarantee that perks will be fulfilled, or that if fulfilled Backers will be satisfied with the perk they received.

How do I claim a perk? Review the list of perks on the right-side of the campaign page. When you see a particular perk on the campaign page that you're interested in, Click on the perk itself. This will have selected the perk for you to continue with the contribution check out process.

https://support.indiegogo.com/hc/en-us/articles/526746-Will-I-get-my-Perk-

However, Campaign owners are required by our Terms of Use to fulfill their perks. If a campaign owner does not fulfill a perk and has been unresponsive, please notify Indiegogo. We will get in touch with the campaign owner to reiterate to them their obligations as a campaign owner.

Indiegogo is not able to mediate disputes between customers, including those related to refunds or the fulfillment of perks. If you are unable to arrive at a resolution, you may also use our Terms of Use in a U.S. court of law, should you choose to take any legal action against the campaign team.

Note: This article does not constitute as legal advice.  We recommend for you to consult with your attorney before taking any legal action

https://www.indiegogo.com/about/terms#/youraccount

No Guarantee. The date to deliver a Perk is an estimate by the Campaign Owner (not Indiegogo) and there is no guarantee that the Campaign Owner will fulfill and deliver the Perk by that date. Indiegogo does not guarantee or represent that Contributions will be used

as promised, that Campaign Owners will deliver Perks, or that the Campaign will achieve its goals. Indiegogo also does not endorse, guarantee, make representations, or provide warranties regarding the quality, safety, morality or legality of any Campaign, Perk or Contribution, or the truth or accuracy of User Content posted on the Services.

https://support.indiegogo.com/hc/en-us/articles/217205028-What-s-the-campaigner-doing-I-m-waiting-for-my-perk-

**Where's my perk?**

Once a project ends, it's easy to get antsy for the delivery of your perk; after all, you wouldn't have backed the project if you weren't stoked about it! You also expect regular updates from the campaign owner detailing their progress. Remember though that once the campaign ends, the real work for the campaigner begins. They now need to take the money you've given them and use it to shoot the film or manufacture their product.

What's the campaigner doing? By way of example, consider a hardware campaign such as the Misfit Shine. After they receive their funds they need to begin the design for manufacture process. Even though they had a working prototype, the manufacturer still needed to deconstruct it and potentially redesign a few pieces. This way they could build it as efficiently as possible.

Once this process was finalized, Misfit needed to acquire the specialized machines that are needed to produce their specific device. A first round of testing followed to ensure that the production process was running smoothly and that the products were defect- free. Often

8

times, products fail this test and then creators need to return to the design to manufacture step to fix the problem. Once Misfit *did* pass this test though, full-scale production could begin.

Finished products were then shipped from the factory and needed to clear customs since they were coming from overseas. This can sometimes take several weeks. The Misfit Shines were then sent to a centralized warehouse where they could be sent to eagerly-awaiting backers. Not just for hardware This is the general process for hardware production, but other creative campaigns such as film projects follow a similar process. As you can imagine, many things can happen between the time the project is raising funds and the expected project release date. This is what makes the post-campaign period the hardest for campaigners; they need to balance communicating with backers with completing the actual project. This is an especially challenging task when most campaign teams are made up of only a few entrepreneurs.

While we expect campaign owners to update backers and answer questions regularly, they may be unable to do so. Remember that their silence does not mean that they aren't planning to deliver. It usually means that they have been very busy creating your perks!

With that said, we ask that campaigners be transparent about the creation process and to communicate delays and adjustments to the project timeline."

KICKSTARTES SITE FURTHER EXPLAINS:

9

Many backers are rallying around their friends' projects. Some are supporting a new effort from someone they've long admired. Some are just inspired by a new idea, while others are motivated to pledge by a project's rewards — a copy of what's being produced, a limited edition, or a custom experience related to the project.

Backing a project is more than just pledging funds to a creator and is unlike purchasing items from a shop. It's pledging your support to a creative idea that you want to see exist in the world

## Why do people back projects?

Many backers are rallying around their friends' projects. Some are supporting a new effort from someone they've long admired. Some are just inspired by a new idea, while others are motivated to pledge by a project's rewards — a copy of what's being produced, a limited edition, or a custom experience related to the project.

Backing a project is more than just pledging funds to a creator and is unlike purchasing items from a shop. It's pledging your support to a creative idea that you want to see exist in the world.

As the above text clearly explains. There is a great amount of benefit for those who back crowdfunding project above and beyond receiving a finished product. If they wished to purchase a backpack any of the backers could have easily gone to Walmart or their local store.  Defendant takes the FTC on its word that it has received complaints. However, we believe the complaints received were received by inducing and encouraging complaints.

END OF ANSWER TO #1.

1.      Describe any refunds made to Crowdfunding Backers, including by Identifying (i) each Crowdfunding Backer who received a refund, (ii) the amount of the refund, (iii) the date the refund was provided, (iv) the product(s) for which the Crowdfunding Backer was refunded, and (v) whether the refund was provided by Defendants or by another individual or entity, such as a crowdfunding platform.

This question is answered in two parts. The first pertains to refunds provided by the crowdfunding platforms. The second is by iBackPack itself.

Part I. REFUNDS PROVIDED BY INDIEGOGO & KICKSTARTER:

Indiegogo and Kickstarter maintain their own refund system. Defendant(s) do not have access to same. The name of the crowdfunding backer, the amount of the refund, the date and the product(s) are unknown. This is true for all campaigns.

Part 2. Any of the MOJO & POW campaign backers whose funds were provided to iBackPack of Texas, LLC received all received refunds. The exact name, amount and product is included in the spreadsheet sent to the FTC named MOJO and POW refunds.

2.      Identify all bank accounts, credit card accounts, PayPal accounts, or other financial accounts used by Defendants in connection with each of their crowdfunding campaigns.

Paypal Account:  ID

████████████

Plains Capital Bank 4587

USAA Federal Savings Bank:

████████████

USAA VISA Card #  **4270 xxxx xxxx 3772**

USAA VISA Card #: **4270 xxxx xxxx 2763**

3.     Describe the salary or compensation paid to Douglas Monahan for his role in each of Defendants' crowdfunding campaigns, including by stating (i) the total amount

of salary or other compensation paid to Douglas Monahan for his role in each crowdfunding campaign, (ii) the intervals at which Douglas Monahan received such salary or other compensation, and (iii) the basis for determining the amount of salary or other compensation that Douglas Monahan would be paid.

ANSWER: Douglas Monahan received no salary or compensation for his role in the crowdfunding campaign.

Describe Defendants' use of employees, independent contractors, or agents, in their crowdfunding campaigns, including by Identifying (i) each current or former employee, independent contractor, or agent of the Defendants who Defendants assert provided goods or services for the development, production, completion, or distribution of campaign products, (ii) the campaign for which such employee, contractor, or agent provided goods or services, (iii) the goods or services provided by such employee, contractor, or agent, (iv) the time period over which such employee, contractor, or agent provided such goods or services, and (v) the method(s) used to pay such employee, contractor, or agent.

Answer: There were no employees. Only independent contractors were used. Every contractor's role was to provided goods or services for the development, production, completion or distribution of campaign products. All contractors worked on all campaigns. The time period for all contractors is between 2011 and 2019. As a small company each of the contractors were responsible for any and all tasks needed to be

14

accomplished. No formal job titles were allocated. Some were discussed. None were agreed upon per a formal agreement. Primary functions were the design of the iBackPack as well as the packaging designs. Descriptions of the duties of all engaged for the iBackPack are included in the letters sent to the FTC. They have been uploaded to FTC servers totaling many gigabytes.

4.      Describe Defendants' use of vendors in their crowdfunding campaigns, including by Identifying (i) each vendor that Defendants assert provided goods or services for the development, production, completion, or distribution of campaign products, (ii) the campaign for which such vendor provided goods or services, (iii) the type and quantity of goods or services provided by such vendor, (iv) the method(s) used to pay such vendor, and (v) the total amount paid to such vendor.

The iBackPack used a number of vendors. All of the vendors provided goods or services for the development, production, completion or distribution of campaign products. It is impossible to determine which vendor provided services for any individual campaign. It is also impossible to determine the quantity of goods and services provided by each vendor. All email communications, chats or telephone information was lost in the flooding of the office. Method to pay each vendor was paypal or cash. The total amount paid each vendor or contractor is being calculated by iBackPack CPA Ron Meyers.  The summaries for all were only provided weeks ago. If the FTC wishes to have each individual contractor added

15

up individually, we can request same or the FTC can add those figures itself. We have no such records with all added as the FTC is requesting.

5.      Identify, by type and quantity, all materials—including but not limited to completed products, components, and parts—obtained as part of Defendants'

crowdfunding campaigns and in Defendants' possession, custody, or control, and identify the campaign for which such material was obtained.

It is impossible to determine the type and quantity of all materials. All records were destroyed in the flood.

6.      For each of the Defendants' crowdfunding campaigns, state all facts on which you base your contention that "Defendants did use the funds primarily to develop, product, complete or deliver [the] products."

Defendant has answered this question many times in numerous documents provided to the FTC. Over one hundred letters have been sent to FTC regarding same. We have provided same to FTC, as well as artwork for the creative materials. Defendant's object to Providing Plaintiff with actual blueprints for iBackPack.  Answering all facts here would be redundant.

Below is a detailed listing of the files sent to the FTC.

| | | | |
|---|---|---|---|
| FTC - 1.5 - Proof ibp is created.pdf | 1/27/2019 11:19 AM | Adobe Acrobat D... | 741 KB |
| FTC - 6. c. - Pow and mojo refunds paid, removal request from suit.pdf | 12/20/2018 4:59 PM | Adobe Acrobat D... | 61 KB |
| FTC - 16. - Mojo and pow refunds paid - full releases signed.pdf | 12/25/2018 3:52 PM | Adobe Acrobat D... | 83 KB |
| FTC - 17. - CROWDfunding market - project not cancelled only delayed.pdf | 12/27/2018 3:44 AM | Adobe Acrobat D... | 3,501 KB |
| FTC - 18. - Samsung exploding batteries - millions recalled.pdf | 12/28/2018 8:47 PM | Adobe Acrobat D... | 62 KB |
| FTC - 20. - Request for way ftc works against ibacpack.pdf | 12/28/2018 11:06 ... | Adobe Acrobat D... | 53 KB |
| FTC - 21. - IGG approached us - money donated - project not cancelled.pdf | 12/31/2019 9:12 PM | Adobe Acrobat D... | 64 KB |
| FTC - 25. - OPENING STATEMENT.pdf | 1/2/2019 12:19 AM | Adobe Acrobat D... | 88 KB |
| FTC - 27. - LITHIUM ION BATTERIES BLOWING UP.pdf | 1/9/2019 2:04 AM | Adobe Acrobat D... | 63 KB |
| FTC - 28. - FTC CLAIM that NO BACKPACKS WERE MADE  IS LUDICROUS.pdf | 1/9/2019 3:45 AM | Adobe Acrobat D... | 53 KB |
| FTC - 33. - Financial affairs is flat out wrong. .pdf | 1/11/2019 10:38 AM | Adobe Acrobat D... | 54 KB |
| FTC - 35.  ibackpack iOS app screens for your review.pdf | 1/14/2019 2:30 AM | Adobe Acrobat D... | 53 KB |
| FTC - BULLET RESISTANT VERSION. WE DESIGNED, CREATED, TESTED, DISTRIBU... | 2/12/2019 7:20 PM | Adobe Acrobat D... | 43,591 KB |
| FTC - FINISHED IBACKPACK 4.pdf | 12/31/2018 10:53 ... | Adobe Acrobat D... | 1,217 KB |
| FTC - FINISHED PRODUCTS CREATED, MANUFACTURED, SHIPPED, TESTED, BET... | 9/21/2019 4:04 PM | Adobe Acrobat D... | 4,583 KB |
| FTC - iBackpack - Website Drafts.pdf | 2/11/2019 1:55 AM | Adobe Acrobat D... | 1,225 KB |
| FTC - IBACKPACK 4.pdf | 12/31/2018 11:08 ... | Adobe Acrobat D... | 2,468 KB |
| FTC - IBACKPACK COMPONENTS.pdf | 2/12/2019 10:41 AM | Adobe Acrobat D... | 7,019 KB |
| FTC - IBACKPACK II.pdf | 12/31/2018 10:50 ... | Adobe Acrobat D... | 3,740 KB |
| FTC - IBACKPACK ILLUSTRATIONS.pdf | 12/31/2018 10:47 ... | Adobe Acrobat D... | 2,798 KB |
| FTC - iBackPack Mobile App Prototype.pdf | 12/29/2018 8:00 AM | Adobe Acrobat D... | 11,045 KB |
| FTC - IBACKPACK PACKAGING PARTS.pdf | 12/31/2018 11:06 ... | Adobe Acrobat D... | 2,755 KB |
| FTC - IBP finished product 2.pdf | 12/28/2018 8:48 PM | Adobe Acrobat D... | 9,582 KB |
| FTC - Indiegogo Warnings To Consumers.pdf | 1/16/2019 12:19 PM | Adobe Acrobat D... | 2,212 KB |
| FTC - IPHONE APPS..pdf | 2/11/2019 2:21 AM | Adobe Acrobat D... | 11,045 KB |
| FTC - IS THE FTC SURE THE PETITION IS MEANT FOR US.pdf | 1/9/2019 6:07 AM | Adobe Acrobat D... | 53 KB |
| FTC - LITHIUM BATTERY PHOTOS BLOWING UP.pdf | 1/9/2019 3:20 AM | Adobe Acrobat D... | 2,216 KB |
| FTC - MANY COMPONENTS INCLUDED IN BACKPACK, MOBILE APP, COMPLET... | 12/31/2018 11:39 ... | Adobe Acrobat D... | 844 KB |
| FTC - MONIES RAISED WERE USED FOR CREATING, DESIGNING, TESTING, CODI... | 2/11/2019 2:28 AM | Adobe Acrobat D... | 5,508 KB |
| FTC - NO ORDERS TAKEN, HIGH RISK WAS KNOWN, IGG APPROACHED DWMO... | 12/27/2018 10:54 ... | Adobe Acrobat D... | 3,491 KB |
| FTC - No personal information has ever been sold.pdf | 12/24/2018 7:05 AM | Adobe Acrobat D... | 53 KB |
| FTC - PACKAGING - ALL.pdf | 2/12/2019 7:07 PM | Adobe Acrobat D... | 5,727 KB |
| FTC - PACKAGING - EARBUDS, FAN FOR IpHONE, FAN FOR all phones.pdf | 2/12/2019 5:42 AM | Adobe Acrobat D... | 2,337 KB |
| FTC - PHOTO - meet the ibackpack.pdf | 1/27/2019 12:08 PM | Adobe Acrobat D... | 1,926 KB |
| FTC - smartphone app - 182 unique pages.pdf | 12/29/2018 8:00 AM | Adobe Acrobat D... | 11,045 KB |
| FTC - TOP DESIGNERS BUILT IBACKPACK FROM SCRATCH.pdf | 1/2/2019 12:18 AM | Adobe Acrobat D... | 4,471 KB |
| FTC - VIDEOS AT FACTORIES MAKING IBACKPACK.pdf | 2/11/2019 2:05 AM | Adobe Acrobat D... | 2,325 KB |
| FTC - WE USED MONIES TO CREATE, MANUFACTURER, PRODUCE AND DISTRIB... | 2/11/2019 2:23 AM | Adobe Acrobat D... | 4,210 KB |
| FTC - YOUTUBE CHANNEL PAGE TWO - IBACKPACK.pdf | 1/14/2019 2:52 AM | Adobe Acrobat D... | 2,322 KB |
| FTC -BACKPACK PHOTOS OF REAL LIVE BAG.pdf | 1/14/2019 3:13 AM | Adobe Acrobat D... | 22,129 KB |
| IBACKPACK VIDEOS FOR FTC.pdf | 1/27/2019 11:17 AM | Adobe Acrobat D... | 1,270 KB |

1.

| | | | |
|---|---|---|---|
| FTC - 3. - Format of answers - huge misu... | 12/20/2018 9:57 AM | Adobe Acrobat D... | 49 KB |
| FTC - 4. - Denial of sharing customer inf... | 12/20/2018 10:41 ... | Adobe Acrobat D... | 217 KB |
| FTC - 5. - False information - request for ... | 12/20/2018 11:02 ... | Adobe Acrobat D... | 51 KB |
| FTC - 6. a. - Pow and mojo refunds paid, ... | 12/20/2018 4:15 PM | Adobe Acrobat D... | 56 KB |
| FTC - 7. - FTC letter to 4000 backers was ... | 12/22/2018 6:51 AM | Adobe Acrobat D... | 396 KB |
| FTC - 12. Numerous enhancements to b... | 12/24/2018 10:12 ... | Adobe Acrobat D... | 56 KB |
| FTC - 13. Mojo and pow refunds proven.... | 12/24/2018 10:21 ... | Adobe Acrobat D... | 617 KB |
| FTC - THE FTC INFO IS WRONG - IS THE... | 1/9/2019 5:18 PM | Adobe Acrobat D... | 100 KB |
| ftc stipulated order and final - Google Se... | 6/8/2019 5:26 AM | Adobe Acrobat D... | 35 KB |

7.      Identify the location and availability (or condition) of any computer servers or cloud networks on which any relevant Documents are stored, including but not limited to any computer servers or cloud networks hosted or maintained by a non-party.

No relevant documented are stored on any cloud networks, hosted or maintained by a non party. One server is at Douglas Monahan's 409 Colonial Drive, Friendswood, Texas 77546 location. Server is operational. It is five years old. The condition is quirky.

8.      Identify all internet service providers, cloud storage providers, or other electronic storage providers who provided service to Defendants after January 1, 2015.

Answer: ISPs include: Rackspace, GoDaddy, iPage, There are no electronic storage providers or cloud storage providers.

Respectfully submitted,

19

Dated:  November 11, 2019          /s/  Douglas W. Monahan

                                   Douglas W. Monahan


                                   Attorney Pro Se

**CERTIFICATE OF SERVICE**

I, Douglas Monahan, an attorney Pro Se, hereby certify that on November 11, 2019, I caused to be served true copies of the foregoing Request for Production on the Defendants, with their written consent, by electronic mail.

/s/  Douglas Monahan

Patrick Roy

Houston, Texas

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

Federal Trade Commission,

      Plaintiff,

      v.

iBackPack of Texas, LLC, *et al.*,

      Defendants.

Civil Action No. 3:19-cv-00160

Judge Jeffrey V. Brown
Magistrate Judge Andrew M. Edison

**DEFENDANTS IBACKPACK, LLC PRODUCTION OF DOCUMENTS
FOR PLAINTIFF – THE  FEDERAL TRADE COMMISSION**

**ANSWERS FOR PRODUCTION**

For the ease of understanding this document, Defendant is answering the Plaintiff's

questions immediately below the Plaintiff's request.

All Documents reflecting the Defendants' provision of completed products—as distinct

from prototypes, testing components, beta products, or otherwise uncompleted

products—to any consumer in fulfillment of the consumer's pledge or contribution to

the following crowdfunding campaigns:

      a.      Defendants' "iBackPack" campaign launched on the Indiegogo

              platform in August 2015;

      b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter

platform in March 2016;

c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

Note:  There are no documents to produce. The iBackPack was unable to ship a completed product as listed above.

2.      Documents sufficient to show the ultimate disposition of all funds received by Defendants' through each of the following crowdfunding campaigns:

a.      Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

      c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

      d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

Paypal records 2015 – 2019 are attached. Plains Capital Bank Records are attached.

Excel file named General Ledger – corporate and personal expenses 2014 – 2019. .

3.      All Documents—including but not limited to receipts, paid invoices, contracts or agreements with employees or contractors, pay records (including W-2 forms and 1099 forms) for employees or contractors, cancelled checks, and account statements for any financial accounts used to make payments—showing expenditures that Defendants assert were made to develop, produce, complete, or distribute products for each of the following crowdfunding campaigns:

      a.      Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

      b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

      c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

      d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

No W-2s were issued. No 1099 forms were issued. Paypal statements have been provided. Account statements for Paypal have been sent to FTC. Bank records for Plains

3

Capital Bank have been sent.

      4.      All Documents—including but not limited to account statements for any financial accounts used to make refunds—showing any refunds made to any consumer who made a pledge or contribution to any of the following crowdfunding campaigns:

    a.      Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

    b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

    c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

    d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

<span style="color:red">Paypal account information is provided.  Independent spreadsheet showing only the refunds is also provided.</span>

5.     A copy of, or access to, any software applications developed for any of the following crowdfunding campaigns:

    a.      Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

    b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

    c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

    d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

<span style="color:red">The 182 pages for the iBackPack Mobile Application designs have been sent via email to the FTC.</span>

6.    All communications—including but not limited to e-mails, contracts, purchase orders, insertion orders, or design specifications—between Defendants and any vendors that Defendants assert provided goods or services for the development, production, completion, or distribution of products for any of the following crowdfunding campaigns:

a.    Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

b.    Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

c.    Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

d.    Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

The application design has been sent via email at 10:15 am. 11-20. It should be noted this has been identified, and sent to the FTC when Defendant answered each of the allegations of Plaintiff's original complaint.

7.      All communications with any current or former employee, independent contractor, or agent of the Defendants who Defendants assert worked on the development, production, completion, or distribution of products for any of the following crowdfunding campaigns:

      a.      Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

      b.      Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

      c.      Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

      d.      Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

None to provide.

All communications, including but not limited to all consumer complaints and Defendants' responses to consumer complaints, between Defendants and any consumer who made a pledge or contribution to any of the following crowdfunding campaigns:

   e.  Defendants' "iBackPack" campaign launched on the Indiegogo platform in August 2015;

   f.  Defendants' "iBackPack 2.0" campaign launched on the Kickstarter platform in March 2016;

   g.  Defendants' "MOJO" campaign launched on the Indiegogo platform in October 2015; and

   h.  Defendants' "POW" campaign launched on the Indiegogo platform in February 2016.

<span style="color:red">Defendant has none of the communication requested above.</span>

8.  All Documents—including but not limited to any insurance claims, communications with an insurer, and communications with Defendants' internet service providers—evidencing the loss or destruction of any Documents relevant to the claims and defenses in this lawsuit.

   We have provided a copy of the USAA Insurance Policy. Copy of the subcontractor ERS (Electronic Restoration Services) as well the USAA insurance documents clearly showing a number of notebook computers were completely destroyed as well as desktop servers – completely destroyed. A total loss of close to $60,000

Respectfully submitted,

Dated:  November 11, 2019

/s/ Doug Monahan
409 Colonial Dr.
Friendswood, Texas 77546

## CERTIFICATE OF SERVICE

I, Doug Monahan, as attorney pro se, hereby certify that on November 11, 2019, I caused to be served true copies of the foregoing Request for Production on the Plaintiffs legal counsel Dan Hanks and Patrick Roy with their written consent, by electronic mail.

/s/  Doug Monahan
409 Colonial Dr.
Friendswood, Texas 77546
512.281.6533

1